UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

CAPITOL RECORDS, LLC,

        Plaintiff,                           Civil Action File No.
                                                     12 Civ 0095 RJS/AJP

    -against-

REDIGI INC.,

        Defendant.
                                                    **DECLARATION**
----------------------------------------------------------------x

       **JOHN OSSENMACHER** declares under penalty of perjury:

       1. I am Chief Executive Officer and a founder of ReDigi Inc.  I have had a very successful corporate career at three major NYSE-listed companies including Sylvania Lighting International (President, Electronic and Conservation Products), Parker Hannifin Corporation (Director), and Pacific Scientific (President, Energy Products).  I am a multiple patent holder and primary inventor for controllable, energy efficient CFL's which technology has become the undisputed industry leader and is being sold, globally, at major retailers every day.  I have led teams that were responsible for advancing flight controls and systems that are in use on most commercial and military aircraft flying today.  I have been part of corporate governance and public stock offerings. I have also had a successful career as an entrepreneur, founding and building companies like Electro-Mag International, which developed revolutionary control technologies and was subsequently acquired by Sylvania Lighting within 18 months of its launch, and Conserving America Corporation, which was awarded some of the largest lighting efficiency contracts ever issued, and served as a key supplier to the US government for Conserving

America's proprietary control systems.  I have served on many industry organizations and charitable groups.  I have a wide breadth of education and experience which began with my Bachelors of Science in Electro-Mechanical engineering from Michigan State University in 1981.  I left semi retirement to found ReDigi in 2009. I respectfully offer this declaration in opposition to plaintiff's motion for preliminary injunction.

### ABOUT OUR BUSINESS

2.  The home page of ReDigi's web site, www.redigi.com, welcomes visitors to the "Online Marketplace for Pre-Owned Digital Music" and offers "previously listened to songs at used prices". The technical details about our business are set forth in the accompanying declaration of our Chief Technical Officer, Larry Rudolph, but in summary what we do is provide cloud music storage in personal lockers, and a used digital music marketplace for eligible, pre-owned mp3 and mp3-type files (hereinafter "MP3" files) which reside in those lockers. The technology behind our sale process does not involve the making of even a single copy, or even a RAM copy; the exact file is transferred in a manner whereby only the record locator, or file pointer, is changed. The Eligible File remains in the same location in the ReDigi Cloud and is not copied. Only a modification of the record locator, from the seller's locker to the buyer's locker, has occurred. Our verification technology ensures that (a) no copies of a file sought to be uploaded can remain on the user's computer or attached devices, (b) in the event any device is subsequently attached to the user's computer, and a copy is located on the attached device, the user must delete the file or the user's account will be suspended, and (c) if a file is downloaded, no copy may remain in the user's cloud locker.

3.  The only files which are eligible for our service – either for storage or for sale –

are files which were lawfully purchased from iTunes, or subsequently from ReDigi, thereby excluding music tracks copied from CDs, or downloaded from other online vendors or file sharers, or obtained from any other source.  The terms and conditions used by iTunes (exhibit A to Ray Beckerman declaration) do not in any way prohibit any part of ReDigi's business model. Plaintiff's citation of the terms and conditions used by Amazon.com is completely irrelevant since Amazon files are not allowed to be uploaded to our service. Ultimately, we anticipate that our business model will expand to include Eligible Files other than those downloaded from iTunes, such as recordings sold by independent musicians, recordings sold by independent labels, recordings sold by other online retailers, etc., once all technical, legal, and business issues are worked out, and will also include new music sales, but to date we have not gotten to that point. We may never get to that point if we are saddled with litigations like this.

    4.  Music cloud locker storage is a rapidly growing business. Among the companies which provide general cloud locker storage to consumers are Dropbox, Microsoft LiveMesh & SkyDrive, Apple MobileMe, Rackspace, Amazon AWS, Box.net, Google Docs / GMail Drive, ADrive, Mozy, Asus webstorage, iDrive, and others. Among the companies which provide cloud locker storage specifically for MP3's, and make it possible for their users to privately stream their music from the cloud, are Apple iCloud, Google Music, Amazon Cloud Drive and Player, Bitspace, Maestro.fm, Mougg, MusicPlayer.fm,  Deezer, MP3tunes, and others. A sampling of articles discussing this industry is attached hereto as exhibit A.

    5.  Two key features of our cloud music storage business are its (a) verification technology and business model which preclude the existence of more than one copy, and limit the eligible files to those lawfully purchased, and (b) used digital music marketplace, which does

not implicate the reproduction right since there is no copy being made, and does not implicate the distribution right because only the digital file, and no "material object" in which the digital file is embedded, is sold.

      6. As explained in Dr. Rudolph's accompanying declaration, ReDigi's structure ensures that no copies of an Eligible File are made when a resale transaction occurs in the ReDigi online marketplace. When another user purchases such a file, the record locator associating the file with the seller's cloud locker is modified to associate the file with the purchaser's cloud locker. In such a transaction only the record locator is changed; the file remains in the same location in the ReDigi Cloud and is not copied.

      7. The ReDigi website provides links to 30-second clips of music and artwork which are on the website of Rdio, Inc., pursuant to a license agreement with Rdio, Inc., which agreement states that Rdio is licensed to provide same by, among others, EMI Group Limited (exhibit B), which is identified by plaintiff in its Rule 7.1 statement as one of its multitudinous affiliates.

      **TIMING**

      8. The timing of plaintiff's sudden "emergency" is curious indeed. Plaintiff has been aware of our process and approach, and has been actually discussing it with us, since early 2010 – i.e., for the past two (2) years. Our initial discussions with plaintiff were with Ron Werre, Chief Operating Officer of plaintiff's parent company EMI, and Mark Piibe, a vice president of EMI. They were very positive and supportive of the whole concept of ReDigi. We had multiple discussions. Mr. Werre said he thought that the data that could be collected by consolidating listening habits on each specific track could be significant in helping build solid, helpful

marketing data for them. Mr. Piibe's comments, which he indicated were based on his past experience at Napster, were very favorable regarding our substantial technical and solid verification and deletion approach. There wasn't the slightest indication of any problem with our business, or any request that we refrain from moving forward with it. We have at all times been completely forthcoming about our business and business plans, issuing public press releases at various junctures.

9.  The first indication we received from the "Big 4" record companies (of which plaintiff's parent is one) of a negative attitude towards our business model was the vague November 10th "cease and desist" letter included in plaintiff's exhibits, which we learned of through a New York Times reporter (the RIAA sent the letter to the press three (3) or four (4) days *before* sending it to us). One might wonder why, if the plaintiff and the RIAA believed ReDigi was committing copyright infringement as of November 10th, and if they believed it was truly causing them "irreparable harm", they *never identified a single act of copyright infringement*, never sent any kind of DMCA notice, and waited more than two (2) months to submit a preliminary injunction motion... and *still haven't identified a single act of infringement*.

### HARM TO PLAINTIFF

10.  Even if plaintiff were right that ReDigi's used music marketplace business somehow infringes its copyrights, this infringement would be fully compensable in damages. ReDigi keeps detailed records of all of the purchase and sale transactions, including the buyer and the seller, the date and time of the transaction, and the metadata of the music file, including title, artist, album, owner (seller), store identification, original store, and the hash of the acoustics. So plaintiff would be able to identify each infringed work, and if it can prove damages

by reason of those transfers, or that ReDigi improperly profited, plaintiff will be entitled to calculate its damages and obtain a money judgment.

### HARM TO REDIGI

11. An injunction would put us out of business, pure and simple.

12. We are a startup company. We are still in beta. We are employing people and creating jobs.

13. The cloud of plaintiff's "cease and desist" letter and lawsuit, needless to say, are already making it difficult or impossible to enter into new relationships with other companies and investors that would enable us to grow our business.

14. A preliminary injunction would devastate ReDigi, effectively shutting it down and putting it out of business before the case is resolved on the merits.

### STATUS QUO

15. The present status quo is that plaintiff is a long established giant in the recording industry. A fairly small number of its mp3 recordings, and only those which have been lawfully purchased through iTunes, on which plaintiff has already received compensation in the neighborhood of 70% of the retail price of each file, are being sold through a fledgling company, in a new industry, which employs less than 15 people, and which is careful to protect the plaintiff's right not to have multiple copies floating around, and to protect against any form of unregulated copying. This small company is using revolutionary new, patent-pending, technology, which performs a service for all copyright owners by forensically analyzing mp3 files to protect against unauthorized copying. The process adds value to new mp3's sold by plaintiff each day, by (a) adding, to lawfully acquired mp3 files which otherwise have no

economic value, a true economic value -- an actual resale price -- and on the other hand (b) making pirated copies of which consumers may have possession economically worthless, since they cannot be resold and therefore have no resale value. Our fledgling company is providing a valuable service to the public and to copyright holders. We have created a service that is far superior in copyright protection than the existing systems currently readily accepted on the resale of CD's.  For example; the ReDigi service continually monitors and requires deletion of any and all copies that may have been previously made by the user, no matter when or where they are found, thereby helping users maintain compliance with copyright laws, unlike CD resales where there is no required ongoing or follow-up mechanism to aid in compliance.

16. That is the status quo. Denying an injunction would preserve the status quo. Granting an injunction would put a fledgling company, creating jobs in a new technology, out of work, and squash an entirely unique service to consumers and to music makers.

**ALLEGED STREAMING AND ARTWORK**

17. Plaintiff falsely accuses ReDigi of streaming infringing 30-second clips, and hosting infringing artwork. All they would have had to do was right click their mouses for the artwork, or play any one of the 30-second clips, to know that this accusation was false. Right clicking the artwork shows that the artwork is located not on our site, but at Rdio's, with links in this format: http://media.rd.io/[...].jpg And playing any of the 30 second clips would likewise have shown that the music is located not on our site, but at Rdio's, with links in this format: http://www.rdio.com/[...] And Mr. McMullan's unsubstantiated allegation that the users store copies of the clips on ReDigi is likewise false, as all that is retained in the "memory bank" of viewed clips is a list of pointers to the offsite links, which Mr. McMullan could likewise have

easily ascertained by clicking one of them.  Copies of our agreements with Rdio, Inc., licensing us to use this material, are annexed hereto as exhibit B. The Rdio agreement specifically states:

> Certain Transmitted Content is provided by third party licensors of Rdio, including, without limitation, Universal Music Group, Sony Music Entertainment, Warner Music, Inc., *EMI Group Limited*, IODA, Orchard Enterprises, NY, Inc., Isolation Network, Inc., and IRIS (collectively, the Transmitted Content Providers"). (emphasis supplied)

It is therefore highly unlikely that Mr. McMullan, who identifies himself as "Executive Vice-President of Legal Affairs for EMI Music North America ("EMI")" was unaware, when he signed his declaration, that Rdio is an authorized licensee of EMI Group Limited, since the latter company is listed in plaintiff's Rule 7.1 Statement as having an ownership interest in plaintiff.

      18.  Neither is the private streaming by a user of the stored songs in his personal cloud locker, through an internet-connected device using the user's secure login to access his or her ReDigi account, a "public performance", as it can be viewed only by the user. Each ReDigi user agrees to "(I) keep [the user's password secure and confidential, (ii) not permit others to use [the user's] account, (iii) refrain from using other users' accounts, (iv) refrain from selling, trading, or otherwise transferring [the user's] account to another party". (Exhibit C) No copy of a music file so "streamed" is stored; rather, as with any digital music player, the recording is loaded into RAM, and disappears when the song stops playing. I.e., no "public performance" is permitted.

WHEREFORE it is respectfully requested that plaintiff's motion be in all respects denied.

Dated: Cambridge, Massachusetts
      January 25, 2012

_____
JOHN OSSENMACHER