COWAN, LIEBOWITZ & LATMAN, P.C.
1133 AVENUE OF THE AMERICAS
NEW YORK, NY 10036-6799
(212) 790-9200

Attorneys for Plaintiff
CAPITOL RECORDS, LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

CAPITOL RECORDS, LLC,                                    :

                              Plaintiff,                 :          12 Civ. 0095 (RJS)

            -against-                                    :

REDIGI INC.,                                             :

                              Defendant.                 :

-------------------------------------------------------------- x

# PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..............................................................................................i

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ................................................................................................3

ARGUMENT ....................................................................................................................3

CAPITOL IS ENTITLED TO A PRELIMINARY INJUNCTION AGAINST REDIGI'S
INFRINGEMENT OF CAPITOL'S SOUND RECORDINGS AND ARTWORK ......................3

I.      CAPITOL IS LIKELY TO SUCCEED ON THE MERITS OF ITS COPYRIGHT
        INFRINGEMENT CLAIMS ...................................................................................4

        A.      ReDigi is a Direct Infringer of Capitol's Copyrights ................................4

                1.      Capitol Owns Valid Statutory and Common-Law Copyrights..................4

                2.      ReDigi Violates Capitol's Exclusive Rights in the Works.........................5

                        (a)     ReDigi Reproduces the Works in Copies .......................................5

                        (b)     ReDigi Distributes Copies of the Works to the Public...................8

                        (c)     ReDigi Publicly Performs the Works by Digital Audio
                                Transmission.................................................................................9

                        (d)     ReDigi Publicly Displays the Copyrighted Artwork....................11

                3.      The First Sale Defense Does Not Apply to ReDigi ....................................12

        B.      ReDigi Is A Secondary Infringer.................................................................16

                1.      ReDigi Induces Its Users' Infringements ...............................................16

                2.      ReDigi Is a Contributory Infringer ..........................................................17

                3.      ReDigi Is Vicariously Liable for Its Users' Infringements ......................19

II.     REDIGI'S CONDUCT IS CAUSING IRREPARABLE HARM TO CAPITOL.............20

III.    THE BALANCE OF HARDSHIPS FAVORS CAPITOL........................................23

IV.     AN INJUNCTION SERVES THE PUBLIC INTEREST ........................................24

CONCLUSION ...............................................................................................................25

## TABLE OF AUTHORITIES

**CASES**

Page(s)

A&M Records, Inc. v. Napster, Inc.,
   239 F.3d 1004 (9th Cir. 2001) ............................................................................18, 19

Arista Records LLC v. Does,
   604 F.3d 110 (2d Cir. 2010) ...................................................................................17

Arista Records, LLC v. Lime Group, LLC,
   715 F. Supp.2d 481 (S.D.N.Y. 2010) .....................................................................16

Arista Records, LLC v. Usenet.com, Inc.,
   633 F. Supp. 2d 124 (S.D.N.Y. 2009) ..............................................................8, 9, 16

Bogoni v. Gomez,
   2011 WL 6957599 (S.D.N.Y. Dec. 28, 2011) ........................................................25

Bobbs-Merrill Co. v. Straus, 210 U.S. 339, 350-51 (1908) ........................................15

Capitol Records, Inc. v. Naxos of America, Inc.,
   4 N.Y.3d 540 (2005) ............................................................................................4, 5

City Merchandise, Inc. v. Broadway Gifts Inc.,
   No. 08 Civ. 9075 (RJS), 2009 U.S. Dist. LEXIS 5629 (S.D.N.Y. Jan. 27, 2009) ....................4

CJ Prods. LLC v. Concord Toys Int'l, Inc.,
   2011 WL 178610 (E.D.N.Y. Jan. 19, 2011) ............................................................24

Columbia Pictures Indus., Inc. v. Aveco, Inc.,
   800 F.2d 59 (3d Cir. 1986) .....................................................................................18

Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc.,
   866 F.2d 278 (9th Cir. 1989) ..................................................................................11

Fonovisa, Inc. v. Cherry Auction, Inc.,
   76 F.3d 259 (9th Cir. 1996) ....................................................................................19

Gershwin Publishing Corp. v. Columbia Artists Management, Inc.
   443 F.2d 1159 (2d Cir. 1971) .................................................................17, 18, 19, 20

Hotaling v. Church of Jesus Christ of Latter-Day Saints,
   118 F.3d 199 (4th Cir. 1997) .....................................................................................8

*Intellectual Reserve, Inc. v. Utah Lighthouse Ministry, Inc.*,
  75 F. Supp. 2d 1290 (D. Utah 1999) ....................................................... 18

*Maverick Recording Co. v. Harper*,
  598 F.3d 193 (5th Cir. 2010) ............................................................. 6-7

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005) ........................................................................ 16

*New York Times Co., Inc. v. Tasini*,
  533 U.S. 483, 121 S. Ct. 2381, 150 L. Ed. 2d 500 (2001) ............................ 8, 14

*Peer Int'l Corp. v. Luna Records, Inc.*,
  887 F. Supp. 560 (S.D.N.Y. 1995) ........................................................ 19

*Playboy Enters., Inc. v. Chuckleberry Publ'g, Inc.*,
  939 F. Supp. 1032 (S.D.N.Y. 1996) ........................................................ 8

*Playboy Enters., Inc. v. Frena*,
  839 F. Supp. 1552 (M.D. Fla. 1993) .................................................... 8, 12

*Playboy Enters., Inc. v. Russ Hardenburgh, Inc.*,
  982 F. Supp. 503 (N.D. Ohio 1997) ..................................................... 9, 18

*Playboy Enters., Inc. v. Webbworld, Inc.*,
  968 F. Supp. 1171 (N.D. Tex. 1997) ....................................................... 9

*Reckitt Benckiser Inc. v. Motomco Ltd.*,
  760 F. Supp. 2d 446 (S.D.N.Y. 2011) ...................................................... 3

*Salinger v. Colting*,
  607 F.3d 68 (2d Cir. 2010) ........................................................... 4, 20-21

*Sega Enters. Ltd. v. MAPHIA*,
  948 F. Supp. 923 (N.D. Cal. 1996) ........................................................ 6

*Shapiro, Bernstein & Co. v. H.L. Green Co.*,
  316 F.2d 304 (2d Cir. 1963) ........................................................... 19, 20

*Sony Corp. of America v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984) ...................................................................... 17

*Twin Peaks Prods. v. Publ'ns Int'l. Ltd.*,
  996 F.2d 1366 (2d Cir. 1993) ............................................................. 4

*United States v. ASCAP*,
  627 F.3d 64 (2d Cir. 2010) .............................................................. 10

Ventura Travelware, Inc. v. A to Z Luggage Co., Inc.,
   1 U.S.P.Q. 2d 1552 (E.D.N.Y. 1986) .......................................................................24

Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.,
   192 F. Supp. 2d 321 (D.N.J. 2002)......................................................................11-12

Warner Bros. Entm't Inc. v. WTV Sys., Inc.,
   2011 WL 4001121 (C.D. Cal. Aug. 1, 2011) ...........................................................11

Warner Bros. Records, Inc. v. Walker,
   704 F. Supp. 2d 460 (W.D. Pa. 2010) ......................................................................7

**STATUTES**

17 U.S.C. § 101 ...........................................................................................5,9-10,11,13

17 U.S.C. § 106 ...............................................................................................5,7,9,11,12

17 U.S.C. § 107 ............................................................................................................12

17 U.S.C. § 108 ............................................................................................................12

17 U.S.C. § 109 ...........................................................................................2,12,13,14,15

17 U.S.C. § 110 ............................................................................................................12

17 U.S.C. § 111 ............................................................................................................12

17 U.S.C. § 112 ............................................................................................................12

17 U.S.C. § 301 ..............................................................................................................5

17 U.S.C. § 410 ..............................................................................................................4

**OTHER AUTHORITIES**

2 M. & D. Nimmer, Nimmer on Copyright § 8.14[C][2], at8-192.5 (2011)................10

U.S. Copyright Office, August 2001 "DMCA Section 104 Report"..............12,13,14,15

H.R. Rep. No. 94-1476 (2d Sess. 1976) ...................................................................10

## PRELIMINARY STATEMENT

Plaintiff Capitol Records, LLC ("Capitol"), a leading record company, brings this motion for a preliminary injunction to prevent defendant ReDigi, Inc. ("ReDigi") from widespread infringement of Capitol's copyrighted sound recordings and associated album artwork. Although ReDigi promotes itself as a technological pioneer, it is simply an online infringer, engaged in unauthorized copying, distribution, performance, and display of Capitol's copyrighted works. It is less notable for its technology than for the uncontrolled breadth of its infringement and brashness of its claims.

ReDigi styles itself as "the world's first and only online marketplace for used digital music." The "used" music files ReDigi markets, however, are not secondhand, scratched CDs that physically pass from one user to another, but pristine digital files that ReDigi reproduces, stores and distributes without authorization. ReDigi encourages users to "sell" files resident on their home computers by having copies of those files "uploaded" to ReDigi's "cloud" storage. Upon uploading, ReDigi purports to remove the original file from the user's home computer. Interested "buyers" then "download" copies of the files available in the "cloud" for prices below those available via legitimate digital merchants, such as Amazon or iTunes. In shopping for available songs, users play sound clips from the music files and review artwork displayed publicly on the ReDigi site. ReDigi, the consignment dealer, takes a percentage commission on each transaction, and those who upload songs earn credits toward purchases of other songs.

Throughout the entire process, ReDigi and its users engage in numerous acts of copyright infringement. Uploading, storing and downloading digital music files necessarily entail making multiple, unauthorized copies of the original file and transferring those copies to the public, in violation of Capitol's exclusive rights of reproduction and distribution. Playing sound clips and

showing album artwork on the ReDigi site violate Capitol's rights of public performance and display. The infringements are, in other words, comprehensive and constant throughout all operations of the ReDigi service.

To defend its infringing conduct, ReDigi improperly invokes the "first sale doctrine" codified at 17 U.S.C. §109(a). That doctrine permits owners of a "particular copy," defined elsewhere in the statute as the "material object" in which a copyrighted work is "fixed," to "dispose of the possession of that copy." However, as the Copyright Office itself concluded in a comprehensive study of this very issue, the first sale doctrine does not apply to digital transmissions, which by their very nature do not involve the physical transfer of any material object. Rather, digital transmissions like those ReDigi makes can only be accomplished by reproduction of the original file and creation of a new copy, regardless of whether the original file is removed from the selling user's hard drive or not. Congress did not design the first sale doctrine to immunize unauthorized copying, but only to permit owners of particular items of physical property to part with that property alone. In addition, ReDigi fails to meet the other key requirements for first sale immunity, because it is not itself an "owner" of any copy "lawfully made."

Not only does ReDigi misapply this doctrine, but it deliberately deceives the public by trumpeting the legality of its service on its website and boasting that it has created a new legitimate secondhand marketplace for digital music. Moreover, ReDigi falsely states on its website that it compensates record labels like Capitol and works for the benefit of the music industry. It thus not only deceives consumers about what conduct is permitted but manipulatively reassures them that engaging in "resale" via ReDigi is in the best interests of companies like Capitol.

2

Capitol requires an immediate injunction to halt this infringing conduct, deception of the public, and destruction of a market it has worked for decades to cultivate. Because song files cycle through ReDigi on a daily basis, Capitol has no practicable means of monitoring the scope of ReDigi's and its users' infringements. Likewise, the continued availability of Capitol's recordings on ReDigi's site, along with false claims that the "labels" are being compensated, foster a misimpression that online "resale" is a legitimate, lawful activity that benefits companies like Capitol. Finally, if ReDigi's conduct goes unchecked, Capitol's ability to compete via legitimate online distributors of digital music files, like Amazon and iTunes, will be destroyed. For these reasons, the Court should enter an immediate injunction requiring ReDigi to remove Capitol's recordings and artwork from the ReDigi site.

## STATEMENT OF FACTS

Capitol respectfully refers the Court to the Declaration of Alasdair J. McMullan ("McMullan Decl.") and attached exhibits for a full recitation of the facts relevant to this motion. As used in this memorandum, the terms "Copyrighted Recordings," "Pre-1972 Recordings," and "Copyrighted Artwork" have the same meaning as given those terms in the McMullan Declaration.

## ARGUMENT

### CAPITOL IS ENTITLED TO A PRELIMINARY INJUNCTION AGAINST REDIGI'S INFRINGEMENT OF CAPITOL'S SOUND RECORDINGS AND ARTWORK

In order to obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Reckitt Benckiser Inc. v. Motomco Ltd., 760 F. Supp. 2d 446, 451 (S.D.N.Y. 2011).

3

See also Salinger v. Colting, 607 F.3d 68, 77 (2d Cir. 2010).[1]  As set forth below, Capitol easily

meets these standards.

## I.   CAPITOL IS LIKELY TO SUCCEED ON THE MERITS OF ITS COPYRIGHT INFRINGEMENT CLAIMS

### A.   ReDigi is a Direct Infringer of Capitol's Copyrights

Copyright infringement requires a showing that plaintiff is the owner of exclusive rights

in the works at issue, and that defendant has violated those exclusive rights.  Twin Peaks Prods.

v. Publ'ns Int'l, Ltd., 996 F.2d 1366, 1372 (2d Cir. 1993).  These elements are the same for

federal copyright infringement and infringement of common-law copyright under state law.

Capitol Records, Inc. v. Naxos of America, Inc., 4 N.Y.3d 540, 563 (2005).

#### 1.   Capitol Owns Valid Statutory and Common-Law Copyrights

As set forth in the accompanying McMullan Declaration, Capitol owns exclusive rights

in the Copyrighted Recordings and Copyrighted Artwork, including the non-exhaustive,

illustrative list of works set forth in Exhibit 1 to the McMullan Declaration.  McMullan Decl. ¶¶

3-5 and Ex. 1.  Moreover, because the certificates of registration for such works were issued

before or within five years after the first publication of the works, they constitute prima facie

evidence of the facts stated therein, including Capitol's ownership of copyright in these works.

17 U.S.C. § 410(c).  See, e.g., City Merchandise, Inc. v. Broadway Gifts Inc., No. 08 Civ. 9075

(RJS), 2009 U.S. Dist. LEXIS 5629, at *3-4 (S.D.N.Y. Jan. 27, 2009).

Capitol also owns exclusive rights in the Pre-1972 Recordings, including the two

representative works identified in the McMullan Declaration, by virtue of agreements providing

---

[1]  The first prong of this test may also be satisfied by showing sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in plaintiff's favor.  See Salinger, 607 F.3d at 70.

Capitol with ownership of the common law copyrights in such works.  See McMullan Decl. ¶ 6.

The Pre-1972 Recordings are subject to protection under state law rather than federal copyright

law, and the Copyright Act cannot be used to "annul[] or limit[]" those rights "until February 15,

2067." 17 U.S.C. § 301(c).  See also Naxos, 4 N.Y.3d at 556 n. 8.

## 2.      ReDigi Violates Capitol's Exclusive Rights in the Works

The Copyright Act provides the owner of a copyright with certain exclusive rights,

including the right to reproduce the copyrighted work in copies or phonorecords, to distribute

copies or phonorecords of the copyrighted work to the public, to display the copyrighted work

publicly and (in the case of sound recordings), to perform the copyrighted work publicly by

means of a digital audio transmission.[2]  17 U.S.C. §§ 106(1), (3), (5), (6).  As set forth below,

ReDigi, without authorization from Capitol, violates each of these exclusive rights.

### (a)      ReDigi Reproduces the Works in Copies

ReDigi's comprehensive infringement of Capitol's copyrights begins with violation of

Capitol's exclusive right to "reproduce" the Copyrighted Recordings in "copies."  Although the

ReDigi website cryptically claims that its "genius" is "to facilitate the transfer of a digital music

file from one user to another without copying or file sharing," see McMullan Decl. Ex. 2, the

entire service and business model are, by ReDigi's own admission, predicated upon making

multiple, unauthorized copies of sound recordings, including the Copyrighted Recordings and

Pre-1972 Recordings owned by Capitol.

---

[2] Although sound recordings are technically fixed in "phonorecords" rather than "copies" under the definitions of § 101, there is no material distinction between the two terms for purposes of this action and accordingly the term "copies" will be used here throughout for ease of reference in identifying the material objects in which any copyrighted works, including the sound recordings at issue, are embodied.

The tutorial video on ReDigi's website homepage (McMullan Decl. Ex. 4) reveals how buying and selling digital music via its service necessarily entail making multiple copies of sound recordings. The video encourages users first to download the "ReDigi Desktop Client" to open a ReDigi account and begin selling "used" digital files. After the user then chooses and confirms the tracks he or she wishes to sell using the software, "ReDigi will upload your songs for sale and clean all of those unwanted files off your computer." Id. (emphasis added).

Uploading, by its very nature, can only be accomplished by making an unauthorized copy of the original user's track. See, e.g., Sega Enters. Ltd. v. MAPHIA, 948 F. Supp. 923, 931-32 (N.D. Cal. 1996) (holding that "copies were made" for purposes of Copyright Act when protected works were "uploaded to or downloaded from" defendant's electronic bulletin board). The user does not "sell" that original track but merely agrees to its deletion after it has been duplicated in a copy and that copy transferred, by "upload," to the ReDigi service. ReDigi's claim that it instantaneously deletes the original file from the user's computer is not only impossible to verify, but also irrelevant; whatever the destiny of the original file, an unauthorized copy of that file is what is transferred to and now resides in ReDigi's storage medium. McMullan Decl. ¶ 11, 13. No tangible, material object is or could be physically transferred to the ReDigi "cloud."

The video then explains that interested purchasers can designate songs they wish to buy from any computer, after which those songs are "safely stored in the ReDigi Cloud." Users are urged, "you'll be able to buy a song from any computer, and download it later to your computer." McMullan Decl. ¶ 14 and Ex. 4. Both storage and downloading again presuppose the making of additional copies of the file that resided on the original user's computer. See, e.g., Maverick Recording Co. v. Harper, 598 F.3d 193, 197 (5th Cir. 2010) ("[Defendant] infringed

6

Plaintiffs' exclusive right to reproduce their copyrighted works by downloading the 37 audio files to her computer without authorization."); Warner Bros. Records, Inc. v. Walker, 704 F. Supp. 2d 460, 465 (W.D. Pa. 2010) ("Courts have uniformly held that downloading sound recordings . . . without the authorization of the copyright holder constitutes an unlawful reproduction of the work in violation of § 106(1) of the Copyright Act."). The track "stored" in and offered to consumers from ReDigi's "cloud" is necessarily a copy of the user's original file.

Despite ReDigi's protestations to the contrary, its own pre-launch press release acknowledges plainly that ReDigi duplicates files in "copies," explaining that its technology effects a transfer "without allowing multiple copies to exist at the same time." McMullan Decl. Ex. 3 (emphasis added). Implicit in such a statement is of course the admission that duplication has occurred and that a "copy" of the original file has been made. Indeed, multiple copies are made during the process, since the user's original file, resident on that user's hard drive, is duplicated and then transferred and stored by the ReDigi service in ReDigi's own separate server or "cloud," and an additional copy is made when a transaction is consummated so that a digital file can be transferred to the so-called "purchaser."

Whether the original file was simultaneously or subsequently deleted does not matter, as the Copyright Act does not excuse unauthorized reproduction simply because the infringer chooses to destroy the source copy. It is the act of reproduction itself that is reserved for the copyright owner by 17 U.S.C. §106(1). Thus, at the very core of ReDigi's system is the serial unauthorized reproduction of sound recordings. The system simply cannot work without making copies in direct violation of the copyright rights of Capitol and other owners of sound recordings.

7

**(b)**     **ReDigi Distributes Copies of the Works to the Public**

ReDigi's admitted "transfer" of downloads of song files to customers also violates

Capitol's exclusive right to distribute copies of the Copyrighted Recordings to the public.  See

Arista Records, LLC v. Usenet.com, Inc., 633 F. Supp. 2d 124, 146-47 (S.D.N.Y. 2009)

("Defendants' delivery of copies of their copyrighted works by transmitting copies in response to

subscribers' requests to download a digital music file constitutes a 'distribution' under the

Copyright Act").  The Usenet Court's decision rested on the Supreme Court's ruling in New

York Times Co., Inc. v. Tasini, 533 U.S. 483, 121 S. Ct. 2381, 150 L. Ed. 2d 500 (2001), in

which defendants operated an online database from which users could download digital copies of

newspaper articles on request.  See 533 U.S. at 498.  The Supreme Court found that it was "clear"

that "by selling copies of the Articles through the NEXIS Database," the defendants "distribute

copies of the Articles to the public by sale" in violation of the copyright owner's exclusive right

of distribution.  Id. (internal quotations omitted).[3]

Moreover, as in Usenet, ReDigi's active participation in the process of infringement

easily satisfies any requirement of volitional conduct on ReDigi's part to render it liable as a

direct infringer.  ReDigi, for example, encourages users to purchase and sell recordings by

offering them coupons and credits every time they upload songs for sale.  It also boasts that its

"verification engine" will vet song files to ensure that tracks are "eligible" for sale and were

---

[3] See also Hotaling v. Church of Jesus Christ of Latter-Day Saints, 118 F.3d 199, 201
(4th Cir. 1997) (library "distributes" a published work when it places unauthorized copy in its
collection and makes it available to public); Playboy Enters., Inc. v. Chuckleberry Publ'g, Inc.,
939 F. Supp. 1032, 1039 (S.D.N.Y. 1996) (website providing nude pictorial images to
subscribers and allowing users to download the images constituted distribution in violation of
injunction); Playboy Enters., Inc. v. Frena, 839 F. Supp. 1552, 1556 (M.D. Fla. 1993)
(unauthorized uploading of copyrighted images to be downloaded by other bulletin board
subscribers constitutes infringing distribution).

obtained from legitimate sources, and offers to "help" users determine whether their files are legitimate or pirated. This level of intervention, oversight and encouragement plainly constitutes volitional conduct under the governing case law. Usenet, 633 F. Supp. 2d at 147-49. See also Playboy Enters., Inc. v. Russ Hardenburgh, Inc., 982 F. Supp. 503, 510-11 (N.D. Ohio 1997) (defendant's policy of encouraging subscribers to upload files and adoption of screening policy before files made available to public rendered it liable as direct infringer); Playboy Enters., Inc. v. Webbworld, Inc., 968 F. Supp. 1171, 1175 (N.D. Tex. 1997) (defendant's "function is not to provide Internet access, but rather to provide its subscribers with adult images which are contained in the storage devices of its computers").

> **(c)      ReDigi Publicly Performs the Works by Digital Audio Transmission**

ReDigi's website proclaims yet another one of its infringing acts by touting the unauthorized public performances it makes of Capitol's recordings. In promoting the ease of shopping on ReDigi, the site's video tutorial tells users they may listen to an audio performance of an excerpt of a song with a single click: "To listen to a 30 second clip of a song, drag it to your playbox or click the song." McMullan Decl. Ex. 4. In so doing, ReDigi makes an unauthorized public performance via digital audio transmission under 17 U.S.C. § 106(6).[4]

The Copyright Act states that to "perform" a work is to "recite, render, play, dance, or act it, either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it

---

[4] The tutorial then advises users, "We'll store it [the clip] in your memory bank, so you know which songs you listened to." McMullan Decl. Ex. 4. It appears that this feature of ReDigi makes yet another copy to "store" in individual users' "memory banks," even as it makes an unauthorized public performance.

audible." 17 U.S.C. § 101.  Under this definition, ReDigi's unauthorized audio streams are performances of Capitol's sound recordings.  See, e.g., United States v. ASCAP, 627 F.3d 64, 74 (2d Cir. 2010) ("A stream is an electronic transmission that renders the musical work audible as it is received by the client-computer's temporary memory. This transmission, like a television or radio broadcast, is a performance because there is a playing of the song that is perceived simultaneously with the transmission.").

In addition, these performances are also public because any ReDigi user can access them.  See 17 U.S.C. § 101 (to "publicly" perform or display a work defined as "to transmit or otherwise communicate a performance or display of the work … to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places at the same time or at different times").  For a transmitted performance to be public, it need not actually be received by a substantial number of persons, or by anyone at all.  H.R. Rep. No. 94-1476, at 65 (2d Sess. 1976).  It is enough if the performance is "open," that is, available to a substantial number of people.  2 M. & D. Nimmer, Nimmer on Copyright § 8.14[C][2], at 8-192.5 (2011).  A conventional television broadcast or web transmission is accordingly a public performance, whether or not anyone watches it and notwithstanding its receipt by individuals in their own homes.

Finally, the performance occurs by means of digital audio transmission.  To "transmit" a performance is "to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent."  17 U.S.C. § 101.  ReDigi's on-demand streams communicate the sounds fixed in Capitol's recordings to recipients located "beyond the

place from which they are sent," i.e., users who are not at ReDigi's physical location.[5]  See, e.g.,

Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc., 866 F.2d 278, 282 (9th Cir.

1989) ("under the transmit clause a public performance at least involves sending out some sort of

signal via a device or process to be received by the public at a place beyond the place from

which it is sent"); Warner Bros. Entm't Inc. v. WTV Sys., Inc., 2011 WL 4001121, at *5 (C.D.

Cal. Aug. 1, 2011) ("In this case, Defendants are violating Plaintiffs' exclusive right to publicly

perform their Copyrighted Works by transmitting those Copyrighted Works to the public over

the internet, without a license or Plaintiffs' permission, through the use of Defendants' Zediva

service."). Accordingly, ReDigi violates Capitol's exclusive right of public performance of the

Copyrighted Recordings by digital audio transmission under 17 U.S.C. § 106(6).

### (d)      ReDigi Publicly Displays the Copyrighted Artwork

ReDigi copies onto its servers, and transmits to users visual images of the Capitol's

Copyrighted Artwork.  McMullan Decl. ¶¶ 5, 16.  Such activity violates Capitol's exclusive right

to display these works publicly under §106(5).  The Copyright Act defines "display" as "to show

a copy of [a work], either directly or by means of a film, slide, television image, or any other

device or process or, in the case of a motion picture or other audiovisual work, to show

individual images nonsequentially." 17 U.S.C. § 101. ReDigi's transmission of these images to

users "shows" copies of those works by means of a "device or process" and thus violates

Capitol's exclusive public display rights. See, e.g., Video Pipeline, Inc. v. Buena Vista Home

Entm't, Inc., 192 F. Supp. 2d 321, 332 (D.N.J. 2002) ("Video Pipeline's use of the

---

[5] To complete the definitional circle, the ReDigi transmissions are digital because they are "in whole or in part in a digital or other nonanalog format," 17 U.S.C. § 101 (definition of "digital transmission") and they are "audio" transmissions because, as ReDigi admits, users "listen" to them. The meaning of the term "audio" is so well understood that it does not require definition in the Copyright Act.

copyrighted motion pictures allowed the display of its images to occur over the Internet in public and satisfies the definition of 'public display.'"); Playboy Enters., Inc. v. Frena, 839 F. Supp. 1552, 1557 (M.D. Fla. 1993) (bulletin board operator's "display of [plaintiff's] copyrighted photographs to subscribers was a public display" because "audience consisted of 'a substantial number of persons outside of a normal circle of family and its social acquaintances.'").

### 3.    The First Sale Defense Does Not Apply to ReDigi

ReDigi has indicated in public statements and on its website that its service is legally permissible under § 109(a) of the Copyright Act, the so-called "first sale doctrine," which imposes a narrow limitation on the distribution right contained in §106(3). However, the first sale doctrine has no application to digital transfers, as the Copyright Office itself explained in its August 2001 "DMCA Section 104 Report," which can be found on the Copyright Office's site at www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf (hereafter the "Report") and which is discussed below in further detail.

Section 109(a) provides in relevant part:

> Notwithstanding the provisions of section 106 (3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord.

ReDigi's reliance on §109 fails for three reasons. First, by its plain language, the section is not a defense to infringement of all exclusive rights, but only to violation of the distribution right.[6] As demonstrated above, however, ReDigi flagrantly violates Capitol's reproduction

---

[6] Some defenses, such as fair use, apply to violation of any §106 right . See 17 U.S.C. § 107. Others, such as §§ 108, 109, 110, 111, and 112, apply only in limited circumstances. Congress limited §109(a) specifically to claims involving the distribution right of § 106(3).

rights, its public performance rights and its public display rights in addition to its distribution rights. Accordingly, even if the other conditions of section 109 were met -- and they are not -- ReDigi would remain liable for copyright infringement of these other important rights. Section 109 is definitionally too narrow to comprehend the breadth of ReDigi's infringing conduct. See Report at 79 ("Section 109 limits a copyright owner's exclusive right of distribution. It does not, by its terms, serve as a defense to a claim of infringement of any of the other exclusive rights.").

Second, §109 requires that the "owner" of "a particular copy" – that is, a particular "material object" under the definition in section 101 – "sell or dispose of the possession" of "that copy" in order to claim the benefit of the defense.[7] A ReDigi user does no such thing. While ReDigi seeks to create the illusion that the first user is transferring "possession" of his/her "particular copy" to the second user, the reality is that the second user never acquires "possession" of the "particular copy" with which the first user started. Nor is it possible for such a physical transfer to occur, as material objects cannot pass through the Internet. Indeed, the first user's copy allegedly ceases to exist as part of ReDigi's process and therefore cannot be "possessed" by the second user or anybody else.[8]

The fallacy of ReDigi's argument is apparent if the same process employed by ReDigi is viewed in a context outside the digital world. For example, if the first individual owned a print of a photograph, allowed the second individual to make a digital scan of it, and then immediately threw the original print into the fire, no one would suggest that the first individual had "sold" his

---

[7] Section 101 defines "Copies" as "material objects ... in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."

[8] To be clear, there is a material object in the first user's possession, e.g., a hard-disk computer drive, but that disk is not transferred to the second user and also no longer embodies the copyrighted work following the deletion process.

print to the second individual.  Clearly the second user cannot possess the first user's physical

print when it is in ashes.  The same result necessarily obtains on the Internet, because the

Copyright Act definitions that govern §109(a) are the same.  Cf. Tasini, 533 U.S. at 502

(Copyright Act should be applied in "media neutral" manner; electronic archive governed by

same principles as hypothetical hard-copy library).

     As noted above, the Copyright Office explored the question of whether the first sale

doctrine applied in the context of online transmissions in 2001 and unequivocally concluded that

the defense was unavailable under the statute.  The Report issued by the Register explained that

the copying necessarily involved in making a digital transfer removed digital transfers from the

contours of the first sale defense:

> The transmissions that are the focus of proposals for a "digital first sale
> doctrine" result in reproductions of the works involved.  The ultimate
> product of one of these digital transmissions is a new copy in the
> possession of a new person. Unlike the traditional circumstance of a first
> sale transfer, the recipient obtains a new copy, not the same one with
> which the sender began.    Indeed, absent human or technological
> intervention, the sender retains the source copy.  This copying implicates
> the copyright owner's reproduction right as well as the distribution right.
> Section 109 provides no defense to infringements of the reproduction
> right.  Therefore, when the owner of a lawful copy of a copyrighted work
> digitally transmits that work in a way that exercises the reproduction right
> without authorization, section 109 does not provide a defense to
> infringement.

Report at 79-80 (footnotes omitted, emphasis added).[9]  Such a result is, as the Report points out,

entirely consistent with the very origin of the first sale doctrine in which the Supreme Court drew

---

[9] A footnote in this passage confirms the "media neutrality" principle applied by the
Supreme Court in Tasini, and specifically applies it the context of digital transmissions and §109.
The Report notes that §109 applies in the same way to all copies, "[r]egardless of whether a copy
is created as a result of the nearly instantaneous transmission of digital information through
broadband computer connections or as a result of months of painstaking labor of a cloistered
monk working with a quill by candlelight." Id. at 79 n.270.

a sharp distinction between the rights of distribution and reproduction, "creating an exception to the vending (i.e., distribution) right only to the extent it didn't interfere with the reproduction right." Id. at 80 (citing Bobbs-Merrill Co. v. Straus, 210 U.S. 339, 350-51 (1908)). Because both the plain language of the Copyright Act and the underlying policy on which the first sale doctrine is based make plain that it does not apply in circumstances such as the present case in which reproduction of the copyrighted work occurs, there is no basis for such a defense absent an express amendment of the Copyright Act by Congress.[10]

Finally, there is a third reason that ReDigi is ineligible for the first sale defense in this case: ReDigi is not the "owner" of a "lawfully made" copy. Even if the originating user is a lawful owner, ReDigi is not itself an owner of anything. ReDigi does not purchase a lawful download from iTunes, for example, but simply duplicates the first user's copy (and subsequently duplicates it again for the second user). Moreover, because ReDigi has no authorization from the copyright holder to make the copies it does, the copies it holds on its "cloud" are not lawfully made copies either. The copy acquired by the original purchaser may be lawful, but that does not magically transform ReDigi's unauthorized copy of that user's file into a lawful copy. Accordingly, separate and apart from the physical impossibility of transferring a material object over the Internet, section 109(a) is also inapplicable because ReDigi cannot qualify as the "owner" of a "lawfully made" copy.

---

[10] The Report actually went on to consider whether the Copyright Act should be amended to incorporate a first sale defense for digital transmissions. Given the distinctions between physical and digital copies, as well as the greater threat posed by piracy in the online context, the Report did not recommend adopting a digital first sale doctrine. In any event, of course, it is the province of Congress to make such a determination and there is no basis under the present statutory scheme for such a defense.

**B.**     **ReDigi Is A Secondary Infringer**

Assuming *arguendo* that some of the reproductions, distributions, performances and displays that occur in connection with ReDigi are carried out by users rather than ReDigi itself, ReDigi is nonetheless liable for those infringements under well-established principles of secondary liability.

**1.**     **ReDigi Induces Its Users' Infringements**

Under the Supreme Court's holding in Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 545 U.S. 913 (2005), "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." Id. at 919. See also Arista Records, LLC v. Lime Group, LLC, 715 F. Supp.2d 481, 506, 508-09 (S.D.N.Y. 2010). This same standard applies to the providers of online services as well as to the maker of "devices." Usenet, 633 F. Supp. 2d at 151-52.

Here, as in Grokster, Lime Group and Usenet, ReDigi knowingly and willfully seeks to attract users to participate in unauthorized reproductions and distributions of Capitol's copyrighted works. It encourages those users to violate the terms of certain of their original vendor agreements, such as those imposed by Amazon.com (McMullan Decl. ¶ 20 and Ex. 6), and essentially creates a marketplace where users engage in widespread infringement by promising that it will confirm the legitimacy of users' right to sell their files.

In addition, the ReDigi video tutorial explains that for each song uploaded, a user earns "ReDigi coupons" which can be used to buy additional songs for a "discounted price." Likewise, when those uploaded songs sell, the original user earns ReDigi "credits" that can be applied to the purchase of new songs. McMullan Decl. Ex. 4. Further encouraging

infringement, the ReDigi website offers contests and incentives urging users to avail themselves of the service.  ReDigi promises, "Store or Sell at Least 10 MP3s on the ReDigi Cloud and be Entered to Win" prizes ranging from a Fiat sports car to headphones.  Moreover, by simply storing those 10 songs for purposes of later resale, the user is promised, "Get 5 FREE songs just for storing 10 songs on ReDigi."  McMullan Decl. Ex. 2.  Given these facts, there can be no dispute that ReDigi actively and affirmatively induces its users to commit infringements of the Copyrighted Recordings on a massive scale, to the extent that ReDigi itself does not directly commit those infringements.

### 2.    ReDigi Is a Contributory Infringer

ReDigi is also a contributory infringer.  Under the Supreme Court's holding in Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417 (1984), a contributory infringer is "one who with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another."  Id. at 487 (citing Gershwin Publishing Corp. v. Columbia Artists Management, Inc. 443 F.2d 1159, 1162 (2d Cir. 1971)).

ReDigi clearly has knowledge that unauthorized copies of copyrighted recordings are being made via its site.  Indeed, the entire purpose of its website is to permit the duplication and distribution of copyrighted song files.  While ReDigi seeks to hide behind a deliberate misapplication of the first sale doctrine, it cannot avoid liability based on its own subjective and misguided interpretation of the law.  See, e.g., Arista Records LLC v. Does, 604 F.3d 110, 118 (2d Cir. 2010) ("The knowledge standard is an objective one; contributory infringement liability is imposed on persons who 'know or who have reason to know' of the direct infringement.").  Moreover, ReDigi betrays its knowledge of its legal risk at every turn.  Its website is filled with defensive protestations about why its service is legal.  It boasts falsely that it is compensating

17

record labels, even though Capitol has never received a penny of compensation despite repeated

protests.  And its President has readily acknowledged that users who want to violate the

copyright laws by retaining copies of files that ReDigi purports to "delete" may be able to do so.

In addition, ReDigi has received specific notice from the RIAA of the infringing conduct taking

place, McMullan Decl. ¶24 and Ex. 7, but has continued to make Capitol's sound recordings (as

well as the recordings of other labels) available for sale.

ReDigi also contributes materially to its users' infringements.  "Material contribution" to

infringement may consist of providing the means by which the infringement occurs.  <u>See</u>, <u>e.g.</u>,

<u>Columbia Pictures Indus., Inc. v. Aveco, Inc.</u>, 800 F.2d 59, 62-63 (3d Cir. 1986) (video store

liable where it provided viewing rooms with VCRs and encouraged customers to use them to

view infringing videos); <u>Gershwin</u>, 443 F.2d at 1162-63 (by forming local concert association,

defendant created market for performers using copyrighted compositions).  For example, in

<u>Intellectual Reserve, Inc. v. Utah Lighthouse Ministry, Inc.</u>, 75 F. Supp. 2d 1290, 1293-95 (D.

Utah 1999), the Court held that a website that posted the URLs of third-party sites containing

infringing copies of the Church of Latter Day Saints' <u>Church Handbook of Instructions</u> actively

encouraged users to visit pirate sites.  Similarly, where an online bulletin board company

encouraged customers to upload infringing content by offering a financial incentive program, it

was found to have contributorily infringed. <u>See</u> <u>Russ Hardenburgh</u>, 982 F. Supp. at 514.

ReDigi's activities here similarly provide a material contribution to infringement.  At the

most basic level, its software makes the infringement possible.  <u>A&M Records, Inc. v. Napster,</u>

<u>Inc.</u>, 239 F.3d 1004, 1022 (9th Cir. 2001) (Napster service provides the "site and facilities" that

make infringement of copyrighted music possible).  Moreover, by offering incentives, including

prizes and discounted prices for users engaged in the distribution of their copyrighted recordings,

ReDigi actively encourages infringing conduct in a manner that clearly renders it liable for contributory infringement under the relevant case law.

**3.     ReDigi Is Vicariously Liable for Its Users' Infringements**

ReDigi is also vicariously liable for its users' infringements.  Vicarious liability for copyright infringement exists where the defendant "has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities."  Gershwin, 443 F.2d at 1162.  See also Napster, 239 F.3d at 1022; Shapiro, Bernstein & Co. v. H.L. Green Co., 316 F.2d 304, 306 (2d Cir. 1963).  Unlike contributory infringement, knowledge is not an element of vicarious liability.  Gershwin, 443 F.2d at 1162; Peer Int'l Corp. v. Luna Records, Inc., 887 F. Supp. 560, 565 (S.D.N.Y. 1995).

A defendant's "ability to block infringers' access to a particular environment for any reason whatsoever" constitutes proof of its right and ability to supervise and control the infringing activities.  Napster, 239 F.3d at 1023.  See also Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259, 261, 262-63 (9th Cir. 1996) (defendant flea market operator had right and ability to control vendors where it possessed right to terminate vendors and exclude them from flea market for any reason); Shapiro, Bernstein, 316 F.2d at 306-08 (store owner vicariously liable for concessionaire's sales of infringing records, where owner "retained the ultimate right of supervision over the conduct of the record concession and its employees").

ReDigi promises that its "'Verification Engine' analyzes each music file uploaded for sale into the ReDigi marketplace to verify that it is eligible for resale, accepting only previously, legally downloaded tracks ..." McMullan Decl. Ex. 3.  Thus, by ReDigi's own admission, it has the right and ability to control what recordings are offered for sale on its website.  The problem is not that ReDigi is unable to control the infringing activity, but that it refuses to do so based on

19

its own misguided interpretation that as long as the digital recording was originally purchased legally, it can be further reproduced and sold. Where a defendant is "in a position to police the infringing conduct," its "failure to police the conduct" gives rise to vicarious liability. Gershwin, 443 F.2d at 1162-63.

ReDigi also has a direct financial interest in its users' infringing activities. According to a ReDigi spokeswoman quoted in the New York Times, ReDigi sells tracks for approximately 79 cents, and earns a fee of "5 to 15 percent." See McMullan Decl. Ex. 5. There can be no more compelling evidence of a direct financial benefit than receiving a share of the payments made for "purchase" of the infringing files stored by ReDigi. See, e.g., Shapiro, Bernstein, 316 F.2d at 306 (imposing vicarious liability on owner of department store who received 10-12% of gross profits of independent concessionaire selling pirated sound recordings in the store). In developing a business model based on the profits earned from infringing copyrighted recordings that ReDigi could clearly prevent from being sold if it so chose, ReDigi has rendered itself vicariously liable for copyright infringement under the governing standards.

## II.   REDIGI'S CONDUCT IS CAUSING IRREPARABLE HARM TO CAPITOL

ReDigi's service and aggressive promotion of its "online marketplace" cause irreparable harm to Capitol, its legal interests and goodwill, and its ability to manage its intellectual property in the future. While these harms pose grave economic threats, they are also impossible to remedy by money damages alone and require the issuance of a preliminary injunction.

As the Second Circuit has recently clarified, courts no longer automatically presume irreparable harm upon a showing of likely success in a copyright infringement case. However, the Second Circuit also acknowledged that "as an empirical matter," it may "well be the case" that "most copyright plaintiffs who have shown a likelihood of success on the merits" will be

"irreparably harmed absent preliminary injunctive relief." See Salinger, 607 F.3d at 82. Factors

that tend to support a finding of irreparable harm include threats of "market confusion" and the

"notoriously difficult" prospect of proving loss of sales due to infringement. Id. at 81 (citation

omitted). Capitol faces both threats, as well as others, in the instant case.

First, the very nature of ReDigi's service makes it nearly impossible to monitor the scope

of infringement and the losses and damages Capitol is suffering. According to the ReDigi

website, each track is sold on a "first listed, first sold basis," so that there is constant turnover of

copied files. If, as ReDigi claims, it erases source files from user computers once uploaded to

the ReDigi "cloud," and then also presumably erases the "cloud" copy once a second user "buys"

that track from the "cloud," the chain of infringing copies itself is in constant flux. It thus

becomes tremendously difficult to monitor ReDigi's inventory of files constantly to keep tabs on

which files are being uploaded and/or downloaded, which include infringing copies and displays

of artwork, which also include unauthorized sound clips that are publicly performed, and what

the total scope of infringement is. This sequence of infringing events needs to be stopped now

for Capitol even to have a fair chance at understanding the scope of the problem and measuring

the losses it is suffering. See McMullan Decl. ¶ 26.

Second and perhaps more threatening is ReDigi's public deceptions, which cause the

kind of "marketplace confusion" that damages and supplants Capitol's market and requires

interlocutory relief. In promoting its service, ReDigi misleads the public into believing that its

distribution scheme is legal and approved by and beneficial to record companies like Capitol. At

the bottom of every page on the site, ReDigi boasts:

> ReDigi is the world's first and only online marketplace for used digital music. Its
> genius lies in its ability to facilitate the transfer of a digital music file from one
> user to another without copying or file sharing. This gives digital music a resale

> value for the first time ever, and consumers the freedom to buy and sell the music they rightfully own. ReDigi also gives back to artists and labels through generous payments with every track sold (and resold).

See McMullan Decl. Ex. 2.  This message is false and harmful to Capitol in a number of ways.

It suggests that ReDigi has somehow technologically created an exception to the copyright law that permits wholesale copying of digital files.  Consumers are led to believe that there is now a legitimate, legal marketplace for "used" -- meaning only unwanted -- digital files that can be transferred freely, without regard to the copyright rights of sound recording owners or agreements with vendors like Amazon, who provided those files to users with carefully stated restrictions against redistribution. The suggestion that files are "transferred" without being "copied" is a distinction of ReDigi's own imagination, and is belied by ReDigi's own description of the uploading, downloading and cloud storage it provides.  ReDigi is simply trying to redefine what the act of "copying" is to serve its own business goals and confuse consumers about what they can and cannot do with a digital music file.

Moreover, ReDigi's promise that it "gives back" to artists and "labels" is false.  Capitol has received no compensation from the many "used" copies of its copyrighted recordings posted on and made available via the ReDigi service. See McMullan Decl. ¶ 29.  Elsewhere, ReDigi's website makes similar false representations.  The ReDigi homepage defensively proclaims the service to be "THE LEGAL ALTERNATIVE," and linked pages offer a confusing mini-treatise on the "First Sale Doctrine," wherein ReDigi boasts that it "makes a significant contribution to copyright compliance well beyond any method previously available in any secondary music market." See McMullan Decl. ¶ 30 and Ex. 2.  Again, ReDigi's false promise is not only that it provides a means for "legal" copying, but that its service is contributing to the welfare of the musical community.  Consumers who might otherwise be disinclined to engage in infringement

22

may be coaxed into unlawful activity with the false promise that they are acting in accordance with law and actually benefitting the recording community.

Finally, beyond infringing in ways that are difficult to track and creating public confusion about what is or is not lawful conduct, ReDigi is undermining the legitimate market for digital music files. ReDigi makes available hundreds of unauthorized copies of Capitol's recordings at reduced prices. As digital reproductions, those recordings suffer no degradation in sound quality – as might a used CD – and thus compete with and supplant Capitol's market for legitimate digital distributions through authorized distributors, like Amazon or iTunes. See McMullan Decl. ¶ 31. The process is uncontrolled, in a constant state of turnover, and falsely presented to the public as a new legitimate frontier that benefits parties like Capitol.

Ultimately, this combination of constant turnover, confusion of the public about legitimate conduct, and erosion of the marketplace for legitimate digital distribution imposes irreparable harm on Capitol. It undermines Capitol's ability to manage its intellectual property in a sensible way in accordance with both the benefits and limitations of existing copyright law, which have informed how Capitol exploits its copyrights in the digital world. If ReDigi wants to redefine what copyright law allows in the digital environment, it may petition Congress, but it cannot act unilaterally in a way that jeopardizes Capitol's ability to compete fairly and viably in accordance with existing law.

## III.    THE BALANCE OF HARDSHIPS FAVORS CAPITOL

In contrast to the jeopardy Capitol faces in the absence of an injunction, interlocutory relief imposes minimal burden on ReDigi. Capitol asks only that its own recordings and artwork be removed from the service. ReDigi is free to negotiate appropriate deals with any other record labels or owners of sound recordings as it wishes; indeed, its claims of "giving back" to artists

and labels suggest that it seeks to do so.  However, having jumped the gun and copied, distributed, displayed and performed Capitol's copyrights without permission, ReDigi is ill-situated to complain that an injunction will disrupt its operations.  ReDigi might well have considered seeking Capitol's permission or negotiating an appropriate arrangement with Capitol before launching its service if it was truly concerned with the welfare of the musical community.  But it did not, and should not now be heard to complain that an injunction burdens a presumptuous business model that permits it to compete unfairly with and siphon off of Capitol's years of investment.  See CJ Prods. LLC v. Concord Toys Int'l, Inc., 2011 WL 178610, at *5 (E.D.N.Y. Jan. 19, 2011) (finding balance of hardships "clearly favors plaintiffs" where "an injunction is necessary to stop defendants from infringing on plaintiffs' [copyrighted] products, that is, competing unlawfully" by "profiting from the manufacture and sale of goods based on designs they did not create or invest time and money to promote; nor have they been otherwise authorized to use"); Ventura Travelware, Inc. v. A to Z Luggage Co., Inc., 1 U.S.P.Q. 2d 1552, 1553 (E.D.N.Y. 1986) (balance of hardships favored plaintiff where "the potential injury to plaintiff's sales and good will outweighs any prejudice defendants might suffer by losing business that was obtained by deliberately copying plaintiff's products").

## IV.    AN INJUNCTION SERVES THE PUBLIC INTEREST

The public has no interest in being deceived about what is lawful, about what the first sale doctrine "protects," or about whether ReDigi "gives back" to the musical community.  The public also has no interest in being lured into acts of infringement that might expose individuals to personal claims for damages or injunctions.  In contrast, the public interest is served when the balances created by the Copyright Act are enforced and preserved.  Copyright owners like Capitol have exclusive rights of reproduction, distribution, performance and display, subject to

carefully delineated statutory exceptions, such as the first sale limitation on the distribution right. Those rights and limitations reflect consideration of various policies that animate the Copyright Act, including giving rights holders the incentives to create. ReDigi's attempt to arrogate to itself authority to create a new legislative exception under the copyright law undermines the statutory balance set by Congress, and should be curtailed by the injunction requested herein. See Bogoni v. Gomez, 2011 WL 6957599, at *7 (S.D.N.Y. Dec. 28, 2011) (holding preliminary injunction did not disserve public interest where "there is undoubtedly a great public interest in the vigilant enforcement of congressional statutes").

## CONCLUSION

For all of the foregoing reasons, Capitol's motion for a preliminary injunction should be granted.

Dated: New York, New York
       January 19, 2012

Respectfully submitted,

COWAN, LIEBOWITZ & LATMAN, P.C.
Attorneys for Plaintiff Capitol Records, LLC

By:_____
       Richard S. Mandel
       Jonathan Z. King

1133 Avenue of the Americas
New York, New York 10036-6799
(212) 790-9200