C26TCAPA

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CAPITOL RECORDS, LLC,

                Plaintiff,

          v.                        12 CV 95 (RJS)

REDIGI INC.,

                Defendant.

------------------------------x
                                    New York, N.Y.
                                    February 6, 2012
                                    3:30 p.m.

Before:

               HON. RICHARD J. SULLIVAN,

                                    District Judge

                      APPEARANCES

COWAN, LIEBOWITZ & LATMAN
     Attorneys for Plaintiff
BY:  RICHARD MANDEL
     JONATHAN KING

RAY BECKERMAN, PC
     Attorneys for Defendant
BY:  RAY BECKERMAN
     M. TY ROGERS
```

C26TCAPA

| | |
|---|---|
| 1 | (In open court, case called, appearances noted) |
| 2 | THE COURT:  All right.  Mr. Rogers, good afternoon to |
| 3 | you, and I should note that the docket sheet has you at |
| 4 | Vandenberg & Feliu. |
| 5 | MR. ROGERS:  That was my former firm.  I changed |
| 6 | everything in the Southern District system.  I'm surprised.  I |
| 7 | will look into that. |
| 8 | THE COURT:  Check into it.  Maybe you didn't make a |
| 9 | copy of it when they moved it over.  That was a little |
| 10 | copyright joke. |
| 11 | Good afternoon.  And I gather we have some others in |
| 12 | the gallery interested in the subject or more than just a |
| 13 | passing interest in the subject. |
| 14 | We're here on I guess two potential motions.  I have |
| 15 | the motion of plaintiff's for a preliminary injunction.  So I |
| 16 | got the opening brief that was dated January 6 as well as -- |
| 17 | I'm sorry, the complaint is January 6, the answer is |
| 18 | January 19, and I have the opening brief January 26, the |
| 19 | reply -- excuse me, the response January 27, it's date of |
| 20 | docketing, then the reply brief February 1st.  I also have |
| 21 | premotion letters related to defendant's contemplated motion |
| 22 | for a summary judgment, so I have a January 19 letter from |
| 23 | Mr. Rogers and a January 24 and letter in response by |
| 24 | Mr. Mandel. |
| 25 | So that's what I have got.  I have got something from |

C26TCAPA

```
1   counsel from Google that I have already dealt with, but nothing

2   else from the parties.  Right?

3            MR. MANDEL:  That's correct, your Honor.

4            THE COURT:  I find this to be a fascinating issue.  We

5   raised a lot of technical and statutory issues that make this

6   kind of a niche case, as far as I'm concerned.

7            So I have read the papers, and I read them carefully,

8   but I'm happy to hear further argument, particularly since

9   defendants have not had a chance to respond to the reply

10  papers, which I guess fine tune some of the arguments that were

11  made in the opening brief.  I'm curious to have a little oral

12  argument now.

13           So it's plaintiff's motion, so we'll start with

14  plaintiffs.  And I think there's no dispute as to what the

15  standard is here.  I think we ought to start with irreparable

16  harm, because it seems to me that this is the kind of thing

17  that money should take care of.

18           Mr. Mandel?

19           MR. MANDEL:  Your Honor, we don't think that money

20  really will adequately address the injury here, and I think

21  there obviously was a long history for many years where

22  irreparable harm was presumed in copyright cases.

23           Now obviously in *Salinger* the Second Circuit said that

24  is no longer the case, reading the Supreme Court's opinion in

25  *Ebay*.  But at the same time, they were careful to point out as
```

C26TCAPA

```
1   a empirical matter it still well may be that most copyright

2   plaintiffs will be able to establish irreparable harm.  Justice

3   Roberts' current opinion in Ebay where he talks about we're not

4   writing on a blank slate now, obviously years of history can be

5   worth a lot of logic.  And I think that really is the case

6   here.  There is irreparable injury, and for a number of

7   reasons.

8           First of all, with respect to monetary damages, I

9   think there's a real concern whether this defendant would be in

10  a position to provide the kind of judgment that Capitol is

11  entitled to.

12          THE COURT:  Why?  Because they're pretty new?

13          MR. MANDEL:  Not just that, in response to the

14  preliminary injunction motion they essentially said that an

15  injunction would put them out of business.  And so it seems to

16  me that they're really saying their business model, which they

17  decided to go forward on knowing -- they had to know that there

18  was significant risk when they went forward with that business

19  model, and they're saying if they're wrong, they're out of

20  business.

21          THE COURT:  That's not the same as saying you're

22  judgment proof, is it?

23          MR. MANDEL:  I think there's a question if there's

24  added business.  The idea of a beta start up company that has

25  just been in testing mode that goes into it knowing there's a
```

C26TCAPA

1   serious legal question and saying that they'll be out of

2   business if they're not allowed to do this, I think there's

3   real question to whether we get a statutory damage award for

4   hundreds of recordings that could add up to million of dollars,

5   there is no way they would be able to compensate us for that.

6         THE COURT:  But that sounds like speculation more than

7   anything.  You just are surmising because they're a start up,

8   because an injunction in their own mind would potentially

9   threaten the existence of a company whose entire reason for

10   existence is this technology that they're touting, that this

11   must mean they're judgment proof.

12         MR. MANDEL:  I don't think it must mean, but I think

13   it raises a serious question about it such that I think Capitol

14   shouldn't be in a position to be forced to take that risk.

15   Because when you really look at the respective hardships here,

16   the defendant went forward with a business plan where, we

17   submit -- and this obviously ties back to the likelihood of

18   success -- we submit there is really no colorable offense or

19   reason that they are able to do the things that they are doing

20   here.

21         And the reality of the situation is that they had to

22   know that, and they took the risk.  And what Capitol is saying

23   is our most valuable asset is our copyrights.  Why should we

24   have to put that at risk while they're in testing mode getting

25   an opinion as to whether what they do is valid?  Wouldn't the

C26TCAPA

```
1   better thing to do here be to establish that you have some
2   possibility of actually having a real defense here?
3            THE COURT:  That's sort of setting the standard for a
4   preliminary injunction on its head.  It says we'll presume a
5   preliminary injunction until they can establish they have a
6   likelihood of success in defending.
7            MR. MANDEL:  I'm speaking to the balance of hardships.
8            THE COURT:  I'm asking about irreparable harm.
9            MR. MANDEL:  So beyond just the money damage question,
10  I think there is also irreparable injury here in the sense that
11  this is being touted and promoted to the public as legal in
12  their Web site.  They're saying this is a legal alternative.
13  The whole idea of using a digit marketplace is something that
14  we submit is something that is not legally cognizable.  And
15  being out there and creating this confusion in the public mind
16  and opening up this Pandora's box inviting people to infringe
17  in a similar manner, saying well, if I take steps to delete my
18  copy after I do this, I can do this wonderful sale, there's a
19  real risk that essentially the infringement is going to be very
20  widespread and Capitol will lose control of its assets, its
21  copyrights, its most valuable assets.
22           THE COURT:  Dangerous legal theory is a basis for
23  establishing irreparable harm?
24           MR. MANDEL:  Untenable legal theory that has no
25  support.  And that, we submit, ties back to whether we
```

C26TCAPA

1    established that we're right, but we think it's pretty clear

2    it's not legally supportable.  And to be able to create

3    confusion in the public mind this is something that is legal,

4    that people have the right to duplicate their files, and as

5    long as after they submit it --

6          THE COURT:  But do you have authority for this

7    proposition?  Public market confusion is people will think this

8    is Pepsi, for crying out loud, and it's not Pepsi.  People will

9    think this is a legally defensible theory that they're

10   operating under, and I can't think that's a case of irreparable

11   harm.

12         MR. MANDEL:  We haven't had a lot of case law since

13   *Salinger*.  We have decades of experience where it was routinely

14   presumed there was irreparable harm once likelihood of success

15   was established in a copyright case.  There hasn't been a lot

16   of fleshing out of the legal standard.  You have the history of

17   a copyright context, given the nature of the injury, the loss

18   of control of your property rights.

19         The fact that essentially the statutory scheme is

20   being turned on its head, instead of having a right to exclude

21   people from making reproductions and from using your

22   copyrighted material, you are sort of turning it the other way

23   and setting up almost a compulsory licensing scheme or some

24   kind of statutory exception that's not there.  So we do think

25   that that is unfair and not what is intended in the copyright

C26TCAPA

| 1 | area, because this is intangible property that is very

| 2 | difficult to control, and it has a tremendous value that is not

| 3 | easy to quantify.

| 4 |          THE COURT:  I'm sorry to interrupt you.  That's one of

| 5 | the benefits of having the robe is I'm able to do that.  And

| 6 | since I'm the fact finder, or at least the decision maker here,

| 7 | I apologize.  So everybody, I will interrupt you from time to

| 8 | time, not maliciously, but because I have a short attention

| 9 | span.

| 10 |          So my question is even outside of the copyright area,

| 11 | irreparable harm has to be established for a preliminary

| 12 | injunction.  Are you aware of any other authority in which the

| 13 | dangerousness of a legal theory is advanced as a basis for

| 14 | establishing irreparable harm?

| 15 |          MR. MANDEL:  I'm not, but I guess I wouldn't say it's

| 16 | the dangerousness of the legal theory, what I will say it's the

| 17 | unsupportable contention there's right to do something that

| 18 | there is clearly not a right to do.  It's misinformation to the

| 19 | public about the applicable statutory scheme.  There's

| 20 | misinformation about the contributions that are supposedly made

| 21 | to the record labels and to the music community and all of

| 22 | those things that we think do fall into place in terms of

| 23 | establishing irreparable harm combined with just the loss of

| 24 | control and the difficulty of quantifying the damage when your

| 25 | intangible property right that you have a right to generally

C26TCAPA

1    exclude others from using is basically being cast aside and

2    you're told well, you will stand here and take it at face

3    value, that at the end of this, money will be enough.

4              THE COURT:  But you're saying that lost sales would

5    not be the measure, there are certain people you would not sell

6    to under any circumstances.

7              MR. MANDEL:  No, I'm saying the danger here goes

8    beyond the specific lost sales that may quantifiable.  There

9    may be other infringements that are being encouraged by the

10   activity.  There is misinformation being communicated to the

11   public.

12             THE COURT:  But the encouragement of other

13   infringement, is that anywhere cited as a basis for

14   establishing irreparable harm?  I haven't seen it.

15             MR. MANDEL:  I haven't seen it either, but as I said,

16   copyright plaintiffs have not had a long period of time where

17   they have actually been required to prove much.  It's been

18   presumed for decades in this circuit and elsewhere that

19   irreparable harm is almost assumed.  And I think what the

20   Supreme Court said is OK, fine, that has changed, and you can

21   no longer rely on that presumption, but we're also not writing

22   on a clean slate here.  There's a reason why that presumption

23   existed for 30 years, and it is because of recognizing the

24   nature of the kind of injury that's at play when you deal with

25   copyrighted intellectual property.

C26TCAPA

1      THE COURT:  But here we're talking about lost sales

2  for which they're getting 39 cents a song and you or your

3  licensees would be getting a buck and a quarter.  That seems to

4  me pretty easy to quantify and pretty easy to establish damages

5  on, and a money judgment should take care of the whole thing.

6      MR. MANDEL:  Potentially, assuming there is money to

7  withstand a judgment, notwithstanding that they're a data

8  company that would be out of business by virtue of a decision

9  that their business model doesn't work.

10      THE COURT:  But then it's your burden to establish

11  that they don't have the wherewithal to withstand the judgment,

12  not their obligation to prove they can, right?

13      MR. MANDEL:  We think there's significant risk there,

14  that you have to look at it in context.  And I think there is

15  also a risk that the marketplace in general -- that there will

16  be harm beyond that not just from their service but from other

17  people who will infringe.

18      I have said what I have to say.  I don't know that I

19  can add anything to it.  But we do believe that the strong

20  tradition in copyright cases of granting and presuming

21  irreparable harm flows from a natural recognition of the nature

22  of that right, and we think that continues to be at play even

23  more when you're dealing with a defendant that has no real

24  basis to do what it's doing under the law.

25      THE COURT:  All right.  Let's take these one element

C26TCAPA

```
 1   at a time.  So I'm happy to hear -- who is going to carry the

 2   ball for the defense, Mr. Rogers or Mr. Beckerman?

 3            MR. BECKERMAN:  I will.

 4            THE COURT:  Let's talk about irreparable harm.  If

 5   they win, as they seem confident they're going to, are you

 6   going to be -- is there any prospect of your client having any

 7   assets from which to pay a money judgment?

 8            MR. BECKERMAN:  I haven't asked them that.

 9            THE COURT:  All right.  Why not?  You don't want to

10   know the answer or you don't think it's relevant?

11            MR. BECKERMAN:  The question is whether the plaintiff

12   will be made whole of an award by money judgment.  And I have

13   asked them -- we put in our papers that they keep very careful

14   records of every single transaction, so there won't be any

15   problem in computing the amount of damages.

16            THE COURT:  But that's not my question.  My question

17   is, assuming you're right about quantifying the damages, if

18   there's going to be any prospect of them recovering on the

19   damages.  Because if the answer is "not a chance," it seems to

20   me that might be pretty significant for establishing

21   irreparable harm.  Don't you think?

22            MR. BECKERMAN:  I have no idea.  The plaintiff has the

23   burden of proving that and hasn't shown that.  If that were to

24   be a basis for preliminary injunction, then why even come to

25   court when you're a small company that doesn't have the kind of
```

C26TCAPA

```
 1    money the plaintiff does?

 2              THE COURT:  It's not --

 3              MR. BECKERMAN:  What is interesting is everything that

 4    Mr. Mandel is saying is based on his statements that we

 5    obviously don't have a defensible legal model.  But yet, if it

 6    were so clear we didn't have a defensible legal model, it's

 7    unclear to me why he hasn't been able to make out a case of

 8    copyright infringement.

 9              THE COURT:  I'm not sure that I follow you.  We keep

10    moving from the element I want to focus on.  But what are you

11    talking about that he hasn't made out a case?

12              MR. BECKERMAN:  He brings up in the discussion of

13    irreparable harm that we have an indefensible legal model, but

14    he hasn't been able to show any instance of copyright

15    infringement.  There isn't any part of our process that

16    infringes anyone's copyrights.

17              And his papers are a moving target.  They say -- they

18    keep attacking uploads without their permission and downloads

19    without their permission, then saying they're not attacking the

20    uploads and downloads, they're attacking the sale.

21              THE COURT:  I don't think that's a fair

22    characterization of his papers.  I think he's saying the

23    uploading and downloading that you seem to concede in your

24    papers require the kind of copying that the Copyright Act

25    prohibits.
```

C26TCAPA

```
 1              That's your point, right, Mr. Mandel?

 2              MR. MANDEL:  Yes, your Honor.

 3              THE COURT:  So that's what he's saying.  Whether he is

 4      right is another story, but that's what he's saying.

 5              MR. BECKERMAN:  The uploading and downloading are --

 6      if they did not have all the verification technology, it will

 7      still be protected as a fair use.  Uploading to a cloud and

 8      downloading is a quintessential fair use.  And they claimed --

 9      after Google raised that concern, they claim they're not

10      raising that issue, even though they repeatedly state in their

11      motion papers that they repeatedly attacked the uploads and

12      downloads.

13              Now then on the site itself they falsely claim that

14      there's a copy made, but there is no copy made.  The sale

15      transaction which take place is done without copying, it's done

16      with the exact file that's uploaded.  The record locator is

17      simply pointed one, the sale transaction takes place, and the

18      concomitant transaction, the actual file stays exactly where it

19      is, it is not changed, and it is not copied, it's simply owned

20      by someone else.

21              THE COURT:  Well, what you said, page 9 of your

22      opposition brief, the only copying which takes place in the

23      ReDigi service occurs when a user uploads user files to the

24      ReDigi cloud, thereby storing copies thereof in the user's

25      personal Cloud locker, thereby placing copies of files on his
```

C26TCAPA

1        or her computer.

2                MR. BECKERMAN:  It's a single file, unique file.  It's

3        the same unique file, cannot be uploaded twice.  Plus, it is

4        not even permitted to be maintained on the user's computer on

5        attached devices.  The software requires it.  So there's a

6        single instance of a file, and after that single instance is in

7        their cloud locker and has passed all the verification tests,

8        at the client level and then at the sever level, then it's

9        something which is accepted into the cloud locker.

10               THE COURT:  All right.  Again, I want to stay focused

11       for now on the irreparable harm.

12               So you're not sure whether your client has the ability

13       to pay a money judgment because you haven't asked.  But you're

14       suggesting it's plaintiff's burden, and they haven't proven

15       that your client can't.  Right?  That's your basic argument for

16       irreparable harm.

17               MR. BECKERMAN:  I have not asked any client whether,

18       if the plaintiffs were to get a large money judgment, whether

19       they will be able to pay it or not.  I have collected judgments

20       in many cases where the defendant did not have money to pay a

21       judgment, but nevertheless assets or income or other items were

22       found.

23               THE COURT:  But you don't know one way or the other.

24               With respect to the argument that there are other

25       harms that result that can't be compensated for by a money

C26TCAPA

1   judgment, your response to that?

2           MR. BECKERMAN:  What are they?  There's absolutely

3   nothing.  This is just about money.  It's just about the desire

4   to suppress competition.  It's got -- there's nothing in their

5   papers about anything but money.  The shareholders of Capitol

6   Records are going to go to bed crying at night?  It's absurd.

7   Capitol Records will go out of business?  It's ridiculous.

8           THE COURT:  I don't think that's the suggestion.  I

9   don't think anybody suggested Capitol Records is going to go

10  out of business.  I think the concern is whether or not they

11  will be able to collect on a money judgment or whether there is

12  a violation of the Copyright Act that can't be otherwise

13  compensated for.

14          MR. BECKERMAN:  Which they have shown none, no

15  violation of the Copyright Act.  They have made up facts which,

16  if they were true, would be copyright violations, but they're

17  non-existent facts they made up.  Many of them were facts they

18  themselves could easily verify but they chose not to and put in

19  no evidence by an investigator or anyone like that who would

20  claim to have witnessed the contract infringement.  Instead,

21  they have two declarations of attorneys based on peeking at the

22  Web site.

23          THE COURT:  All right.  You indicate and you have an

24  affidavit to that effect, that your client keeps track of every

25  sale they make, and so it's very easy to ascertain the number

C26TCAPA

1     of sales.

2              MR. BECKERMAN:  That's correct, your Honor.

3              THE COURT:  No question about that in your mind,

4     right?

5              MR. BECKERMAN:  There is no question about that.

6              THE COURT:  OK.

7              MR. BECKERMAN:  And they keep records of other things,

8     too.  They keep records of every single unique file that passes

9     through.

10             THE COURT:  Every unique file that passes through,

11    what does that mean?

12             MR. BECKERMAN:  Every file that passes through the

13    marketplace.  So not only is there a record of the buying count

14    and selling count, there's also a record of the exact file,

15    because their software is designed to ensure that that file

16    never gets sold there again except by the authorized -- the

17    true owner.

18             THE COURT:  Well, all right.  I think we're drifting

19    into a different element.

20             With respect to irreparable harm, I think you said

21    what you plan to say, right?

22             MR. BECKERMAN:  Yes, your Honor.

23             THE COURT:  Is there anything that you want to say in

24    response?

25             MR. MANDEL:  Very quickly, your Honor.

C26TCAPA

1          First of all, with respect to precedent, *Salinger*

2    itself talks about marketplace confusion, so there is some

3    precedent.  That language actually appears in *Salinger*, which

4    is a copyright case.

5          THE COURT:  But that's the confusion that somebody

6    will think JD Salinger wrote the darn thing when it is Norah

7    Jones that recorded the album.

8          MR. MANDEL:  There's a recognition there can be other

9    types of confusion that take place in a copyright context that

10   could bear on whether it's irreparable harm or not.  That's not

11   traditionally a copyright interest, the idea of who wrote the

12   work is really more in the nature of a trademark kind of

13   injury, but yet in the copyright context they find that's

14   potentially irreparable harm, irreparable injury.  It may be

15   somewhat new, because there frankly isn't a lot of law that

16   employs *Salinger* and looked at what a copyright owner has to

17   show, but it's not as if there is no idea for the support that

18   that type of injury, that could be irreparable harm.

19         THE COURT:  But the injury that you are talking about

20   is the same injury that flows from them defending this suit,

21   right?  You're saying that's a dangerous thing to be saying

22   this is legal.  Whether they say it on their Web site or say it

23   in their answer, that is going to perhaps embolden or mislead

24   someone to violate copyright law.  That strikes me as nutty,

25   for irreparable harm, for defending the suit or bringing --

C26TCAPA

1          MR. MANDEL:  Obviously if your Honor didn't find it

2     likely to establish success on the merits, that wouldn't be the

3     case, but I think that we'll obviously talk about that.  But I

4     think once you look at it and make a determination it is likely

5     that we're going to succeed on the merits, I don't think it's

6     crazy at all that somebody should be able to encourage people

7     to infringe by engaging in a model that finds no statutory

8     support and that is unlikely to ever be successful in a

9     courtroom.

10          THE COURT:  It seems to me this is really an argument

11     that likelihood of success on the merits equals irreparable

12     harm, when has already been rejected.

13          MR. MANDEL:  But the other point on irreparable harm

14     in terms of monetary -- whether they could satisfy a judgment,

15     obviously it's difficult for us to satisfy that burden going in

16     without any discovery, without an opportunity to know how the

17     copy is capitalized.  And now Mr. Beckerman is saying today "I

18     didn't ask," so he's not in a position to make any

19     representations to the Court.

20          We would suggest that if that really needs to be

21     shown, that maybe we be given an opportunity for some expedited

22     discovery to find out exactly what the level of capitalization

23     here is and what the likelihood is that they really are going

24     to be able to satisfy a potential substantial judgment.  If

25     that is something -- that's something we couldn't obviously in

C26TCAPA

1    our moving papers at this juncture possibly have met the burden

2    on, but there's enough suggestion just in the response

3    saying -- and I think their quote in The New York Times, "If we

4    can't do this, we're out of business," the idea that they will

5    leave money around to satisfy a big judgment I think is a lot

6    for us to take at face value.  So we would like an opportunity

7    maybe to have some expedited discovery on that point.

8         THE COURT:  But it seems to me that since this is the

9    service they provide, to be enjoined from providing this

10   service would almost by definition put them out of business,

11   wouldn't it?  It's not like they make colas and record players

12   and airplane engines as well so that business continues.

13        MR. MANDEL:  They have told us they do storage.  They

14   tried to make the whole defense be about storage.  So

15   presumably they could still do that.  But beyond that, this

16   motion only deals with Capitol's recordings, it's not going to

17   enjoin them from selling the other labels' recordings.  And

18   what the other labels decide to do or what deals they may or

19   may not be able to strike with the other labels is entirely

20   open.  But it's certainly not the case by not being able to

21   distribute Capitol's recordings they're out of business.

22   They're out of the business of during the pendency of this

23   trial, until trial, of distributing Capitol's recordings.  So

24   it is more limited.

25        THE COURT:  OK.  So irreparable harm, I think I have

C26TCAPA

1    heard what I'm going to hear.

2            Let's now talk about likelihood of success on the

3    merits, which is what I think everybody really wants to talk

4    about.

5            MR. MANDEL:  In terms of likelihood of success, first

6    of all, as your Honor pointed to, we think the admission at

7    page 9 of their brief that basically copying take place to

8    upload to the cloud and download to the locker is really almost

9    dispositive here.  It's an admission there is an act of

10   reproduction.  That is in violation certainly of the prima

11   facie right of the copyright owner under 106 to have exclusive

12   rights and not to have others reproduce it.  And the question

13   becomes:  Is there some defense that would allow that

14   reproduction to take place?

15           THE COURT:  They have offered two, fair use of

16   essential step doctrine.

17           MR. MANDEL:  But when you actually look at the

18   argument on them, they're arguing defending a case that we

19   never brought.  This case was brought because there's an online

20   supposed resale market for digital music, and that's what

21   sparked the complaint, and that's what we thought we made clear

22   in our papers.  To the extent there was any confusion, I think

23   in our reply papers we certainly made it clear beyond question

24   as to what the nature of the injury that we're talking about

25   here is.  So the question is:  Is there a defense?  And when

C26TCAPA

1   you look at fair use, their whole defense on fair use basically

2   presupposes that we're challenging just the mere act of

3   storage.

4           THE COURT:  That's my question to you.  So if someone

5   just decided to store digital recordings that they purchased

6   through iTunes, they wanted to store it in a cloud, that

7   requires copying, according to your papers.  Right?

8           MR. MANDEL:  Yes.  And that's not what we're

9   challenging here.

10          THE COURT:  But why not?  So what is the difference

11  between what is going on here that you are challenging and the

12  hypothetical I just supposed?

13          MR. MANDEL:  Because what is really going on, what

14  their entire Web site talks about, their Facebook page,

15  everything, is a resale market, the ability not to store it,

16  but to sell it.  It's stored in the cloud for the purpose of

17  resale.

18          THE COURT:  But well, it's stored in the cloud, and

19  the process of storage requires a copying.  And that process

20  you're saying -- I think you're conceding is not a violation of

21  the Copyright Act.

22          MR. MANDEL:  For purposes of this case, we're not

23  making that claim.  We're not challenging that.  What we're

24  saying is that you can't subdivide what they're doing.  And

25  they're really saying essentially user A starts out, and he can

C26TCAPA

1    start the copy.  So his is fair use.  User B, who bought the

2    file, they can download it because they're taking it from the

3    cloud to their computer.  But at the end of the day, what has

4    really happened is that file has been distributed, has been

5    transmitted from the first user to the second.

6          THE COURT:  No question.  So I have my little iPod

7    player right here and I have all the great Bee Gees hits, and I

8    decided I'm moving out of the '70s and want to get progressive,

9    so I sell to my law clerk my iPod with all my favorite Bee Gees

10   songs.

11         MR. MANDEL:  That's fine, because you transferred the

12   material object in which the copies are affixed, and that would

13   be a first sale.  And you're not making another copy, you're

14   giving them -- your iPod happens to be preloaded with sound

15   recordings, and that's fine.

16         THE COURT:  But now I'm more technically advanced, so

17   I have it actually stored in a cloud that allows me to listen

18   to the same great numbers through just through different

19   technology, but you're saying I can't transfer any of those

20   wonderful songs to her.

21         MR. MANDEL:  That's correct, and that's the statutory

22   scheme.  And it's really because the first sale doctrine is

23   based on the notion of the actual copy, you can't make a

24   reproduction.

25         THE COURT:  And that's a statutory language question,

C26TCAPA

1  or is it a licensing contractual question?

2          MR. MANDEL:  It's interpretation.  We cite to the

3  Copyright Office Report of 2001, which we think has some very

4  interesting discussion of this whole issue.  And if you look at

5  the origins, it set out a very clear distinction between

6  reproduction and distribution, and the idea was there's a

7  recognition that physical property, that you have a right

8  generally to dispose of that, but not to reproduce it and

9  dispose of a copy.

10          And so it's not just a technical distinction, it is a

11  distinction on which the entire doctrine turns.  And basically,

12  what we're saying about the reproduction is you can't stand

13  there and pretend that the reproduction is just about space

14  shifting if the whole purpose that you're encouraging and the

15  whole business model that you developed is focused on idea of

16  selling that recording.

17          THE COURT:  But what if I stored it in the cloud when

18  I still liked Bee Gee's and decided to sell it later when I

19  decided I don't and I want to recoup some of the investment,

20  you're saying that's violation?

21          MR. MANDEL:  And their technology talks about actually

22  checking something that makes it available for resale, so I

23  think users have the opportunity to actually use their

24  technology, decide when they're offering it for resale.  And

25  we're saying certainly the point that you do that, you can't

C26TCAPA

1    really say anymore it's just about storage because what you're

2    doing is you're distributing it.

3        THE COURT:  But it was about storage at the time I

4    copied it into the cloud, right?  It is a hypothetical.

5        MR. MANDEL:  Hypothetically it could have been about

6    that, but if you look at the business model --

7        THE COURT:  This is -- indulge me on my hypothetical.

8    Are you saying the outcome is different in if I chose to store

9    these things, in fact did store them for my own use for a year,

10   and after a year I decided to move to a new decade and sell my

11   collection?

12       MR. MANDEL:  I think it is different, and the reason

13   it's different is maybe it will be the case that Congress will

14   decide that there's enough reliability in the technology that

15   they have developed and that others may develop that they're

16   willing to extend the first sale doctrine in a way that it can

17   apply in this digital environment and someone can have a

18   broader right to distribute it, but it's not there now.

19       THE COURT:  So that's my point.  My point is you're

20   saying the statutory language is where I ought to go and where

21   I ought to stop, because the statutory language would prohibit

22   what going is on here, even though if I had the CDs or the

23   iPod, I could go to the flea market and sell the darn thing.

24       MR. MANDEL:  That's right.  We say the statutory

25   language, but also the history of the first sale, it's the

C26TCAPA

1    clear interpretation of first sale that says that you can't

2    make a copy in the context of first sale.  All those things

3    together, which the copyright office was looking when they

4    opined on the question, all together saying to us maybe someday

5    maybe there should be a new digital right.  They haven't done

6    that now, and under existing law there is certainly not that

7    right.

8            THE COURT:  What about your response to the opposition

9    brief which talks about pointers, sometimes like in some ways

10   the language being utilized in the technology being described

11   to differ between the parties so they're almost talking past

12   each other, so talking about a pointer, we're not copying,

13   we're allowing somebody else to, in essence, have the click

14   rights to something that is in the cloud?

15           MR. MANDEL:  I think once again what they try do is

16   break this process down and then OK, pointer, so there's no

17   copying made, so it's just space shifting here, just space

18   shifting here.  But as we said in our reply papers, it shifted

19   from one user to another.

20           THE COURT:  But that happens in flea markets all the

21   time, and that's a time honored right.  But if we're

22   interpreting a statute that predates the technology, why would

23   we interpret it in such a way as to prevent the first purchaser

24   from ever being able to have rights in that or the ability to

25   resell it?  Why would we take that away if we have two choices,

C26TCAPA

1    you get to make a sale like a flea market owner or --

2            MR. MANDEL:  I think in the first instance we would

3    say that decision would be for Congress to make.  I think the

4    Copyright Office went on after, it said there is no digital

5    first sale, it then analyzed should the Copyright Act be

6    amended to provide.  They decided -- their determination was

7    no, it shouldn't be.  But ultimately whether it should or

8    shouldn't be is a congressional question.  We say it doesn't

9    satisfy it right now, and right now I think that's a function

10   of the statutory language and history.

11           THE COURT:  I have the statute right here in front of

12   me.  What provision are you referring to?

13           MR. MANDEL:  Section 109.

14           THE COURT:  What part of it?

15           MR. MANDEL:  109(a), I believe it is, talks about the

16   right to -- let me take the statute.

17           Notwithstanding the provisions of 106(3), the owner of

18   a particular copy or phonorecord lawfully made under this title

19   is entitled, without the authority of the copyright owner, to

20   sell or otherwise dispose of the possession of that copy or

21   phonorecord.

22           So the whole idea of first sale I think is borne out

23   in all the cases that interpreted it, as well as that it's the

24   particular material object, and the example that your Honor

25   gave is really a good example that illustrated that.  If you

C26TCAPA

```
 1    have the iPod and you distribute the iPod the recordings are
 2    on, then you have distributed that particular copy.
 3            If you make a copy and then put it up somewhere else
 4    in order to distribute it, it isn't that particular copy
 5    anymore that you're distributing.  And that is basically the
 6    whole essence of the first sale doctrine is that it didn't
 7    include the right to reproduction any more than if I had a book
 8    or CD that I could photocopy, give the copy to my friend, and
 9    then decide I don't want this book anymore, I'm going to throw
10    the book in the garbage.  That wouldn't be covered by the first
11    sale doctrine, and neither is this.  It's logically no
12    different.
13            THE COURT:  But in terms on definition of copies, 101,
14    copies are material objects.
15            MR. MANDEL:  It turns on the definition of copies and
16    the notion of that particular copy, because what 109 is really
17    saying is that you have a right to dispose of the particular
18    copy if lawfully made.
19            And that's another issue.  We don't think it's
20    lawfully made because if the copy was made for the purpose of
21    distributing it, it's not lawfully made.  You don't have a
22    right to make a copy and distribute it to somebody else.  So
23    that's another problem under 109, and I think they try to
24    confuse this.  And I understand the hypotheticals are
25    interesting in terms of if I store it today and a year from now
```

C26TCAPA

1    I sell it, but the real marketplace model as presented and

2    promoted as going to make them money is not by a kind of

3    differentiation, it's about:  Hey, sell your digital music.

4    It's happening essentially together.  And that there may be

5    some people that decide to store it there and not sell, that's

6    not what the business model is about.  That's what

7    distinguishes them from any other places where they could store

8    them.  What distinguishes them is they're telling people you

9    should sell it because you could put it up there, you earn

10   credits to distribute it, you can sell it to somebody else.

11   And that's their business model, and it turns on reproduction,

12   which is not allowed under the cases and statute.

13           And also it's not a lawfully made copy because it's

14   not lawfully made.  If it's for purposes of distribution, you

15   don't have a right to copy a copyrighted work to distribute it

16   to somebody else, even if you decided to throw away your work.

17   That's my example with the book.  I could photocopy my book.  I

18   can't give the photocopy to my friend even if I throw my book

19   in the garbage.  And functionally, it may seem like I should be

20   able to do that.

21           THE COURT:  You can give the book.

22           MR. MANDEL:  I could give the book.

23           THE COURT:  And you could sell the book.

24           MR. MANDEL:  I could sell the book.

25           THE COURT:  Basically you're saying the technology

C26TCAPA

| | |
|---|---|
| 1 | created a real great windfall to publishers because they get to |
| 2 | shut down secondary markets that previously existed before |
| 3 | technology, right? |
| 4 | MR. MANDEL:  I don't think so, because I think if |
| 5 | you're going to get into the policy question, which I'm kind of |
| 6 | avoiding because what I'm saying is the statute speaks to this, |
| 7 | it's Congress's province to make those judgments.  But if you |
| 8 | want to look at the policy point of view, there is enormous |
| 9 | risk that the copyright owner is being subjected to here.  The |
| 10 | fact that it's the lead-in for my computer, what assurance do I |
| 11 | have that before I have done that I haven't downloaded it onto |
| 12 | some other device, that I don't reconnect that computer and I |
| 13 | listen to -- continue to listen to the music? |
| 14 | THE COURT:  But that aside, there's always been a |
| 15 | desire, frankly, to shoot down the swap meets and shut down the |
| 16 | secondary markets for CDs and records. |
| 17 | MR. MANDEL:  Because oftentimes that marketplace is |
| 18 | selling infringing copies and there's illegal bootleg copies. |
| 19 | Nobody is saying we want to shut down the right to an album, |
| 20 | legitimate CD that I purchased to resell, but not to make |
| 21 | copies and distribute en masse copies it.  That is something |
| 22 | that is a concern to the record company. |
| 23 | THE COURT:  So you're OK with people selling their old |
| 24 | records and selling their old CDs? |
| 25 | MR. MANDEL:  Absolutely. |

C26TCAPA

| | |
|---|---|
| 1 | THE COURT:  So if somebody like defendants come up |
| 2 | with a way to really verify that the copy has been deleted, you |
| 3 | would be OK with telling Congress, sure, we think that |
| 4 | previously owned, preowned digital audio files should be able |
| 5 | to be sold? |

      MR. MANDEL:  I can't speak to what my client would say in that legislative discussion.

      THE COURT:  I would be willing to take a hunch.

      MR. MANDEL:  But my point is they shouldn't have to take that gamble because, first of all, if the technology is proven to that extent, then Congress can enact that protection. We have a real question, because even Mr. Ossenmacher agrees in The Times article if people want to get around it, they will get around it.  That's obvious you can do that, you just download it to a different device not synced to the computer, and bingo, you have got around it.

      So it's cold comfort to say to my client, don't worry, this is all going to work great and nothing is going to happen, because we know that there's a long history here where people want to infringe.  We have seen a lot of case law, *Napster* and all these cases that have come up going to Supreme Court. There's a lot of effort to sell infringing copies, and asking my client against that backdrop and decades of litigation and experience to take it at face value that people are going to do the right thing, I don't think that's something that they have

C26TCAPA

1     to do, and certainly not something Congress said they have to

2     do.  If Congress makes that judgment, fine, but they haven't

3     made that judgment yet.

4              THE COURT:  But yours is a legal argument, and it's

5     not a licensing of contract argument, it's a statutory

6     interpretation argument.

7              MR. MANDEL:  I believe that's correct.

8              THE COURT:  So it doesn't turn on whether or not the

9     conditions of buying the audio file were such that the seller

10    made the buyer promise they won't resell.

11             MR. MANDEL:  I don't think that's really critical to

12    it, no.

13             And should I move on to the essential step doctrine?

14             THE COURT:  Yeah, let's do that, too.

15             MR. MANDEL:  So in terms of fair use, I want to say --

16    I won't go through it, but if you look at the four factors,

17    which they haven't briefed, all they cited is a case under the

18    digital recording act, not even a fair use case involving the

19    *MP3* case, and they haven't gone through the four factors.

20             We think the cases that looked, like the *MP3.com* and

21    *Napster* decision, when they analyzed fair use in the context of

22    what is really going on is basically copying to be able to

23    distribute digital files, they have really given this defense

24    short thrift, and we don't think it works here by pretending

25    the service is something other than what it is and redefining

C26TCAPA

1   it into component parts.  And fair use is an equitable

2   doctrine, it's a rule of reason.  It would be the wrong

3   approach for the Court to close its eyes to the reality of what

4   is taking place and do this kind of formalistic dissection

5   without really looking at the end result, so we think fair use

6   is not even colorable here.

7          In terms of the essential step, which is really the

8   other step that they assert in terms of reproduction, basically

9   in the first instance we don't even think this is a computer

10  program under the statutory definition, a set of instructions

11  to carry out a result.  But even if it is, the case law that we

12  cited is very clear that 117 of the Copyright Act is all about

13  internal use, and the statutory language there says for no

14  other purpose, it has to be essential to the use and for no

15  other purpose.

16         And the purpose here again is to make a distribution,

17  to be able to transmit to to somebody else.  That's the

18  quintessential example of what you can't do under 117.  Because

19  117 is a limited exception that recognizes when you buy a piece

20  of software, in order to use it, you have to technically make a

21  copy.  When I put it in my computer, by definition a copy is

22  made into my hard drive, if it didn't do that, I couldn't use

23  the program.

24         That really has no bearing on what is going on here,

25  where it's not essential to make the copy to use it, it's only

C26TCAPA

1    essential if you want to distribute it to somebody else, which

2    you have no legal right to do.  So the essential step under all

3    the cases that we cited clearly doesn't fall into protecting

4    this kind of use, and I don't believe they even cited a case to

5    the contrary.

6         So really the defenses I think are really weak on the

7    law.  When you really look at the case law, they have basically

8    nothing.  They're arguing a lot of policy but neither fair use

9    or essential step work here, and in the end, what we're left

10   with is that they are wishing that there were a right to do

11   something that they don't have a right to do under the law.

12        THE COURT:  All right.  But for essential step, I mean

13   you just conceded, I think, that making a copy is necessary to

14   be able to access and listen to the audio file you purchased,

15   right?

16        MR. MANDEL:  Yes.

17        THE COURT:  So if you have -- I have twins girls, if

18   one of them buys the Bee Gees and the other buys the Beatles

19   and says great, we'll share, we have got one computer, we'll

20   just share and each listen to the other's purchased files, is

21   that a violation then of the copyright law?

22        MR. MANDEL:  No, because it's the same computer and

23   they have each downloaded a particular file that they're

24   listening to.  You can play anything that you want on your

25   computer.  The language of 117 says it's essential to the use

C26TCAPA

1    and for no other purpose, and the case law is very clear when

2    it talks about "for no other purpose" is for internal use, not

3    for an ability to make distributions.

4              THE COURT:  But if the enterprising one to says the

5    lazy one, "I will charge you five bucks and you can listen to

6    the Bee Gees," is she all the sudden going to show up in a

7    copyright case?

8              MR. MANDEL:  I think there's a lot of hypothetical

9    examples, but what is going on, the marketplace reality is

10   about setting up a mechanism by which people can sell to anyone

11   out there in the world.  And I don't think we're concerned

12   about your sister or anything like that.  And in that case, I

13   don't think that anybody is transmitting it to another computer

14   anyway, if they're using the same computer.

15             So the real question is when you set up a business

16   model that is based on distribution and reproduction, how does

17   that fall within 117?  And it clearly doesn't.  And we don't

18   think it's a computer program, but if it is under the case law,

19   it is clear under the statutory language that it is not

20   protected by the essential step doctrine.

21             I don't know if you want me to move on to other than

22   reproduction.  We have kind of talked about distribution.

23             THE COURT:  Covers the arts, that sort of thing?

24             MR. MANDEL:  I meant distribution I think we have

25   already touched upon, so we have talked about reproduction and

C26TCAPA

1    distribution.

2          The only point I want to make on distribution that we

3    didn't cover, we talked about the defense of first sale, but

4    didn't talk about the question of whether it's actually a

5    distribution.  They seem to say well, it's not a distribution

6    because you're not distributing copies.  And we think if you

7    look at the precedents, basically they made clear courts have

8    not hesitated to say when you transmit electronic files that is

9    a distribution.  In fact, the Supreme Court in *Tasini* said the

10   sale of copyrighted articles through LexisNexis is a

11   distribution.

12         And as practical matter, if you look at the

13   consequences of that, it would be devastating, it would be open

14   season on copyrighted works if you essentially were saying put

15   it up on the internet, transmit to anyone you want, you're not

16   distributing.  That can't be right, and courts had no trouble

17   saying that's not right, there is a violation of distribution

18   right under the precedents.

19         What they try and say is well, if there's a violation

20   of distribution rights, there must be a first sale defense.

21   But that's not the case, because the point is the first sale

22   talks about that particular copy, and that material object is

23   not what is being sold, there's a reproduction there.

24         THE COURT:  That's your point about material versus a

25   non-material copy.

C26TCAPA

1          MR. MANDEL:  Correct.  And I don't know if you want me

2     to briefly address performance and display as well.

3          THE COURT:  I think I get it from the papers.

4          MR. MANDEL:  I don't think that I need to say much

5     more.  I think I said in my reply papers, again, the cases talk

6     very clearly about streaming clips to people who are interested

7     purchasers.  That's what their tutorial says on the Web site

8     they do.  That is not the same as going to my locker and

9     stream.  That would not be a public performance, and we didn't

10    challenge that.  So again, we're talking at cross purposes.

11    We're not addressing the same thing.

12         THE COURT:  So a link you have no trouble with.

13         MR. MANDEL:  I think what I'm saying is that the

14    individual person in their locker who may own a file we are not

15    challenging their right to play it, but what we're saying is

16    when you stream to interested purchasers anything in these

17    clips for the purpose of enticing them to make a purchase

18    that's not legally authorized in the first place, that is a

19    violation.  That is a public performance.

20         THE COURT:  All right.  But again, let's get back to

21    my analogue world of my Bee Gees recordings CD.  If I went a

22    flea market and allowed people to listen to my recording, CD,

23    before purchasing, is that a violation?  Is that a performance?

24         MR. MANDEL:  Is that a public performance?  That might

25    be if you're playing it in a public setting.

C26TCAPA

1          THE COURT:  I have a CD player right there with a set

2     of headphones to listen to see if it's damaged or not damaged

3     or see if the --

4          MR. MANDEL:  It's certainly not what is going on in

5     this case, I think.

6          THE COURT:  But why not?  It seems to me that to

7     perform a work means to recite, render, play, dance or act it,

8     directly or by means of any device or process.

9          MR. MANDEL:  It may be that that's a public

10    performance, and maybe we could get into an argument whether

11    that's a fair use purpose of legitimate sale.  The truth is,

12    here it's not.

13         THE COURT:  Here it would be furtherance of a sale.

14         MR. MANDEL:  Not an authorized sale for all the

15    reasons we already discussed.

16         THE COURT:  So it comes back to, I think, your

17    interpretation of the Copyright Act and --

18         MR. MANDEL:  It's connected to that.  And I think they

19    rely on a license that says that you can't use their clips for

20    purposes of encouraging infringement, which is exactly what we

21    say is going on here because they're doing it to interest

22    people and make purchases that are not legally permitted.

23         The last point to round out liability, just to briefly

24    mention the DMCA, I think they make a half-hearted defense

25    here, but they don't even really say that they fall under the

C26TCAPA

1    requirements of the statute, they just say our notice was

2    defective.  Of course, there's no requirement that you even

3    give a notice, so it's kind of -- I don't understand their

4    argument.

5            There are three things they're required to show that.

6    They haven't attempted to show that they can satisfy all three

7    of those things to claim a DMCA immunity.  And clearly and most

8    directly, they can't establish that they don't have a right and

9    ability to control, and that they don't profit from the

10   infringing activity because they take a piece of every sale.

11   That's a direct financial benefit.  And they said they have a

12   right and ability to control, because that's the whole purpose

13   of their verification engine is to decide prescreen whether it

14   will be offered or not.

15           The problem with their verification is it's based on

16   an erroneous legal principal that seems to assume they're

17   entitled to make a distribution they're not entitled to make,

18   but they clearly have the ability to control it, by their own

19   admission, and clearly financially benefit.  And perhaps for

20   that reason they haven't even argued that they fall within the

21   DMCA immunity in their papers, and they don't under the clear

22   language of the statute.

23           So that's all I have to say on likelihood of success

24   on merits.

25           THE COURT:  OK.  Mr. Beckerman.

C26TCAPA

1          MR. BECKERMAN:  Your Honor, could I start off by

2     addressing a hypothetical?  Because I want to make sure that

3     the hypothetical that you asked Mr. Mandel --

4          THE COURT:  I don't know why she likes the Bee Gees,

5     she just likes them.  Why do you like them so much?

6          MR. BECKERMAN:  The hypothetical that your Honor

7     addressed to Mr. Mandel about in the flea market letting people

8     listen to it.  That can't go on.  No one can listen to what's

9     in the cloud locker except the user, and it would have to --

10          THE COURT:  But you indicated it's a link to some

11     other authorized site.

12          MR. BECKERMAN:  There are links to the download site

13     with the 30 second clips like they have on iTunes where you

14     sample it.

15          THE COURT:  But who authorized it?

16          MR. BECKERMAN:  Well, this is licensed by Ridio, and

17     Ridio is a licensee of plaintiff.  And we don't stream anything

18     there, we just have the links to audio under our license with

19     Ridio.  Similarly, the artwork is just links that are provided

20     by Ridio pursuant to the license agreement pursuant to their

21     agreement with plaintiff.

22          So I just want to make that clear that that's the only

23     public streaming that goes on, and it's pursuant to license.

24     And it's not on the site at all.

25          THE COURT:  It's not on the site.  It's not in the

C26TCAPA

 1    cloud, you mean?

 2            MR. BECKERMAN:  It's not on the ReDigi cloud at all,

 3    it's just linked.

 4            THE COURT:  I understand that from the papers, which

 5    is why I think that's kind of beside the point.  Did you not

 6    understand that, Mr. Mandel, or was that your understanding as

 7    well?

 8            MR. MANDEL:  That's my understanding of what they have

 9    said.

10            THE COURT:  You're not sure it's true.

11            MR. BECKERMAN:  It wasn't clear to me why Mr. Mandel

12    keeps talking about fair use and essential step, because we

13    only recognized those in connection with the upload and

14    downloading of the storage locker, which he doesn't challenge.

15    He's only challenging the -- we never said the fair use

16    doctrine or the essential step defense has any bearing on the

17    used digital marketplace.  The used digital marketplace is

18    completely lawful for completely other reasons.  It doesn't

19    involve any kind of copying.

20            THE COURT:  Well, let me stop you there.  What you're

21    saying is there's copying done to get the audio file in the

22    cloud, but there's no copying after that.

23            MR. BECKERMAN:  No copying on the site at all.  The

24    upload and the download --

25            THE COURT:  I'm not sure that's a distinction that

C26TCAPA

 1 necessarily matters, no copying on the site, but if you're

 2 enabling or assisting someone else in copying someplace else,

 3 then you could be held liable for the infringement, right?  At

 4 least conceivably.

 5          MR. BECKERMAN:  I will just concede the uploading and

 6 downloading is copying, but arguably it's not even a copy under

 7 *Cartoon Network*, but I won't -- I'm not making that point.

 8          THE COURT:  But just so I'm clear, because in using

 9 Bee Gee's analogies, my technology may be as dated as my

10 musical tastes, but you're conceding copying is necessary to

11 upload into the cloud and copying is also necessary for the

12 purchaser to listen, right?

13          MR. BECKERMAN:  For the purchaser, the purchaser after

14 he purchased it?

15          THE COURT:  Yeah.  Is there a copying that is

16 necessary after that or not?

17          MR. BECKERMAN:  There will be a copy in RAM, no doubt.

18          THE COURT:  OK.

19          MR. BECKERMAN:  But the actual sale transaction

20 involves no copying.  And Mr. Mandel has falsely stated --

21 well, the papers falsely allege in a number of places that

22 there are copies floating around on the site, which is

23 completely false.  And the sale is effective without any

24 copying whatsoever, it's just a change in the record locator.

25 And there are various grounds, neither of which is fair use or

C26TCAPA

1    essential step, for a finding that to be lawful.  The Court

2    could find it on alternative grounds, either that under the

3    distribution section, 106, the MP3 files are not material

4    objects, as plaintiffs themselves concede in their papers, or

5    your Honor could say well, even if they were material objects,

6    well, the definition is exactly the same for the first sale

7    exception.

8          So in this particular case I don't even need to decide

9    the material objects in question, because in this particular

10   case I have a very clear application of the first sale

11   doctrine, because this particular copy has changed ownership

12   without any reproductions being made.  So it clearly fits

13   within the first sale doctrine.

14         THE COURT:  Well, I mean I think what you're arguing

15   is it's sort of a tandem application of essential step and fair

16   use, right?

17         MR. BECKERMAN:  No, they have nothing to do with the

18   sale.

19         THE COURT:  Well, the copying is necessary to get into

20   the cloud all together, right, and so what Mr. Mandel is saying

21   as long as it's for one's own personal use, that's OK, but if

22   it's going really for the purpose of a distribution, that's not

23   OK.

24         MR. BECKERMAN:  Well, purposes are going to be

25   individual to every person.  Like with the Bee Gees, you decide

C26TCAPA

1    you wanted to move into the modern age, you put them there, you

2    were thinking you don't want these cluttering up your computer

3    any more, you played a few just for the heck of it to see if it

4    works and say, you know, you maybe I acted too hasty, and you

5    store them there for a year and then you decided to take them

6    back.  Mr. Mandel is trying to ask you to disregard what

7    actually happens.  The actual physical event that is occurring,

8    he's asking you to avoid -- to pay no attention to that

9    technology, disregard that.

10            THE COURT:  I think there may be a dispute to what the

11   technology is, which I think is foreshadowing what we're going

12   to be talking about with your contemplated motion for summary

13   judgment, because maybe there's some factual disputes that have

14   to be resolved first.

15            MR. BECKERMAN:  There has to be some evidence on this

16   side and some evidence on that side.  There can't be some

17   evidence on this side and some lawyer speculating as to what he

18   thinks may be going on.

19            THE COURT:  We haven't had any discovery, so there's

20   no evidence on any side at this point.

21            MR. BECKERMAN:  He should not have brought a lawsuit

22   without evidence of a copyright infringement.  If there were a

23   copyright infringement, it would have been a small matter for

24   an investigator to open up an account -- and this is what they

25   do all the time, in fact they probably did.  I think it is

44

C26TCAPA

1   interesting they made a preliminary injunction motion and there

2   was no investigation.  But maybe there was a investigator and

3   they didn't like the information he brought back to them.  How

4   could you bring a lawsuit without an investigator?

5          If the investigator could show that some law was being

6   violated, that a copy was being made, contrary to what we said,

7   if he could show there is public performance or if he could

8   show there was unlawful copies littering the place -- the

9   likely claim is it is completely fabricated by the attorneys --

10  where is that evidence?  There has to be some threshold for

11  bringing a lawsuit instead of terrorizing people in the first

12  place.

13         THE COURT:  I think we're getting ahead of ourselves

14  here.  I was suggesting that the summary judgment motion seems

15  to be premature because we have had no discovery at all, and at

16  this stage of a case, nobody is expected to be basically

17  attaching affidavits and asking the Court to resolve disputed

18  issues of fact.

19         MR. BECKERMAN:  I have a very strict policy, if Court

20  tells me a motion is premature, I don't make it.

21         THE COURT:  But right now we're talking about the

22  preliminary injunction motion, and it seems to me what

23  Mr. Mandel is saying is that there is a copying, and it's

24  copying for the purpose of a sale.  And you're suggesting there

25  is a copying, but it's a necessary first step for the purchaser

C26TCAPA

1   to listen, but the sale itself doesn't involve any copying.

2   That's really what -- I think each of is characterizing what

3   goes on here slightly differently.  It also happens to coincide

4   with legal theories, not surprisingly, perhaps.

5              But what Mr. Mandel said a moment ago is if you had a

6   book and you made copies in the book for your own use, that

7   would be one thing, but if you sold the photocopies of the book

8   to somebody else, that would be an infringement.  Do you agree

9   with that?

10             MR. BECKERMAN:  If you sold copies of the book, that

11  would be an infringement.

12             THE COURT:  Right.  So I think it's --

13             MR. BECKERMAN:  I wasn't sure if it's OK to make --

14             THE COURT:  I said it's a matter of which analogy one

15  chooses for this different and unique technology.

16             MR. BECKERMAN:  We're not selling a copy of the file,

17  we're selling the actual file.

18             THE COURT:  I think what you're suggesting is you're

19  selling access to a file, right, that's in a cloud, and the

20  process of putting it in the cloud is an essential step for the

21  user.  The first user and the process of accessing it in the

22  cloud, which might entail a copy, is a necessary step for the

23  purchaser to listen, but they're essential.  Is that really

24  what you're arguing?

25             MR. BECKERMAN:  We don't access a separate thing, we

C26TCAPA

1   sell title.  One of the reasons that we started out this

2   business model with iTunes is because iTunes sells the title to

3   the MP3.

4           THE COURT:  But if I had a whole bunch of books in my

5   library and I decided who needs this, I could hang stuff on my

6   walls if I didn't have these book cases, so I'm going digitize

7   every book in my library and I could put it in the cloud, are

8   you suggesting that I could never sell those books, the digital

9   versions of those books to someone else?

10          MR. BECKERMAN:  No.

11          THE COURT:  No?  Why not?  What's the difference?

12          MR. BECKERMAN:  Well, in this case, we have gone --

13  we're doing something which is lawful and which they don't

14  challenge, which is enable people to store it.

15          Secondly, we have --

16          THE COURT:  But can I interrupt you?  Are you

17  suggesting that the first step of digitizing my books and

18  storing in a cloud would in of itself be a violation of

19  Copyright Act, for my own use?

20          MR. BECKERMAN:  I'm not aware of a precedent for it,

21  but I would imagine it would probably be a fair use just like

22  the fair use of an MP3 file.

23          THE COURT:  But you're suggesting selling it from the

24  cloud would be an infringement, right?

25          MR. BECKERMAN:  Well, you still have the book in your

C26TCAPA

 1  book case.

 2          THE COURT:  I have got rid of all the books.

 3          MR. BECKERMAN:  Well, a ReDigi user --

 4          THE COURT:  I had a bonfire.

 5          MR. BECKERMAN:  Well, you had it.

 6          THE COURT:  I had digitized all my books, put them in

 7  my cloud, and then burned all my books and put up paneling so I

 8  didn't need the book cases.  Are you saying -- you're not

 9  disputing that I could go look at my digital books without

10  violating the Copyright Act, right?  You're saying I can do

11  that?  You think about that.

12          Mr. Mandel, can I do that?

13          MR. MANDEL:  No.

14          THE COURT:  You're saying I can't do that.  But I

15  could make photocopies and leave them -- I could make a copy of

16  the chapters or things that I want to use for my term paper.

17          MR. MANDEL:  I don't think there's a case that

18  actually addressed it.  I think you would have to look

19  factually at each situation.  Arguably it would be a fair use

20  if you were making the copies for your own personal use.

21          THE COURT:  Yeah, my own personal use.

22          Do you know what real estate costs in Manhattan?  I

23  don't want books all over the place.

24          MR. MANDEL:  I think the problem here -- I don't think

25  we actually do have a factual dispute.  Their papers

C26TCAPA

1  acknowledge that a copy is made.  What I really don't

2  understand is there is no copying in the resale, but you

3  couldn't have a resale without the copy.  That's the point.

4  There would be no marketplace.  There would be no possible

5  resale but for the copy, because you wouldn't be able to take

6  the pointer and point it from A to B.  So it seems to me to be

7  a very formalistic and not appropriate way to look at it,

8  particularly where you've gone out and marketed your whole

9  service as being based on a marketplace, that's how you make

10  your money, you take a cut of sales.

11        Now for legal purposes, we're saying it's just

12  storage, I'm just storing it, and there's no copying.  Well, if

13  there's no copying, you wouldn't be able to have a marketplace.

14  Of course there's copying.  We don't think fair use or any of

15  these defenses you can look at in that kind of isolated way

16  where you don't actually look at what is happening.

17        On these facts before the Court, based on what

18  defendant has done and how the marketplace is set up, how it's

19  trying to make money, clearly the copying is being done for an

20  improper purpose.  And they're trying to kind of put themselves

21  in some other clothing because maybe that would be a fair use,

22  but that's not what we have here.

23        THE COURT:  I'm curious about the consistent

24  application of law in different hypotheticals.  It's certainly

25  instructive for me.  So I know you don't want to indulge me in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C26TCAPA

```
 1    these, but it seems to me if a pure storage cloud marketed
 2    itself for that purpose to a user who has got scads of digital
 3    recordings, then that user were to try and they bequeath their
 4    access to their files to somebody else, could they do that?
 5          MR. MANDEL:  I don't know.  I would have to think
 6    about that.
 7          THE COURT:  Well, we're on Mr. Beckerman's time now
 8    anyway, so I wanted to give him a chance to think about my
 9    hypothetical.
10          MR. BECKERMAN:  I'm not a hundred percent sure that
11    digitization of a book is -- I don't know that it's not a
12    violation of reproduction right.  I really am just not up to
13    speed on that issue.
14          THE COURT:  OK.
15          MR. BECKERMAN:  I don't know.  The difference between
16    a book and these iTunes files is that each iTunes file has very
17    specific unique identifier.  So even if a million different
18    copies are bought of the same song, every single unique file
19    has an a different identifier; it has a different purchase
20    date, it has a different purchaser, and it has the UITS, in the
21    later versions of it, which is a unique encrypted code, which
22    is going to be different for every single one.  So there is
23    only -- there can only be one of that unique file.
24          There can be multiple instances of it with unlawful
25    copying or even with lawful copying, but we have gone the extra
```

C26TCAPA

1  mile by having software which searches your computer and any

2  attached devices and any devices which come later at any future

3  time, all which have are designed to prevent you from having

4  any additional copies of that file.  I think it's doing a

5  tremendous service to the recording industry because it's

6  telling people that have related copies that's not the same.

7  They might think it's the same, but it's not the same because

8  they can't resell it.  Whereas, this can be resold, it has a

9  market value.

10         THE COURT:  I think I understand that point.

11         Did you want to respond to any other points of

12  Mr. Mandel?

13         MR. MANDEL:  If I could briefly.

14         THE COURT:  I'm asking Mr. Beckerman if he wants to

15  respond to points you made.

16         MR. BECKERMAN:  He's talking about us making

17  half-hearted defenses.  The thing is, we had 20 pages and we

18  had about six and a half days to put it all together.  I could

19  write a brief on this.  It seems to me, to all us of us,

20  sophisticated lawyers, that this was an obvious DMCA case.  But

21  we chose to emphasize the things that say this isn't legal.  If

22  they had given a proper DMCA notice --

23         So Mr. Mandel, shoot me, I'm sorry, but --

24         THE COURT:  Don't do that, that would be illegal, I

25  could tell you.  As a former criminal lawyer, I know.

C26TCAPA

```
1              MR. BECKERMAN:  As far as essential step and fair use,
2    Mr. Mandel says we are using fair use as a defense on
3    distribution, which we didn't, as opposed to spending more time
4    in our brief on these subjects.  Why should we?  Their own
5    lawyer stood up before the United States Supreme Court and says
6    space shifting is OK.  Why should I make a big deal?  Why
7    should I analyze all the factors?
8              THE COURT:  Because I think the issue -- well,
9    Mr. Mandel can respond to his own --
10             MR. BECKERMAN:  I am speaking to an incredibly hot
11   bench, so I don't feel I need to go repeat everything in my
12   papers.
13             THE COURT:  Hot I think is sort of -- warm, warm and
14   inviting, like a nice bath.
15             MR. BECKERMAN:  If your Honor has any questions, I
16   have nothing further.
17             THE COURT:  I may have some other questions after
18   hearing from Mr. Mandel.
19             Did you want to respond?
20             MR. MANDEL:  Briefly.  First of all, I want to clarify
21   in terms of there being a violation, we did put in evidence in
22   the declaration.  We attached an exhibit of the recordings that
23   we found on the ReDigi site offered for sale.  We did ourselves
24   download and verify they were our recordings.  I didn't think
25   what was what the dispute was about.
```

C26TCAPA

```
1              They set up their marketplace to be able to sell

2      lawfully purchased copies.  I don't understand them to be

3      disputing that Capitol's recordings have been made available

4      and have been offered for sale.  And in fact they have been.

5      As we said in our papers, we gave a hundred -- more than a

6      hundred examples of our recording that we own copyrights for

7      that were up there in the cloud that are available for sale.

8      And in fact our people -- Capitol downloaded them and verified

9      they were the song.  They didn't come back -- and they say they

10     have all these recordings, they didn't say that wasn't Capitol

11     recordings, we never had Capitol's recordings up there.  I

12     don't think there's a serious -- they say there's no proof of a

13     violation, but that's a very clear.  The issue is a legal

14     issue.

15             And I understand the hypotheticals are very

16     interesting, and we have been doing it ourselves all week, and

17     they're hard, and they're informative, and I do appreciate why

18     the Court is doing it and pushing us.  But at the end of the

19     day, I do want to return to what really is at issue here,

20     because that's ultimately what we're deciding.  And I just

21     return to the same thing, you can't set up a business model

22     that is effectively going to make money from distribution of

23     digital files which could not take place without a

24     reproduction -- by their own admission, there's a necessary

25     step in order to do that -- and then turn around and defend it
```

C26TCAPA

1    by some well, you know that's just space shifting, even though

2    we assume that most of what takes place on the site is sales.

3    That's what they're in business to do, that's what they're

4    doing to make money.  That's what they advertised.  Yes, there

5    may be an isolated case of someone who decides to store up

6    there and doesn't do anything, but that's not what they're in

7    business for.  That's not what most people are going to do.

8            In fact, what should be enjoined is the sale, and it

9    seems like they have the mechanism because their own system

10   says you have to click a button to offer it for sale.  Well, as

11   far as Capitol is concerned, with respect to its recordings,

12   that button should not be available.  People should not be able

13   to go up in the cloud and click a button and say I'm selling

14   stuff that they don't have a right to sell that they reproduce.

15           So from our perspective, while the hypotheticals are

16   interesting, while the technology may be new, the principles

17   are pretty clear, and we think it's a pretty clear violation in

18   terms of summary judgment.  I don't think there's going to be

19   many factually disputed issues.  Obviously, we think there's a

20   likelihood of success on the merits.  By definition, summary

21   judgment is going to be inappropriate for the defendant.

22           THE COURT:  I guess the other factors which I think

23   you touched on, Mr. Mandel, with respect to a preliminary

24   injunction or balancing of the equities and public interest, so

25   I think you've hit each of those.  If you wanted to elaborate

C26TCAPA

1    in any way, I will give you a minute.

2         MR. MANDEL:  I will say briefly I think with balance

3    of hardships we cited a couple of cases, particularly in our

4    reply brief, that I think are worth taking a look at.  One of

5    them quotes a Southern District case where they're talking

6    about balance of hardships.  We're not going to worry about the

7    hardship when you're engaging in an activity that you shouldn't

8    have been doing in the first place and roll out in testing mode

9    a service that basically is based on something that cannot be

10   justified under existing law.  You have taken your risk and

11   that is something that you should have to bear the risk on.

12   You can't turn around and say it can be a real hardship.

13        In terms of public interest, we say the public

14   interest in upholding the statutory scheme that has clearly

15   defined principles for what is and isn't appropriate is

16   obviously served by an injunction.

17        THE COURT:  Mr. Beckerman, do you want to respond?

18        MR. BECKERMAN:  Well --

19        THE COURT:  Those two, the balance of equities and the

20   public interest.

21        MR. BECKERMAN:  It's obvious that this is not about

22   public interest on Mr. Mandel's part, it's about the private

23   interest of the corporation.  And it's very obvious that the

24   public is better off with competition, with new companies

25   developing, new technologies, and relying on old principals of

C26TCAPA

1   law and working hard to avoid copyright infringement and to

2   prevent copyright infringement to make sure their site can't be

3   used for infringement.

4           THE COURT:  Or that whose site can't be?

5           MR. BECKERMAN:  ReDigi's site cannot be used for

6   copyright infringement.  Their software on the client

7   application.  There is software on the server.  All of these

8   are meant to create a one-to-one relationship of the unique

9   file, so that it makes copyright infringement impossible.  If

10  you are using the ReDigi system, there's no way it can be used

11  to infringe copyright.

12          THE COURT:  If you copied a file onto some other

13  device, you're saying that ReDigi's software, its server is

14  able to determine that so that the seller can't have saved the

15  original someplace else?

16          MR. BECKERMAN:  ReDigi does not have super powers to

17  monitor the entire universe, it has the power to make sure that

18  its software and its site cannot possibly be used for copyright

19  infringement.  If someone wants to commit a copyright

20  infringement not using the ReDigi system, ReDigi can't stop

21  them.  But if they ever plug in the device that has that song

22  on it, the ReDigi system will find it -- not that song, that

23  unique file, if there's a copy of that unique file on there.

24          THE COURT:  In the cloud.

25          MR. BECKERMAN:  No, on the client's application, too.

C26TCAPA

THE COURT:  Well, if I have two computers and I have

downloaded a bunch of audio files from iTunes on the computer,

then I burn copies to a CD or to another computer, and then I

try sell -- upload into the cloud and then sell what was on the

computer A, are you telling me that your software is going to

be able to tell you that hey, wait a minute, that guy burned a

copy?

MR. BECKERMAN:  Absolutely.

THE COURT:  Absolutely on the sever level?

MR. BECKERMAN:  The software searches the entire

sever, and if there's any unique file that has ever gone

through their marketplace and is in the hands of someone who is

not the actual purchaser, they will pick it up and they will

force that account to cancel.

THE COURT:  Is that your understanding, Mr. Mandel?

MR. MANDEL:  No.  Because I think in the hypothetical

we're assuming you don't load to a device -- that you never

connect back to the computer.  As far as ReDigi is concerned,

it may seem all perfectly fine because it's not showing up that

you have made a copy and it's been deleted from the computer

that you reconnected to ReDigi, but it's sitting on another

computer has never been connected to ReDigi.

THE COURT:  That's what I don't know.

MR. MANDEL:  I don't know how it could.

MR. BECKERMAN:  I said we cannot police everything, we

C26TCAPA

1    can only police the ReDigi system.  And there's no way that

2    that file could ever be sold on the ReDigi marketplace because

3    they have a record of every single unique file that went

4    through that sale process.

5        THE COURT:  But I don't -- maybe the principal concern

6    is not somebody selling multiple times the same audio file, the

7    concern is somebody selling all their audio files but keeping

8    the same audio files so they have retained and sold at the same

9    time.

10        MR. BECKERMAN:  If they never plugged in the other

11   computer, and if they did it with software that wasn't ReDigi

12   software and never plugged into the ReDigi software, then yes,

13   how would they ever know about it?

14        THE COURT:  But that's their principal concern, it

15   will be Napster with an in-between step, right?

16        MR. MANDEL:  Yes.

17        MR. BECKERMAN:  It's the same with CDs, it's the same

18   with audio cassettes, people can infringe copyright, but ReDigi

19   has nothing to do with it.  ReDigi prevents it.  If you use

20   ReDigi software and plug in a storage device that has the song

21   that's gone through -- a file that's gone through there before,

22   it will pick that up on the client level, and then there's a

23   server-wide search and rejects it.  It calls it a violation,

24   and it will not accept it into the cloud.

25        THE COURT:  Along those lines then, Mr. Mandel, if you

C26TCAPA

```
 1    own any CDs and I download them, I copy them all, in turn
 2    convert them to digital files that I put in a cloud or don't
 3    put in a cloud, I put them somewhere else and sell my CDs, is
 4    that a copyright infringement?
 5              MR. MANDEL:  No, technically you could do that.  You
 6    may be committing an infringement by making the copy possibly
 7    because --
 8              THE COURT:  That's what I'm asking.
 9              MR. MANDEL:  You're asking if a copy is --
10              THE COURT:  Is making the copy an infringement?
11              MR. MANDEL:  I think if you're making it for purposes
12    of being able to keep something that you are actually trying to
13    sell but keeping, I think it will be a violation.  But I think
14    that the problem in the digital area is particular because of
15    the ease with which these files can be reproduced because the
16    whole history of that.  We're dealing with the decades of cases
17    that in this area the problem is particularly acute, and I
18    think that the risk we're taking in the kind of hypotheticals
19    is too great to bear that risk, and certainly where the law has
20    not at this point set up any defense that allows it.  If
21    Congress is comfortable that the technology is so good or the
22    right to do this is so important, it can recognize it, but it's
23    not there at this point, and we think there are real questions
24    about the technology, because there are ways around it so
25    easily.
```

C26TCAPA

1           THE COURT:  OK.  You wanted to say something?

2           MR. BECKERMAN:  Just what he says is absolutely

3      correct, which why they should be embracing the defendant

4      instead of suing them.  They want to make sure they get a piece

5      of the action.  There's a moving declaration for Mr. McMullan

6      that says well, ReDigi software, they say they do this and they

7      say they do that, but that can't be possible because we have

8      been trying for ten years to do that, so it's a ludicrous

9      statement on their part.  But the thing is ReDigi is doing

10     something that they should have been doing and actually helps

11     their industry.  So all this nonsense about the irreparable

12     harm is just that.

13          THE COURT:  I'm not sure I have to get into whether or

14     not something helps the industry or not, but it is interesting.

15          I'm going to -- why don't we take a break for a minute

16     five minutes or so.  I'm going to think about what you said and

17     decide whether I want to rule now or whether I want to reserve.

18     So let's take five, you can use the restroom, get a drink of

19     water, and the court reporter may take a drink of water because

20     the poor man has been working every minute.  So thanks.

21          (Recess taken)

22          THE COURT:  I think I'm prepared to rule.  We have had

23     almost a couple of hours of argument.

24          I want to thank the parties for their papers and also

25     for the argument.  It was very helpful.  Obviously a lot of

C26TCAPA

1    time and preparation went into it, and it's always appreciated

2    by me.  I rely on lawyers who educate me and help me get

3    focused on the issues, so I thank those who spoke and those who

4    were involved in the preparation, and that might be more than

5    the lawyers at the tables.

6            I think there's no doubt what the standard is here.

7    The standard, which I think each of you has quoted to me, is

8    the *eBay v. MercExchange* case from the Supreme Court.  After

9    that case the Second Circuit sort of revised its own standard

10   but said there's really no difference between that standard and

11   the Supreme Court standard, and I think that's true.

12           The key issues really are irreparable harm and

13   likelihood of success on the merits, or short of that,

14   whether -- this was the point made in plaintiff's papers --

15   even if there's not likelihood of success on the merits, that

16   there is a close or a serious question on a balance of

17   hardships that tips in favor of the moving party.  And then the

18   other issues that we talked about include the balance of

19   equities and the public interest.

20           In this case, I think the lack of irreparable harm is

21   one that really is the issue that causes me to deny the motion.

22   It seems to me that money damages should be able to take care

23   of all of this.  The Second Circuit in *Salinger* made very clear

24   what the standard is, and the fact is that this is an

25   extraordinary remedy, and so a Court will have to consider

C26TCAPA

1   whether or not monetary damages are inadequate to compensate

2   for the injury alleged.

3          In assessing that, the Court has to look to whether

4   market confusion exists or whether there's a prospect of

5   difficulty in proving the loss of sales due to infringement.  I

6   think with respect to market confusion, I really don't think

7   that the market confusion being argued by plaintiffs here is

8   what is at the heart of demonstrating irreparable harm.  The

9   fact that defendants have espoused a legal theory or defense

10  both in their papers to the Court and on their Web site and in

11  public pronouncements doesn't really equate to the kind of

12  market confusion that the Second Circuit was talking about in

13  *Salinger*.

14         With respect to the difficult prospect of plaintiff

15  proving loss of sales due to infringement, I think the

16  defendant clearly argues that it keeps careful records, and

17  that if it were found to be infringing on plaintiff's

18  copyrights, there would be a record from which to calculate

19  damages.  I have seen nothing to refute that, and I'm persuaded

20  that's the case.  So I think there has not been a showing of

21  irreparable harm that would merit the extraordinary relief

22  sought here.

23         I think likelihood of success on the merits is

24  something that plaintiffs have demonstrated.  I should bear in

25  mind or at least repeat what the lawyers already know, which is

C26TCAPA

1    that that doesn't mean that I'm finding that the plaintiffs

2    would win in this case, it's just that they have demonstrated

3    that there are arguments that on their face look to be

4    compelling or potentially persuasive arguments.  They have

5    certainly done a good job of articulating those based on the

6    statute, which I think covers that element.

7            The balance of equities I think is kind of a push.  I

8    think each side has interests that would be affected by the

9    ruling on a preliminary injunction, and each interest is a

10   significant one.  By virtue of the size of the defendant, if

11   the Court were to begin a preliminary injunction, that would

12   have a devastating impact on the company.  By the same token,

13   the plaintiffs have an interest that its copyrights are

14   protected and enforced.  So I think each has a strong interest

15   in the preliminary injunction that's being sought.

16           And as to the public interest, I think obviously the

17   public has an interest in seeing copyright law enforced.  On

18   the other hand, that copyright law includes recognitions of

19   things like legitimate secondary markets and the ability of

20   owners to resell their items.

21           So I think we've had a preview of what the arguments

22   are on those fronts, and I think ultimately that's where this

23   case will be resolved.  I'm not resolving it today.  I'm not

24   going to grant the preliminary injunction.  As I said, there

25   hasn't been irreparable harm established.

C26TCAPA

```
 1              But I do think with limited discovery we should be
 2     able to get this teed up for summary judgment or a trial
 3     perhaps even on stipulated facts if the parties can get there,
 4     then we should try to resolve this as quickly as possible.
 5     There's no reason why the courts have to be slow and have to be
 6     cumbersome or costly, for that matter.  If it is the case that
 7     parties really are in agreement about most of the facts that
 8     are pertinent to this case, I think stipulating to those facts,
 9     identifying where there may be some disputes factually, that
10     should then be the focus of discovery and will be an efficient
11     use of time.
12              So what I will do -- well, let me move to the second
13     contemplated motion, the motion for summary judgment.  I think
14     that's premature at this point because it's not clear to me
15     that there are wholly undisputed facts.
16              Now the parties seem to push back on me a little for
17     that one to suggest there are maybe fewer disputed facts than I
18     imagine.  If that's the case, let's get it teed up quickly, but
19     for now, I think it would be premature to make that motion.
20     But I say that without prejudice to either side coming back to
21     me soon with premotion letters saying now we're ready to go,
22     and explaining what the disputes left are.
23              MR. BECKERMAN:  For the record, we withdraw.
24              THE COURT:  The letter?  You don't have to do that.
25     There's no offense taken.  I don't mean to suggest that.
```

C26TCAPA

1    That's just the way I see it.

2          So what I was going to propose is that I give the

3    parties maybe a week or ten days to confer and get back to me

4    with a discovery schedule that should track in general terms my

5    contemplated case management plan.  It's on the Web site, take

6    a look.  And that's not designed to be set in stone, it's not a

7    one-size-fits-all approach, it's the generally accepted version

8    that I use.  If there are things about this case that are

9    unique and that should require a tailoring of the case

10   management plan, I'm open to that.  I mean I think courts have

11   to be practical and responsive and ultimately concerned about

12   the efficient resolution of disputes.

13         So take a look at it, and then if there are things

14   that you agree should be tweaked, let me know that, and if you

15   think there are things about which you disagree, where one of

16   you thinks that a tweaking will be in order and another thinks

17   that tweaking would be counter productive, set that out in a

18   letter that explains your positions.

19         But do you think ten days is enough time?

20         MR. MANDEL:  Yes.

21         MR. BECKERMAN:  Your Honor, Ty and I have three days

22   of arbitration during the next five or six days, so I would

23   appreciate if we could possibly have a little longer time in

24   which to do that.

25         THE COURT:  I don't think it will take too long.  Do

C26TCAPA

1      take a look at my template.  It's basically saying when you're

2      going to do interrogatories and document requests, when you're

3      going to do depositions, when you're going to wrap up fact

4      discovery, and whether you'll have experts and when you'll

5      finish that up.  So take a look at it.  I don't think it's too

6      onerous.  It will require a little bit of communication between

7      the parties.  By design it requires that.  So if you're

8      completely engaged in something else that might make it hard

9      for you, does two weeks make a difference?

10             MR. MANDEL:  That's fine, your Honor.

11             THE COURT:  Two weeks from today is the 20th, that's a

12     Court holiday.  But what I'm asking you to do is send me, via

13     email to my chamber's email address, the case management plan,

14     proposed case management plan, and any correspondence that

15     requires me to resolve any disputes.  So I'll be here, and what

16     you send me through email I will get in real-time.  So that's

17     fine, so we don't need to worry about the Court holiday.

18             Is there anything else we should cover today?

19             MR. MANDEL:  I don't think so, your Honor.

20             THE COURT:  Mr. Beckerman?

21             MR. BECKERMAN:  No, thank you, your Honor.

22             THE COURT:  Let me again thank you.  I found it very

23     interesting and very well argued, so maybe that's why I kept

24     you all as long as I did.  I like to see good lawyers plying

25     their trade.  I will issue a very short order that just

C26TCAPA

1    memorializes the result here, but mostly just rely on what I

2    said on the record.

3              If you need a copy of the transcript, you can take

4    that up with the court reporter now or later through Web site.

5              MR. MANDEL:  Thank you, your Honor.

6              MR. BECKERMAN:  Thank you, your Honor.

7              THE COURT:  Thanks very much, have a good day.

8                              o0o

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25