UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
CAPITOL RECORDS, LLC,                          :

                                  Plaintiff,   :        12 Civ. 0095 (RJS)

        -against-                              :

REDIGI INC.,                                   :

                                  Defendant.   :

------------------------------------------------------------ x

<br><br>

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

# REDACTED

<br><br>

COWAN, LIEBOWITZ & LATMAN, P.C.
Attorneys for Plaintiff Capitol Records, LLC
1133 Avenue of the Americas
New York, New York 10036-6799
(212) 790-9200

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 2

ARGUMENT ............................................................................................................................. 3

PLAINTIFF'S MOTION FOR PARTIAL  SUMMARY JUDGMENT SHOULD BE
GRANTED ................................................................................................................................. 3

I.      REDIGI IS LIABLE FOR DIRECT INFRINGEMENT OF CAPITOL'S
        COPYRIGHTED SOUND RECORDINGS ................................................................... 4

        A.      Capitol Owns Valid Statutory and Common-Law Copyrights ............................... 4

        B.      ReDigi Has Violated Capitol's Exclusive Right of Reproduction .......................... 5

                1.      By Definition, the Recreation of the Copyrighted Work in a New
                        Material Object Constitutes a Violation of the Exclusive Right of
                        Reproduction Under the Copyright Act ........................................................ 5

                2.      ReDigi Is Bound by its Prior Judicial Admissions of Copying  and
                        Cannot Avoid Such a Finding by Recharacterizing its  Activities
                        Under a New Label ....................................................................................... 7

        C.      ReDigi Distributes Copies of the Works to the Public .......................................... 10

        D.      ReDigi's Active Participation in and Oversight Over the Infringing
                Activity Renders it Liable as a Direct Infringer .................................................... 11

II.     REDIGI IS LIABLE AS A SECONDARY INFRINGER ............................................. 13

        A.      ReDigi Is Liable for Vicarious Copyright Infringement ....................................... 13

        B.      ReDigi Is Liable for Contributory Copyright Infringement ................................... 15

        C.      ReDigi Is Liable for Inducement of Copyright Infringement ................................ 16

III.    REDIGI HAS NO VALID DEFENSE TO INFRINGEMENT ..................................... 17

        A.      There is No Basis for ReDigi's Fair Use Defense ................................................. 17

        B.      The Essential Step Doctrine Does Not Apply ....................................................... 18

        C.      The First Sale Defense Is Inapplicable ................................................................. 20

i

      D.       There is No DMCA Immunity Available to ReDigi ...............................................23

CONCLUSION .................................................................................................................24

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

<span style="font-variant:small-caps">Cases</span>

A&M Records v. Napster, Inc.,
   239 F.3d 1004 (9th Cir. 2001) ...................................................................13, 15, 18

Aetna U.S. Healthcare v. Frazier,
   2002 WL 1677700 (W.D.N.Y. July 22, 2002) ............................................................9

Apple Computer, Inc. v. Formula Int'l, Inc.,
   594 F. Supp. 617 (C.D. Cal. 1984) ..........................................................................20

Arista Records LLC v. Does,
   604 F.3d 110 (2d Cir. 2010) ....................................................................................15

Arista Records, LLC v. Greubel,
   453 F. Supp. 2d 961 (N.D. Tex. 2006) ...............................................................10, 11

Arista Records, LLC v. Lime Group, LLC,
   715 F. Supp.2d 481 (S.D.N.Y. 2010) ......................................................................16

Artista Records, LLC v. Usenet.com, Inc.,
   633 F. Supp. 2d 124 (S.D.N.Y. 2009) .............................................3, 11, 13, 14, 16

Aymes v. Bonnelli,
   47 F.3d 23 (2d Cir. 1995) ........................................................................................20

Barnaby Music Corp. v. Catoctin Broad. Corp. of New York,
   8 U.S.P.Q.2d 1942 (W.D.N.Y. 1988) .....................................................................3, 6

Capitol Records, Inc. v. Naxos of America, Inc.,
   4 N.Y.3d 540 (2005).................................................................................................4

Cass County Music Co. v. Khalifa,
   914 F. Supp. 30 (N.D.N.Y.), aff'd, 112 F.3d 503 (2d Cir. 1996) ............................3

Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.,
   150 F.3d 132 (2d Cir. 1998) ........................................................................3, 17, 18

Centrifugal Force, Inc. v. Softnet Commc'ns, Inc.,
   2011 WL 744732 (S.D.N.Y. Mar. 1, 2011).............................................................19

Chase v. Public Utility Comm'n of Pa.,
   2008 WL 906491 (M.D. Pa. Mar. 31, 2008) ............................................................6

City Merchandise, Inc. v. Broadway Gifts Inc.,
    2009 WL 195941 (S.D.N.Y. Jan. 27, 2009) ........................................................................ 4

Columbia Pictures Indus., Inc. v. Aveco, Inc.,
    800 F.2d 59 (3d Cir. 1986) ............................................................................................... 15

Expediters Int'l of Wash., Inc. v. Direct Line Cargo Mgmt. Servs., Inc.,
    995 F. Supp. 468 (D.N.J. 1998) ........................................................................................ 19

Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.,
    443 F.2d 1159 (2d Cir. 1971) .............................................................................3, 13, 14, 15

Gibbs v. Cigna Corp.,
    440 F.3d 571 (2d Cir. 2006) ............................................................................................... 9

Hotaling v. Church of Jesus Christ of Latter-Day Saints,
    118 F.3d 199 (4th Cir. 1997) ............................................................................................ 11

In re Fosamax Prods. Liability Litig.,
    647 F. Supp. 2d 265 (S.D.N.Y. 2009) ................................................................................ 9

Intellectual Reserve, Inc. v. Utah Lighthouse Ministry, Inc.,
    75 F. Supp. 2d 1290 (D. Utah 1999) ................................................................................ 16

ISC-Bunker Ramo Corporation v. Altech, Inc.,
    765 F. Supp. 1310 (N.D. Ill. 1990) ................................................................................... 20

London-Sire Records, Inc. v. Doe 1,
    542 F. Supp. 2d 153 (D. Mass. 2008) ............................................................................6, 11

Matthew Bender & Co. v. West Publ'g Co.,
    158 F.3d 693 (2d Cir. 1998) ............................................................................................... 7

Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,
    545 U.S. 913 (2005) ........................................................................................................ 16

Mirage Editions, Inc. v. Albuquerque A.R.T. Co.,
    856 F.2d 1341 (9th Cir. 1988) .......................................................................................... 21

Motown Records Co., LP v. DePietro,
    2007 WL 576284 (E.D. Pa. Feb. 16, 2007) ...................................................................... 11

New York Times Co. v. Tasini,
    533 U.S. 483 (2001) ...................................................................................................10, 11

Olan Mills, Inc. v. Linn Photo Co.,
    23 F.3d 1345 (8th Cir. 1994) ........................................................................................... 11

Peer Int'l Corp. v. Luna Records, Inc.,
    887 F. Supp. 560 (S.D.N.Y. 1995) ............................................................3, 14

Perfect 10, Inc. v. Amazon.com, Inc.,
    508 F.3d 1146 (9th Cir. 2007) ....................................................................7

Perfect 10, Inc. v. Cybernet Ventures, Inc.,
    213 F. Supp. 2d 1146 (C.D. Cal. 2002) ....................................................14

Playboy Enters., Inc. v. Russ Hardenburgh, Inc.,
    982 F. Supp. 503 (N.D. Ohio 1997) ............................................12, 13, 16

Practiceworks, Inc. v. Prof'l Software Solutions of Ill., Inc.,
    72 U.S.P.Q.2d 1691 (D. Md. 2004) ..........................................................19

Purgess v. Sharrock,
    33 F.3d 134 (2d Cir. 1994) ........................................................................9

RCA Records v. All-Fast Sys. Inc.,
    594 F. Supp. 335 (S.D.N.Y. 1984) ..........................................................11

RCA/Ariola Int'l Inc. v. Thomas & Grayston Co.,
    845 F.2d 773 (8th Cir. 1988) ....................................................................11

Ringgold v. Black Entm't Television, Inc.,
    126 F.3d 70 (2d Cir. 1997) ........................................................................17

Sega Enters. Ltd. v. MAPHIA,
    948 F. Supp. 923 (N.D. Cal. 1996) ............................................................7

Shapiro, Bernstein & Co. v. H.L. Green Co.,
    316 F.2d 304 (2d Cir. 1963) ..........................................................13, 14, 15

Sony Corp. of America v. Universal City Studios, Inc.,
    464 U.S. 417 (1984) ..................................................................................15

Sygma Photo News, Inc. v. High Society Magazine, Inc.,
    778 F.2d 89 (2d Cir. 1985) ........................................................................3

Twin Peaks Prods., Inc. v. Publ'ns Int'l Ltd.,
    996 F.2d 1366 (2d Cir. 1993) ....................................................................4

UMG Recordings, Inc. v. MP3.com, Inc.,
    92 F. Supp. 2d 349 (S.D.N.Y. 2000) ....................................................3, 18

United States v. Sachs,
    801 F.2d 839 (6th Cir. 1986) ....................................................................22

Universal City Studios Prods. LLLP v. Bigwood,
    441 F. Supp. 2d 185 (D. Me. 2006) ...................................................................11

Western World Ins. Co. v. Stack Oil, Inc.,
    922 F.2d 118 (2d Cir. 1990) .............................................................................9

STATUTES

17 U.S.C. § 101 ...........................................................................................5, 6, 19

17 U.S.C. § 106(1) .....................................................................................5, 10, 20

17 U.S.C. § 106(2) ...........................................................................................10

17 U.S.C. § 107 .............................................................................................17, 18

17 U.S.C. 109(a) .................................................................................................21

17 U.S.C. § 117(a) .........................................................................................19, 20

17 U.S.C. § 202 .....................................................................................................5

17 U.S.C. § 301(c) ................................................................................................4

17 U.S.C. § 410(c) ................................................................................................4

17 U.S.C. § 512(c) ..............................................................................................23

OTHER AUTHORITIES

Fed. R. Civ. P. 56(c) ............................................................................................3

Final Report of the National Commission on New Technological Uses of Copyrighted
    Works, H.R. Rep. No. 1307, 96th Cong., 1st Sess., 22 (1980) .................................7

H.R. Rep. No. 94-1476, 56 (1976) .....................................................................5

M. & D. Nimmer, Nimmer on Copyright (Matthew Bender, rev. ed. 2012) ...................7, 19, 23

S. Rep. No. 94-473, 58 (1975).............................................................................6

U.S. Copyright Office, Library of Cong., DMCA Section 104 Report (2001), available at
    www.copyright.gov/reports/studies/.......................................................................21

## PRELIMINARY STATEMENT

ReDigi offers a service whose very economic survival depends on the unauthorized reproduction and distribution of copyrighted sound recordings. ReDigi users, under the close supervision and with the active encouragement and participation of ReDigi, upload copies of their iTunes files from their home computers to ReDigi's cloud server and sell those files to other users at steep discounts off of iTunes prices. Through this infringing system, (a) the sellers earn credits to purchase more music files, (b) the purchasers get pristine copies of song files for less than they would pay through legitimate channels, and (c) **REDACTED**

**REDACTED** Somehow, ReDigi protests that this service is compliant with copyright law. It is not even close.

Through a series of semantic machinations and technological smokescreens, ReDigi casts itself as something other than a garden-variety infringer by claiming it trades only in "used" music files. There is, however, no such thing as a "used" digital file, akin to a dog-eared book or scratched CD, because digital works can only be uploaded and transmitted through their reproduction in new copies or "phonorecords," embodied on different discs or servers. To try to get around this problem, at the very end of discovery (and in contradiction to its prior judicial admissions), ReDigi invented another label, insisting that rather than copying files, it merely "migrates data" by "moving" it in "blocks." However, this last-minute re-characterization is legally irrelevant, as the Copyright Act prohibits the unauthorized creation or "fixation" of new "phonorecords," defined as the "material objects" in which sound recordings are fixed. ReDigi's service operates precisely by creating such new phonorecords, when it takes a music file from the physical object of a user's private computer and recreates it on the physical, "material object" of its own cloud server. These facts are undisputed and fatal to ReDigi's defenses.

1

Finally, ReDigi would somehow exonerate these infringements by insisting that it deletes the user's original music files from her computer upon their upload to the ReDigi cloud. Putting aside the conceded fact that ReDigi's technology cannot prevent sellers from nonetheless retaining copies of the recordings they have supposedly transferred, there is simply no defense under copyright law that permits one to copy and sell a recording as long as the original is deleted or destroyed. Indeed, the very fact that the original needed to be deleted at all is conclusive proof that an unauthorized reproduction – the very essence of copyright infringement – has taken place. Whatever new labels ReDigi has chosen to apply to its conduct, the factual record remains essentially as it was when the Court concluded on Capitol's preliminary injunction motion that Capitol was likely to succeed on the merits of its claims. Because the undisputed evidence now confirms that Capitol has indeed proven copyright infringement as a matter of law, its motion for partial summary judgment on liability should be granted.

## STATEMENT OF FACTS

The relevant facts are set forth in the accompanying Plaintiff's Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Pl. 56.1"), Declaration of Alasdair J. McMullan ("McMullan Decl."), Declaration of Colleen Hall ("Hall Decl."), Declaration of Richard S. Mandel ("Mandel Decl."), excerpts from the Deposition of Larry Rudolph ("Rudolph Dep.") and John Ossenmacher ("Ossenmacher Dep."), and the exhibits referenced in such documents. They will not be separately repeated herein, but rather referenced where relevant.

## ARGUMENT

## PLAINTIFF'S MOTION FOR PARTIAL
## SUMMARY JUDGMENT SHOULD BE GRANTED

Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In order to defeat summary judgment, "the non-moving party may not rely on mere conclusory allegations nor speculation, nor can it rely on mere denials or unsupported alternative explanations of its conduct. Rather, it must come forward with evidence sufficient to allow a reasonable jury to find in its favor." Arista Records, LLC v. Usenet.com, Inc., 633 F. Supp. 2d 124, 143 (S.D.N.Y. 2009) (citations and quotations omitted).

Courts in this Circuit have frequently granted summary judgment in favor of copyright plaintiffs, including in connection with claims for secondary liability.[1] As set forth below, Capitol is entitled to summary judgment on its claims of both direct and secondary liability based on infringement of Capitol's rights of reproduction and distribution of Capitol's copyrighted sound recordings.

---

[1] See, e.g., Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc., 150 F.3d 132, 146 (2d Cir. 1998) (affirming summary judgment for plaintiff in copyright infringement action); Sygma Photo News, Inc. v. High Society Magazine, Inc., 778 F.2d 89, 92 (2d Cir. 1985) (affirming summary judgment for plaintiff on direct and vicarious claims of copyright infringement); Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc., 443 F.2d 1159, 1162 (2d Cir. 1971) (affirming summary judgment for plaintiff on contributory and vicarious infringement claims); Usenet, 633 F. Supp. 2d at 146-158 (granting summary judgment for plaintiff on direct and secondary liability claims); UMG Recordings, Inc. v. MP3.com, Inc., 92 F. Supp. 2d 349, 353 (S.D.N.Y. 2000) (granting partial summary judgment for plaintiffs on copyright infringement claim); Cass County Music Co. v. Khalifa, 914 F. Supp. 30, 32-34 (N.D.N.Y.) ("Summary judgment is available in suits brought by copyright owners for copyright infringement"; granting summary judgment on vicarious infringement claim), aff'd, 112 F.3d 503 (2d Cir. 1996); Peer Int'l Corp. v. Luna Records, Inc., 887 F. Supp. 560, 565 (S.D.N.Y. 1995) (granting summary judgment in plaintiff's favor on vicarious infringement claim); Barnaby Music Corp. v. Catoctin Broad. Corp. of New York, 8 U.S.P.Q.2d 1942, 1944 (W.D.N.Y. 1988) (finding vicarious infringement as a matter of law and granting plaintiffs' motion for summary judgment).

## I.   REDIGI IS LIABLE FOR DIRECT INFRINGEMENT OF CAPITOL'S COPYRIGHTED SOUND RECORDINGS

Copyright infringement requires a showing that plaintiff is the owner of exclusive rights in the works at issue, and that defendant has violated those exclusive rights.  <u>Twin Peaks Prods., Inc. v. Publ'ns Int'l Ltd.</u>, 996 F.2d 1366, 1372 (2d Cir. 1993).  These elements are the same for federal copyright infringement and infringement of common-law copyright under state law. <u>Capitol Records, Inc. v. Naxos of America, Inc.</u>, 4 N.Y.3d 540, 563 (2005).

### A.   <u>Capitol Owns Valid Statutory and Common-Law Copyrights</u>

As set forth in the accompanying McMullan Declaration, Capitol owns exclusive rights in the Copyrighted Recordings set forth in the illustrative list of works contained in Exhibit 1 to the McMullan Declaration.  McMullan Decl. ¶ 3 and Ex. 1.  Moreover, because the certificates of registration for such works were issued before or within five years after the first publication of the works (<u>see</u> McMullan Decl. ¶ 4 and Ex. 1), they constitute <u>prima facie</u> evidence of the facts stated therein, including Capitol's ownership of copyright in these works.  17 U.S.C. § 410(c). <u>See</u>, <u>e.g.</u>, <u>City Merchandise, Inc. v. Broadway Gifts Inc.</u>, 2009 WL 195941, at *1 (S.D.N.Y. Jan. 27, 2009).

Capitol also owns common law copyrights in the Pre-1972 Recordings identified in the McMullan Declaration.  <u>See</u> McMullan Decl. ¶ 5.  The Pre-1972 Recordings are subject to protection under state rather than federal law, and the Copyright Act cannot "annul[] or limit[]" those rights "until February 15, 2067."  17 U.S.C. § 301(c).  <u>See also</u> <u>Naxos</u>, 4 N.Y.3d at 556 n. 8.

**B.     ReDigi Has Violated Capitol's Exclusive Right of Reproduction**

      **1.     By Definition, the Recreation of the Copyrighted Work in a New Material Object Constitutes a Violation of the Exclusive Right of Reproduction Under the Copyright Act**

The Copyright Act provides the copyright owner with the exclusive right "to reproduce the copyrighted work in copies or phonorecords." 17 U.S.C. § 106(1). "Phonorecords" are in turn defined as "material objects in which sounds … are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101.[2] In the case of sound recordings, the species of copyrighted work at issue in this case, "[t]he copyrightable work comprises the aggregation of sounds," which is to be "distinguished from 'phonorecords,' the latter being physical objects in which sounds are fixed." H.R. Rep. No. 94-1476, 56 (1976) ("House Report"). See also 17 U.S.C. §101 (defining "sound recordings" as "works that result from the fixation of a series of musical, spoken, or other sounds, … regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied"); cf. 17 U.S.C. §202 ("Ownership of a copyright … is distinct from ownership of any material object in which the work is embodied").

These statutory definitions distinguishing the copyrighted work from the material object in which the work is fixed also serve to define the nature of the reproduction right under section 106(1). As the Senate and House Reports for the 1976 Copyright Act explain in identical terms:

> Read together with the relevant definitions in section 101, the right 'to reproduce the copyrighted work in copies or phonorecords' means the right to produce a material object in which the work is duplicated, transcribed, imitated, or simulated in a fixed form from which it can be

---

[2]The definition of "phonorecords" is in all material respects identical to the definition of "copies" in 17 U.S.C. § 101, except that "phonorecords" applies specifically to the fixation of "sounds" in material objects.

'perceived, reproduced, or otherwise communicated, either directly or
with the aid of a machine or device.'

S. Rep. No. 94-473, 58 (1975); House Report at 61 (emphasis added).  In other words, the

recreation of a copyrighted work in a new or different material object necessarily serves "to

reproduce the copyrighted work in phonorecords" within the meaning of section 106(3).  See,

e.g., Chase v. Public Utility Comm'n of Pa., 2008 WL 906491, at *5 (M.D. Pa. Mar. 31, 2008)

("the reproduction right guaranteed by § 106 ensures that a copyright owner has the exclusive

right to create new material objects in which a copyrighted work may be fixed").

ReDigi's "marketplace" is predicated on precisely such reproductions of copyrighted

works in new "material objects."  In order to offer a music file (such as a Capitol recording) for

sale, a user must first upload that file from the physical disc on her home computer to the

physical discs associated with ReDigi's remote server, designated the ReDigi "cloud" and

located in Arizona.  Pl. 56.1 ¶¶ 21-23.  The recordings can be perceived (and are thus "fixed" as

"phonorecords") when embodied on either the user's computer or the ReDigi server,[3]

# REDACTED

Id. ¶24.  Thus, uploading the music files to the ReDigi server results in a new fixation of the

copyrighted work in a different physical object, located in a different physical space, creating

what is by definition a new phonorecord.  See, e.g., London-Sire Records, Inc. v. Doe 1, 542 F.

Supp. 2d 153, 171 (D. Mass. 2008) (explaining that "appropriate segment of the hard disk" on

which digital sequence representing the sound recordings is encoded constitutes a "phonorecord"

---

[3] See 17 U.S.C. § 101 ("A work is 'fixed' in a tangible medium of expression when its
embodiment in a copy or phonorecord … is sufficiently permanent or stable to permit it to be
perceived, reproduced, or otherwise communicated for a period of more than transitory
duration.").

under the statute).[4]  Likewise, after purchase, the majority of ReDigi users download copies of

the newly acquired files from the ReDigi cloud to their home computers, making yet another new

fixation and reproduction of the work, such as a Capitol recording.  Pl. 56.1  ¶¶ 50, 52-53.

Because uploading and downloading, by their very nature, can only be accomplished by

making an unauthorized phonorecord of the original user's recording, Capitol's exclusive right to

reproduce the Copyrighted Recordings (or Pre-1972 Recordings) in phonorecords is violated

whenever such uploads or downloads occur.  See, e.g., Sega Enters. Ltd. v. MAPHIA, 948 F.

Supp. 923, 932 (N.D. Cal. 1996) (holding that "copies were made" for purposes of Copyright

Act when protected works were "uploaded to or downloaded from" defendant's electronic

bulletin board).  Stated otherwise, by creating a new fixation of Capitol's recordings on a new

disc or server, ReDigi has created a new phonorecord, and has thus violated Capitol's exclusive

right of reproduction.  2 M. & D. Nimmer, Nimmer on Copyright § 8.02[C], at 8-35 (Matthew

Bender, rev. ed. 2012) (hereinafter "Nimmer") ("copyright infringement occurs whenever an

unauthorized ... phonorecord is made").

> ### 2.     ReDigi Is Bound by its Prior Judicial Admissions of Copying
> ###        and Cannot Avoid Such a Finding by Recharacterizing its
> ###        Activities Under a New Label

In an attempt to avoid this elemental application of copyright law, ReDigi's witnesses

sought during depositions at the end of discovery to recast the upload process as "data

---

[4] In this respect, the electronic file itself – which is simply a digital sequence that cannot be perceived – does not constitute a "phonorecord," except to the extent that it is fixed in a material object from which it can be perceived or reproduced.  See, e.g., Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1160 (9th Cir. 2007) ("A photographic image is ... 'fixed in a tangible medium of expression,' for purposes of the Copyright Act, when embodied (i.e., stored) in a computer's server (or hard disk, or other storage device"); Matthew Bender & Co. v. West Publ'g Co., 158 F.3d 693, 703 (2d Cir. 1998) ("reproductions of copyrighted works contained on media such as floppy disks, hard drives, and magnetic tapes ... meet the Copyright Act's 'fixation' requirement."); Final Report of the National Commission on New Technological Uses of Copyrighted Works, H.R. Rep. No. 1307, 96th Cong., 1st Sess., 22 (1980) ("Because works in computer storage may be repeatedly reproduced, they are fixed and, therefore, are copies.").

migration," in which electronic files are "moved" in "blocks" from one source to another, rather than copied. See Rudolph Dep. at 57-58, 226-27. For all the reasons discussed above (see pp. 4-7, supra), this semantic shift is legally irrelevant. However ReDigi may describe its technological process, that process undisputedly results in the fixation of the copyrighted work in a new material object – the very essence of reproduction under the statutory structure addressed above. The issue is not one of technology, but of the Copyright Act's plain definitions of phonorecords, fixation, and reproduction.

In any event, ReDigi's belated effort to recharacterize its service flies in the face of its prior clear judicial admissions, and ReDigi cannot now avoid summary judgment by conveniently changing its story. In its brief in opposition to Capitol's motion for a preliminary injunction in this case, ReDigi unequivocally acknowledged that copies of Capitol's sound recordings were made during upload to, and download from, the ReDigi cloud:

> The only copying which takes place in the ReDigi service occurs when a user uploads music files to the ReDigi Cloud, thereby storing copies thereof in the user's personal Cloud Locker, or downloads music files from the user's Cloud Locker, thereby placing copies of the files on his or her computer.

ReDigi PI Opp. Br. (Docket No. 14) at 9.[5] ReDigi sought to justify such copying by relying on various affirmative defenses, such as fair use and the essential step defense, without ever suggesting that its technology actually operated in such a way as to avoid making a copy.

---

[5] At his deposition, one of ReDigi's witnesses, Larry Rudolph, claimed first to "disavow" this statement in ReDigi's brief, while shortly thereafter suggesting perhaps that it was just the "clearest" way of describing ReDigi's "sophisticated" methods. Rudolph Dep. at 76-78. In contrast, ReDigi's other witness, Mr. Ossenmacher, disingenuously claimed that the statement referenced ReDigi's prior practice (now discontinued) of making temporary "archival" copies as back-ups on the user's computer during the upload process. Ossenmacher Dep. at 45-46. However, when pressed about the illogic of his explanation, Mr. Ossenmacher could not deny that the statement in the brief – which never references any back-up process or copies on a user's computer – expressly refers to copies stored in the ReDigi cloud. Id. at 52.

8

As the Second Circuit has explained, "[a] court can appropriately treat statements in briefs as binding judicial admissions of fact." Purgess v. Sharrock, 33 F.3d 134, 144 (2d Cir. 1994). Such statements are "filed with the court subject to the penalty of sanctions," id., and can be treated as "a formal judicial admission that is conclusive against [a party] in a motion for summary judgment." Aetna U.S. Healthcare v. Frazier, 2002 WL 1677700, at *3 (W.D.N.Y. July 22, 2002) (citations and quotations omitted). See also In re Fosamax Prods. Liability Litig., 647 F. Supp. 2d 265, 276 (S.D.N.Y. 2009) (construing statements in brief as judicial admission binding on summary judgment motion).

The statements in ReDigi's brief admitting copying are appropriately treated as binding judicial admissions, particularly where they are also confirmed by other admissions to similar effect, including in its answer. "Facts admitted in an answer, as in any pleading, are judicial admissions that bind the defendant throughout this litigation." Gibbs v. Cigna Corp., 440 F.3d 571, 578 (2d Cir. 2006). See also Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121-22 (2d Cir. 1990) (fact conceded in amended answer and counterclaim constituted formal judicial admission conclusively established against defendant on summary judgment).

ReDigi's answer states: "Upon the upload of an Eligible File to a User's Cloud Locker, such file and all copies thereof residing on the user's computer, and on attached synchronization and storage devices, are deleted therefrom." Answer (Docket No. 6) ¶ 47 (emphasis added). ReDigi's 30(b)(6) witness, Mr. Rudolf, also made the same statement in his sworn declaration in opposition to Capitol's preliminary injunction motion (see Rudolph Declaration (Docket No. 11) ¶ 6) and testified to similar effect at his deposition.[6] See Pl. 56.1Statement ¶ 19. There would,

---

[6] In the same declaration, ReDigi touted the fact that it had applied for a patent to cover its technology. The patent states, among other things, that for a "digital media object" (elsewhere defined to include music files) "to be offered for sale, it is first copied to the remote

of course, be no need to "delete" anything on the original user's computer unless a separate copy (or more precisely phonorecord) had been made on the ReDigi server, as ReDigi expressly acknowledged in its preliminary injunction opposition brief.

ReDigi cannot now walk away from its binding admissions that the music files uploaded to the ReDigi cloud and offered for sale are copies of the original files, which have been deleted from the user's computer. The Copyright Act does not excuse unauthorized reproduction simply because the infringer chooses to destroy the source copy. Rather, it is the act of reproduction itself that is reserved for the copyright owner by 17 U.S.C. §106(1). Accordingly, ReDigi's system simply cannot work without violating Capitol's exclusive right to reproduce its copyrighted sound recordings in phonorecords.

### C.    ReDigi Distributes Copies of the Works to the Public

ReDigi also violates Capitol's exclusive right to "distribute ... phonorecords of the copyrighted work to the public by sale or other transfer of ownership ...." 17 U.S.C. § 106(2). ReDigi's entire business is premised on allowing users to sell phonorecords uploaded to the ReDigi cloud and thereby transfer ownership from one user to another. Pl. 56.1 ¶¶ 6-8.

"[T]he courts have not hesitated to find copyright infringement by distribution in cases of ... electronic transmission of copyrighted works." Arista Records, LLC v. Greubel, 453 F. Supp. 2d 961, 968 (N.D. Tex. 2006) (citing cases). Indeed, the Supreme Court reached such a result in New York Times Co. v. Tasini, 533 U.S. 483 (2001), in which defendants operated an online database from which users could download digital copies of newspaper articles on request. Id. at 498. The Supreme Court found that it was "clear" that "by selling copies of the Articles through

---

server and stored on the disc." At his deposition, Mr. Rudolph disavowed this statement as well, again urging that ReDigi's upload process involves data "migration" rather than copying. In keeping with its tactical about-face in advance of this motion, ReDigi made no such distinction when it boasted of its patent filing earlier. Pl. 56.1 ¶¶ 27-30.

the NEXIS Database," the defendants "distribute copies of the Articles to the public by sale" in violation of the copyright owner's exclusive right of distribution. Id. (internal quotations omitted).  See also London-Sire Records, 542 F. Supp. 2d at 173-174 ("An electronic file transfer is plainly within the sort of transaction that § 106(3) was intended to reach.").

There is no dispute that actual sales occurred, as Capitol's paralegal purchased more than 100 of Capitol's recordings as "used" files offered through the ReDigi site as part of her investigation.[7]  Pl. 56.1 ¶¶ 68-69.  Moreover, documentation produced by ReDigi also reflects additional consummated sales of the Copyrighted Recordings, in violation of Capitol's exclusive right of distribution.[8]  Id. ¶ 73.

### D.   ReDigi's Active Participation in and Oversight Over the Infringing Activity Renders it Liable as a Direct Infringer

Having engaged in "volitional conduct" that transcends acting as a mere "passive conduit" for the infringement of works selected by its users, ReDigi should be held liable as a direct infringer.  See Usenet, 633 F. Supp. 2d at 147-149.  The undisputed evidence reflects ReDigi's active participation in the infringement at a level that easily crosses the threshold for finding direct infringement.

First, ReDigi is intimately involved in selecting and screening every single music file uploaded to its system pursuant to a "stringent" set of rules it has established.  Its software scans

---

[7] Plaintiffs can prove infringement by relying on acts committed at the behest of investigators.  See, e.g., Olan Mills, Inc. v. Linn Photo Co., 23 F.3d 1345, 1348 (8th Cir. 1994); RCA/Ariola Int'l Inc. v. Thomas & Grayston Co., 845 F.2d 773, 777, 781 (8th Cir. 1988); RCA Records v. All-Fast Sys. Inc., 594 F. Supp. 335, 338 (S.D.N.Y. 1984).

[8] Even without actual consummated sales, the mere act of making infringing files available for sale is sufficient to establish a violation of the distribution right.  See, e.g., Hotaling v. Church of Jesus Christ of Latter-Day Saints, 118 F.3d 199, 201 (4th Cir. 1997); Greubel, 453 F. Supp. 2d at 969, 971; Universal City Studios Prods. LLLP v. Bigwood, 441 F. Supp. 2d 185, 190-191 (D. Me. 2006); Motown Records Co., LP v. DePietro, 2007 WL 576284, at *3 (E.D. Pa. Feb. 16, 2007).

users' computers to identify "eligible files," then closely vets each file to ensure it satisfies ReDigi's criteria. Pl. 56.1 ¶¶ 10-15. After uploading, ReDigi subjects music files to a "deeper" and "more intensive" analysis on ReDigi's cloud server, including collecting various items of information about the file, "validating file source and ownership, and verifying that the file was not modified or tampered with." Id. ¶¶ 31-35. ReDigi can block users from accessing its cloud if its criteria are not met. Id. ¶ 15. Rather than a "passive conduit," ReDigi actively participates in determining which files circulate through its infringing service.

ReDigi also aggressively encourages users to sell their recordings through its service.

# REDACTED

(Pl. 56.1 ¶¶ 7-8), and its website and marketing materials thus unabashedly promote such activities. ReDigi offers users coupons and prizes for uploading songs to the ReDigi cloud, sends them emails and newsletters urging them to sell songs or increase their credits for purchases, and readily agrees that the goal and purpose of the ReDigi service is to "get users to sell their songs." Id. ¶¶ 38-45.

ReDigi's level of intervention, oversight and encouragement plainly constitutes volitional conduct under the governing case law. In Playboy Enters., Inc. v. Russ Hardenburgh, Inc., 982 F. Supp. 503 (N.D. Ohio 1997), the Court granted summary judgment of direct liability against online bulletin board operators, which had a policy of encouraging subscribers to upload files and used a screening policy that allowed employees to view files before they were uploaded and to move them to a generally available file for subscribers. Id. at 513-14. The defendants' active encouragement to upload files, combined with their control over which files were discarded and which were moved into a generally available area for subscribers "transform[ed] Defendants from passive providers of a space in which infringing activities happened to occur to active participants in the process of copyright infringement." Id. at 513.

12

This Court relied on the Russ Hardenburgh case in Usenet in granting plaintiff record companies summary judgment on their direct infringement claim against online service providers operating a global system of online bulletin boards.  633 F. Supp. 2d at 148-149.  The Usenet Court found that defendants had similarly taken active measures to encourage the use of digital music files, and routinely exercised control over which newsgroups their servers accept and store and which they reject.  Id.  Unlike a "passive conduit" that simply facilitates the exchange of content, defendants "actively engaged in the process so as to satisfy the 'volitional conduct' requirement for direct infringement."  Id. at 149.

The same result follows here.  Indeed,

**REDACTED**

Pl. 56.1 ¶ 35.  Such

involvement is at complete odds with the notion of a "passive conduit" and, accordingly, subjects ReDigi to direct liability for the infringing conduct occurring on its site.

## II.    REDIGI IS LIABLE AS A SECONDARY INFRINGER

Even if the copyright violations addressed in Point I above are deemed to be carried out by ReDigi users rather than ReDigi itself, those acts would constitute direct infringements in circumstances sufficient to render ReDigi liable for infringement under well-established principles of secondary liability.  See Usenet, 633 F. Supp. 2d at 149.

### A.    ReDigi Is Liable for Vicarious Copyright Infringement

Vicarious liability for copyright infringement exists where the defendant "has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities."  Gershwin Publishing Corp. v. Columbia Artists Management, Inc. 443 F.2d 1159, 1162 (2d Cir. 1971).  See also A&M Records v. Napster, Inc., 239 F.3d 1004, 1022 (9th Cir. 2001); Shapiro, Bernstein & Co. v. H.L. Green Co., 316 F.2d 304, 306 (2d Cir. 1963).  Unlike

13

contributory infringement, knowledge is not an element of vicarious liability.  Gershwin, 443

F.2d at 1162; Peer Int'l Corp. v. Luna Records, Inc., 887 F. Supp. 560, 565 (S.D.N.Y. 1995).

There can be no dispute that ReDigi has the right and ability to supervise the infringing

activity.  As discussed above, ReDigi's software scans all music files on a user's computer and

selects those ReDigi considers "eligible."  It then re-analyzes those files on its own cloud server,

and has the right and ability to block users based on that analysis.  Pl. 56.1  ¶¶ 10-15, 31-35.

# REDACTED

Id. ¶ 35.  Because ReDigi exercises complete oversight over what content it will

accept on its server and supervises the sales process, it unquestionably has the right and ability to

control the infringing conduct.  See, e.g., Perfect 10, Inc. v. Cybernet Ventures, Inc., 213 F.

Supp. 2d 1146, 1173-74 (C.D. Cal. 2002) (finding control where service provider had monitoring

program providing detailed instructions regarding content, forbade certain types of content and

refused access to sites failing to comply with instructions).

The problem is not that ReDigi is unable to control the infringing activity, but that it

refuses to do so based on its stubborn adherence to an unlawful business model.  Where a

defendant is "in a position to police the infringing conduct," its "failure to police the conduct"

gives rise to vicarious liability.  Gershwin, 443 F.2d at 1162-63.  See also Shapiro, Bernstein,

316 F.2d at 306-08 (store owner vicariously liable for concessionaire's sales of infringing

records, where owner "retained the ultimate right of supervision over the conduct of the record

concession and its employees"); Usenet, 633 F. Supp. 2d at 157  (defendant's "ability to block

infringers' access to a particular environment for any reason whatsoever is evidence of the right

and ability to supervise") (quoting Napster, 239 F.3d at 1023).

ReDigi also has the most direct of financial interests in its users' infringing activities, as it charges a transaction fee for every sale on its website. Pl. 56.1 ¶¶ 7-8, 54-55. See, e.g., Shapiro, Bernstein, 316 F.2d at 308 (store owner who received 10-12% of profits of concessionaire selling pirated sound recordings at store held vicariously liable). With a business model based on profits earned from infringing sales it could clearly block, ReDigi is vicariously liable for copyright infringement.

### B.      ReDigi Is Liable for Contributory Copyright Infringement

A contributory infringer is "one who with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417, 487 (1984) (citing Gershwin, 443 F.2d at 1162). ReDigi clearly has knowledge of the infringing activity at issue in this case; it set up its entire business to encourage the unauthorized exploitation of copyrighted recordings. While ReDigi invents various labels and theories to cloud the issues, it cannot evade the clear proscriptions of the Copyright Act or liability thereunder based on a subjective and incorrect interpretation of the law. See, e.g., Arista Records LLC v. Does, 604 F.3d 110, 118 (2d Cir. 2010) ("The knowledge standard is an objective one; contributory infringement liability is imposed on persons who 'know or who have reason to know' of the direct infringement").

ReDigi also contributes materially to user infringements. Its service is the very "means by which the infringement occurs." Columbia Pictures Indus., Inc. v. Aveco, Inc., 800 F.2d 59, 62-63 (3d Cir. 1986) (video store provided viewing rooms with VCRs and encouraged customers to use them to view infringing videos). See also Gershwin, 443 F.2d at 1162-63 (by forming local concert association, defendant created market for performers using copyrighted compositions). Its software processes uploads, sales and downloads of unauthorized copies of Capitol's works and thus provides the "site and facilities" for infringement. Napster, 239 F.3d at

1022.   And, by offering the various incentives and inducements noted above, ReDigi actively and necessarily (for its own survival) encourages infringing sales.  See Intellectual Reserve, Inc. v. Utah Lighthouse Ministry, Inc., 75 F. Supp. 2d 1290, 1293-95 (D. Utah 1999) (website posting URLs of sites containing infringing copies of plaintiffs' works actively encouraged users to visit pirate sites); Russ Hardenburgh, 982 F. Supp. at 514 (online bulletin board encouraged customers to upload infringing content by offering a financial incentive program).

### C.      ReDigi Is Liable for Inducement of Copyright Infringement

Under Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 545 U.S. 913 (2005), "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." Id. at 919.  See also Arista Records, LLC v. Lime Group, LLC, 715 F. Supp.2d 481, 506, 508-09 (S.D.N.Y. 2010).  This same standard applies to providers of online services as well the maker of "devices." Usenet, 633 F. Supp. 2d at 151-52.

As in Grokster, Lime Group and Usenet, and for the reasons noted above, ReDigi willfully induces users to make unauthorized reproductions and distributions of Capitol's copyrighted works.  It urges users – with coupons, prizes, credits and other encouragements – to copy and sell recordings without the requisite permission. Pl. 56.1 ¶¶ 39-48.  And, while ReDigi unequivocally and repeatedly assures those users in "marketing materials" that "YES. ReDigi is LEGAL,"

# REDACTED

ReDigi must now be held to answer for actively and affirmatively inducing copyright infringement.

16

### III.    REDIGI HAS NO VALID DEFENSE TO INFRINGEMENT

#### A.    <u>There is No Basis for ReDigi's Fair Use Defense</u>

ReDigi asserts fair use as an affirmative defense.  <u>See</u> Answer (Docket No. 6) ¶ ¶ 64, 68.
The fair use defense hinges on "whether the copyright laws's goal of promoting the Progress of
Science and Useful Arts would be better served by allowing the use than by preventing it."
<u>Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.</u>, 150 F.3d 132, 141 (2d Cir. 1998).  It
permits certain uses of a copyrighted work "for purposes such as criticism, comment, news
reporting, teaching … scholarship, or research."  17 U.S.C. § 107.  While these categories are
only illustrative, a Court first should consider whether a use falls within or is "similar to" those
listed in the statute.  <u>See</u> <u>Ringgold v. Black Entm't Television, Inc.</u>, 126 F.3d 70, 78 (2d Cir.
1997).

Nothing ReDigi does satisfies these broader purposes.  By simply duplicating sound
recordings to undersell Capitol's legitimate retailers, ReDigi undermines incentives for artistic
creativity and is far removed from the kinds of uses, such as "criticism" or "scholarship," that
add to the store of creative works.  ReDigi argued fair use at the preliminary injunction stage
based on "space shifting," where copying is "for personal, non-commercial use."  ReDigi PI
Opp. Br. (Docket No. 14) at 10.  This case has nothing to do with personal storage of one's own
files, but rather ReDigi's commercial enterprise based on sales transactions.[9]  The only "shifting"
that takes place is of infringing music files from one user to another.

More important, none of the four statutory fair use factors supports the defense here.
Under the first factor, the "the purpose and character" of ReDigi's use is quintessentially "of a
commercial nature,"  <u>see</u> 17 U.S.C. § 107(1), as  ReDigi earns a transaction fee on every sale.

---

[9]

# REDACTED

See UMG Recordings, Inc. v. MP3.com, Inc., 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000).

Moreover, ReDigi's copying and distribution of Capitol's recordings is hardly "transformative."

By offering replicas of Capitol's recordings, ReDigi's copies "merely supersede" Capitol's

works and add nothing "new, with a further purpose or different character." See Castle Rock,

150 F.3d at 142; Napster, 239 F.3d at 1015 ("downloading MP3 files does not transform the

copyrighted work"); MP3.com, Inc., 92 F. Supp. 2d at 351 (copied MP3 recordings added no

"new aesthetics, new insights and understandings").

 The second statutory factor, "the nature of the copyrighted work," 17 U.S.C. §107(2),

disfavors fair use where creative works such as sound recordings are at issue. See, e.g., Napster,

239 F.3d at 1016; MP3.com, Inc., 92 F. Supp. 2d  at 351-52 (sound recordings are "close to the

core of intended copyright protection" and "far removed from the more factual or descriptive

work more amenable to fair use") (citations and quotations omitted).  And, where ReDigi

duplicates entire recordings wholesale, it fails to satisfy the third fair use factor of "the amount

and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C.

§ 107(3).  See MP3.com, Inc., 92 F. Supp. 2d at 351-52 (entire recordings taken).

 Finally, ReDigi has a direct negative effect on "the potential market for or value of the

copyrighted work." 17 U.S.C. § 107(4).   **REDACTED**

   see Pl. 56.1 ¶ 51, but which are sold at "used" prices,

supplants the market for legitimate digital distribution.  See Napster, 239 F.3d at 1017

("deleterious effect on the present and future digital download market" defeats fair use).

 **B.** **The Essential Step Doctrine Does Not Apply**

 ReDigi also asserts the "essential step defense" under section 117 of the Copyright Act.

See Answer (Docket No. 6) ¶ ¶ 65, 69.  This defense permits owners of a "computer program" to

make "another copy or adaptation," provided "that such new copy or adaptation is created as an

essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner." 17 U.S.C. § 117(a). Because loading software into a computer necessarily entails making a copy, the section ensures that the owner of a computer program has a "legal right to copy it to that extent which will permit its use by that possessor." See Nimmer § 8.08[B][1], at 8-134.3 (quoting legislative history).

As a threshold matter, ReDigi is not the "owner" of the sound recordings that are duplicated (Rudolph Dep. at 254), and thus cannot assert § 117(a) as a defense to its own acts of direct infringement. See Point I, D supra. In any event, § 117(a) on its face does not apply to copying sound recordings for resale. First, sound recordings are not "computer programs": "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." 17 U.S.C. § 101. They are not akin to the executable code of software, which instructs a computer to execute functions to bring about a result, but rather artistic works that may be embodied in various kinds of media.

In addition, the copies made by ReDigi and its users are decidedly not "created as an essential step in the utilization" of the recordings and used "in no other manner." They are used for the express purpose of resale. Section 117 only applies to copies made for the computer program owner's own "internal use" and not to those that are distributed, transferred or made accessible to unrelated third parties. See, e.g., Centrifugal Force, Inc. v. Softnet Commc'ns, Inc., 2011 WL 744732, at *6 (S.D.N.Y. Mar. 1, 2011) (§ 117 provides defense for "software user that makes a copy or adaptation of a program in their own use of that program") (emphasis added); Practiceworks, Inc. v. Prof'l Software Solutions of Ill., Inc., 72 U.S.P.Q.2d 1691, 1696 (D. Md. 2004) (§ 117(a) applies only to "uses that are internal, not external"); Expediters Int'l of Wash., Inc. v. Direct Line Cargo Mgmt. Servs., Inc., 995 F. Supp. 468, 478 (D.N.J. 1998) (§ 117

exemption only applies to copy made for internal use and not for distribution); <u>ISC-Bunker Ramo Corporation v. Altech, Inc.</u>, 765 F. Supp. 1310, 1332 (N.D. Ill. 1990) (§ 117 applies to "copies of the software for [defendant's] own internal use on its own machines"); <u>Apple Computer, Inc. v. Formula Int'l, Inc.</u>, 594 F. Supp. 617, 621-22 (C.D. Cal. 1984) (§ 117 exemption only permits the "owner-user" to make a copy for its own "internal use" and that copy "cannot be made accessible to others").

In the context of "adaptation," subject to the same restrictions as copying, the Second Circuit explained that § 117(a) "was intended to apply to modifications for internal use, as long as the adapted program is not distributed in an unauthorized manner." <u>See</u> <u>Aymes v. Bonnelli</u>, 47 F.3d 23, 26 (2d Cir. 1995). In determining that a defendant did qualify for the exemption, the Court noted that there was no evidence that the modified programs were "distributed, transferred, or used for any purpose other than [defendant's] own internal business needs." <u>Id.</u> at 27. Here, of course, the files are copied for the express purpose of resale, so § 117(a) cannot apply.

### C.  <u>The First Sale Defense Is Inapplicable</u>

ReDigi has also asserted the "first sale doctrine" of § 109(a) of the Copyright Act as an affirmative defense. <u>See</u> Answer (Docket No. 6) ¶ ¶ 66, 67,70, 76. Section 109(a) provides in relevant part:

> Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord.

As an initial matter, §109(a) imposes a narrow limitation solely on the distribution right contained in § 106(3), and is not a defense to infringement of any other exclusive rights. As demonstrated above, ReDigi also violates Capitol's reproduction rights under § 106(1). Accordingly, even if the other conditions of § 109 were met -- and they are not -- ReDigi would

remain liable for infringing Capitol's reproduction rights. See U.S. Copyright Office, Library of Cong., DMCA Section 104 Report (2001), available at www.copyright.gov/reports/studies/ dmca/sec-104-report-vol-1.pdf (hereafter the "DMCA Report") at 79 ("Section 109 limits a copyright owner's exclusive right of distribution. It does not, by its terms, serve as a defense to a claim of infringement of any of the other exclusive rights.").

 With respect to Capitol's distribution right, ReDigi's first sale defense fails because §109(a) only permits the owner of a "<u>particular</u> phonorecord" to dispose of "<u>that</u> phonorecord." 17 U.S.C. 109(a) (emphasis added); <u>see</u>, <u>e.g.</u>, <u>Mirage Editions, Inc. v. Albuquerque A.R.T. Co.</u>, 856 F.2d 1341, 1344 (9th Cir. 1988) ("the right to transfer [under the first sale doctrine] applies only to the particular copy of the book which appellant has purchased and nothing else"). As discussed above, in order to sell a recording, a ReDigi user must first upload the recording to the ReDigi server, necessarily resulting in the fixation of the copyrighted work in a new phonorecord. <u>See</u> pp. 4-7, <u>supra</u>. It is that newly fixed phonorecord that is sold, rather than the "particular phonorecord" with which the seller began. <u>See</u> DMCA Report at 79 ("The ultimate product of ... digital transmissions is a new copy in the possession of a new person. Unlike the traditional circumstance of a first sale transfer, the recipient obtains a new copy, not the same one with which the sender began").

 Indeed, the very fact that the seller's uploaded file has to be deleted from his computer, <u>see</u> Pl. 56.1 ¶¶ 18-20, confirms that it is a different phonorecord which has been conveyed to the buyer. If it were the same phonorecord that were transferred, no deletion would be required or could even logically take place. Nor is such phonorecord "lawfully made" within the meaning of § 109(a), since there is no right to reproduce a copyrighted work for purposes of sale. <u>See</u>, <u>e.g.</u>,

21

United States v. Sachs, 801 F.2d 839, 843 (6th Cir. 1986) ("the first sale doctrine only permits the sale of a particular lawfully made copy, not its reproduction") (citing cases).

In the above-referenced DMCA Report, the Copyright Office explored this very question of whether the first sale doctrine applied in the context of digital transmissions and unequivocally concluded that the defense was unavailable under the statute. See DMCA Report at 79-80. As the DMCA Report explained, the very nature of digital transactions requires that a reproduction be made and thus precludes application of the first sale doctrine:

> Digital transmission of a work does not implicate the alienability of a physical artifact. When a work is transmitted, the sender is not exercising common-law dominion over an item of personal property; he is exercising the central copyright right of reproduction with respect to the intangible work. Conversely, the copyright owner's reproduction right does not interfere at all with the ability of the owner of the physical copy to dispose of ownership or possession of that copy, since the first sale doctrine applies fully with respect to the tangible object (e.g., the user's hard drive) in which the work is embodied.

DMCA Report at 87. See also id. at 86 ("The tangible nature of the copy is not a mere relic of a bygone technology. It is a defining element of the first sale doctrine and critical to its rationale").

In addition to its analysis of existing law, the DMCA Report actually considered and rejected legislative proposals to amend the Copyright Act to incorporate a "digital first sale doctrine" that would cover precisely the kind of system ReDigi claims to offer. See DMCA Report at 79 n.272 (noting proposal that would "permit the transmission of a work from one person to another, generally via the Internet, provided the sender's copy is destroyed or disabled (whether voluntarily or automatically by virtue of a technological measure)").[10] Of course, the

---

[10] As a policy matter, given the distinctions between physical and digital copies, as well as the greater threat posed by piracy in the online context, the DMCA Report did not recommend adopting a digital first sale doctrine. The record in this case supports the same conclusion, as

very fact that a statutory amendment would be required to legalize ReDigi's system of transmission and deletion only serves to underscore that existing law does not excuse ReDigi's infringement.  Because both the plain language of § 109 and the underlying policy on which it is based preclude its application to ReDigi, there is no basis for a first sale defense absent an express amendment of the Copyright Act by Congress.

### D.   There is No DMCA Immunity Available to ReDigi

ReDigi has asserted that it is entitled to a safe harbor defense under section 512 of the Digital Millennium Copyright Act.  See Answer (Docket No. 6) ¶ 62.  However, to claim a DMCA immunity for "information residing on systems or networks at direction of users" (17 U.S.C. § 512(c)), a service provider must show that it "does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity." 17 U.S.C. § 512(c)(1)(B).  As previously discussed, ReDigi receives payments based on every infringing sale, and has the right and ability to control such infringements by virtue of its active involvement and oversight over which recordings will qualify as eligible for upload to the ReDigi cloud.  Thus, the defense is not available to ReDigi.[11]

---

there are numerous ways in which users can circumvent ReDigi's system and retain copies of the recording they have sold.  Pl. 56.1 ¶¶ 57-64.  In any event, of course, it is the province of Congress to make such a determination, and there is no basis under the present statutory scheme for creating a digital first sale defense.

[11]ReDigi also claims that Capitol "failed to comply with the notification requirements of the Digital Millennium Copyright Act, 17 U.S.C.  § 512."  Answer (Docket No. 6) ¶ 63.  However, the statutory "notice and takedown" procedure is purely voluntary and imposes no obligation on Capitol to provide any notification.  See Nimmer §12B.04[A][3], at 12B-59 ("copyright owners are not obligated to give notification of claimed infringement in order to enforce their rights") (quoting legislative history).

## **CONCLUSION**

For all of the foregoing reasons, Capitol's motion for partial summary judgment finding

ReDigi has infringed Capitol's rights of reproduction and distribution should be granted.

Dated: New York, New York
      July 20, 2012                 Respectfully submitted,

                           COWAN, LIEBOWITZ & LATMAN, P.C.
                           Attorneys for Plaintiff Capitol Records, LLC

                           By:

                                  Richard S. Mandel
                                  Jonathan Z. King

                           1133 Avenue of the Americas
                           New York, New York 10036-6799
                           (212) 790-9200