UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
CAPITOL RECORDS, LLC,

                          Plaintiff,

        v.

REDIGI INC.,

                     Defendant.

-------------------------------------------------------------X

Civil Action No.: 12CIV0095
(RJS)

## MEMORANDUM OF LAW IN SUPPORT OF REDIGI INC'S MOTION FOR SUMMARY JUDGMENT

MEISTER SEELIG & FEIN LLP
Two Grand Central Tower
140 East 45th Street, 19th Floor
New York, New York 10017
Phone: (212) 655-3580
*Attorneys for ReDigi Inc.*

Gary Adelman, Esq.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................... iii

FACTUAL BACKGROUND ..................................................................... 2

D.   TRANSFER OF OWNERSHIP .......................................................... 6

E.   SUBSEQUENT USE
OF A PURCHASED PHONORECORD ................................................. 7

LEGAL STANDARD .............................................................................. 7

ARGUMENT ........................................................................................ 9

II.  NO REPRODUCTION IS INVOLVED
IN A SALE ON THE REDIGI SERVICE ............................................. 10

A.   INFRINGEMENT IS NOT A DEFINITIONAL ISSUE ........................... 12

III. COPIES FOR THE PURPOSE OF STORAGE
ARE PROTECTED BY FAIR USE ..................................................... 14

A.   CAPITOL CONCEDED THE LEGALITY OF STORAGE
FOR PERSONAL USE ..................................................................... 14

B.   FAIR USE PROTECTS DOWNLOADS OF
PERSONAL USE COPIES ............................................................... 15

IV.  THE FIRST SALE DOCTRINE
PROTECTS THE REDIGI MARKETPLACE ........................................ 19

A.   FIRST SALE DOCTRINE APPLIES
TO DIGITAL SOUND RECORDINGS ................................................ 19

i

B.  RESALE OF DIGITAL MUSIC FURTHERS
THE GOALS OF COPYRIGHT LAW ................................................................................ 22

V.    PERFORMANCE AND DISPLAY RIGHTS
HAVE NOT BEEN INFRINGED ................................................................................ 24

CONCLUSION................................................................................................................ 25

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ........................................................................................................ 8

*Bobbs-Merrill Co. v. Straus,*
   210 U.S. 339 (1908) ................................................................................................ 23, 24

*C. M. Paula Co. v. Logan,*
   355 F. Supp. 189 (N.D. Tex. 1973) ....................................................................... 13, 25

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.,*
   536 F.3d 121 (2d Cir. 2008) ....................................................................... 10, 12, 20, 24

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ........................................................................................................ 8

*Chertkova v. Connecticut Gen. Life Ins. Co.,*
   92 F.3d 81 (2d Cir. 1996) ............................................................................................... 8

*Corley v. United States,*
   556 U.S. 303 (2009) ..................................................................................................... 21

*Dr. Miles Med. Co. v. John D. Park & Sons Co.,*
   220 U.S. 373, 31 S. Ct. 376, 55 L. Ed. 502 (1911)  *overruled by Leegin Creative Leather*
   *Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 127 S. Ct. 2705, 168 L. Ed. 2d 623 (2007) ......... 23

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
   499 U.S. 340 (1991) ................................................................................................. 8, 12

*Fox Film Corp. v. Doyal,*
   268 U.S. 123, 127 (1932) ............................................................................................. 22

*Griffin v. Oceanic Contractors, Inc.,*
   458 U.S. 564 (1982) ..................................................................................................... 20

*Landreth Timber Co. v. Landreth,*
   471 U.S. 681, 685 (1985) ............................................................................................. 20

*Lawson v. Suwannee Fruit & S.S. Co.,*
   336 U.S. 198 (1949) ..................................................................................................... 21

*London-Sire Records, Inc. v. Doe 1,*
   542 F. Supp. 2d 153 (D. Mass. 2008) .......................................................................... 19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986).................................................................................. 8

*Quality King Distribs v. L'anza Research Int'l, Inc.*,
   523 U.S. 135 (1998).................................................................................. 23

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1994).................................................................................. 20

*Sony Corp. of America v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984)........................................................................... passim

*Stenberg v. Carhart*,
   530 U.S. 914 (2000).................................................................................. 21

*Torraco v. Port Auth. of New York & New Jersey*,
   615 F.3d 129 (2d Cir. 2010)..................................................................... 21

*Twentieth Century Music Corp. v. Aiken*,
   422 U.S. 151 (1975).................................................................................. 24

*U.S. ex rel. Eisenstein v. City of New York, New York*,
   556 U.S. 928 (2009).................................................................................. 20

*US v. Ron Pair Enterprises, Inc.*,
   489 U.S. 235 (1989).................................................................................. 20

*Weissmann v. Freeman*,
   868 F.2d 1313 (2d Cir. 1989)................................................................... 15

**Statutes**

17 U.S.C. § 101............................................................................................. 2

17 U.S.C. § 106(1)........................................................................................ 9

17 U.S.C. § 107................................................................................... 15, 16, 19

17 U.S.C. §106.................................................................................. 11, 15, 22

17 U.S.C. §109.................................................................................. 20, 21, 22

U.S. Const. Art. 1, §8, cl. 8......................................................................... 23

**Rules**

Fed. R. Civ. P. 56......................................................................................... 8

Defendant ReDigi Inc. ("ReDigi") submits this memorandum of law in support of its motion for summary judgment dismissing Plaintiff Capitol Records, LLC's ("Capitol") claims. Capitol cannot prove that ReDigi has directly or secondarily violated its exclusive rights in reproduction, distribution, display or performance. Notwithstanding the colorful prose in its Complaint, the record shows that Capitol's claims are nothing but unfounded assumptions. Capitol cannot prove that a predicate act of infringement takes place on the ReDigi system. To the extent use of the ReDigi's service implicates any of Capitol's exclusive rights, that use is protected by the first sale doctrine, fair use and other policy based limitations on Capitol's rights.

Capitol's position is that ownership of digital music cannot be transferred without copying. Capitol has taken the stance that infringement is a definitional issue based on the nature of the digital goods and that because a digital track was resident on one drive and later resident on another, it has been reproduced. As explained herein, this position is without merit. Infringement is not a definitional issue. It has always been, and remains, an issue requiring proof, which Capitol cannot provide. Capitol cannot demonstrate that an act of infringement takes place using ReDigi's service. As such, Capitol's claims fail as a matter of law.

In tandem, Capitol should not be allowed to prevail here as its position is contrary to the express purpose of copyright law. This is a case of first impression, and here Capitol seeks to create precedent that the first sale doctrine cannot apply to digital goods. This would be an extremely lucrative and convenient outcome for Capitol, as it would ensure that Capitol could control the use and alienation of digital phonorecords to their own repeated advantage where copyright law does not provide for unlimited, perpetual control. Copyright law gives a limited monopoly to incentivize creation. But that inducement is secondary to the goal that copyright law promotes the broad public availability of literature, music and other arts. In all cases of first

1

impression that clarify the boundaries of copyright law in light of new technological change, authority mandates that the Copyright Act be construed in light of this basic purpose.

At the core of ReDigi's business model is the undisputed notion that consumers have rights in the personal property they legally acquire and, by law, should be allowed to donate, gift, re-sell and otherwise dispose of that legally purchased digital property as they see fit.  Secondary markets, especially those related to music, art and literature, are beneficial to society as they further encourage broad public availability of the types of work that, as a society, we believe enrich us as a whole. Capitol seeks to restrict the availability of digital music by preventing a legal secondary market for digital music.  The interpretation of legal principles that Capitol has and continues to advance here for this purpose does not and cannot serve the basic purpose of the Copyright Act.[1]  For all the reasons set forth herein Capitol cannot and should not prevail.

## FACTUAL BACKGROUND

ReDigi was founded to find a way for people to lawfully gift their digital music to others in need who could not afford to buy music, and to provide a donation service so that people would not steal digital music. See ReDigi's Statement of Undisputed Facts ("RSUF") ¶3. As its founders began delving into whether their idea would fit within the confines of copyright law, they discovered the first sale doctrine. *Id.*  They quickly realized that technology that could effectuate transfers within the parameters of the law was not readily available and they set out to develop a technology that would be compliant with copyright law. *Id.* ¶4. As ReDigi developed it grew into a service that would provide a marketplace for individuals to re-sell their legally purchased digital goods. *Id.* ¶5, 7. ReDigi's founders thought extensively about the boundaries

---

[1] Referring to 17 U.S.C. § 101 *et seq.*

of copyright law, looked at other legally existing technologies and transfer methods, researched

case law and tried to create a legally compliant system. *Id.* ¶6.

## A. ELIGIBILITY REQUIREMENTS

In order to use the Redigi system for storage or sale, a user must download a software



[2] "Eligible File(s)" solely refers to the original source file purchased from iTunes by the user as determined by Media Manager. *See* RSUF. ¶¶ 8,9, 24.





**C. PURCHASES OF NEW MUSIC ON ITUNES THROUGH REDIGI 2.0**



## D. TRANSFER OF OWNERSHIP

Once the Eligible File is in the Cloud Locker, only the user associated with that place on

the Cloud Locker has access to its contents and the phonorecords stored therein through



████████████████████████████████████████

and completely. *Id.* ¶50. Money or credit is transferred between the buyer and seller, but the

phonorecord itself is untouched, and is not reproduced or moved, and only one user has

ownership at a time. *Id.* ¶51.

## E.  SUBSEQUENT USE OF A PURCHASED PHONORECORD

After ownership of any given phonorecord has been transferred, the new owner of that

phonorecord can stream the file to themselves or can download the file to his or her computer.

*Id.* ¶52.  When a ReDigi user opts to download a purchased track, he or she requests the

download. *Id.* ¶53.  The original Eligible File is maintained in the Cloud Locker so that the user

can continue to stream that phonorecord for their own personal use, but if they choose to later re-

sell the phonorecord they do not have ██████████ Eligible File to the Cloud Locker. *Id.*

This feature also encourages users to utilize ReDigi as a cloud storage service so that they can

access their music anywhere and/or prevent loss in the event that their personal computer is lost

or destroyed. *Id.* ¶54.  Based on consumers' experiences with other music services, consumers

expect to be able to use their digital phonorecords on their computers so that their music library

service, whether it be iTunes or something else, will automatically sync their library with their

portable devices. *Id.* ¶55.  Such personal use copies ("Personal Use Copy") are authorized by

ReDigi's terms of service which limit use of downloads and streaming and provide that any such

purchased music can only be "downloaded or streamed for [the user's] personal use." *Id.* ¶56.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See*

Fed. R. Civ. P. 56(a). The burden of demonstrating that no factual dispute exists is on the moving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  However, once the moving party has met this burden, the burden shifts to the opposing party, who must properly address the movants assertion of fact with materials as required by Rule 56(c).

No genuinely triable factual issue exists when the moving party demonstrates that after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *See Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996). "Only disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For a dispute to be genuine there must be more than "metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.  Where defendant moves for summary judgment, although it has the burden of showing there is no genuine issue of material fact, the plaintiff is not "relieved of his own burden of producing . . . evidence that would support a jury verdict," plaintiff must present affirmative evidence to defeat a summary judgment motion. *Id.* at 256-257.

To succeed on a claim of copyright infringement, plaintiff must prove two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Although the words copy, copying, and copies are used colloquially in many ways, within the lexicon of the Copyright Act and case law interpreting the Copyright act those words have specific meanings. In relation to Plaintiff's burden of proof, "'copying' is 'shorthand for the infringing of any of the copyright owner's . . . exclusive rights" set forth in Section 106 of the Copyright Act." *See*

8

Nimmer on Copyright § 8.02, p. 1 (2012).  As such Plaintiff is burdened with actually proving

that violation of the reproductive, distribution, display or performance right actually took place

in violation of its rights "to do and to authorize" such acts. *See* 17 U.S.C. § 106.

## ARGUMENT

Capitol cannot proffer evidence proving its claims alleging copyright infringement,

inducement of copyright infringement, contributory copyright infringement, and vicarious

copyright infringement in connection with its alleged copyrighted content as well as common

law copyright infringement for certain of its pre 1972 sound recordings here.

As will be explained at length below, no rational trier of fact could find that infringement

takes place through use of the ReDigi system.  To the extent any discrete acts by users on the

ReDigi system even implicate any of Capitol's exclusive rights, those acts are not infringements

by virtue of statutory and/or equitable, policy based limitations on Capitol's exclusive rights.

Although Capitol will surely try to convince this Court that it can prevail on the grounds that the

essence of digital transfer of a phonorecord is the *sine qua non* of copyright infringement -- that

is simply not the case.  Nor can Capitol prevail on its claims of infringement against ReDigi by

claiming that ReDigi users *could* commit separate acts of infringement outside of the ReDigi

system, as practically speaking those acts have no connection to ReDigi.  Capitol cannot provide

any evidence that its exclusive rights have been violated in an infringing manner. On its best day,

Capitol's argument raises non-verifiable (i.e. metaphysical), doubt that infringement *could* take

place, but that is not the factual reality of the ReDigi system and is certainly not enough to prove

infringement.  As such, Capitol's claims must be dismissed as a matter of law.

Capitol cannot prove that archival copies of its copyrighted works were made. However, even in the event that one was, any duplicate archival copies that may have been made prior to March of 2012, do not violate Capitol's exclusive reproductive right, as they were not sufficiently fixed to satisfy the durational requirement in the Copyright Act. Controlling law mandates that the fixation requirement "imposes both an embodiment requirement and a duration requirement." *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 129 (2d Cir. 2008). In *Cartoon Network*, the Second Circuit held that even where a copyrighted work is sufficiently "embodied" in a disk, in that it is sufficiently permanent or stable to permit it to be perceived, reproduced or communicated, the embodiment must also last for a "period of more than transitory duration." *Id.* at 129-130. Where "[n]o bit of data remains in any buffer for more than a fleeting 1.2 seconds", the work is only embodied for a "transitory" period and "thus fails the duration requirement." *Id.*

Here, the duplicate archival copies that may have been made would only have existed for mere seconds until the migration of the Eligible File was complete. *See* RSFU ¶¶25-30. After the migration was complete the archival files would be deleted. *Id.* ¶29,30. Based upon the holding in *Cartoon Network*, there can be no dispute that notwithstanding the fact that an archival copy may have been embodied, its existence for mere milliseconds is a "transitory" period that fails the duration requirement. As such it is not sufficiently fixed to qualify as a reproduction of a phonorecord under the Copyright Act and cannot be an infringement.

## II. NO REPRODUCTION IS INVOLVED IN A SALE ON THE REDIGI SERVICE

When a sale transaction is completed on the ReDigi system, there is no reproduction of a phonorecord that would violate Capitol's exclusive rights. Capitol can proffer no evidence that a

"reproduction" takes place in a sale transaction, which would allow a reasonable juror to find that the copyright in Capitol's sound recordings had been infringed.

Capitol's entire lawsuit is premised on the misguided belief that it is simply not possible to transfer a copyrighted digital good – here a phonorecord – without violating the reproduction right protected by 17 U.S.C. §106.  *See* Adelman Decl., Ex. 12, McMullan Tr. Pp 126-129. However Capitol's position that phonorecords cannot be transferred without a reproduction is illogical and untrue.  When a user completes a sale transaction of a phonorecord residing on the user's personal hard drive, through the ReDigi system, there are two distinct steps.



██████████████████████████████████   With reference to the three aforementioned

steps, there is never an instance when an Eligible File could exist in more than one place or be

accessed by more than one user. *Id.* ¶36, 48. Thus no reproduction has occurred.

Capitol's position that phonorecords in digital format cannot be transferred without an

express violation of the reproduction right is not premised on a sustainable interpretation of the

Copyright Act. This interpretation would ignore any inquiry as to how technology actually

effectuates transfer of data, which has been expressly rejected in this Circuit. Moreover such an

interpretation would be tantamount to endorsing the view that certain provisions of the Copyright

Act do not apply to digital goods at all. This is not a plausible argument, nor would policy

considerations relating to an individual's right to alienation of property support such a notion.

### A.   INFRINGEMENT IS NOT A DEFINITIONAL ISSUE

Capitol's position is that proof of infringement of the exclusive right to reproduction is

purely a "definitional issue." *See* Adelman Decl., Ex. 12, McMullan Tr. 126:9-18. Essentially

Capitol has espoused the belief that because the file merely has existed in different places that

alone is "copying under the Copyright Act." *Id.* at 125:25-126:2-8. However the language and

judicial interpretation of the Copyright Act supports no such conclusion. To the contrary to

prevail in an infringement action a plaintiff must prove copying. *Feist Publ'ns, Inc.,* 499 U.S. at

361. Additionally the Second Circuit has rejected the notion that one can ignore facts of specific

transfer methods or assume that existence satisfies fixation requirements. *See Cartoon Network,*

536 F. 3d at 130 (whether transmission techniques infringe is necessarily fact specific).

The mere fact that a copyrighted "copy" or "phonorecord" existed in one place and later

existed in another does not constitute proof of a "reproduction" or duplication. When presented

with similar questions, Courts have specifically rejected this argument and held that processes

which involve the moving of works such as printed images for re-application of that original image elsewhere is not copying. *See C. M. Paula Co. v. Logan*, 355 F. Supp. 189, 191 (N.D. Tex. 1973). In *C.M. Paula Co.*, the defendant utilized a process of transferring printed designs from legally purchased greeting cards to other mediums. Essentially the defendant coated greeting cards that plaintiffs copyrighted designs had been affixed to, with resins to form a decal, and then through the use of chemicals lifted the original image from the greeting card and reapplied that same lifted image elsewhere. *Id.* at 190. The Court held that such a process was not a reproduction. *Id.* at 191. Each plaque sold by defendant required the purchase and use of an individual piece of artwork marketed by plaintiff. If defendant wanted to make 100 plaques using the identical print, defendant would be required to purchase one hundred separate prints, and that process did not "constitute copying." *Id.* The Court rejected the notion that merely because the embodiment of the design was affixed to two different mediums at different times, that it was "reproduced" or "copied" in violation of the Copyright Act. The embodiment of the design was simply transferred. However transfer of the work from one physical medium to another does not constitute a reproduction where no reproduction of the work was made.

Here ReDigi's process is substantially identical to the above case. When a ReDigi user

each digital file sold on the ReDigi system requires that the purchase of that digital file offered for sale by Capitol via iTunes. In order for one hundred digital files of a song to be available for purchase on ReDigi, one hundred digital files of the song had to have been previously purchased

from iTunes and offered for sale on ReDigi.  *See* RSUF ¶80.  The essence of a violation of the right to reproduction has no connection to the fact that a phonorecord existed at one point in time in a different place but no longer exists there.  The *sine qua non* of infringement is that a "reproduction" was made, i.e. that there could have been an Eligible File on the user's hard drive and a duplicate in the Cloud Locker in existence at the same time.  ReDigi does not allow that to happen during ███████████ sale process, thus there is no reproduction or infringement.

### III. COPIES FOR THE PURPOSE OF STORAGE ARE PROTECTED BY FAIR USE

The only reproductions of phonorecords that are allowed to be made by users on the ReDigi system are Personal Use Copies, which are protected by fair use and/or the license that comes with the purchase of the phonorecord from iTunes.  A Personal Use Copy that is downloaded from the Eligible File in the Cloud Locker is for personal use only. These Personal Use Copies are not infringements as they are protected by the doctrine of fair use and/or the license that is granted with the purchase of a phonorecord.

### A.  CAPITOL CONCEDED THE LEGALITY OF STORAGE FOR PERSONAL USE

As an initial matter Capitol has admitted that cloud storage is legal for personal use.  At oral arguments for Capitol's preliminary injunction motion the Court specifically asked:

> THE COURT:  That's my question to you.  So if someone just decided to store digital recordings that they purchased through iTunes, they wanted to store it in a cloud, that requires copying, according to your papers.  Right?
> MR. MANDEL:  <u>Yes.  And that's not what we're challenging here.</u>
> . . .
> THE COURT:  But well, it's stored in the cloud, and the process of storage requires a copying.  And that process you're saying -- I think you're conceding is not a violation of the Copyright Act.
> MR. MANDEL:  For purposes of this case, <u>we're not making that claim.  We're not challenging that</u>.  (Emphasis Added.)  *See* Adelman Decl., Ex. 4, at 21:4-23.

Capitol has made clear that it is not challenging that reproductions made for the storage process do not violate the Copyright Act.  Here, the express purpose of the Personal Use Copies

can only be for storage and personal use on the user's personal devices. Thus Capitol cannot reasonably dispute the legality of ReDigi's storage service that also allows users to elect to download Personal Use Copies of the tracks they purchase to their personal and portable devices. As such there should be no dispute that Personal Use Copies are not an infringement.

## B. FAIR USE PROTECTS DOWNLOADS OF PERSONAL USE COPIES

However, even in the event that Capitol attempts to withdraw its previous admissions, Personal Use Copies are protected by the fair use doctrine. *See* 17 U.S.C. § 107. Section 107 specifically provides that notwithstanding Section 106 the fair use of a copyrighted work, including such use by **reproduction** in copies or **phonorecords** for certain purposes, is not an infringement of a copyright. *Id.* The fair use doctrine allows a holder of the privilege to use copyrighted material in a reasonable manner without the consent of the copyright owner. *Weissmann v. Freeman*, 868 F.2d 1313, 1323 (2d Cir. 1989). The fair use doctrine is grounded in the well founded notion that copyright protection is only a limited monopoly and the protection has never accorded copyright owners complete control over all possible uses of his or her work. *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 432 (1984). Even the exclusive right to reproduction is not within the exclusive domain of the copyright holder, because the law recognizes that an individual may reproduce a copyrighted work for a "fair use" which the copyright owner cannot exert control over. *Id.* at 433. Section 107 identifies factors that enable a court to apply "an 'equitable rule of reason' analysis to particular claims of infringement" to determine whether the use in question qualifies. *Id.* at 448. In determining whether a use in any particular case is fair use the factors to be considered include:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation

to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. *See* 17 U.S.C. § 107.

On ReDigi when a user chooses to download a Personal Use Copy of a phonorecord purchased through the ReDigi system, the user is making the Personal Use Copy so he or she can use it at a later time or in a different place, such as on a portable music player. *See* RSUF ¶¶60-64. This enables users to listen to their legally purchased music at their convenience, in any place, and without an internet connection, which consumers have come to expect through almost every service available to them. *Id.* ¶63. Where use is "private home use [it] must be characterized as a noncommercial, nonprofit activity." *See Sony Corp. of Am.*, 464 U.S. at 449.

The nature of the use of a Personal Use Copy of a purchased track is undisputedly personal and not commercial in nature. In fact, ReDigi has made it part of its terms of service that digital media purchased through ReDigi can only be "downloaded or streamed for [the user's] personal use." *See* RSUF ¶62. By prohibiting other uses there is no dispute that the intended nature of the use is personal and as such weighs in favor of finding of fair use.

As to the nature of the copyrighted work itself, it is beyond dispute that, individuals purchase music and build their personal music collections to enjoy music. Storing Personal Use Copies of music on different devices merely enables an individual to hear a work he or she has already legally purchased whenever he or she wants. Thus this factor weighs in favor of a finding of fair use. *Sony,* at 449-50 ("time-shifting merely enables a viewer to see such a work which he had been invited to witness in its entirety free of charge, the fact that the entire work is reproduced . . . does not have its ordinary effect of militating against a finding of fair use.").

By virtue of the overwhelming number of products that are sold and promoted for the purpose of allowing and encouraging users to listen to their music anywhere, consumers expect to be able to store and use their Personal Use Copies of their purchased music in their portable

devices. *See* RSUF ¶63. This is especially true for iTunes users as this practice is expressly

authorized by the Terms of Service, which *inter alia* authorize use on other devices and burning

To allow users to do what they have already been authorized to do, i.e. listen to music

they purchased conveniently, here, reproduction of the entire work does not have the ordinary

effect of weighing against a finding of fair use. *See Sony Corp. of Am.*, 464 U.S. at 449-50.

Like the above, analyzing the last factor, the effect of the use upon the potential market

for or value of the copyrighted work, also points to fair use. "A challenge to a noncommercial

use . . . requires proof of either that the particular use is harmful, or that if it should become

widespread it would adversely affect the potential market for the copyrighted work." *Id.* at 451.

Here Capitol can show no such likelihood of harm. The practice of one user

downloading Personal Use Copies of music files to his or her personal and portable devices for

convenient enjoyment has no effect on the potential market for the copyrighted work, nor does it

have an effect on the value of the work. As discussed at length above, ReDigi's system only

allows users to sell previously legally purchased phonorecords. *See* RSUF ¶8-12. Allowing users

to control where their music is stored, and when and how they can later use that music, does not

diminish the potential market for or value of the copyrighted work. To be eligible for upload or

sale through ReDigi any track had to have been purchased from iTunes. *Id.* ¶8, 66. As such

Capitol has already received the benefit of a sale and value for the work. Capitol cannot

realistically argue that this type of personal use for the purpose of storage and/or convenient use, affects the potential market for their content.  In fact any such argument would be seriously undercut by the fact that Capitol has encouraged this practice. *Id.* ¶68, 72. Capitol cannot credibly argue that Personal Use Copies would be harmful here, when they authorize the practice elsewhere.

It is clear that the fair use doctrine, which urges Courts to apply an equitable rule of reason, absolutely protects a user's right to download a Personal Use Copy for convenience of use. This is especially true given the Congressional intent behind enactment of Section 107 to limit a copyright owner's control over its exclusive rights.  The House Report noted that given:

> the endless variety of situations and combinations of circumstances that can rise in particular cases precludes the formulation of exact rules in the statute. The bill endorses the purpose and general scope of the judicial doctrine of fair use, but there is no disposition to freeze the doctrine in the statute, especially during a period of rapid technological change. Beyond a very broad statutory explanation of what fair use is and some of the criteria applicable to it, the courts must be free to adapt the doctrine to particular situations on a case-by-case basis. *Sony Corp. of Am.*, 464 U.S. at 448 n.31 citing H.R. Rep. No. 94-1476, at 65-66.

If Capitol, and the recording industry as a whole, has encouraged use of their copyrighted work in a way that *requires* reproduction for transfer to multiple portable devices, as they have with iTunes, they should not be allowed to prohibit that practice now.  Each of the statutory factors and equitable considerations unique to this circumstance support the conclusion that Personal Use Copies of music files for personal convenience is protected by the fair use doctrine.

Although the statutory factors are not to be ignored in a fair use analysis, Courts must adapt the doctrine to situations on a case-by-case basis and in light of technological changes. *Id.* Here, where technologies that allow convenient use of legally purchased music on personal devices, a practice which Capitol has authorized, equity demands that the practice be allowed. There is no reason this use could be considered unfair, most importantly because the use does not

18

harm Capitol. Here Capitol has conceded the legality of cloud storage. Here Capitol has

encouraged users to download copies of their previously purchased music tracks to multiple

devices. Here, the use is fair and Capitol should be estopped from taking any contrary position.

## IV. THE FIRST SALE DOCTRINE PROTECTS THE REDIGI MARKETPLACE

Capitol's second claim of infringement is premised on the allegation that ReDigi and/or

its users have infringed upon Capitols exclusive distribution right. This claim also fails on the

grounds that ReDigi's marketplace is protected by the first sale doctrine. *See* 17 U.S.C. §109(a).

Although Plaintiff will certainly argue that the first sale doctrine is inapplicable to digital goods,

such an interpretation is squarely at odds with any logical interpretation of Section 109.

### A.    FIRST SALE DOCTRINE APPLIES TO DIGITAL SOUND RECORDINGS

It cannot be disputed that a "phonorecord" as defined in the Copyright Act includes

digital music files, thus Section 109 must apply to digital files. Section 109 allows:

> **the owner of . . . phonorecord lawfully made** under this title, or any person
> authorized by such owner, **is entitled, without the authority of the copyright
> owner, to sell** or otherwise dispose of the possession of **that . . . phonorecord.**
> (Emphasis Added). *See* 17 U.S.C. §109(a).

There is no question that digital music files qualify under the definition of "phonorecord"

in the Copyright Act. Phonorecords are "material objects in which sounds . . . are **fixed** by any

**method now known or later developed**, and from which the sounds can be perceived,

reproduced, or otherwise communicated, either directly or with the aid of a machine or device."

(Emphasis Added). *Id.* at §101. Other Courts have consistently premised findings on the fact

that digital music files were "phonorecords" within the meaning of the Copyright Act, insofar as

they have granted relief to content owners such as Capitol. *See e.g. London-Sire Records, Inc. v.*

*Doe 1*, 542 F. Supp. 2d 153, 171 (D. Mass. 2008) ("any object in which a sound recording can be

fixed is a 'material object' . . . that includes the electronic files."). To this end Capitol's claims

19

are premised on the idea that electronic files are phonorecords and qualify under the definition, otherwise Capitol would not have an infringement claim here. *See* 1/19/12 Cap. Br. p. 5 n 2.

████████████████████████████████████████████████

phonorecord in digital form from iTunes he or she is the owner of a phonorecord lawfully made under the Copyright Act. *Id.* ¶69. Thus in accordance with the provisions of Section 109, that individual is entitled to sell or otherwise dispose of the possession of that phonorecord. *See* 17 U.S.C. § 109.[5] On the ReDigi system that is precisely what users are allowed to do.

Capitol's position is effectively interpreting Section 109 as excluding digital files from the meaning of phonorecord in that section, which violates the most basic, established principles of statutory interpretation, which "require statutes to be construed in a manner that gives effect to all of their provisions." *U.S. ex rel. Eisenstein v. City of New York, New York*, 556 U.S. 928, 933 (2009). "The plain meaning of legislation should be conclusive." *US v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242-43 (1989) (citing *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982). The starting point in every case involving statutory construction starts, "with the language of the statute itself." *Ron Pair Enterprises, Inc.*, 489 U.S. at 241(citing *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685 (1985). "Statutory definitions control the meaning of

---

[5] To the extent that on opposition Capitol argues that the first sale doctrine has no application to digital transfers based on the report of the Copyright Office from August 2001 "DMCA Section 104 Report," it is not binding. *See Cartoon Network*, 536 F. 3d at 129 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1994)) (the Second Circuit held that the DMCA Section 104 Report "deserves only Skidmore deference, deference based on its 'power to persuade'" and further declined to follow the Report's interpretation regarding the durational requirements). Moreover the Report does not stand for the proposition that the first sale doctrine does not apply to works in a digital form. The report explicitly stated the opinion of the Copyright Office that section 109 does apply to works in digital form. *See* DMCA Section 104 Report at 78. The Report's focus was whether there should be a digital first sale doctrine that applies to instances where "reproduction of the works [are] involved." *Id.* at 70-80. Since reproduction is not involved in ReDigi's sale process this Report has no bearing on the issues before this Court.

statutory words ... in the usual case." *Lawson v. Suwannee Fruit & S.S. Co.*, 336 U.S. 198, 201 (1949); *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000) ("When a statute includes an explicit definition, we must follow that definition...."); 2A N. Singer & J. Singer, Statutes and Statutory Construction § 47:7, pp. 298-299, and nn. 2-3 (7th ed.2007).

"[P]honorecord" is a defined term in the Copyright Act and thus has a single meaning wherever it appears in the Copyright Act. *See* RSUF ¶70. It would be absurd and contrary to controlling law to interpret the "phonorecord" as having different meanings between Section 109 and 106. Moreover interpreting "phonorecord" as being inclusive of digital files in Section 106, so as to confer rights on Capitol, and then as excluding digital goods in Section 109 would not give full effect to the provisions of Section 109. Specifically, that interpretation would not give full effect to the provision allowing individuals to sell or dispose of lawfully obtained "phonorecords" without the copyright owner's consent. Congress has not excluded digital files from resale, but has expressly carved out other limitations on rental, lease and lending of phonorecords. *See* 17 U.S.C. 109(b). The fact that Congress did not exclude re-sales of phonorecords in digital form in Section 109(a), demonstrates that it never intended to do so.

Interpreting "phonorecord" differently between sections of the Copyright Act would further violate basic principles, which call for the avoidance of "endorsing statutory interpretations that would lead to absurd results." *Torraco v. Port Auth. of New York & New Jersey*, 615 F.3d 129, 145 (2d Cir. 2010)(citing *Corley v. United States,* 556 U.S. 303 (2009)). Interpreting phonorecord as having two different meanings would lead to confusion and uncertainty where Congress created definitions for the purpose of uniformity in interpretation.

Moreover, this issue cannot be disputed by Capitol, because they cannot have their cake and eat it too. *If* Capitol owns the exclusive rights as enumerated in Section 106 to phonorecords

in digital form, which Capitol claims here (RSUF ¶71), *then* the limitations on those rights apply to phonorecords in digital form as well. There can be no other interpretation of the law. If "phonorecord" is inclusive of digital music files for the purposes of ownership of exclusive rights, and Capitol is allowed to prosecute people based on the transmission of digital goods, then, "phonorecord" as used in Section 109(a) must include digital music and Section 109(a) must be interpreted to mean that that an owner of a lawfully made digital phonorecord can sell that digital phonorecord without Capitol's permission or authorization.

## B. RESALE OF DIGITAL MUSIC FURTHERS THE GOALS OF COPYRIGHT LAW

ReDigi's application of the first sale doctrine, as inclusive of the right to re-sell digital goods, is further consistent with the policy considerations underlying the Copyright Act.

The Constitution gives Congress the power to "promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." U.S. Const. Art. 1, §8, cl. 8. "The limited scope of the copyright holder's statutory monopoly, like the limited copyright duration required by the Constitution, reflects a balance of competing claims upon the public interest." *See Sony Corp. of Am.*, 464 U.S. at 432 (quoting *Fox Film Corp. v. Doyal*, 268 U.S. 123, 127 (1932)).

On one hand creative work should be encouraged and rewarded, but the motivations and incentives to create must ultimately serve the cause of promoting broad public availability of literature, music and other arts. *Id.* To this end although the immediate effect of copyright law is to secure a fair return for creative labor, the "ultimate aim, is by this incentive, to stimulate artistic creativity for the general public good." *Id.* The primary object of conferring a limited monopoly lies in the "general benefits derived by the public from the labors of authors." *Id.* ReDigi does not dispute that copyright owners are entitled to a fair return for their creative labor.

But their entitlement to monetary return is clearly limited by the greater goal, which is to create

and allow public access to a wealth of music and art, because that enriches society as a whole.

This foundation was part of the reason the First Sale Doctrine was adopted at common

law, prior to its codification. *See Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 351 (1908).  In

*Bobbs-Merill* the court noted that the copyright owner sold copies of the book in quantities and at

a price "satisfactory to it" and when it did so it exercised its right to vend. *Id.*

> "To add to the right of exclusive sale the authority to control all future retail sales
> . . . would give a right not included in the terms of the statute, and, in our view,
> extend its operation, by construction, beyond its meaning, when interpreted with a
> view to ascertaining the legislative intent in its enactment." *Id.*

"The whole point of the first sale doctrine is that once the copyright owner places a

copyrighted item in the stream of commerce by selling it, he has exhausted his exclusive

statutory right to control its distribution." *Quality King Distribs v. L'anza Research Int'l, Inc.*,

523 U.S. 135, 152 (1998). This reflects the common law rule that "a general restraint upon

alienation is ordinarily invalid." *Dr. Miles Med. Co. v. John D. Park & Sons Co.*, 220 U.S. 373,

404-5 (1911).[6] Here basic policy considerations underlying the Copyright Act, dictate that the

first sale doctrine is without doubt applicable to phonorecords in digital form.  Capitol sold

When

Capitol sold each phonorecord it exercised its right to distribution and received the benefit from

the limited monopoly that it is entitled to.  As a result Capitol has exhausted its exclusive

statutory right to control distribution. *Quality King Distribs,* 523 U.S. at 152. To the extent

technological change has created any ambiguity as to whether the first sale doctrine applies, the

---

[6] Overruled with respect to vertical agreements restraining trade by *Leegin Creative Leather
Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007).

Supreme Court has held that the Copyright Act must be construed in light of its basic purpose -- to benefit society as a whole. *Sony Corp. of Am.*, 464 U.S. at 432, *citing Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975) ("[w]hen technological change has rendered its literal terms ambiguous, the Copyright Act must be construed in light of this basic purpose.").

Here Capitol's attempt to control distribution of digital personal property in perpetuity, does not further the ultimate purpose of copyright law. Rather it stifles the re-dissemination of goods by sale or gift. Capitol has received the benefit that the limited monopoly of copyright protection provides when it was paid for the first sale. Upon the completion of that transaction Capitol has exercised its distribution right and its right to control distribution is exhausted. Capitol's attempt to control further control distribution is overreaching and beyond the scope of its exclusive rights. *Bobbs-Merrill Co.*, 210 U.S. at 351. Finding for Capitol would in effect give Capitol a Court sanctioned extension of rights under the copyright act and a general restraint on alienation of property, which is against policy, and should not be endorsed by this Court.

## V. PERFORMANCE AND DISPLAY RIGHTS HAVE NOT BEEN INFRINGED

Capitol also cannot prevail on the claim of infringement of its rights to public performance and/or display. To the extent Capitol is claiming that its rights re infringed by streaming a track placed in the Cloud Locker by the user, controlling authority precludes this claim. The Second Circuit has held that streaming "to a single subscriber using a single unique copy . . . [is] not performance[] 'to the public,' and therefore does not infringe any exclusive right of public performance." *See Cartoon Network*, 536 F. 3d at 139. Here when a user streams a track in his or her Cloud Locker, that user is the only user who has the authority to access that track, and he or she streams it from the single unique phonorecord that the specific user owns. As such there is no infringement of the exclusive right to public performance.

24

As to performance of 30 second clips, at the time of ReDigi's launch and some thereafter,



ReDigi itself does not display artwork or publicly perform clips of the songs.

*Id.* ¶78. ReDigi's website links to sites that have the authority to display and perform the works.

*Id.* ¶79. When users click on those links they are taken to sites that display the artwork or 

to play a clip of the song. *Id.* ReDigi does not infringe these rights.

**CONCLUSION**

For all of the foregoing reasons, it is clear that Capitol cannot satisfy its burden of

proving a *prima facie* case of copyright infringement or raise any genuine issue of material fact

as to the issue of proof of a predicate infringing act that would allow a reasonable juror to find

that such infringement takes place. At best Capitol's claims are tantamount to speculative

theories about what *could happen* but have no basis in fact or reality and are not enough to

survive summary judgment. Capitol has no evidence that a predicate act of infringement takes

place on or with the help of the ReDigi system. For this reason its claims must be dismissed.

Dated: New York, New York
   July 20, 2012

Respectfully submitted,

Gary Adelman, Esq.
Meister Seelig & Fein, LLP
140 East 45th St., 19th Floor
New York, New York 10017
Phone (212) 655-3580
Email gpa@msf-law.com

---

[7] ReDigi lost the license with 7Digital because Capitol refused to approve it based on the used element allegedly being against their best internal practices. *See* RSUF ¶75.