**EXHIBIT 4**

C26TCAPA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

CAPITOL RECORDS, LLC,

               Plaintiff,

       v.                  12 CV 95 (RJS)

REDIGI INC.,

               Defendant.

------------------------------x

                        New York, N.Y.
                        February 6, 2012
                        3:30 p.m.

Before:

               HON. RICHARD J. SULLIVAN,

                        District Judge

                 APPEARANCES

COWAN, LIEBOWITZ & LATMAN
       Attorneys for Plaintiff
BY:  RICHARD MANDEL
     JONATHAN KING

RAY BECKERMAN, PC
       Attorneys for Defendant
BY:  RAY BECKERMAN
     M. TY ROGERS

C26TCAPA

1  you look at fair use, their whole defense on fair use basically

2  presupposes that we're challenging just the mere act of

3  storage.

4       THE COURT:  That's my question to you.  So if someone

5  just decided to store digital recordings that they purchased

6  through iTunes, they wanted to store it in a cloud, that

7  requires copying, according to your papers.  Right?

8       MR. MANDEL:  Yes.  And that's not what we're

9  challenging here.

10      THE COURT:  But why not?  So what is the difference

11  between what is going on here that you are challenging and the

12  hypothetical I just supposed?

13      MR. MANDEL:  Because what is really going on, what

14  their entire Web site talks about, their Facebook page,

15  everything, is a resale market, the ability not to store it,

16  but to sell it.  It's stored in the cloud for the purpose of

17  resale.

18      THE COURT:  But well, it's stored in the cloud, and

19  the process of storage requires a copying.  And that process

20  you're saying -- I think you're conceding is not a violation of

21  the Copyright Act.

22      MR. MANDEL:  For purposes of this case, we're not

23  making that claim.  We're not challenging that.  What we're

24  saying is that you can't subdivide what they're doing.  And

25  they're really saying essentially user A starts out, and he can

**EXHIBIT 5**

REDIGI INC.

TERMS OF USE FOR BETA SOFTWARE, SITE AND SERVICES

These Terms of Use (collectively, the "Terms") are a binding contract between you
and ReDigi Inc. ("ReDigi").

You understand and agree that by installing, accessing or using the Music Manager
Software (the "Software"), ReDigi.com (together with its related websites, the
"Site"), the services related to the Software and/or included on the Site (the
"Services"), and/or the applications and documentation associated therewith and
any upgrades or enhancements of any of the foregoing (collectively with the
Software, the Site and the Services, the "ReDigi Products"), you will be bound by
these Terms.

If you agree to these Terms on behalf of a business or organization, you represent
and warrant that you have the authority to bind the business or organization to
these Terms and your agreement to these Terms will be treated as the agreement of
the business or organization. In that event, "you" and "your" will refer to and apply
to the user of the ReDigi Products or that business or organization, as required by
the context. If you do not agree with these Terms, ReDigi is not willing to license to
you and you may not use the ReDigi Products.

This Agreement is effective on June 11, 2012, for current users of the ReDigi
Products, and upon acceptance for new users.

These Terms are preliminary, and ReDigi reserves the right at any time to modify
these Terms and to impose new or additional terms or conditions on your use of the
ReDigi Products. Such modifications and additional terms and conditions will be
effective immediately and incorporated into these Terms without notice. It is your
responsibility to periodically check our terms to inform yourself of any such
changes. Your continued use of the ReDigi Products will be deemed acceptance
thereof.

A. Beta Terms and Conditions

1. Generally

The versions of the ReDigi Products to which these Terms apply are Beta versions,
which ReDigi has not yet released to the general public. You acknowledge that the
ReDigi Products are believed by ReDigi to contain defects and may be incomplete,
experimental and untested in nature. ReDigi's primary purposes of making the
ReDigi Products available to certain parties prior to releasing them to the general
public are to obtain feedback on performance and identify any defects. You
acknowledge and agree that participation in the Beta testing of the ReDigi Products
does not imply, guaranty or otherwise entitle you to any discounted, special or

otherwise advantageous pricing terms for any subsequent release of the ReDigi Products, including, without limitation, the general availability release.

2. Disclaimer; Allocation of Risk

YOU BEAR THE RISK OF USING THE REDIGI PRODUCTS. THE BETA VERSIONS OF THE REDIGI PRODUCTS MAY NOT WORK THE WAY THE FINAL VERSIONS OF THE REDIGI PRODUCTS WILL, AND THE FEATURES AND FUNCTIONALITY YOU FIND IN THE BETA VERSIONS OF THE REDIGI PRODUCTS MAY NOT APPEAR IN THE FINAL VERSIONS.

REDIGI TAKES NO RESPONSIBILITY FOR ANY MALFUNCTION OR UNDESIRED ACTION OCCURRING AS A RESULT OF YOUR USE OF THE REDIGI PRODUCTS AND SHALL HAVE NO OBLIGATION TO RESPOND TO REPORTS OF MALFUNCTION OR ANOMALY OF ANY KIND WITHIN ANY AMOUNT OF TIME OR AT ALL, OR TO MAKE ANY EFFORT TO PROVIDE ANY FIX FOR ANY OF THE SAME.

ReDigi will endeavor to keep all data submitted by you in connection with your use of the ReDigi Products private, but you are advised to safeguard important data, to use caution and to not rely in any way on the correct functioning or performance of the ReDigi Products. REDIGI MAKES NO CLAIM THAT THE REDIGI PRODUCTS ARE ENTIRELY SECURE AND TAKES NO RESPONSIBILITY FOR ANY BREACH OF PRIVACY OR LOSS OF DATA OR ANY OTHER INFORMATION AS A DIRECT RESULT OF YOUR USE OF THE REDIGI PRODUCTS.

3. Confidentiality

You acknowledge that (a) the ReDigi Products are private and are available to specific parties prior to the date ReDigi releases ReDigi Products to the general public (the period leading up to such date, the "Beta Period") and (b) in the course of using the ReDigi Products and performing your duties under these Terms, you may obtain information relating to the ReDigi Products and/or ReDigi ("Proprietary Information"). Such Proprietary Information shall belong solely to ReDigi and includes, but is not limited to, these Terms, the features and mode of operation of the ReDigi Products, trade secrets, know-how, inventions (whether or not patentable), techniques, processes, programs, ideas, algorithms, schematics, testing procedures, screenshots, image files, software design and architecture, computer code, internal documentation, design and function specifications, product requirements, problem reports, analysis and performance information, benchmarks, software documents, and other technical, business, product, marketing and financial information, plans and data.

Until the termination of the Beta Period and for a period of at least two (2) years thereafter, you agree not to use (except as expressly authorized by these Terms or any subsequent terms and conditions that, in accordance herewith, may apply to your use of the ReDigi Products) or share any Proprietary Information with anyone

else without prior written consent from a senior member of the ReDigi staff unless such Proprietary Information becomes part of the public domain without breach of these Terms by you. Notwithstanding the foregoing, if you are requested or required (by oral questions, interrogatories, requests for information, subpoena, civil investigative demand, or similar process or by applicable rules or regulations to which you are subject) to disclose any Proprietary Information, it is agreed that you will provide ReDigi with prompt notice of such request(s) or requirement(s), to the extent practicable, so that ReDigi may seek an appropriate protective order and/or waive your compliance with the provisions of this Section. If, failing the entry of a protective order or the receipt of a waiver hereunder, you or your representatives are compelled to disclose Proprietary Information under pain of liability for contempt or other censure or penalty, you and/or your representatives may disclose such Proprietary Information without liability hereunder.

4. Feedback

It is expressly understood, acknowledged and agreed that during the Beta Period, you shall, regardless of whether or not formally requested to do, (a) inform ReDigi of the portions of the ReDigi Products that you have used and the nature and extent of such use and (b) provide to ReDigi reasonable suggestions, comments and feedback regarding the ReDigi Products, including but not limited to, usability, bug reports and test results, with respect to ReDigi Product testing (collectively, "Feedback"). For the avoidance of doubt, all Feedback shall be deemed Proprietary Information hereunder and the sole and exclusive property of ReDigi. None of the feedback or other information relating to the ReDigi Products may be used, published or otherwise disclosed by you in any manner or for any purpose whatsoever.

B. General Terms and Conditions

1. Eligibility

You must be 13 years of age or older to visit the Site or use the ReDigi Products in any manner, and, if under the age of 18 or the age of majority as that is defined in your jurisdiction, must use the ReDigi Products under the supervision of a parent, legal guardian or other responsible adult. By accessing the Site or otherwise accepting these Terms, you represent and warrant to ReDigi that you have reached the age of majority in your jurisdiction, and that you have the right, authority and capacity to agree to and abide by these Terms. You also represent, warrant and covenant to ReDigi that you will comply with all local, state, federal, and national laws, statutes, ordinances, and regulations that apply to your use of the ReDigi Products.

2. Music Manager Software License

Subject to these Terms and in accordance with any documentation supplied by ReDigi, including any disclaimers or other notices that may be provided in connection with your use of the Software, ReDigi grants you a personal, non-sublicensable, non-exclusive license to use the Software during the Beta Period.

ReDigi shall at all times retain all title to and ownership of the Software and all copies thereof. You will not reproduce or modify the Software or any portion thereof. You shall not rent, sell, lease or otherwise transfer the Software or any part thereof or use it for the benefit of a third party. You shall not reverse assemble, reverse compile or reverse engineer the Software, or otherwise attempt to discover any Software source code or underlying Proprietary Information.

3. Use of Content

(a) Except as otherwise expressly provided herein with respect to Digital Media (as defined in Section 5(a)), ReDigi authorizes you to view and access a single copy of the content available on or from the Site solely for your personal use. The contents of the Site, such as text, graphics, images, logos, button icons, software and other content (collectively, "Content"), are protected under United States and foreign copyright, trademark and other laws. All Content is the property of ReDigi, its content suppliers or its users. The compilation (meaning the collection, arrangement and assembly) of all Content on the Site is the exclusive property of ReDigi and is protected by United States and foreign copyright, trademark, and other laws. Unauthorized use of the Content may violate these laws and is strictly prohibited.

(b) Except as permitted by these Terms, you agree not to sell or modify the Content or reproduce, display, publicly perform, distribute, or otherwise use the Content in any way for any public or commercial purpose, in connection with products or services that are not those of the ReDigi Products, in any other manner that is likely to cause confusion among consumers, that disparages or discredits ReDigi or its licensors, that dilutes the strength of ReDigi's or any of its licensors' property, or that otherwise infringes ReDigi's or any of its licensors' intellectual property rights. You further agree to in no other way misuse Content that appears on this Site. The use of the Content on any other website or in a networked computer environment for any purpose is prohibited. Any code that ReDigi creates to generate or display any Content on the pages making up the Site is also protected by ReDigi's copyright and you may not copy or adapt such code.

4. Site Restrictions

(a) You may not use the ReDigi Products in order to transmit, post, distribute, sell, store or destroy material, including without limitation, Content: (i) in violation of any applicable law or regulation, (ii) in a manner that will infringe the copyright, trademark, trade secret or other intellectual property rights of others or violate the

privacy, publicity or other personal rights of others, or (iii) that is defamatory, obscene, threatening, abusive or hateful.

(b) You are also prohibited from violating or attempting to violate the security of the Site, including without limitation, the following activities: (i) accessing data not intended for you or logging into a server or account which you are not authorized to access; (ii) attempting to probe, scan or test the vulnerability of a system or network or to breach security or authentication measures without proper authorization; or (iii) attempting to interfere with service to any other user, host or network, including, without limitation, via means of submitting a virus to the Site, overloading, "flooding", "spamming", "mailbombing" or "crashing." Violations of system or network security may result in civil and/or criminal liability. ReDigi will investigate occurrences that may involve such violations and may involve, and cooperate with, law enforcement authorities in prosecuting users who are involved in such violations.

(c) You further agree to: (i) keep your password secure and confidential, (ii) not permit others to use your account, (iii) refrain from using other users' accounts, (iv) refrain from selling, trading, or otherwise transferring your account to another party and (v) refrain from charging anyone for access to any portion of the Site, or any information therein. Further, you are responsible for anything that happens through your account until you close down your account or prove that your account security was compromised due to no fault of your own.

(d) If you believe that any user or any content posted by any user of the Site violates these Terms, please contact ReDigi at <a href="mailto:Support@ReDigi.com">Support@ReDigi.com</a>. If notified of User Content (as defined in below) or other materials which allegedly do not conform to these Terms, ReDigi may in its sole discretion investigate the allegation and determine whether to take any other actions and whether to remove or request the removal of the User Content. ReDigi has no liability or responsibility to its users for performance or nonperformance of such activities.

5. User Content and Digital Media

(a) Subject to these Terms, ReDigi provides Services that permit you and other users to (i) license or purchase digital content, as applicable, which may include information, data, text, software, music, sound, photographs, graphics, video, messages or other digital materials submitted, posted or displayed on or through the Site (collectively, the "Digital Media") by ReDigi itself or by users of the Site for end-user use only and (ii) sell your rights to Digital Media deemed eligible by ReDigi in its sole discretion to other users of the Site, provided, that any such sale is contingent on there being demand for such Digital Media on the Site as determined by ReDigi in its sole discretion.

(b) You understand that all Digital Media and other information, data, text, software, music, sound, photographs, graphics, video, messages or other materials submitted, posted or displayed on or through the Site (collectively, "User Content") by you is your sole responsibility. You agree that any User Content submitted, posted or displayed on or through the Site by you: (i) shall be your sole responsibility; (ii) shall not infringe or violate the rights of any other party or violate any laws; (iii) shall not contribute to or encourage infringing or otherwise unlawful conduct, and (iv) shall not otherwise be obscene, objectionable, or in poor taste. You or a third party licensor, as appropriate, retain all patent, trademark and copyright rights to any User Content you submit, post or display on the Site and you or such third party licensor, as appropriate, are responsible for protecting those rights. You agree to provide accurate and complete information in connection with your submission of any User Content to the Site.

(b) By submitting, posting or displaying User Content on the Site, you grant ReDigi a worldwide, royalty-free, non-exclusive license to use such User Content as part of the ReDigi Services, without any compensation or obligation to you. ReDigi will discontinue this licensed use within a commercially reasonable period after such User Content is removed from the Site. You represent and warrant that you have the right to grant or that the holder of any rights, has completely and effectively waived all such rights and validly and irrevocably granted to you the right to grant, the license stated above. Subject to the foregoing, the owner of such User Content placed on the Site retains any and all rights that may exist in such User Content.

(c) You acknowledge that (i) download and use of the Software (including any updates thereto) is required to assist you with the verification and transfer of any User Content to the Site and (ii) if such User Content includes Digital Media, the verification and transfer process described above involves identifying and deleting all copies of such Digital Media on the computer or device on which the Software has been downloaded as well as all devices that are linked thereto and creating a digital finger print for such Digital Media. You acknowledge the importance of complying with these Terms and allowing the Software to work as described in these Terms and in any disclaimers or other notices that may be provided in connection with your use of the Software.

(d) You acknowledge and agree that, if you transfer Digital Media on the Site and offer it for sale, such action constitutes your representation and warranty to ReDigi and to the purchaser of such Digital Media that (i) your are the lawful owner of such Digital Media, (ii) you have not altered or modified such Digital Media, (iii) you have to your knowledge destroyed all copies of such Digital Media other than the uploaded file, (iv) upon purchase of such file by a purchaser on the Site you transfer all of your rights and title in and to the uploaded file and all copies thereof to the purchaser, (v) if you should discover any other copies of such file, regardless of form or media, you will promptly destroy the same, and you consent to the deletion thereof by or at the request of ReDigi from all devices or libraries on or in which it may be found at any time, with or without further notice, and without liability of or

recourse to ReDigi. With respect to Digital Media that you designate for transfer on the Site, you authorize ReDigi, in its discretion, to designate or cause the designation on your behalf of your space on the Site as an authorized device with any third party from whose site you purchased or downloaded such Digital Media, and to request on your behalf the re-download thereof to the Site pursuant to any applicable terms of such site that permit such re-download by you without cost to you.

(e) With respect to Digital Media available for purchase on the Site, any such Digital Media that you purchase may be downloaded or streamed for your personal use from the Site, or stored on the Site. Once downloaded from the Site, you assume and retain all risks related to the ownership and use thereof, including, without limitation, the risk of loss, damage or destruction. Digital Media that you purchase from another user on the Site and download from the Site is not available for re-download in the event you should damage, destroy or lose such Digital Media due to a computer crash or for any other reason. Digital Media that you purchase as "new" on the Site, when available, is provided pursuant to arrangements between ReDigi and one or more third party distributors or other sources, and is subject to the terms established by such third party; you agree to abide by such terms with respect to such purchases. ReDigi makes no representations or warranties, and assumes no responsibility or liability with respect to such purchases, and you agree to look solely to such third parties regarding any recourse for such purchases. Digital Media available from YouTube on the Site is subject to the terms of service of YouTube. ReDigi makes no representations or warranties, and assumes no responsibility or liability with respect to such Digital Media, and you agree to look solely to YouTube regarding any recourse for such Digital Media. ReDigi is not affiliated with YouTube, iTunes, Apple or any other source of Digital Media available on the Site.

(f) ReDigi claims no ownership or control over any User Content submitted, posted or displayed on or through the Site and does not represent or guarantee the truthfulness, accuracy, or reliability of User Content or any other communications posted by users or endorse any opinions expressed by users. You acknowledge that any reliance on User Content posted by other users of the Site will be at your own risk.

(g) ReDigi has the right, but not the obligation, to screen or monitor any Digital Media (which may include User Content) available through the Site, to investigate any reported or apparent violation of these Terms, and to take any action that ReDigi in its sole discretion deems necessary or appropriate, including without limitation, (i) refusing to accept, post, display or transmit any User Content, (ii) reviewing and removing from the Site any User Content that, in its sole judgment, violates these Terms, violates applicable laws, rules or regulations, is abusive, disruptive, offensive or illegal, or violates the rights of, or harms or threatens the safety of, any of its other users, and (iii) expelling users and preventing their further access to the Site and/or use of the ReDigi Products for violating these Terms or applicable laws, rules or regulations. While ReDigi reserves the right in its sole discretion to remove User Content or other material from the Site from time to time,

ReDigi does not assume any obligation to do so and disclaims any liability for failing to take any such action.

(h) ReDigi will permit users in good standing to request that available credits in their ReDigi user account be transferred from time to time to a credit card, PayPal or similar account of the user specified by the user, in an amount up to the amount of the purchase price of Digital Content purchased new from iTunes through the ReDigi Site, subject to a minimum dollar threshold amount established by ReDigi from time to time (initially, $10). ReDigi shall have the right to limit the amount that may be transferred on a daily or other periodic basis; and $100 per day is hereby established as such limit until further notice. ReDigi shall have the right to limit the time period for calculating iTunes purchases that may be aggregated for purposes of determining the amount that may be transferred from available credits; and one-year is hereby established as such limit until further notice. Except as aforesaid with respect to iTunes purchases, and except for the application of credits in a user's ReDigi account to the purchase of Digital Content on the Site (other than through iTunes), without the consent of ReDigi, which consent may be withheld for any reason or no reason except to the extent otherwise required by applicable law, credits in a user's ReDigi account may not be withdrawn, transferred or applied by the user.

6. Privacy

Your privacy is important to ReDigi. The following terms set forth how ReDigi collects, uses, discloses, transfers, and stores your information.

(a) ReDigi may collect personal information from you in connection with (i) establishing your account on the Site, (ii) your interactions with the Site and (iii) your use of the ReDigi Products, including, without limitation, contact information (such as an email address) and your search and transaction history on the Site. You agree that ReDigi may use your personal information to contact you and deliver information to you that, in some cases, is targeted to your interests, or provide administrative notices or communications applicable to your use of the ReDigi Products. By accepting these Terms, you expressly agree to receive this information. If you do not wish to receive these communications, you can opt out of any further receipt by contacting ReDigi at <a href="mailto:optOUT@ReDigi.com">optOUT@ReDigi.com</a>. ReDigi may also aggregate certain non-personally identifiable information about its users (such as age, gender, location and occupation) and use such anonymous information to prepare reports that it provides to its users, service providers, or, in connection with a merger, acquisition, or sale of substantially all of ReDigi's assets, certain other third parties.

(b) ReDigi uses cookies for the protection and convenience of its users. Cookies enable ReDigi to serve secure pages to its users without asking them to sign in repeatedly. If a user's system is idle for a designated length of time, however, the

cookie will expire, forcing the user to sign in again to continue his or her session. This prevents unauthorized access to the user's information while the user is away from his or her computer. ReDigi may store non-personally identifying information about you such as searches for Digital Media conducted by your computer in a cookie that it places on your computer. ReDigi does this in order to present you with recommendations based on your interests as expressed previously through your searches. Most Internet browsers enable you to erase cookies from your computer hard drive, block all cookies, or receive a warning before a cookie is stored.

(c) As mentioned above, download and use of the Software is required in connection with verifying and transferring User Content to the Site. In the event any User Content is determined ineligible for transfer to, and listing for sale on, the Site, any information generated by the Software with respect to such ineligibility (which may include information on the origin of Digital Media files included in such User Content) shall be stored solely on the computer or other device on which you downloaded the Software for your independent, personal use and shall not be collected, stored or ‚Äì except in connection with the initial eligibility determination ‚Äì otherwise used by ReDigi on the Site or elsewhere.

(d) ReDigi may disclose specific user information when, and to the extent that, ReDigi determines that such disclosure is necessary to comply with the law, to cooperate with or seek assistance from law enforcement or to protect the interests or safety of ReDigi or other users of the Site. In addition, personal information ReDigi has collected may be passed on to a third party in the event of a transfer of ownership or assets or a bankruptcy of ReDigi. Such disclosures may be made with or without your consent, and with or without notice.

(e) ReDigi does not sell a user's personally identifiable information to anyone for any reason if the user has indicated a desire for ReDigi to keep the information private by notifying ReDigi at <a href="mailto:optOUT@ReDigi.com">optOUT@ReDigi.com</a>.

7. Disclaimer of Warranties and Consequential Damages; Limitation of ReDigi's Liability

(a) Because user authentication on the Internet is difficult, ReDigi cannot and does not confirm that each user of the Site is who he or she claims to be. ReDigi makes no representations about the accuracy, reliability, completeness, or timeliness of the ReDigi Products or the Content. The use of the ReDigi Products and the Content is at your own risk. Changes are periodically made to the ReDigi Products and may be made at any time. You acknowledge and agree that you are solely responsible for the form, content and accuracy of any User Content submitted, posted or displayed on or through the Site by you.

(b) REDIGI TRIES TO KEEP THE SITE UP, ERROR-FREE, AND SAFE, BUT YOU USE IT AT YOUR OWN RISK AND REDIGI DOES NOT GUARANTEE THAT THE REDIGI

PRODUCTS OR THE CONTENT WILL BE SAFE OR SECURE. REDIGI DOES NOT WARRANT THAT THE REDIGI PRODUCTS WILL OPERATE ERROR-FREE OR THAT THE SITE AND ITS SERVERS ARE FREE OF COMPUTER VIRUSES OR OTHER HARMFUL MECHANISMS. IF YOUR USE OF THE REDIGI PRODUCTS OR THE CONTENT RESULTS IN THE NEED FOR SERVICING OR REPLACING EQUIPMENT OR DATA, REDIGI IS NOT RESPONSIBLE FOR THOSE COSTS. THE REDIGI PRODUCTS AND THE CONTENT ARE PROVIDED ON AN "AS IS" BASIS WITHOUT ANY WARRANTIES OF ANY KIND. REDIGI, TO THE FULLEST EXTENT PERMITTED BY LAW, DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING THE WARRANTY OF MERCHANTABILITY, FITNESS FOR PARTICULAR PURPOSE AND NON-INFRINGEMENT. REDIGI MAKES NO WARRANTIES ABOUT THE ACCURACY, RELIABILITY, COMPLETENESS, OR TIMELINESS OF THE REDIGI PRODUCTS OR THE CONTENT.

(c) REDIGI CANNOT GUARANTEE AND DOES NOT PROMISE ANY SPECIFIC RESULTS FROM YOUR USE OF THE REDIGI PRODUCTS ‚Äì INCLUDING, WITHOUT LIMITATION, ANY GUARANTEE THAT USER CONTENT THAT YOU TRANSFER TO THE SITE AND DESIRE TO SELL THROUGH THE SITE WILL BE SOLD. NO ADVICE OR INFORMATION, WHETHER ORAL OR WRITTEN, THAT YOU MAY OBTAIN FROM REDIGI THROUGH OR FROM THE SITE SHALL CREATE ANY WARRANTY NOT EXPRESSLY STATED HEREIN.

(d) REDIGI SHALL NOT BE RESPONSIBLE OR LIABLE WITH RESPECT TO ANY SUBJECT MATTER OF THIS AGREEMENT UNDER ANY CONTRACT, NEGLIGENCE, STRICT LIABILITY OR OTHER THEORY (I) FOR LOSS OR INACCURACY OF DATA OR COST OF PROCUREMENT OF SUBSTITUTE GOODS, SERVICES OR TECHNOLOGY, OR (II) FOR ANY INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES INCLUDING, BUT NOT LIMITED TO LOSS OF REVENUES AND LOSS OF PROFITS, IN ANY CASE, EVEN IF REDIGI HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. REDIGI SHALL NOT BE RESPONSIBLE FOR ANY MATTER BEYOND ITS REASONABLE CONTROL. REDIGI IS NOT RESPONSIBLE FOR THE ACTIONS, CONTENT, INFORMATION, OR DATA OF THIRD PARTIES, AND YOU RELEASE US, OUR DIRECTORS, OFFICERS, EMPLOYEES, AND AGENTS FROM ANY CLAIMS AND DAMAGES, KNOWN AND UNKNOWN, ARISING OUT OF OR IN ANY WAY CONNECTED WITH ANY CLAIM YOU HAVE AGAINST ANY SUCH THIRD PARTIES. IF YOU ARE A CALIFORNIA RESIDENT, YOU WAIVE CALIFORNIA CIVIL CODE ¬ß1542, WHICH SAYS: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

(e) REDIGI'S MAXIMUM LIABILITY ARISING OUT OF OR IN CONNECTION WITH THE REDIGI PRODUCTS OR YOUR USE OF THE CONTENT, REGARDLESS OF THE CAUSE OF ACTION (WHETHER IN CONTRACT, TORT, BREACH OF WARRANTY OR OTHERWISE), WILL NOT EXCEED THE GREATER OF (I) THE TOTAL FEES COLLECTED BY REDIGI IN CONNECTION WITH SALES AND PURCHASES OF

DIGITAL MEDIA ON THE SITE BY YOU IN THE 12 MONTHS PRIOR TO THE ACTION GIVING RISE TO THE LIABILITY AND (II) $100. APPLICABLE LAW MAY NOT ALLOW THE LIMITATION OR EXCLUSION OF LIABILITY OR INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION OR EXCLUSION MAY NOT APPLY TO YOU. IN SUCH CASES, REDIGI'S LIABILITY WILL BE LIMITED TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW.

8. Indemnification

You agree to defend, indemnify, and hold harmless ReDigi, its affiliates, and their respective officers, directors, employees and agents, from and against any claims, actions or demands (including, without limitation, reasonable legal and accounting fees and costs) alleging or resulting from (a) any User Content or other material you provide to the Site, (b) your use of any Content, or (c) any breach by you of these Terms. ReDigi shall promptly provide you with notice of any such claim, suit or proceeding; provided, however, that ReDigi's failure to provide such notice or delay in providing such notice shall not relieve you from your liabilities or obligations hereunder, except solely to the extent of any material prejudice as a direct result of such failure or delay.

9. Term and Termination

Terms will remain in full force and effect while you are a user of the ReDigi Products at any level. ReDigi reserves the right, at its sole discretion, to pursue all of its legal remedies, including, but not limited to, removal of your User Content from the Site and immediate termination of your account with or ability to access the Site and/or any other ReDigi Products, upon any breach by you of these Terms or if ReDigi is unable to verify or authenticate any information you submit to the Site. Even after you are no longer a user of the ReDigi Products, certain provisions of these Terms will remain in effect, including Sections A.1-A.4 and Sections B.2-B.10.

10. General

(a) These Terms are governed by the laws of the Commonwealth of Massachusetts, without respect to its conflict of laws principles. You expressly agree that exclusive jurisdiction for any claim or dispute with ReDigi or relating in any way to your use of the ReDigi Products resides in the courts of the Commonwealth of Massachusetts. Risk of loss and title for all electronically delivered transactions pass to the purchaser in Massachusetts upon electronic transmission to the recipient.

(b) Any disputes arising out of or relating to these Terms shall be resolved by final and binding arbitration under the rules and auspices of the American Arbitration Association, to be held in Boston, Massachusetts, with a written decision and legal reasoning issued by the arbitrator(s) at either party's request. The parties shall bear equally all fees, costs and expenses of the arbitration; provided that each party shall bear its own legal expenses, attorneys' fees and costs of all experts and witnesses.

(c) You acknowledge and agree that due to the unique nature of ReDigi's Proprietary Information, there can be no adequate remedy at law for any breach of your obligations hereunder, that any such breach may allow you or third parties to unfairly compete with ReDigi resulting in irreparable harm to ReDigi, and therefore, that upon any such breach or threat thereof, ReDigi shall be entitled to injunctions and other appropriate equitable relief without posting a bond in addition to whatever remedies it may have at law.

(d) If any part of these Terms is held invalid or unenforceable, that portion shall be construed in a manner consistent with applicable law to reflect, as nearly as possible, the original intentions of the parties, and the remaining portions shall remain in full force and effect. No waiver of any term of these Terms shall be deemed a further or continuing waiver of such term or any other term. In addition, ReDigi's failure to enforce any term of these Terms shall not be deemed as a waiver of such term or otherwise affect ReDigi's ability to enforce such term at any point in the future.

(e) All of ReDigi's rights and obligations under these Terms are freely and fully assignable by ReDigi in connection with a merger, acquisition, or sale of assets, or by operation of law or otherwise. Neither your rights nor your obligations arising under these Terms are assignable or transferable by you, and any such attempted assignment or transfer shall be void and without effect.

(f) Each party hereto is an independent contractor of the other and no agency, partnership, joint venture or employee-employer relationship is intended or created by these Terms. Except as expressly set forth herein, neither party shall have the power to obligate or bind the other party.

(g) Except as expressly provided in any additional agreement or additional Terms for certain areas of the Site, a particular "Legal Notice," or material on particular pages of the Site, these Terms constitute the entire agreement between you and ReDigi and govern your use of the ReDigi Products, superseding any prior or written agreements between you and ReDigi. As mentioned above, ReDigi reserves the right at any time to modify these Terms and to impose new or additional terms or conditions on your use of the ReDigi Products. Such modifications and additional terms and conditions will be effective immediately and incorporated into these Terms without notice. It is your responsibility to periodically check our terms to inform yourself of any such changes. Your continued use of the ReDigi Products will be deemed acceptance thereof.

**EXHIBIT 6**

**FILED UNDER SEAL**



**EXHIBIT 7**

# Apple Press Info

Press Releases          Product Images & Info          Apple Leadership

## Apple to Launch iCloud on October 12

Download iCloud images

Breakthrough Set of Free Cloud Services includes iTunes in the Cloud, Photo Stream & Documents in the Cloud

CUPERTINO, California—October 4, 2011—Apple® today announced that iCloud®, a breakthrough set of free cloud services, including iTunes® in the Cloud, Photo Stream and Documents in the Cloud, that work seamlessly with your iPhone®, iPad®, iPod touch®, Mac® or PC to automatically and wirelessly store your content in iCloud and push it to all your devices, will be available on October 12. iCloud stores your music, photos, apps, contacts, calendars, documents and more, keeping them up to date across all your devices. When content changes on one device, all your other devices are updated automatically and wirelessly.

"iCloud is the easiest way to manage your content, because iCloud does it all for you and goes far beyond anything available today," said Eddy Cue, Apple's senior vice president of Internet Software and Services. "You don't have to think about syncing your devices, because it happens automatically, and it is free."

iTunes in the Cloud lets you automatically download new music purchases to all your devices, so you can buy a song on your iPad and find it waiting for you on your iPhone—no syncing required. iTunes in the Cloud also lets you download your previously purchased iTunes content, including music and TV shows to your devices at no additional cost.* Since iCloud stores your previously purchased iTunes history, you can see what you've bought no matter which device you bought it on, and since you already own the content, you can play it on your devices or simply tap the iCloud icon to download it to store and play later.

In addition, iTunes Match℠ scans the songs in your music library, including music not purchased on iTunes, and matches them to the more than 20 million songs available on the iTunes Store®, offering them in high-quality, DRM-free 256 kbps AAC encoding. Any unmatched songs are uploaded to iCloud so you can play songs, albums or playlists from your music library on your devices.

iCloud's innovative Photo Stream service lets you take a photo on one device and have it automatically appear on your other devices. A photo you take on your iPhone is sent to iCloud and automatically pushed to your iPad, iPod touch, Mac or PC. You can even view your Photo Stream album on your Apple TV®. iCloud also automatically pushes a copy of the photos you've imported from your digital camera over Wi-Fi or Ethernet, so you can view them on your other devices. iCloud manages your Photo Stream efficiently, showing your last 1000 photos so you don't run out of storage space.

iCloud's Documents in the Cloud keeps your documents up to date across all your devices, automatically, so you don't have to. For example, if you create a document using Pages® on your iPad, that document is automatically sent to iCloud. When you use Pages on another iOS device, you can open the same document with your latest changes and pick up editing or reading right where you left off. Apple's iWork® apps for iOS, Pages, Numbers® and Keynote® will take advantage of iCloud storage, and Apple is also offering developers the APIs they need to enable their apps to work seamlessly with Documents in the Cloud.

iCloud lets you see your App Store™ and iBookstore™ purchase history and download those apps and books to any of your devices at any time. Purchased apps and books can be automatically downloaded to your devices, not just the device they were purchased on. Simply tap the iCloud icon and download your purchased apps and books to any of your iOS devices at no additional cost.

iCloud Backup automatically and securely backs up your most important information to iCloud daily over Wi-Fi whenever your iOS device is connected to a power source. Once you



iCloud
Download (zip)



iCloud
Download (zip)



iCloud
Download (zip)

plug it in, everything is backed up quickly and efficiently. iCloud already stores your purchased music, TV shows, apps, books and Photo Stream; iCloud Backup takes care of everything else, backing up your photos and video in the Camera Roll, device settings, app data, home screen and app organization, messages and ringtones. iCloud Backup can even help you set up a new iOS device or restore the information on one you already own.**

iCloud works seamlessly with your Contacts, Calendar and Mail, so you can share calendars with friends and family, and your ad-free Mail account is hosted at me.com. Your inboxes and folders are kept up to date across your iOS devices and computers, and with icloud.com you have easy web access to your Mail, Contacts, Calendar, Find My iPhone and iWork documents.

The Find My iPhone app can help you if one of your devices is missing. Just use the free Find My iPhone app on another device, or sign in at icloud.com from a computer to see your missing iPhone, iPad or iPod touch on a map, display a message, and remotely lock or wipe your missing device. Find My iPhone now lets you locate a missing Mac running OS X Lion.

Find My Friends is a new app available as a free download from the App Store that lets you easily share your location with people who are important to you. Friends and family appear on a map so you can quickly see where they are. Find My Friends also lets you temporarily share your location with a group of friends, whether it's for a couple of hours for a dinner or a couple of days on a camping trip; when the time is up, the sharing ends. With Find My Friends, you get a notification every time you get a new friend request and if you give them permission, they can see your location. With a simple tap you can hide your location. Parental controls help you manage how your child uses Find My Friends.

iCloud will be available concurrently with iOS 5, the world's most advanced mobile operating system, which includes over 200 new features including Notification Center, an innovative way to easily view and manage notifications in one place without interruption; iMessage™, a new messaging service that lets you easily send text messages, photos and videos between all iOS 5 users; and Newsstand, a new way to purchase and organize your newspaper and magazine subscriptions.

**Pricing & Availability**
iCloud will be available on October 12 as a free download to iPhone, iPad or iPod touch users running iOS 5 or a Mac running OS X Lion with a valid Apple ID. iCloud includes 5GB of free cloud storage for Mail, Document Storage and Backup. Purchased music, TV shows, apps, books and Photo Stream do not count against the storage limit. iTunes Match will be available starting in the US later this month for $24.99 a year. Using iCloud with a PC requires Windows Vista or Windows 7; Outlook 2010 or 2007 is recommended for accessing contacts and calendars. Additional iCloud storage upgrades are available to purchase starting at $20 a year for 10GB, $40 a year for 20GB and $100 a year for 50GB.

iOS 5 will be available as a free software update for iPhone 4S, iPhone 4, iPhone 3GS, iPad 2, iPad and iPod touch (third and fourth generation) customers, allowing them to experience the amazing new features.

*iCloud is available worldwide. iTunes in the Cloud varies by country. iTunes Match and TV shows are US-only. iTunes in the Cloud and iTunes Match may be used on up to 10 devices with the same Apple ID.

**Backup of purchased music is not available in all countries. Backup of purchased TV shows is US only. A purchased item may be unavailable to be restored if it is no longer in the iTunes Store, App Store or iBookstore.

Apple designs Macs, the best personal computers in the world, along with OS X, iLife, iWork and professional software. Apple leads the digital music revolution with its iPods and iTunes online store. Apple has reinvented the mobile phone with its revolutionary iPhone and App Store, and has recently introduced iPad 2 which is defining the future of mobile media and computing devices.

**Press Contacts:**
Simon Pope
Apple
spope@apple.com

(408) 974-0457

Tom Neumayr
Apple
tneumayr@apple.com
(408) 974-1972
Apple, the Apple logo, Mac, Mac OS, Macintosh, iCloud, iTunes, iPhone, iPad, iPod touch, iTunes Match, iTunes
Store, Apple TV, Pages, iWork, Numbers, Keynote, App Store, iBookstore and iMessage are trademarks of
Apple. Other company and product names may be trademarks of their respective owners.


Apple Media Helpline    (408) 974-2042    media.help@apple.com

# iCloud

# Set up iCloud on all your devices.
# The rest is automatic.

To get the most out of iCloud, make sure to set it up on your
iPad, iPhone, iPod touch, Mac, and PC.



### For iPad, iPhone, and iPod touch

Set up now



### For Mac

Set up now



### For PC

Set up now



### Set up iCloud on your Apple TV.

It's easy to get iCloud on your Apple TV. Just turn on Apple TV and enter your Apple ID. You
can get access to your Photo Stream, iTunes Match and any movies and TV shows you've
purchased on your iPhone, iPad, iPod touch, Mac or PC.

Automatic downloads and downloading previous purchases require iOS 4.3.3 or later on iPhone 3GS or later, iPod touch (3rd and 4th generation), or iPad; iOS 5 on iPhone 4 (CDMA model); or a
Mac or PC with iTunes 10.3.1 or later. Previous purchases may be unavailable if they are no longer in the iTunes Store, App Store, or iBookstore. Downloading previous movie purchases requires
iTunes 10.6, iOS 5 or later, or Apple TV software 4.3 or later. Not all previously purchased movies are available for downloading to your other devices. Download iTunes 10.6 free.

iCloud requires iOS 5 on iPhone 3GS or later, iPod touch (3rd and 4th generation), or iPad; a Mac computer with OS X Lion; or a PC with Windows Vista or Windows 7 (Outlook 2007 or 2010 or
an up-to-date browser is required for accessing email, contacts, and calendars). Some features require a Wi-Fi connection. Some features are not available in all countries. Access to some
services is limited to 10 devices.

+You  Search  Images  Maps  Play  YouTube  News  Gmail  More

Sarah Metz

Introducing Google Play  LEARN MORE  CLOSE

# WELCOME TO MUSIC ON GOOGLE PLAY

Home
**Songs**
**Artists**
**Albums**
**Genres**

AUTO PLAYLISTS

Thumbs up
Last added
Free and purchased
Shared with me

INSTANT MIXES

PLAYLISTS

### Your music, anytime, anywhere

Keep your entire collection online for free. Listen
on the web and your mobile devices without the
hassle of wires.

☑ Email me news and offers from Google Play

By proceeding you are agreeing to the Terms of
Service and the Privacy Policy.

DISAGREE      AGREE AND NEXT

LAUNCH NOW

mobile devices without

and more.

gle Play Music

Music Manager is a simple application for adding the music files on your computer to Google Play. Learn more

FREE Two-Day Shipping: See details

Your Amazon.com     Today's Deals     Gift Cards     Help

Shop by
**Department**     Search     MP3 Downloads     Go

Hello. Sign in
Your Account          0     Cart          Wish List

Amazon MP3 Store     Music CDs     New Releases     Recommendations     Advanced Search     Browse Genres     Best Sellers     Amazon Cloud Player     Getting Started     Get Help



Cloud Player is now on
iPhone and iPod touch
▸ Get the app


amazon cloud player

Tell your friends:


Shop for music in the app, save your MP3 purchases to the cloud for backup, and play anywhere, with the same low prices and great selection you can find on the Amazon MP3 website. Or upload your own music library to the cloud, then stream or download your MP3s to your Android device, so you can listen to your music collection anywhere. Get the app from the Amazon Appstore, or get the app from Google Play.


Amazon
DELIVERS
Subscribe to The Amazon MP3 Download newsletter and find out about new releases and sweet digital music deals first.

[ Subscribe ]

Cloud Player is also built in as part of the Kindle Fire - simply tap Music from the Home screen to access your library, then stream it or download it to listen offline. You can also shop for new music - just tap Store to browse Amazon's wide selection. Learn more about listening to music on the Kindle Fire.



     


Get Free
Amazon
Apps
for Android
▸ Learn more

### Technical Details

· Amazon Cloud Player and Amazon Cloud Drive are available for US customers only
· App upgrade is only available for Android OS 2.0+
· PDF and video content is currently not available for purchase on the Amazon MP3 Android app

**Visit our Help Pages**

 Contact Customer Service directly or see Amazon MP3 Frequently Asked Questions to find information on all Amazon MP3 help topics.

### Your Recent History (What's this?)

You have no recently viewed items. After viewing product detail pages or search results, look here to find an easy way to navigate back to pages you are interested in.

Continue Shopping: Top Sellers

Page 1 of 5

Archos 7 320 GB
Internet Media...
★★★☆☆ (112)

Archos 605 Wi-Fi
Portable Media...
★★★☆☆ (39)
$50.00

Archos 5 250 GB
Internet Tablet
★★★☆☆ (283)

| Get to Know Us | Make Money with Us | Let Us Help You |
|---|---|---|
| Careers | Sell on Amazon | Your Account |
| Investor Relations | Become an Affiliate | Shipping Rates & Policies |
| Press Releases | Advertise Your Products | Amazon Prime |
| Amazon and Our Planet | Independently Publish with Us | Returns Are Easy |
| Amazon in the Community | › See all | Manage Your Kindle |
| | | Help |

## amazon.com

Canada   China   France   Germany   Italy   Japan   Spain   United Kingdom

| AbeBooks
Rare Books
& Textbooks | AmazonLocal
Great Local Deals
in Your City | AmazonSupply
Business, Industrial
& Scientific Supplies | AmazonWebServices
Scalable
Cloud Services | AmazonWireless
Cellphones &
Wireless Plans | Askville
Community
Answers | Audible
Download
Audio Books | BeautyBar.com
Prestige Beauty
Delivered |
|---|---|---|---|---|---|---|---|
| Book Depository
Books With Free
Delivery Worldwide | CreateSpace
Indie Publishing
Made Easy | Diapers.com
Everything
But The Baby | DPReview
Digital
Photography | Fabric
Sewing, Quilting
& Knitting | IMDb
Movies, TV
& Celebrities | Junglee.com
Shop Online
in India | MYHABIT
Private Fashion
Designer Sales |
| Shopbop
Designer
Fashion Brands | Soap.com
Health, Beauty &
Home Essentials | Wag.com
Everything
For Your Pet | Warehouse Deals
Open-Box
Discounts | Woot
Never Gonna
Give You Up | Yoyo.com
A Happy Place
To Shop For Toys | Zappos
Shoes &
Clothing | |

Conditions of Use   Privacy Notice   Interest-Based Ads   © 1996-2012, Amazon.com, Inc. or its affiliates

**EXHIBIT 8**

**FILED UNDER SEAL**

**EXHIBIT 9**

**FILED UNDER SEAL**

**EXHIBIT 10**

**FILED UNDER SEAL**

1

2                    UNITED STATES DISTRICT COURT

3                    SOUTHERN DISTRICT OF NEW YORK

4        ----------------------------X

    CAPITOL RECORDS, LLC

5

                          Plaintiff,

6

            v.                        No. 12 Civ. 0095(RJS)

7

    REDIGI INC.,

8

                          Defendant.

9        ----------------------------X

10

11                       RULE 30(b)(6)

12          DEPOSITION OF LAWRENCE S. RUDOLPH ROGEL

13                    New York, New York

14                    Monday, June 18, 2012

15

16

17

18

19

20

21

22

    Reported by:

23  ANNETTE ARLEQUIN, CCR, RPR

    JOB NO. 50449

24

25

## Page 2

June 18, 2012
10:00 a.m.

Rule 30(b)(6) deposition of REDIGI INC., through its representative LAWRENCE S. RUDOLPH ROGEL, held at the offices of Cowan, Liebowitz & Latman, P.C., 1133 Avenue of the Americas, New York, New York pursuant to Rule 30(b)(6) Notice and individually, before Annette Arlequin, a Certified Court Reporter, a Registered Professional Reporter, a Certified LiveNote Reporter, and a Notary Public of the State of New York.

## Page 3

APPEARANCES:

COWAN, LIEBOWITZ & LATMAN
Attorneys for Plaintiff
1133 Avenue of the Americas
New York, New York
BY: JONATHAN Z. KING, ESQ.


MEISTER SEELIG & FEIN
Attorneys for Defendant
140 East 45th Street
New York, New York 10017
BY: GARY ADELMAN, ESQ.

ALSO PRESENT:
JOHN OSSENMACHER, ReDigi, Inc.

## Page 4

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing and sealing be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

- oOo -

## Page 5

L. Rudolph

LAWRENCE S. RUDOLPH ROGEL, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

*      *      *

EXAMINATION BY
MR. KING:

Q.   Good morning, Mr. Rudolph, or should I call you Mr. Rogel?

A.   Call me Rudolph.

Q.   Okay. Mr. Rudolph. My name is Jonathan King. We met before. I represent Capitol Records along with my firm Cowan Liebowitz & Latman and we're here to take your deposition today.

You'll be appearing both in your personal capacity as Mr. Rudolph and also as a corporate designee on behalf of ReDigi Inc. and we'll be asking you some questions.

I gather you've probably been deposed before, but I always like to just set out the ground rules.

I'll ask you questions and you are to provide me answers to the best of your ability.

L. Rudolph

1 hardware, which meant it was covered by -- it
2 was contract agreement. If it was part of
3 hardware, then Broward County already paid for
4 it. It's -- I can't remember the details, but
5 it was a question of whether microcode was
6 hardware or software.
7 Q. Okay. And you also rendered an
8 expert report in that case?
9 A. I wrote an expert report. I don't
10 know if it was submitted. I think it was
11 arbitrated before it was over.
12 Q. Okay. Do you know how the case was
13 resolved?
14 A. I think there was an -- I think it
15 went to arbitration and as usual, I think there
16 was, there was some split on the money as to who
17 had to pay what.
18 Q. And how about the case where you
19 testified as an expert?
20 A. The other case was HP versus Gateway.
21 Q. I've heard of those guys.
22 And who retained you in that case?
23 A. I think it was -- it will come to me
24 in a second. A very large law firm in

L. Rudolph

1 California. DLA Piper.
2 Q. Okay. And whom were they
3 representing?
4 A. HP.
5 Q. Okay.
6 A. And this was copyright. This was
7 patent infringement on, again, something to do
8 with the microprocessor, and I was deposed and,
9 again, they settled before an expert was --
10 report was written.
11 Q. And did you render an exert report in
12 that case?
13 A. No.
14 Q. Okay. And I assume you
15 participated -- your resumé references about a
16 dozen cases in which you participated as an
17 expert?
18 A. Correct.
19 Q. But these are the only two instances
20 in which you've actually testified, the ones
21 you've just described to me?
22 A. Correct.
23 Q. Okay. Do you know whether you've
24 ever had any of your expert reports stricken or

L. Rudolph

1 commented on by a judge?
2 A. Never.
3 Q. That was a poor question.
4 So no judicial opinion has ever made
5 reference to any of your expert reports; is that
6 correct?
7 A. As far as I know, that's correct.
8 Q. Okay. Has anyone ever moved to
9 exclude one of your expert reports?
10 A. Never.
11 Q. You understand that ReDigi has -- the
12 company, the defendant in this lawsuit, has
13 identified you to testify on its behalf as to a
14 number of deposition topics?
15 A. Yes.
16 MR. KING: Gary, should we just do
17 this through counsel just put on the record
18 which topics Mr. Rudolph will be speaking
19 to?
20 MR. ADELMAN: Yes.
21 MR. KING: Okay. So why don't we
22 mark this as Plaintiff's Exhibit No. 1.
23 (Plaintiff's Exhibit 1, 30(b)(6)
24 Notice, marked for identification, as of

L. Rudolph

1 this date.)
2 MR. KING: And it may be just faster
3 to do this with you.
4 Based on our correspondence, Gary, I
5 understand that Mr. Rudolph will be
6 testifying as to topics 1 jointly with
7 Mr. Ossenmacher --
8 MR. ADELMAN: Correct.
9 MR. KING: -- two jointly with
10 Mr. Ossenmacher.
11 MR. ADELMAN: Correct.
12 MR. KING: Three, six jointly with
13 Mr. Ossenmacher.
14 MR. ADELMAN: Both correct.
15 MR. KING: Fourteen.
16 MR. ADELMAN: Correct.
17 MR. KING: Fifteen?
18 MR. ADELMAN: Correct.
19 MR. KING: Sixteen jointly with
20 Mr. Ossenmacher.
21 MR. ADELMAN: Correct.
22 MR. KING: And eighteen, that also
23 may be done with Mr. Ossenmacher. I'm not
24 sure.

L. Rudolph

1  MR. KING: You can just object.
2  MR. ADELMAN: Okay. I think -- you
3  know, if you could just rephrase.
4  BY MR. KING:
5  Q. Was it either your idea or
6  Mr. Ossenmacher's idea to develop ReDigi into a
7  for profit company?
8  A. It was a joint idea between the two
9  of us. I've been in the area of writing
10  patents, writing papers and there's -- I think
11  as you say, that by -- when two people work
12  together and think about alternatives and
13  discuss those, it's a joint idea.
14  Q. Okay. Who came up with the name
15  ReDigi?
16  A. I do not recall.
17  Q. And what does ReDigi stand for?
18  A. Recycled digital goods.
19  Q. Okay. And that name is meant to
20  capture the fact that ReDigi involves the sale
21  and purchase of what ReDigi calls used or
22  recycled digital media?
23  MR. ADELMAN: Objection to form.
24  But you can answer.

L. Rudolph

1  A. It's to capture the idea of recycled,
2  pre-owned digital goods.
3  Q. So when you and Mr. Ossenmacher had
4  this idea of a marketplace for buying and
5  selling used or recycled digital goods, what
6  were your first steps in implementing that idea?
7  A. The first step, the basic step was to
8  figure out how we can identify the difference
9  between a legally acquired digital good versus
10  illegally acquired digital good.
11  It was our belief from the outset
12  that a marketplace would only work where the
13  goods would be legally acquired. We wanted to
14  make sure that we could distinguish between the
15  two.
16  Q. So then did you seek to develop a
17  technology that permitted you to achieve the
18  goal that you just described?
19  A. I developed the technology that
20  attempts to -- that looks at a digital file and
21  defines whether it's legally acquired or not.
22  Q. And you're the computer programmer
23  who wrote the software code that achieves that
24  goal?

L. Rudolph

1  A. I'm the computer architect that
2  pretty much decided how we would be doing that.
3  Q. And once you developed technology to
4  achieve that first goal of identifying whether a
5  digital file was legally acquired, what's the
6  next technological step in implementing this
7  idea of a used digital marketplace?
8  A. The next step was to figure out how
9  one can transfer ownership of a digital file
10  from one user to another without actually --
11  without ever having the point of time when two
12  people, the buyer and seller, both own the song
13  at the same time, they own both the digital good
14  at the same time.
15  Q. Okay. So did you write software code
16  that you believe achieves that goal?
17  A. Correct.
18  Q. And did you seek patent protection
19  for these technologies?
20  A. Yes.
21  Q. Okay. Because I know your
22  declaration that you submitted in your
23  summary -- not summary judgment, the preliminary
24  junction motion made reference to a patent

L. Rudolph

1  application, correct?
2  A. Correct. It's -- I was extremely
3  excited about this notion that we can do a
4  transaction in the cloud to be able to transfer
5  ownership from one user to another.
6  I'm going to be -- I'm answering the
7  minimum information, but I don't know, I had 10
8  or 15 good ideas in my life and this is one of
9  them.
10  Q. And the patent that you filed, and we
11  can take a look at it, the patent that you filed
12  is your wish that it covered both the
13  verification that the legal -- that the file was
14  legally acquired and covered your technology for
15  the transfer as you described it just a moment
16  ago?
17  A. Yes.
18  Q. Okay. Let me take a look at the
19  patent.
20  MR. ADELMAN: Before we go on, I just
21  wanted -- we forgot at the beginning, I
22  wanted to just verify the last depositions
23  were designated attorneys' eyes only for
24  the review period, for our review period

1           L. Rudolph
2      In the case of ReDigi, would that be
3 what you colloquially call the ReDigi cloud?
4     A.   Yes, it is.
5     Q.   Okay.  And a cloud, just for my
6 edification, a cloud is essentially a remote
7 server, right, at least for purposes of this, a
8 simple description?
9     A.   Sure.  Yes.
10    Q.   Okay.  And it is located, it's not up
11 in the clouds, it is located in a physical
12 location, correct?
13    A.   Correct.
14    Q.   Is --
15    A.   Arizona.
16    Q.   Where is yours?
17    A.   I don't know but...
18    Q.   Is yours in Cambridge, Massachusetts?
19 Is ReDigi's in Cambridge?
20    A.   No, it's not.
21    Q.   Where is it located?
22    A.   We're using the Amazon cloud service.
23    Q.   Okay.
24    A.   Which is probably in Arizona
25 somewhere.

1           L. Rudolph
2    Q.   So you're renting server space from
3 Amazon?
4    A.   That is correct.
5    Q.   Okay.  And as the patent paragraph 70
6 says, it says that remote server, which we've
7 now identified as the ReDigi cloud, that's the
8 cloud where ReDigi users can store their music
9 files, correct?
10    A.   That is correct.
11    Q.   Okay.  Now on item -- on Figure
12 No. 2, the server also has various icons or
13 discs attached to it.
14      Are those discs meant to represent
15 the physical storage space that's made available
16 via that server?
17    A.   That is correct.
18    Q.   Okay.  And that again is a physical
19 storage entity on which computer files can be
20 stored?
21    A.   Eventually.
22    Q.   Is that also, you think, probably
23 located in Arizona?
24    A.   Yes.
25    Q.   Okay.  And so music files, when a

1           L. Rudolph
2 ReDigi user stores music in the ReDigi cloud, he
3 or she is most likely storing on a physical disc
4 in Arizona or wherever the rented Amazon cloud
5 server space is, correct?
6    A.   Correct.
7    Q.   And from that disc, that physical
8 disc, the ReDigi user can stream the file back
9 to himself, correct?
10    A.   Correct.
11    Q.   He could also download the file back
12 to his computer, correct?
13    A.   He can download a file from the
14 computer, yes.
15    Q.   Okay.  And now that same disclosure
16 we just read also made reference to a client
17 digital data processor, e.g. a private computer,
18 and that would be item No. 22 in Figure No. 2?
19    A.   Correct.
20    Q.   Okay.  So the way it works is the
21 ReDigi user has the music file on item No. 22 in
22 Figure 2 and then uploads that music file via
23 the Internet, shown in the icon for 26, to the
24 remote server in item 20, which is the ReDigi
25 cloud server, correct?

1           L. Rudolph
2    A.   Correct.
3    Q.   And then if you continue in paragraph
4 -- I'll point you.  If you go back to page 4
5 which is ReDigi00000419, Plaintiff's Exhibit 2,
6 it says, this is maybe three-quarters of the way
7 down the paragraph, it says "The user, a term
8 which is typically used herein to refer to an
9 act of the client digital data processor --
10    A.   Wait.  I lost you.  Where are you?
11 I'm sorry.
12    Q.   Okay.  I'm still in paragraph 70,
13 maybe about halfway down.
14    A.   The second sentence?
15    Q.   It starts -- no, it's about --
16    A.   The second --
17    Q.   It starts -- it's after a long
18 parenthetical and it starts with the term, "The
19 user."
20    A.   Oh, okay, yes.
21    Q.   "The user..." I'll skip the
22 parenthetical, "...may upload or download his or
23 her DMOs between his or her private computer and
24 his or her storage area on the remote server."
25      Okay.  So when the patent refers to

L. Rudolph

1  the "storage area on the remote server," in the
2  case of ReDigi, would that be what ReDigi refers
3  to as the user's cloud locker?
4      A.   Yes.  We talk about the user -- the
5  user's ReDigi cloud locker is on the disc
6  system, yes.
7      Q.   Right.  And that means, at least in
8  virtual terms that means that space on the disc
9  that stores the files associated with that
10 particular user, correct?
11     A.   Correct.
12     Q.   Okay.  And again, the references in
13 the patent to DMO, digital media object, in the
14 case of ReDigi would mean music files, song
15 files, right?
16     A.   That is correct.
17     Q.   So the file, the music file first
18 resides in the ReDigi server as described in
19 this patent application, the file first resides
20 on the private user's computer, on a physical
21 disc on that private user's computer, correct?
22     A.   Perhaps.
23     Q.   Or in one, in one variation.
24 I've got my private computer at home and I've

L. Rudolph

1  got all my iTunes files stored on my hard drive.
2  That's certainly a plausible scenario, correct?
3      MR. ADELMAN:  Objection.  I'm not
4  clear whether you're talking about what the
5  patent says or what actually is happening
6  on --
7      MR. KING:  Well, we're going to --
8      MR. ADELMAN:  So are you just talking
9  about the patent right now?
10     MR. KING:  I'll make it clear.
11 BY MR. KING:
12     Q.   So let's talk about the ReDigi
13 service and then describe it in the terms of
14 this patent.
15     I'm a ReDigi user and I have a song
16 on my hard drive.  That song is stored on my
17 hard drive on a physical disc, correct?
18     A.   That's a plausible scenario.
19     Q.   Okay.  I upload it to the -- I became
20 a ReDigi member, I download the software, my
21 file is deemed eligible, I upload it to the
22 ReDigi cloud server.
23     Now that song is stored on a physical
24 disc somewhere wherever the ReDigi cloud server

L. Rudolph

1  is located, correct?
2      A.   At the end of the transfer, yes.
3  That's correct.
4      Q.   And either from -- and I can play it
5  when it's on my home computer, I can stream it
6  to myself, correct?
7      A.   No.
8      Q.   Or I can play it, I can perform it.
9      A.   No.
10     Q.   I can't?
11     If I have an iTunes file on my home
12 computer, I can't click it and play it through
13 my speakers?
14     A.   If you just loaded --
15     Q.   I'm saying before uploading.
16     A.   Okay.
17     Q.   Can I?
18     A.   Yes, I presume so.
19     Q.   And then if I upload it to the ReDigi
20 cloud also from that remote disc on which it's
21 now embodied, I can also play it back to myself,
22 correct?
23     A.   That is correct.
24     Q.   Now I refer you to paragraph 71 on

L. Rudolph

1  page 4 of Plaintiff's Exhibit 2, which is again
2  ReDigi 419.  It says, "For a DMO..." it's again
3  a digital media object "...to be offered for
4  sale, is it first copied to the remote server
5  and stored on the disc."
6      So is that the case in the ReDigi
7  system, that for a, in the case of a ReDigi, a
8  music file to be offered for sale, it is first
9  copied to the remote server, the ReDigi cloud
10 server and stored on a disc?
11     A.   No.
12     Q.   So that statement in here in
13 paragraph 71 does not describe what happens in
14 the ReDigi service?
15     A.   Correct, it does not describe
16 accurately what happens in the ReDigi service.
17     Q.   Okay.  What is inaccurate about that
18 statement as it applies to ReDigi?
19     A.   ReDigi doesn't copy the file from the
20 user's machine up to the locker.  We transfer
21 the file so that when the file has migrated,
22 transferred from the user machine to the locker,
23 it's no longer on the user machine.  There's
24 never the case that there are two copies, two

Page 58

```
1              L. Rudolph
2    instances of the file both on the user machine
3    and the locker.
4        Q.   Right.  I understand it's never the
5    case that there are -- well, strike that.
6            Has ReDigi invented a new method for
7    uploading files?
8        A.   ReDigi hasn't invented a new method,
9    but we use non-standard methods.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 60

Page 61





16  Do you have contractual arrangements
17  with either Apple or Google that permit you to
18  do this?
19      A.  No, we do not.
20      Q.  Okay.
21      MR. ADELMAN:  Objection to form.
22      Q.  Now with respect to -- let's talk
23  about Apple iCloud's service.
24      Am I correct that the way that
25  service works is once you purchase a song, it's

1               L. Rudolph
2   automatically -- it can be set to automatically
3   download it to all of your devices, correct?
4       A.  I don't know if that's -- it's all
5   your devices.  I don't know exactly.  It's
6   pretty complicated.
7       MR. ADELMAN:  Can we take a
8   two-minute break?
9       MR. KING:  Sure.
10      (Recess is taken.)
11      (Plaintiff's Exhibit 4, Printout from
12      iTunes website describing iCloud service,
13      marked for identification, as of this
14      date.)
15  BY MR. KING:
16      Q.  Okay.  We were discussing Apple's
17  iCloud service, and if you turn to the second
18  page of what we -- well, first of all, I'll
19  represent to you that what I've placed in front
20  of you is Plaintiff's Exhibit 4.  It's just a
21  printout from the iTunes website describing its
22  iCloud service.
23      And if you'll turn to the second page
24  of this document --
25      MR. ADELMAN:  You know what, Jon, I

1               L. Rudolph
2   think I have yours.  You gave me two
3   copies.
4       (Handing.)
5   BY MR. KING:
6       Q.  If you'll turn to the second page of
7   this document, you'll see it says, "Buy here,
8   automatically get it everywhere"?
9       A.  Yes.
10      Q.  It says, "With iTunes in the cloud,
11  the music you download to one device
12  automatically appears on all your devices.  So
13  the song you buy from your Mac at work is ready
14  and waiting for you on your iPod when it's time
15  to drive home.  ITunes will automatically
16  download your new songs, apps, books to your
17  other devices over Wi-Fi or a cellular network."
18      And then I'll refer you to the first
19  page of this document.
20      A.  Um-hmm.
21      Q.  "What's new in iTunes."  It states,
22  "As part of iCloud, iTunes in the cloud takes
23  what you buy on iTunes on one device and pushes
24  it to all your other devices wirelessly and
25  without syncing."

1               L. Rudolph
2       Are you familiar with that service
3   that iTunes provides of automatically wirelessly
4   downloading all your iTunes purchases to all
5   your devices?
6       A.  I can't answer that question because
7   you're asking me to draw a conclusion which I
8   don't agree with.  I mean this is marketing
9   bullshit.
10      I'm sorry.  I'm sorry.  I didn't mean
11  to say that.  This is marketing.  It does not
12  push it to all your devices.  I can't agree with
13  that.  It doesn't push it to your iTune, to your
14  iPad for example.
15      Q.  Right.
16      So it pushes it to your devices that
17  are wireless enabled, correct?
18      A.  That's right and the statements like
19  "to all your devices" is not correct.
20      Q.  Okay.  Do you agree, though, that as
21  currently constituted, the iCloud service pushes
22  an iTune purchase to all your devices that are
23  wireless enabled, like an iPod touch, for
24  example?
25      A.  I am saying I read those words and I

1      L. Rudolph
2      Q.   ReDigi00000339.  It says,
3   "Congratulations to seller.  ReDigi has fulfilled
4   your order."
5          So I gather this is the email someone
6   would get when ReDigi has located someone who
7   has the file that has been ordered and is able
8   to process the sale?
9      A.   This is the email one gets when a
10  song has been offered for sale for which there
11  is an outstanding order and we've done a match.
12     Q.   Okay.  And this is a notification
13  that the orderer receives that a match has been
14  found?
15     A.   No.  This is the email that one
16  receives that the transaction is completed.
17     Q.   Okay.  So now the orderer has
18  officially purchased the song, correct?
19     A.   That is correct.
20     Q.   Okay.  And Plaintiff's Exhibit 10
21  tells the purchaser that that purchaser can keep
22  the song in your cloud or go download it to your
23  computer at any time.  Those options are both
24  available to that purchaser, correct?
25     A.   That is correct.

1      L. Rudolph
2      MR. KING:  I think this exhibit has
3   too many pages in it but we'll mark this
4   11.
5          (Plaintiff's Exhibit 11, Email from
6      customer service to Larry at ReDigi, marked
7      for identification, as of this date.)
8   BY MR. KING:
9      Q.   And I'll really just focus your
10  attention on the first page of Plaintiff's
11  Exhibit 11.  Some other things are attached to
12  it that are redundant of what we've already
13  discussed.
14          This is an email from customer
15  service to Larry at ReDigi.
16          Are you Larry at ReDigi?
17     A.   Yes, I am.
18     Q.   And the subject of this email is "Low
19  on Credit."
20          Does ReDigi notify its users when
21  they are low on credit?
22     A.   Periodically, yes, it does.
23     Q.   Why?
24     A.   We would like people to add more
25  credit, either buying it or getting more credit

1      L. Rudolph
2   by purchasing credit from us.
3      Q.   And they can, and they can increase
4   the amount of credit they have either with money
5   or by obtaining credit by uploading songs?
6      A.   Not by uploading -- they can increase
7   their credit by either selling songs or by
8   charging to their credit card.
9      Q.   Okay.  The reason you want them to
10  have credit is to encourage them to go buy
11  songs, correct?
12     A.   That is correct.
13     Q.   And also you want them to increase
14  the credit in their account by uploading songs
15  and offering them for sale as well, right?
16     MR. ADELMAN:  Objection to form.
17  BY MR. KING:
18     Q.   Because that's one way to increase
19  the credit in your account?
20     A.   Yes, that's one way of increasing the
21  account.
22     Q.   And that stimulates the marketplace
23  activity that you'd like ReDigi to encourage,
24  correct?
25     THE VIDEOGRAPHER:  Object to the

1      L. Rudolph
2   form.
3          You can answer.
4      A.   Yes.
5      Q.   In your preliminary injunction
6   declaration you described various ways in which
7   a user could have committed a, quote, unquote,
8   violation which may or may not result in a
9   suspension of their account.
10          Can you describe for me the
11  circumstances that would lead to a user
12  committing a violation?
13     A.   A violation is when a song is offered
14  for sale or has been sold and we discover a copy
15  of that song on the user's machine.  We call it
16  a violation.
17     Q.   Okay.  And is that only when the user
18  offers the song for sale or has just merely
19  uploaded it to the cloud?
20     A.   We've changed the system now.  It's
21  only when they offer a song for sale or sold.
22     Q.   Okay.  So if I've uploaded the song
23  to the cloud but haven't offered it for sale and
24  I'm a ReDigi user, it won't be deemed a
25  violation if you determine that I have other

1      L. Rudolph
2      A.   What's the question?
3      Q.   Under the terms of service, RDO could
4  terminate your authorization to use the RDO
5  content for any reason, right?
6          MR. ADELMAN:  Asked and answered.
7  Calls for a legal conclusion.
8          You may answer.
9      A.   That's what it says here, yes.
10     Q.   Okay.  So ReDigi had no legal basis
11 to complain for RDO's termination of the API
12 access, did it?
13         MR. ADELMAN:  Calls for a legal
14 conclusion.  Objection.
15         You can answer if you know.
16     A.   I have no idea if we had legal basis
17 for it.
18     Q.   And you're aware that your attorney
19 wrote a letter to court over the weekend
20 threatening an injunction against Capitol
21 Records because of the termination of your RDO
22 agreement?
23     A.   Yes, I do.
24     Q.   Okay.  And what was the legal basis
25 for threatening Capitol with an injunction?

1      L. Rudolph
2          MR. ADELMAN:  Objection.  Calls for a
3  legal conclusion.
4          You may answer.
5      A.   Yeah, I'm not gonna -- I don't know
6  what the legal basis is.
7      Q.   Because there was none, right?
8          MR. ADELMAN:  Objection.
9  Argumentative.
10     A.   I said I don't know if there's a
11 legal basis or not.
12     Q.   Right.
13         So ReDigi threatened Capitol with an
14 injunction without knowing whether it had any
15 legal basis to do so.
16     A.   I didn't say that --
17         MR. ADELMAN:  Objection.
18 Argumentative.
19 BY MR. KING:
20     Q.   Is that correct?
21     A.   I'm not a lawyer.  I don't know what
22 the legal basis is or not.  I don't want to
23 be -- I don't know.  I don't want to make legal
24 conclusions.  I'm not a lawyer.
25     Q.   Has ReDigi followed up with RDO to

1      L. Rudolph
2  pursue any claim against RDO for terminating its
3  API access?
4          MR. ADELMAN:  Objection.
5          You can answer.
6          Objection to form.
7      A.   Not that I know of.
8      Q.   Does ReDigi intend to pursue any
9  claim against RDO for terminating its API
10 access?
11         MR. ADELMAN:  Objection.
12         You can answer.
13     A.   We make that decision every day.  I
14 don't know.  I can't tell you what we're going
15 to do tomorrow.
16     Q.   And does ReDigi -- we've heard no
17 further since February on this when
18 Mr. Beckman's request was rejected by the judge,
19 but does ReDigi intend to pursue any claims in
20 this action, the lawsuit that brings us here
21 today, regarding the termination of the RDO
22 access?
23         MR. ADELMAN:  Objection.
24         First, I don't know who "we" is, and
25 secondly, it's undefined and secondly it

1      L. Rudolph
2  calls for a legal conclusion and it's
3  subject to attorney-client privilege.
4          At this point instruct my client not
5  to answer.
6  BY MR. KING:
7      Q.   Do you believe ReDigi has any basis
8  for making a claim against Capitol regarding the
9  termination of the RDO access?
10         MR. ADELMAN:  Calls for a legal
11 conclusion.
12         To the extent you can answer without
13 violating attorney-client privilege, you
14 may do so.
15     A.   I don't have anything to say about
16 that.
17     Q.   Now after the RDO API was turned off,
18 your account with RDO was suspended.
19         Did ReDigi continue to offer streams
20 of audio clips to ReDigi users by other means?
21     A.   ReDigi did not offer clips by some
22 other means.  We -- people went to, to YouTube
23 clips.
24     Q.   Since the termination of the RDO
25 relationship, is the only way that a user could

L. Rudolph

1 obtain a stream of an audio clip on ReDigi by
2 hearing a YouTube stream? Is that what you're
3 saying?
4     A.    We're saying that we send users to
5 other sites to listen to the clips.
6     Q.    And those other sites, any other
7 sites besides YouTube?
8     A.    ITunes.
9     Q.    Okay. How recently have you --
10 iTunes is a recent referral?
11     A.    Yes.
12     Q.    Okay. And before that it was solely
13 YouTube?
14     A.    Yes.
15     Q.    Okay. The audio streams offered for
16 YouTube had been offered in a couple of
17 different ways, correct?
18     A.    I don't know what you mean by couple
19 of different ways.
20     Q.    Did you ever offer streams of YouTube
21 clips using YouTube's imbedded player, also
22 sometimes called its API, seems to be the same
23 thing?
24     A.    I don't believe we used their

L. Rudolph

1 embedded player.
2     Q.    Okay. There was a period of time
3 when clicking on a little green arrow icon next
4 to a song file pulled up a ReDigi box that said
5 nothing about YouTube and played an audio
6 stream. Also had a little message to Capitol
7 Recordings, but did those audio streams come
8 from YouTube?
9         This is post termination of the RDO
10 agreement.
11     A.    It popped open a window that was
12 small and came -- and that was a YouTube window.
13     Q.    The address that appeared in that
14 window said nothing about YouTube, so the
15 address was masked somehow.
16         Do you recall the green -- it was a
17 green box. Do you recall what I'm talking
18 about?
19         MR. ADELMAN:  Is that a statement or
20 are you asking him?
21         MR. KING:  I don't have an exhibit.
22 He can confirm or deny.
23         MR. ADELMAN:  Well, I'm asking if
24 you're asking or telling him.

L. Rudolph

1 BY MR. KING:
2     Q.    I'm representing that I have seen, I
3 saw multiple times a box that said nothing about
4 window, nothing about YouTube. It was a green
5 box that only identified ReDigi as the source
6 and played an audio stream.
7     A.    At the time I just believe we just
8 made the box really small.
9     Q.    But I could read the address on the
10 box and it said ReDigi, so --
11         MR. ADELMAN:  Objection.
12         MR. KING:  Well, let me finish my
13 question.
14 BY MR. KING:
15     Q.    So is it possible that the stream was
16 actually coming from YouTube but just the
17 address was masked?
18     A.    I don't know if the address masked.
19 I can't remember what appeared on the screen,
20 but ReDigi directed -- it was a -- it was --
21 ReDigi directed the browser to open up a window
22 from -- for YouTube and play it.
23     Q.    Okay. Then how come as a user, I,
24 for example, didn't see any reference to user,

L. Rudolph

1 didn't see any YouTube video?
2     A.    Because it was small. Box was small,
3 the window was small.
4     Q.    The box actually played nothing. It
5 was just a black box surrounded by green. There
6 was no video component to it.
7         So separate and apart from its size,
8 why was there no reference to video or YouTube?
9         MR. ADELMAN:  Objection.
10         Instead of testifying, can you ask
11 him whether the box was black as opposed to
12 stating it affirmatively since you're not
13 testifying?
14 BY MR. KING:
15     Q.    You can confirm or tell me if I'm
16 wrong.
17         MR. ADELMAN:  No. I object to the --
18 fine. Objection to the form.
19     A.    I'm fairly sure that because we made
20 the window small, that all the other images
21 there were not easy to see, weren't displayed,
22 but they were there in the box. They were there
23 in the window.
24     Q.    And that was not via YouTube API or

1            L. Rudolph
2  embedded player?
3     A.   It was not via API embedded player.
4     Q.   Was it just a straight hyperlink?
5     A.   I don't recall how we did the
6  hyperlink.
7     Q.   Were you the person who set this up?
8     A.   No.
9     Q.   Who was?
10    A.   Our engineer.
11    Q.   How do we find out the answer to this
12  question if we want to know how those --
13    A.   We can give you the code.
14
15
16
17
18
19         MR. ADELMAN:  Take it under
20  advisement.
21  BY MR. KING:
22     Q.   Did you ever -- are you familiar with
23  the process of iframing?
24     A.   Somewhat.
25     Q.   Do you believe you ever iframed in

1            L. Rudolph
2  connection with YouTube videos or YouTube audio
3  streams?
4     A.   I believe we did not, but I cannot
5  recall.
6     Q.   Okay.  Now these referrals to
7  YouTube, are they to 30-second clips or to
8  full-length sound recordings?
9     A.   They are whatever there is on
10  YouTube.
11    Q.   How do you select which YouTube links
12  refer --
13    A.   By doing a search on track title and
14  artist.
15    Q.   So for each song that's available on
16  ReDigi, someone actually goes and does a manual
17  search for a YouTube video of that song, places
18  the link on ReDigi?
19    A.   No.  When you click on -- when you
20  click on the song, we then do a lookup.
21    Q.   So by clicking on the song, you're
22  essentially typing the name of the song into the
23  YouTube search bar?
24    A.   It's functionally equivalent, yes.
25    Q.   And do you know whether the links

1            L. Rudolph
2  that you're pulling up are authorized or pirated
3  links?
4         MR. ADELMAN:  Objection to form.
5     Go ahead.
6     A.   We know they're on YouTube.  We don't
7  know anything else.
8     Q.   Right.
9         So they could be copyright infringing
10  the YouTube files, correct?
11         MR. ADELMAN:  Objection to form.
12     Calls for a legal conclusion.
13     You can answer.
14  BY MR. KING:
15    Q.   You just don't know?
16    A.   I don't know.
17    Q.   Okay.  They're just files that come
18  up when you search the name of the track on
19  YouTube; is that correct?
20    A.   I'm assuming that YouTube does the
21  right thing.
22    Q.   Do you have any agreement with
23  YouTube that permits you to do this?
24    A.   We follow the YouTube terms of
25  service.

1            L. Rudolph



**EXHIBIT 11**

**FILED UNDER SEAL**

1

2                 UNITED STATES DISTRICT COURT

3                 SOUTHERN DISTRICT OF NEW YORK

4

5    CAPITOL RECORDS, LLC,          )
                                    )
6                    Plaintiff,     ) 12 Civ. 0095 (RJS)
                                    )
7                 vs.               )
                                    )
8    REDIGI INC.,                   )
                                    )
9                    Defendant.     )
     ------------------------------)
10

11

12       * CONFIDENTIAL – ATTORNEYS' EYES ONLY *

13

14     * CONTAINS OUTSIDE COUNSEL ONLY PORTIONS *

15

16

17        DEPOSITION OF JOHN MARK OSSENMACHER

18                  New York, New York

19                Tuesday, June 19, 2012

20

21

22

23

     Reported by: KRISTIN KOCH, RPR, RMR, CRR, CLR
24

25   JOB NO. 50450

## Page 2

1
2
3
4
5      June 19, 2012
6      10:00 a.m.
7
8
9      Deposition of REDIGI, INC., by JOHN
10     MARK OSSENMACHER, held pursuant to Rule
11     30(b)(6) of the Federal Rules of Civil
12     Procedure, at the offices of Cowan,
13     Liebowitz & Latman, P.C., 1133 Avenue of
14     the Americas, New York, New York, before
15     Kristin Koch, a Registered Professional
16     Reporter, Registered Merit Reporter,
17     Certified Realtime Reporter, Certified
18     Livenote Reporter and Notary Public of the
19     State of New York.
20
21
22
23
24
25

## Page 3

1
2     A P P E A R A N C E S :
3
4
5     COWAN, LIEBOWITZ & LATMAN
6     Attorneys for Plaintiff
7         1133 Avenue of the Americas
8         New York, New York 10036
9     BY:  RICHARD S. MANDEL, ESQ.
10         JONATHAN Z. KING, ESQ.
11
12
13     MEISTER SEELIG & FEIN
14     Attorneys for Defendant
15         140 East 45th Street
16         New York, New York 10017
17     BY:  GARY P. ADELMAN, ESQ.
18
19
20
21     ALSO PRESENT:
22
23         LARRY RUDOLPH
24
25

## Page 4

1
2          IT IS HEREBY STIPULATED AND AGREED
3     by and between the attorneys for the
4     respective parties herein, that filing and
5     sealing be and the same are hereby waived.
6          IT IS FURTHER STIPULATED AND AGREED
7     that all objections, except as to the form
8     of the question, shall be reserved to the
9     time of the trial.
10          IT IS FURTHER STIPULATED AND AGREED
11     that the within deposition may be sworn to
12     and signed before any officer authorized
13     to administer an oath, with the same
14     force and effect as if signed and sworn
15     to before the Court.
16
17
18
19
20          - oOo -
21
22
23
24
25

## Page 5

1     Ossenmacher - Confidential - Attorneys' Eyes Only
2     J O H N   M A R K   O S S E N M A C H E R,
3          called as a witness, having been duly sworn
4          by a Notary Public, was examined and
5          testified as follows:
6     EXAMINATION BY
7     MR. MANDEL:
8          Q.   Please state your name for the
9     record.
10         A.   John Ossenmacher.
11         Q.   And where do you reside,
12     Mr. Ossenmacher?
13         A.   In Boston, Massachusetts.
14         Q.   Okay.  And you are the CEO of the
15     defendant ReDigi, Inc.; correct?
16         A.   Yes.
17         MR. MANDEL: Before we begin, let me
18     just ask you to take a look at what was
19     marked yesterday as Plaintiff's Exhibit 1.
20         As we did yesterday, we can just go
21     over this by counsel.
22         I just want to confirm for the
23     record that Mr. Ossenmacher is being
24     offered as a 30(b)(6) designee on behalf of
25     Defendant ReDigi with respect to topics 1

## Page 22

1  Ossenmacher - Confidential - Attorneys' Eyes Only
2  into the plans that were under discussion with
3  respect to the lacrosse league?
4      A.   Sure.  The idea was to attract a
5  certain demographic, a youthful demographic,
6  you know, that likes music and to do these
7  events on Friday or Saturday evenings when the
8  arenas weren't having another use and so there
9  was going to be an idea to use up-and-coming
10  bands to showcase their abilities and have kids
11  come and listen and enjoy.
12      Q.   So that was separate and apart from
13  the lacrosse league or was it going to be in
14  connection with the lacrosse --
15      A.   It was connected.  It was meant to
16  it be all together, yeah.
17      Q.   And would those concerts promote the
18  lacrosse league, was that part of the idea?
19      A.   Yes.
20      Q.   Now, up until that point it doesn't
21  sound like any of your background was in the
22  music industry.  Is that fair to say?
23      A.   Yes.
24      Q.   Did you have any prior involvement
25  at all with projects in the music industry?

## Page 23

1  Ossenmacher - Confidential - Attorneys' Eyes Only
2      A.   The only reason I am hesitating
3  slightly is we had done some charity things
4  with some bands, but other than that, no.
5  There was -- no.
6      Q.   And in terms of the lacrosse project
7  and the intersection with musical content, did
8  you actually go down the road of exploring how
9  that would be done from a legal perspective?
10      A.   I'm not sure I understand the
11  question.
12      Q.   Let me rephrase it.  Did you have
13  occasion to have to consider any copyright law
14  implications in connection with plans that were
15  under discussion for the lacrosse league?
16      A.   Yes.  I think the discussion there
17  was in the bands that were being considered
18  they had to own the copyright to the material
19  they used, that they were going to use, and
20  that they had to have the rights to whatever
21  performance they were going to do, but, again,
22  that was something the lawyers were working on
23  and I wasn't.
24      Q.   So you weren't personally involved
25  in studying the copyright law aspects of that

## Page 24

1  Ossenmacher - Confidential - Attorneys' Eyes Only
2  situation?
3      A.   Not at that time, no.
4      Q.   Okay.  What happened next after you
5  decided that AWE Mobile wasn't really going to
6  go anywhere?  What did you do next?
7      A.   That's when I, you know, just in
8  things we were doing started looking at -- I
9  had learned lots of things about the arena and
10  learned many things about how their systems
11  work and problems they have, and part of my
12  nature is a problem solver, and so one of the
13  things I learned during that process was they
14  had significant problems with ticketing and how
15  ticketing was handled, the cost of ticketing,
16  and so I started working on a solution with one
17  of the arenas to come up with a new type of
18  digital ticketing technology that would be
19  significant.
20      Q.   And did you actually form any
21  business in connection with that?
22      A.   That was the start of Intellisys
23  Group.
24      Q.   So tell me what Intellisys Group is
25  or was.

## Page 25

1  Ossenmacher - Confidential - Attorneys' Eyes Only
2      A.   So Intellisys was set up and we
3  started working on the ticketing project and
4  then there were a couple of other projects that
5  ended up in Intellisys as well.  One was
6  another arena owner I knew hosts a major -- the
7  world's largest skateboarding event, and so we
8  started working on some skateboarding
9  technology, basically apps and some other
10  things for them, which we delivered and are
11  being used today, in a project we called Skate
12  Hub.  And -- there was something else.  I don't
13  know why I am drawing a blank on it.  There
14  were a few little projects that we had going
15  there and that was kind of, I guess, the time
16  also when towards the end of that when, you
17  know, we started contemplating this idea of
18  donating initially music and using music to
19  help, you know, as Larry said yesterday, the
20  kids with cancer, but it was meant to go to the
21  troops and other people who -- you know, we
22  thought music -- I guess the bottom line was we
23  feel music is good for the soul and makes
24  people feel better and so we thought -- and
25  actually the idea came from my daughter

Page 26

Ossenmacher - Confidential - Attorneys' Eyes Only
1  initially, because she is heavily involved in
2  charitable things, saying "dad, can we help
3  these kids out," she was doing things for the
4  troops at the time, packing up all the gift
5  boxes and all that stuff, and "is there a way
6  we can give them music to make them feel
7  better," and so that was kind of the start of
8  thinking about what are all the reasons why we
9  can or can't gift music, and we originally
10  started -- the project was originally called
11  Gift Music, actually. I think if you go to
12  Gift Music dot-com today it probably takes you
13  to ReDigi, but, I mean, that was the start of
14  it. So that was Intellisys.
15      Q.   Okay. Was Intellisys Group actually
16  formed as a corporate entity?
17      A.   It was formed as an LLC.
18      Q.   And when was that formed?
19      A.   Oh, man. You know, actually, I am
20  trying to think. I will have to go back to our
21  attorneys on that. We were going to set it up
22  as an LLC, but I'm actually not sure if we ever
23  ended up doing it. I think we did. And I
24  would say probably maybe 2008, 2009, somewhere

Page 27

Ossenmacher - Confidential - Attorneys' Eyes Only
1  in that range.
2      Q.   And when you formed Intellisys
3  Group, what was the idea? Did it have a
4  specific business purpose?
5      A.   It was to try to use technology to,
6  you know, do things, and, you know, some of
7  those things were the ones that we kind of
8  mentioned. You know, we had this immediate
9  need with arenas that was on the ticketing
10  side. One of my friends who I got to know
11  pretty well who owns an NBA team and also an
12  arena wanted us to help him with a
13  skateboarding thing. So it was just meant to
14  be kind of a little bit of a catch-all.
15      Q.   A catch-all for the various projects
16  you --
17      A.   Just the projects we were working
18  on, yeah.
19      Q.   And did you have any investors in
20  that entity?
21      A.   No.
22      Q.   Did you envision it as a for-profit
23  entity when you formed it?
24      A.   Parts of it. You know, Gift Music

Page 28

Ossenmacher - Confidential - Attorneys' Eyes Only
1  at the original time was meant to be a
2  charitable, but the other ones were definitely
3  for profit, yes.
4      Q.   So what was the concept of Gift
5  Music when it first came up?
6      A.   The concept was is there a way where
7  other kids or other people can lawfully gift
8  their music to people in need, people that
9  can't afford to buy the music, and do it in a
10  way where they don't steal music, so it was
11  kind of meant to be a way to provide this nice
12  service to people that maybe would make them
13  feel better because they can now listen to
14  music and escape maybe the feeling of
15  chemotherapy that they are in or troops sitting
16  there in the middle of the desert. You know,
17  that was the whole concept. So the original
18  concept was to do it as a donation-type system.
19      Q.   And whose idea was that?
20      A.   Well, that was my daughter's idea.
21      Q.   In its original form were you
22  thinking about it in terms of gifting digital
23  music as opposed to other forms?
24      A.   It was meant specifically for

Page 29

Ossenmacher - Confidential - Attorneys' Eyes Only
1  digital music, yes.
2      Q.   And you said your daughter raised it
3  with you and I take it you became interested in
4  that?
5      A.   Yes.
6      Q.   So what did you do next in terms of
7  exploring the possibilities of bringing that to
8  fruition?
9      A.   So that's where we started to do
10  research, you know, which is also part of my
11  nature, you know, to try to understand things.
12  You know, a lot of it was Internet research and
13  then subsequently discussion with law firms,
14  some of the people that I had known at the
15  time, but it was how do we go about doing this,
16  is there a way to do it.
17      Q.   When you say "Internet research,"
18  did you, yourself, actually do research on the
19  Internet?
20      A.   Yes.
21      Q.   And is that when you first started
22  having occasion to look into copyright law?
23      A.   Yes.
24      Q.   And were you actually trying to

## Page 30

1  Ossenmacher - Confidential - Attorneys' Eyes Only
2  learn the copyright law by doing research?
3      A.   I don't know if I was trying to
4  learn the copyright law.  I was trying to
5  understand the copyright law and how that
6  applied to -- at the time I didn't understand
7  what the -- you know, what the bounds of it
8  were, so I was trying to understand how does
9  that apply to people donating things, for
10  example, like can you donate something that is,
11  you know, copyright protected, and that was
12  part of the original desire to learn more, and
13  then I, of course, learned a lot more.
14     Q.   And in terms of your research, is
15  that when you had first occasion to hear of
16  something called the First Sale Doctrine?
17     A.   I think I had heard of it
18  previously, but it was certainly my first
19  occasion to really delve into it more and seek
20  a greater understanding of it.
21     Q.   And separate and apart from any
22  consultation that you may have had with counsel
23  at the time, did you, yourself, based on your
24  Internet research form any conclusions as to
25  how any aspect of the copyright law impacted on

## Page 31

1  Ossenmacher - Confidential - Attorneys' Eyes Only
2  your potential plans?
3      A.   Yes.
4      Q.   What conclusion did you reach?
5      A.   I reached the conclusion that it was
6  exciting to me, because I found it to be
7  fertile ground on the digital side because
8  technology didn't seem to have been readily
9  available that would allow transfers between
10  users in certain types of parameters, and I
11  thought -- you know, part of what I think got
12  me excited and Larry excited then was the idea
13  of being able to use technology to be able to
14  be compliant with copyright law.
15     Q.   What were the copyright law
16  implications that you based on your research --
17  let me strike that.  Let me rephrase the
18  question.
19          What barriers, if any, did you feel
20  copyright law imposed to the potential plans
21  that you wanted to implement?
22          MR. ADELMAN:  Objection to form.
23      You can answer.
24      A.   Okay.  I thought a couple of things.
25  So one was I -- on the barrier side it seemed

## Page 32

1  Ossenmacher - Confidential - Attorneys' Eyes Only
2  that the challenge, and this is part of the
3  technical part that was exciting to me, was how
4  do you have -- how do you transfer a digital
5  good where two people are owning the same good
6  at the same time, and with technologies that
7  had been previously available obviously it was
8  not possible to do, and so that obstacle, I
9  think, had kind of left the market open because
10  nobody had really understood how do you
11  transfer without having simultaneous ownership
12  by two parties, and then the other thing that
13  as I learned more about copyright law, going
14  back to your question about First Sale
15  Doctrine, was that there are also limitations
16  to copyright law, and so that I did a fair
17  amount of research on, you know, the fact that
18  once something is acquired and purchased and
19  royalties have been paid, that the owner of
20  that is entitled to do certain things with
21  them.  They can gift them, they can sell them.
22  And so I think that education -- you know,
23  those things were important to me.  Those were
24  two big things that came up as I did my
25  research.

## Page 33

1  Ossenmacher - Confidential - Attorneys' Eyes Only
2      Q.   And those are things that you
3  discovered on your own before you even
4  consulted with any attorneys?
5      A.   Correct.
6      Q.   So you identified at least the
7  issues that existed?
8      A.   To me.
9      Q.   Okay.  And based on your
10  evaluation -- let's talk about the first of
11  those things.  You talked about the transfer of
12  digital goods.
13          Was it your conclusion that there
14  would be a copyright law issue if at the end of
15  a so-called transfer the original party still
16  retained a copy of the digital good that was
17  supposedly being transferred?
18          MR. ADELMAN:  Objection to form, but
19      you can answer.
20      A.   No, I didn't think there would be a
21  copyright issue.  Part of what I had learned
22  during copyright was, again, just studying, and
23  one of the things we tried to do is understand
24  how is the law currently implemented and how is
25  the law currently enforced, and so, you know,

## Page 42

1 Ossenmacher - Confidential - Attorneys' Eyes Only
2     A.  I'm not sure I understand the
3 question.
4     Q.  Let me try and rephrase it.
5     Is it correct that based on what you
6 reviewed, that the First Sale Doctrine doesn't
7 apply if you sell something that you copied?
8     A.  So there is language in the
9 copyright law that I recall that has to do with
10 copying things, you know, and I think it was
11 probably meant for books and other types of
12 devices, but yes, I understand there is
13 language in there that talks about that.
14     Q.  Did you understand that in the
15 copyright office report it talked about how if
16 you actually have to make a copy in order to
17 affect the transaction, that it's no longer
18 covered by the First Sale Doctrine?
19     MR. ADELMAN: Objection to form.
20     You can answer.
21     A.  I'm not sure I understand that.
22     Q.  You are not sure you understand my
23 question or you are not sure that's your
24 understanding of what the copyright office
25 said?

## Page 43

1 Ossenmacher - Confidential - Attorneys' Eyes Only
2     A.  Probably both.
3     Q.  Did you understand part of the
4 reason the copyright office -- strike that.
5     Did you understand the copyright
6 office to say that under traditional First Sale
7 Doctrine that if you made a copy of a work and
8 then distributed that copy, that the First Sale
9 Doctrine did not apply?
10     MR. ADELMAN: I am going to object,
11     calls for a legal conclusion, but allow you
12     to answer.
13     A.  I understand in a physical goods
14 world that taking a copy of a hard cover book
15 or something, making a copy of that book and
16 trying to sell that book was the intent of
17 that, and yes, I understand that that's not
18 allowable.
19     Q.  Okay.  In a digital context, if I
20 make a copy of my music file and then
21 distribute that copy, is it your understanding
22 that the First Sale Doctrine does or does not
23 apply to that transaction?
24     MR. ADELMAN: Objection. Calls for
25     a legal conclusion, but I'll allow you to

## Page 44

1 Ossenmacher - Confidential - Attorneys' Eyes Only
2     answer if you know.
3     A.  I'm not sure, but we don't make
4 copies, so we are not worried about that.
5     Q.  Okay.  You say you don't make
6 copies, but you understand that when this issue
7 came up for the first time for resolution
8 before the court in this case that isn't the
9 position that you took in the court; right?
10     MR. ADELMAN: Objection to form.
11     A.  I'm -- I don't agree with that.
12     Q.  Okay.  Well, let me ask you to take
13 a look at, if you can, at Plaintiff's
14 Exhibit 3.
15     You recognize Exhibit 3 as the brief
16 that was submitted by ReDigi in opposition to
17 Capitol's motion for preliminary injunction in
18 this case?
19     A.  Yes, I do.
20     Q.  And if you look at page 9 under the
21 part that begins under Section B(i) the first
22 sentence says: "The only copying which takes
23 place in the ReDigi service occurs when a user
24 uploads music files to the ReDigi cloud thereby
25 storing copies thereof in the user's personal

## Page 45

1 Ossenmacher - Confidential - Attorneys' Eyes Only
2 cloud locker or downloads music files from the
3 user's cloud locker thereby placing copies of
4 the files on his or her computer." You see
5 that language; right?
6     A.  Yes.
7     Q.  And did you review that language
8 before it was submitted to court?
9     A.  Yes.
10     Q.  And you don't believe that that
11 language indicates that a copy takes place in
12 connection with the ReDigi service?
13     A.  Would you like me to explain?
14     Q.  Sure, if you want to.
15     A.  So when -- at this point in time
16 part of the ReDigi service did make an archival
17 copy of the source file and so we made an
18 archival copy because, as Larry had talked
19 about yesterday, one of the things computer
20 scientists often worry about was this whole
21 thing of when you are migrating a file or doing
22 something in the computer world, you know, what
23 could go wrong, and so in the early days of
24 this, which was during this period of time, we
25 were making an archival copy so that during the

## Page 46

1  Ossenmacher - Confidential - Attorneys' Eyes Only
2  migration of the source file to the user's
3  cloud, if there was a problem, we could then
4  rely on the archival file to support whatever
5  data might have been lost in translation or
6  whatever. Subsequent to this, after this point
7  in time we no longer use an archival copy and
8  so we are not -- this is no longer completely
9  accurate, because we don't have that archival
10 copy anymore.
11     Q.  Okay. But this isn't talking about
12 an archival copy. I mean, this says when a
13 user uploads music files to the -- the only
14 copying which takes place occurs when a user
15 uploads music files to the ReDigi cloud thereby
16 storing copies thereof in the user's personal
17 locker, so it's referring to what's in the
18 user's personal locker as a copy, isn't it?
19     MR. ADELMAN: Objection. You
20 misread what that actually says.
21     A.  No.
22     MR. ADELMAN: Hold on. You didn't
23 read it -- was your purpose to characterize
24 it?
25     MR. MANDEL: No, my purpose was to

## Page 47

1  Ossenmacher - Confidential - Attorneys' Eyes Only
2  shorten it, but I am happy to read the
3  whole thing, if you would like.
4      MR. ADELMAN: Yes, I think it's
5  important.
6      MR. MANDEL: Okay.
7      MR. ADELMAN: I appreciate that.
8      Q.  It says: "The only copying which
9  takes place in the ReDigi service occurs when a
10 user uploads music files to the ReDigi cloud
11 thereby storing copies thereof in the user's
12 personal cloud locker."
13     So it does refer to what's in the
14 user's personal locker as a copy; correct?
15     A.  Would you like me to explain that?
16     Q.  Sure.
17     A.  Okay. So, again, the only copying
18 that takes place in ReDigi is a creating of
19 that archival copy when a user goes to push
20 upload. When they decide they want to migrate
21 their file from their computer to their cloud,
22 that was the point in time where we were
23 actually on their computer keeping an archival
24 copy on their computer, and when the process
25 was completed, that was treated as any other

## Page 48

1  Ossenmacher - Confidential - Attorneys' Eyes Only
2  copy and was removed.
3      Q.  During what period of time did
4  ReDigi actually make archival copies during the
5  process of upload?
6      A.  I would say it did it from the point
7  of time of launch, which was October, until --
8  I can't remember the exact date, but it was one
9  of our upgrades. I feel it was sometime in
10 March.
11     Q.  March of 2012?
12     A.  Yes.
13     Q.  And you understand that the defense
14 that was raised to the copying in this brief
15 was that it was a fair use because the user had
16 the right to space-shift their files; correct?
17     MR. ADELMAN: Objection to form.
18 Calls for a legal conclusion, but you are
19 free to answer.
20     A.  I'm not sure and -- you know, I'm
21 not sure what...
22     MR. ADELMAN: When you get to a
23 point that makes sense, I just have to take
24 a break.
25     MR. MANDEL: Sure.

## Page 49

1  Ossenmacher - Confidential - Attorneys' Eyes Only
2      MR. ADELMAN: It doesn't have to be
3  now. Whenever it makes sense.
4      MR. MANDEL: I'll do it shortly.
5      Q.  Was the archival copy that you are
6  talking about actually retained or destroyed
7  once the upload was complete?
8      A.  It was removed once the upload was
9  complete.
10     Q.  So it existed only during the period
11 of the uploading process?
12     A.  Yes.
13     Q.  And then it was deleted?
14     A.  It was removed.
15     Q.  Is there a difference between
16 removing it and deleting it?
17     A.  I like to go with what our CTO
18 directs us. He uses lots of different
19 processes. There are lots of different
20 processes that are part of the ReDigi system,
21 and so I know that we remove those copies.
22     Q.  Well, I am just wondering,
23 because -- if there is a difference between
24 removal and delete, as far as you understand.
25     A.  I think Larry explained yesterday

1  Ossenmacher - Confidential - Attorneys' Eyes Only
2     Q.   That may be fine, but in your prior
3  testimony you didn't say anything about
4  feedback from copyright owners at all, so I am
5  just trying to understand what the actual
6  motivation was for stopping to make archival
7  copies.
8         MR. ADELMAN: Objection to form.
9         You can answer.
10    A.   I'm not sure what prior testimony
11 you are discussing, because we have continually
12 talked about including copyright owners.
13    Q.   Well, not in your answers as to why
14 you stopped making archival copies.  You
15 identified it as a customer service matter and
16 an improvement of the system.  You didn't say
17 it had anything to do with any implication from
18 copyright owners.  So let me just ask it
19 directly.
20       Did you stop making archival copies
21 for any reason related to the potential impact
22 on copyright owners' rights?
23       MR. ADELMAN: Objection to form.
24       Calls for a legal conclusion.  It's
25 argumentative.

1  Ossenmacher - Confidential - Attorneys' Eyes Only
2        You can answer.
3     A.   Not in relation to copy holders'
4  rights, but certainly as part of our learning
5  and understanding it seemed like it might be a
6  nice accommodation to do that, yes.
7     Q.   Okay.  Now, when I first started
8  this discussion about First Sale Doctrine and
9  whether making copies was a problem, you said
10 you weren't worried about that because "we
11 don't make copies."  Do you remember that
12 testimony?
13    A.   Yes.
14    Q.   But when you first started operation
15 you did make copies, so at that point that
16 would have been something you would have had to
17 consider; correct?
18       MR. ADELMAN: Objection to form.
19       You can answer.
20    A.   I'm not sure what the question is.
21 It seemed more like a statement.
22    Q.   It's a question.
23    A.   What's the question?
24    Q.   The question is at the time that
25 ReDigi was making copies, did you ever consider

1  Ossenmacher - Confidential - Attorneys' Eyes Only
2  what impact that had on your interpretation of
3  the First Sale Doctrine?
4        MR. ADELMAN: Objection.  Calls for
5  a legal conclusion, but you can answer.
6     A.   Other than archival copies, ReDigi
7  was not making copies.
8     Q.   And your understanding was the
9  archival copies were okay?
10       MR. ADELMAN: Objection to form.
11       You can answer.
12    A.   Yes.
13    Q.   And did you -- let me bring you
14 back.  I know you said you first started doing
15 some research on the Internet yourself in terms
16 of copyright law.  Do you recall that
17 testimony?
18    A.   Yes.
19    Q.   Would that have been around the
20 2008, 2009 time period?
21    A.   Yes.

## Page 66

1  Ossenmacher - Confidential - Attorneys' Eyes Only

23  Q. When did ReDigi get formed as a
24  corporate entity?
25  A. In May -- April, May of 2011.

## Page 67

1  Ossenmacher - Confidential - Attorneys' Eyes Only
2  Q. And you described the evolution of
3  your idea with the gift of music. How did that
4  evolve into the ReDigi concept? Can you
5  describe how that transformation took place?
6  A. So I would say in early 2011 we
7  started to do a little bit more work with --
8  once we felt we had a technological solution we
9  wanted to look at how would we bring gift music
10  to market and what we realized through user
11  groups -- we did some student user groups when
12  we had students. What we learned through those
13  was people thought it was a cool idea, but they
14  probably wouldn't use it that regularly to
15  donate music, and so then the idea came
16  basically from that was, you know, if you guys
17  would allow us to be able to resell our music,
18  then we would be coming to your site regularly
19  and we would probably donate more, because it
20  would be something we would feel more
21  comfortable doing, so the whole concept then of
22  making the business a marketplace where people
23  could buy and sell used digital music and
24  donate used digital music, that's where that
25  really evolved, is that became more of an ideal

## Page 68

1  Ossenmacher - Confidential - Attorneys' Eyes Only
2  for how we could actually launch a successful
3  business rather than have something that nobody
4  would use.
5  Q. You made reference to a
6  technological solution. How did -- describe
7  for me the process of how that came to be
8  formed.
9  A. Again, with Larry, you know, we
10  spent a lot of time trying to figure out that
11  issue we talked about, many issues, but the key
12  issue that we wanted a solution to was how do
13  we exchange title of a good autonomically or
14  simultaneously with the exchange of cash or
15  ownership and so the whole idea of the
16  in-the-cloud transaction was what we solved and
17  that was some of the patent matter that
18  Jonathan went over with Larry yesterday.
19  Q. How did you meet Larry Rudolph?
20  A. I met Larry in an airport and, you
21  know, we started talking about various things.
22  It's just a matter of how small the world is.
23  I had read his book on bluetooth, because in
24  the arena business bluetooth communications was
25  key to some of the app development we were

## Page 69

1  Ossenmacher - Confidential - Attorneys' Eyes Only
2  doing, because there is very poor Wi-Fi signal
3  in arenas, and so we felt if we could use a
4  bluetooth solution to allow people to continue
5  to these apps internally, which is actually
6  very novel technology, we could provide a good
7  solution there, so we just kind of hit it off
8  and, you know, that's...
9  Q. When was that?
10  A. That was probably -- I think 2008.
11  Q. And during that first conversation
12  in the airport did you actually discuss with
13  him your gift music idea?
14  A. No.
15  Q. So there was no discussion of that
16  at that point?
17  A. That idea didn't exist at that
18  point.
19  Q. And after you met Mr. Rudolph at the
20  airport, you kept in touch with him?
21  A. Yes.
22  Q. And did you -- were you actually
23  discussing with him at that point the
24  possibility of working together on projects?
25  A. We did.

Ossenmacher - Confidential - Attorneys' Eyes Only

1 them to the cloud. Is it lawful how they have
2 gotten them to the cloud. Why is it lawful in
3 the way they have gotten them to the cloud. Is
4 there a better way to do it. Is there a novel
5 way to do it. Is there a way -- you know, how
6 do you do it better and novel and still provide
7 outstanding, you know, robust quality, and so,
8 I mean, there was -- you are asking me to talk
9 about all the things, but there were so many
10 things that we talked about.
11 Q. That's okay. That's helpful in
12 terms of framing the general questions.
13          In terms of how to get it to the
14 cloud, what was your understanding of how that
15 generally was taking place at that point in
16 time?
17 A. I think at that point in time
18 people -- the cloud service that existed
19 employed, you know, standard copying
20 methodology.
21 Q. When you say "standard copying
22 methodology," is that language that Mr. Rudolph
23 used at the time?
24 A. I don't recall his exact language.

Ossenmacher - Confidential - Attorneys' Eyes Only

1 Q. What do you mean by "standard
2 copying methodology"?
3 A. A copy with standard computer and
4 then you would copy a copy to the cloud. You
5 would have a copy of the instance on your
6 computer and a copy of the instance at the
7 cloud simultaneously. So there would be a copy
8 in the cloud of what you have on your computer.
9 Q. So that's what you understand
10 standard to mean, the end result of there being
11 two copies, one on the user's computer and one
12 in the cloud?
13 A. I guess that would be part of it,
14 sure.
15 Q. Is there anything else you
16 understand to be standard copying methodology?
17 A. I'm sure there is lots of them, you
18 know, but I -- again, in this context that's
19 what it meant.
20 Q. And did you discuss with Mr. Rudolph
21 that if you employed standard copying
22 methodology, that wouldn't work, to your
23 understanding, in terms of affecting the
24 transaction?

Ossenmacher - Confidential - Attorneys' Eyes Only

1 MR. ADELMAN: Objection to form.
2 You can answer.
3 A. No, at the time we actually
4 considered doing that because existing services
5 were doing that. It seemed allowable. It
6 seemed the labels were allowing it. It seemed
7 other copyright holders were allowing it. It
8 seemed standard practice that people could
9 actually do that and that users could actually
10 use clouds to copy things to lawfully, so we
11 did consider it but we felt we wanted to be
12 better than that and we wanted to do something
13 different than that, so we did.
14 Q. When you say "better than that," I
15 mean, was it your understanding based on the
16 research you had done that if all that happened
17 was the user just copied it to the cloud and
18 then gave that copy to somebody else while
19 retaining what they started with, that you
20 would have a problem from a First Sale Doctrine
21 perspective?
22 MR. ADELMAN: Objection to form.
23 A. Well, that's not how our service
24 worked. We don't give anything to anybody, nor

Ossenmacher - Confidential - Attorneys' Eyes Only

1 do we keep multiple copies, so if you want me
2 to speak to someone else who is doing
3 something, I'm not sure I can do that. We were
4 not doing that.
5 Q. I understand, but you were talking
6 about what you were going to implement and how
7 you were going to implement it and that's what
8 we are talking about at this --
9 A. You asked me the things we
10 considered and talked about. We talked about
11 what other people were doing, which was that.
12 That's what other people were doing. We didn't
13 want to do that, so -- but we didn't not do
14 that because we didn't think it unlawful. We
15 actually thought it must be lawful because
16 people are doing it.
17 Q. And did you have any familiarity
18 with the concept of file sharing at this point
19 in time?
20 A. In what term?
21 Q. Had you read about the idea of file
22 sharing services?
23 A. Like the Limewires and the Napsters?
24 Q. Yes.

Page 78

1   Ossenmacher - Confidential - Attorneys' Eyes Only
2       A.   Yes.
3       Q.   Did you have any occasion to learn
4   about any lawsuits that existed as a result of
5   that?
6       A.   Yes.
7       Q.   And so you were aware that in the
8   file sharing context there had been decisions
9   that had been rendered that would certainly
10  question the legality of that kind of conduct;
11  correct?
12      A.   Actually, no. The readings I did on
13  those areas were not about the illegality of
14  moving a file to the cloud, but were more the
15  illegality of actually taking that file and
16  then parsing it and copying it millions of
17  times and allowing people access to it that
18  didn't have a right to it. The copyright
19  holder was not protecting their obligation
20  under copyright law to protect their copyright
21  material, and so -- but I didn't find any
22  readings where they said the actual movement of
23  a file from someone's computer to the cloud was
24  unlawful, but what was done after it got there
25  was unlawful.

Page 79

1   Ossenmacher - Confidential - Attorneys' Eyes Only
2       Q.   But you understood that a process by
3   which multiple people ended up with the same
4   music was found to involve unlawful copying;
5   correct?
6       MR. ADELMAN:  Objection to form.
7       Calls for a legal conclusion.
8       A.   All I will say is we thought that
9   was terrible. I mean, part of ReDigi was how
10  to help prevent file sharing, how to prevent
11  piracy. We built the system with many controls
12  so that when we uploaded a copy there is a
13  single instance of that copy and that instance
14  is controlled. So we looked at that and said
15  how do we make sure that we build a system that
16  helps get rid of that type of terrible
17  behavior. I mean, that was horrible.
18      Q.   When you talked with Mr. Rudolph,
19  did you discuss whether you could develop
20  something to get files to the cloud without
21  using standard copying methodology?
22      A.   Yes, we did.
23      Q.   And what do you recall him advising
24  you about in that respect?
25      MR. ADELMAN:  Objection to form.

Page 80



Page 81



## Page 86

1   Ossenmacher - Confidential - Attorneys' Eyes Only
2        A.   Because you are defining iTunes as a
3   master -- iTunes is a file sharer, but they are
4   legalized by the record labels.  They have a
5   master that they continually cut files from, so
6   if you told them, iTunes, they would only have
7   one copy they could sell, which actually might
8   be a good idea for the record labels, because
9   it creates scarcity, but let's just say, you
10  know, that you continue with the file share
11  mentality of an Apple that's legalized by
12  contract, then, of course, it will always stay
13  there.  But if iTunes only had one file to sell
14  and they sold that to someone, they would not
15  maintain a source file.  They are only
16  maintaining a source file because they are
17  authorized to do that in their file share
18  system.
19       Q.   I am not asking about why they are
20  doing it, though.  I am trying to ask about
21  technologically what happens.
22       A.   Well, you are comparing us to
23  iTunes.  You are saying since iTunes still has
24  a source copy.  They have a source copy for a
25  different reason.

## Page 87

1   Ossenmacher - Confidential - Attorneys' Eyes Only
2        Q.   Right.  I understand.  They have a
3   source copy because they want to continue to
4   sell that file --
5        A.   Absolutely.
6        Q.   -- to lots of other people pursuant
7   to authorization, and that's not what I am
8   asking.
9        What I am saying is because ReDigi
10  doesn't want to do that, doesn't it have to do
11  something different from iTunes to ensure that
12  the file is no longer on the user's hard drive?
13       A.   Yes.
14            MR. ADELMAN:  Objection to form.
15       Q.   What does it do?
16       A.   It migrates the file.  It doesn't
17  allow that file to stay on the user's computer.
18  It picks it up packet by packet and moves it to
19  the cloud.
20       Q.   That, what you have described, is
21  the same thing as what iTunes does packet by
22  packet; right?
23            MR. ADELMAN:  Objection to the form.
24       A.   But there is only one set of
25  packets.  iTunes has an infinite set of

## Page 88



## Page 89

1   Ossenmacher - Confidential - Attorneys' Eyes Only



24       A.   I may or may not have.  I mean,
25  Larry and I sit right next to each other in our

**EXHIBIT 12**

# In The Matter Of:

*Capitol Records, LLC vs.*
*REDIGI, Inc.*

---

*Alasdair McMullan*
*June 20, 2012*

---

*Precise Court Reporting*
*200 Old Country Road*
*Suite 110*
*Mineola, New York 11501*
*516-747-9393   718-343-7227   212-581-2570*

Original File 57345.txt
**Min-U-Script® with Word Index**

1
2  UNITED STATES DISTRICT COURT
3  SOUTHERN DISTRICT OF NEW YORK
4  ------------------------------------------X
5  CAPITOL RECORDS, LLC,
6           Plaintiff,
7        -against-    Civil Action No.
8  REDIGI INC.,        12 CIV 0095 (RJS)
9           Defendant.
10 ------------------------------------------X
11        140 East 45th Street
12        New York, New York
13
14        June 20, 2012
15        10:14 A.M.
16
17        DEPOSITION of ALASDAIR MCMULLAN,
18 taken pursuant to the Federal Rules of Civil
19 Procedure, and Notice, held at the
20 above-mentioned time and place before Edward
21 Leto, a Notary Public of the State of New
22 York.
23
24
25

1
2  A P P E A R A N C E S :
3
4    COWAN, LIEBOWITZ & & LATMAN, P.C.
5      Attorneys for Plaintiff
6      1133 Avenue of the Americas
7      New York, New York 10036
8    BY: JONATHAN Z. KING, ESQ.
9        -and-
10     RICHARD MANDEL, ESQ.
11
12   MEISTER SEELIG & FEIN LLP
13     Attorneys for Defendant
14     140 East 45th Street
15     New York, New York 10017
16   BY: GARY ADELMAN, ESQ.
17
18
19 ALSO PRESENT
20   Brad Cohen
21   Larry Rudolph
22   John Ossenmacher
23   Mike Walker
24   Sarah Matz
25

1
2        IT IS HEREBY STIPULATED AND
3  AGREED by and among counsel for the
4  respective parties hereto, that the filing,
5  sealing and certification of the within
6  deposition shall be and the same are hereby
7  waived;
8        IT IS FURTHER STIPULATED AND
9  AGREED that all objections, except to the
10 form of the question, shall be reserved to
11 the time of the trial;
12       IT IS FURTHER STIPULATED AND
13 AGREED that the within deposition may be
14 signed before any Notary Public with the
15 same force and effect as if signed and sworn
16 to by the Court.
17
18
19
20
21
22
23
24
25

1        A. McMullan
2  A L A S D A I R    M C M U L L A N, having
3  first been duly sworn by a Notary Public of
4  the State of New York, was examined and
5  testified as follows:
6  EXAMINATION BY
7  MR. ADELMAN:
8    Q.   Please state your name for the
9  record.
10   A.   Alasdair McMullan.
11   Q.   What is your business address?
12   A.   150 Fifth Avenue, New York, New
13 York 10011.
14       MR. ADELMAN: As in Mr. Piibe's
15 deposition, we'll designate the entire
16 deposition as attorneys eyes only
17 subject to a subsequent review pursuant
18 to the protective order for the 30 day
19 period.
20       Good morning, Mr. McMullan.
21       THE WITNESS: Good morning.
22       MR. ADELMAN: My name is Gary
23 Adelman. I'm the attorney for ReDigi,
24 Inc. in a matter captioned Capitol
25 Records, LLC versus ReDigi. Have you

Page 125

1         A. McMullan
2     A.   What's the question?
3     Q.   Has anyone at Capitol hired
4 someone outside of Capitol to analyze the
5 tracks in any way?
6     A.   Not that I know of.
7     Q.   Other than your legal degree, do
8 you have any other degrees?
9     A.   I have an undergraduate degree.
10     Q.   And other than that, undergrad,
11 legal degree, any other degrees?
12     A.   No.
13     Q.   To your knowledge, has anyone at
14 Capitol reviewed ReDigi's code?
15     A.   To my knowledge, no.
16     Q.   If you can turn back to your
17 Declaration.
18     A.   Exhibit-G?
19     Q.   Yes.  Sorry.  Exhibit-G.  Thank
20 you.  Paragraph 14, the last sentence says
21 "both storage and downloading again
22 presuppose the making of copies of the file
23 that resided on the original user's
24 computer."  How do you know that?
25     A.   Because the file resides on the

Page 126

1         A. McMullan
2 original user's computer and a copy of it
3 then appears on the ReDigi server, and then
4 if someone downloads it to their computer, a
5 copy of it appears on their hard drive.  So
6 three copies now have existed.  So that's
7 the sine qua non of copying under the
8 Copyright Act.
9     Q.   But you haven't looked at the
10 system and you don't have a degree in
11 computer science, so how do you know that
12 copies are being made?
13     A.   You need neither of those things
14 because it's a Copyright Law definitional
15 issue.  If there's a copy resident on one
16 material object and that copy then ends up
17 resident on another material object, there
18 has been a copy made.
19     Q.   And where in the Copyright Law
20 does it say that?
21         MR. MANDEL: Objection.
22     A.   I mean if you have a copy of that
23 Copyright Act, I can point you to it.
24         (Copy of Copyright Act was marked
25     as Defendant's Exhibit-J for

Page 127

1         A. McMullan
2     identification; 6/20/12, E.L.)
3     Q.   Exhibit-J that I'm handing you is
4 the complete copy of the Copyright Act, by
5 Counsel.
6     A.   So the definition of copy says
7 it's a material object in which a work is
8 fixed by any method.
9     Q.   But where does it say that when a
10 file is moved, that it goes from one
11 material object to another, where is that in
12 the Copyright Law?
13         MR. MANDEL: Objection.  Calls
14     for a legal conclusion.
15     Mischaracterizes the testimony.
16         MR. ADELMAN: I think we're a
17     little beyond that.
18         MR. MANDEL: We're way beyond
19     frankly getting into an area --
20         MR. ADELMAN: He said if I have
21     the Copyright Law, he'll point to it.
22         MR. MANDEL: My problem is
23     you're asking for legal analysis.
24         MR. ADELMAN: The point is
25     made.  That's fine.

Page 128

1         A. McMullan
2         MR. MANDEL: The point is
3     nothing.
4         MR. ADELMAN: The point has
5     been made.
6     A.   Is there a question or not?
7     Q.   No.  There's no question.  You've
8 answered my question.  Thank you.
9     A.   For the record, I never did
10 answer the last question.
11     Q.   Okay.
12         MR. MANDEL: If you want to
13     complete your answer.
14         THE WITNESS: I only take
15     exception to his statement that I
16     answered the question.  I'm just saying
17     I did not.
18     Q.   Okay.  So you're free to answer.
19 I'm not stopping you.
20     A.   Can you read back the last
21 question?
22         MR. MANDEL: Can you read it
23     back.
24         MR. ADELMAN: Yes.  Read it
25     back.

Page 129

| | |
|---|---|
| 1 | A. McMullan |
| 2 | (The requested portion was read.) |
| 3 | MR. MANDEL: You can answer, |
| 4 | subject to my objection. |
| 5 | A. I take issue with your statement |
| 6 | that anything is moved. What it says is |
| 7 | that a copy is something that's fixed in a |
| 8 | material object, and your hypothetical or |
| 9 | your explanation explained that there were |
| 10 | three different material objects. So by |
| 11 | definition, copies had to have been made |
| 12 | because you couldn't end up with three |
| 13 | different material objects fixing the same |
| 14 | work unless copies were made. And that's |
| 15 | the sine qua non of copyright infringement, |
| 16 | because there was no permission to allow it |
| 17 | to happen on the ReDigi system. |
| 18 | Q. Just for the record, I didn't say |
| 19 | there were three material objects, you did. |
| 20 | A. Correct. |
| 21 | Q. So in your own hypothetical, |
| 22 | you're assuming that each piece of hardware |
| 23 | is a material object; is that correct? Or |
| 24 | you're stating it, you're not assuming. I'm |
| 25 | sorry, you don't like the word "assume." |

Page 130

| | |
|---|---|
| 1 | A. McMullan |
| 2 | A. Each disc where the work is fixed |
| 3 | is a material object. |
| 4 | Q. Okay. Thank you. |
| 5 | MR. ADELMAN: Off the record. |
| 6 | (A discussion was held off the |
| 7 | record.) |
| 8 | Q. This has been previously marked |
| 9 | as Exhibit-21. |
| 10 | A. (Reviewing). Okay. |
| 11 | Q. And do you recognize this |
| 12 | document? |
| 13 | A. Yes. |
| 14 | Q. And can you identify it? |
| 15 | A. It's a letter from Jennifer |
| 16 | Pariser to John Ossenmacher. |
| 17 | Q. And this letter is on behalf of |
| 18 | Universal Music, SONY Music Entertainment, |
| 19 | Warner Music Entertainment and EMI Music |
| 20 | North America, correct? |
| 21 | A. Yes. Well, yes. |
| 22 | Q. That's what it says here? |
| 23 | A. No. That's right. |
| 24 | Q. And to your knowledge, did all |
| 25 | four of the majors request that Jennifer |

Page 131

| | |
|---|---|
| 1 | A. McMullan |
| 2 | Pariser send this letter? |
| 3 | MR. MANDEL: I'm going to |
| 4 | object to the extent it gets into |
| 5 | attorney/client communications. |
| 6 | Q. Have you ever spoken to |
| 7 | Universal, SONY or Warner about this case, |
| 8 | or about ReDigi I should say? |
| 9 | MR. MANDEL: Outside the |
| 10 | context of legal discussions through |
| 11 | the legal group of the RIAA? |
| 12 | MR. ADELMAN: Well, that's |
| 13 | in-house communications with outside -- |
| 14 | that's not privileged. |
| 15 | MR. MANDEL: Our position is |
| 16 | there's a joint privilege shared by the |
| 17 | record companies and the RIAA. |
| 18 | MR. ADELMAN: I'd like to see |
| 19 | some joint defense letter or something |
| 20 | like that that states that. |
| 21 | MR. MANDEL: There's no need |
| 22 | for a joint letter. |
| 23 | MR. ADELMAN: Anyway, you can |
| 24 | make your objection. |
| 25 | A. What's the question? |

Page 132

| | |
|---|---|
| 1 | A. McMullan |
| 2 | Q. The question is, did you have |
| 3 | conversations with Universal, SONY or Warner |
| 4 | concerning ReDigi? |
| 5 | MR. MANDEL: You can answer yes |
| 6 | or no. |
| 7 | A. Yes. |
| 8 | Q. Who at SONY Music did you have a |
| 9 | conversation with about ReDigi? |
| 10 | A. I don't recall. |
| 11 | Q. What about Universal, who at |
| 12 | Universal Music did you have a conversation |
| 13 | about ReDigi? |
| 14 | A. I don't recall. |
| 15 | Q. If I said Harvey Geller, would |
| 16 | that refresh your recollection? |
| 17 | A. I just don't recall if it was him |
| 18 | or somebody that worked for him. |
| 19 | Q. How about Warner Music? |
| 20 | A. I think it was Tucker McCrady. |
| 21 | Q. So what does the RIAA do for |
| 22 | Capitol Music, or EMI Music North America? |
| 23 | A. The RIAA is a trade association. |
| 24 | It performs a number of functions. Most |
| 25 | relevant to me, there's a committee of |

**EXHIBIT 13**

Capitol with ownership of the common law copyrights in such works. <u>See</u> McMullan Decl. ¶ 6. The Pre-1972 Recordings are subject to protection under state law rather than federal copyright law, and the Copyright Act cannot be used to "annul[] or limit[]" those rights "until February 15, 2067." 17 U.S.C. § 301(c). <u>See also Naxos</u>, 4 N.Y.3d at 556 n. 8.

### 2. ReDigi Violates Capitol's Exclusive Rights in the Works

The Copyright Act provides the owner of a copyright with certain exclusive rights, including the right to reproduce the copyrighted work in copies or phonorecords, to distribute copies or phonorecords of the copyrighted work to the public, to display the copyrighted work publicly and (in the case of sound recordings), to perform the copyrighted work publicly by means of a digital audio transmission.[2] 17 U.S.C. §§ 106(1), (3), (5), (6). As set forth below, ReDigi, without authorization from Capitol, violates each of these exclusive rights.

### (a) ReDigi Reproduces the Works in Copies

ReDigi's comprehensive infringement of Capitol's copyrights begins with violation of Capitol's exclusive right to "reproduce" the Copyrighted Recordings in "copies." Although the ReDigi website cryptically claims that its "genius" is "to facilitate the transfer of a digital music file from one user to another without copying or file sharing," <u>see</u> McMullan Decl. Ex. 2, the entire service and business model are, by ReDigi's own admission, predicated upon making multiple, unauthorized copies of sound recordings, including the Copyrighted Recordings and Pre-1972 Recordings owned by Capitol.

---

[2] Although sound recordings are technically fixed in "phonorecords" rather than "copies" under the definitions of § 101, there is no material distinction between the two terms for purposes of this action and accordingly the term "copies" will be used here throughout for ease of reference in identifying the material objects in which any copyrighted works, including the sound recordings at issue, are embodied.