UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
CAPITOL RECORDS, LLC,                            :

                        Plaintiff,            :   12 Civ. 0095 (RJS)

         -against-                                     :

REDIGI INC.,                                              :

                 Defendant.          :

-------------------------------------------------------------- x

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# REDACTED

COWAN, LIEBOWITZ & LATMAN, P.C.
Attorneys for Plaintiff Capitol Records, LLC
1133 Avenue of the Americas
New York, New York 10036-6799
(212)790-9200

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ....................................................................................................... 3

ARGUMENT ............................................................................................................................ 3

I.    REDIGI VIOLATES CAPITOL'S EXCLUSIVE RIGHT OF
REPRODUCTION ....................................................................................................... 3

     A.    ReDigi's Alleged "Migration" of Files to its Server Creates  Unauthorized
Phonorecords As Defined By The Copyright Act ...................................... 3

     B.    ReDigi's Admitted "Deletion" of Uploaded Music Files From Users'
Computers Confirms that ReDigi Reproduces Capitol's Sound Recordings .......... 7

     C.    **REDACTED** ................ 10

     D.    **REDACTED** ..................... 11

          1.    A Ruling on ReDigi 2.0 Would Be Advisory ............................................. 12

          2.    Summary Judgment on ReDigi 2.0 Should be Denied Pursuant to
Fed. R. Civ. P. 56(d) .................................................................................. 13

          3.    If Used in Connection With Capitol's Recordings, ReDigi 2.0
Would Infringe Capitol's Copyrights ......................................................... 16

     E.    Downloads of "Used" Music Files Purchased on ReDigi Are Conceded to
Be Unauthorized Reproductions of Capitol's Sound Recordings ......................... 18

II.   REDIGI VIOLATES CAPITOL'S EXCLUSIVE RIGHT OF DISTRIBUTION ........... 19

III.  REDIGI HAS FAILED TO DEMONSTRATE THAT IT IS ENTITLED TO
SUMMARY JUDGMENT ON THE CLAIMS FOR VIOLATION OF
CAPITOL'S RIGHTS OF PERFORMANCE AND DISPLAY ..................................... 24

CONCLUSION ....................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Arista Records, LLC v. Greubel,
    453 F. Supp. 2d 961 (N.D. Tex. 2006) ..................................................................23

C.M. Paula Co. v. Logan,
    355 F. Supp. 189 (N.D. Tex. 1973) ........................................................................9

Cal. Pub. Employees' Ret. Sys. v. Ebbers (In re Worldcom, Inc. Sec. Litig.),
    308 F. Supp. 2d 214 (S.D.N.Y. 2004) ..................................................................16

Chase v. Public Utility Comm'n of Pa.,
    2008 WL 906491 (M.D. Pa. Mar. 31, 2008) ...........................................................6

Gibbs v. Cigna Corp.,
    440 F.3d 571 (2d Cir. 2006) ................................................................................11

Hayes v. New York City Dep't of Corrections,
    84 F.3d 614 (2d Cir. 1996) ..................................................................................12

London-Sire Records, Inc. v. Doe I,
    542 F. Supp. 2d 153 (D. Mass. 2008)................................................................23, 24

Miller v. Wolpoff,
    321 F.3d 292 (2d Cir. 2003) .....................................................................17, 18, 19

New York Times Co. v. Tasini,
    533 U.S. 483 (2001) ............................................................................................23

Pacific Gas & Elec. Co. v. State Energy Res. Conservation and Dev. Comm'n,
    461 U.S. 190 (1983) ............................................................................................16

Rivera v. Salomon Smith Barney, Inc.,
    No. 01 Civ. 9282 (RWS), No. 01 Civ. 9282 (RWS), 2002 WL 31106418 (S.D.N.Y.
    Sept. 20, 2002)...................................................................................................16

Robinson v. Transworld Airlines, Inc.,
    947 F.2d 40 (2d Cir. 1991) ..............................................................................17, 19

Roy Export Co. v. Columbia Broadcasting Sys., Inc.,
    503 F. Supp. 1137 (S.D.N.Y. 1980), aff'd, 672 F.2d 1095 (2d Cir. 1982) ..............21

Sega Enters. Ltd. v. Accolade, Inc.,
    977 F.2d 1510 (9th Cir. 1992) ...............................................................................9

Sega Enters. Ltd. v. MAPHIA,
    948 F. Supp. 923 (N.D. Cal. 1996) ........................................................................ 9

Time, Inc. v. Bernard Geiss Assocs.,
    293 F. Supp. 130 (S.D.N.Y. 1968) ...................................................................... 21

STATUTES

17 U.S.C. § 101 ..................................................................................................... 6, 24, 27

17 U.S.C. § 106 ......................................................................................................... 6, 23

17 U.S.C. § 109(a) ......................................................................................................... 23

OTHER AUTHORITIES

M. & D. Nimmer, Nimmer on Copyright (Matthew Bender, rev. ed. 2012) ............................ 6, 7

C. Wright et al., Federal Practice and Procedure (3d ed. 1998) ................................... 17

Fed. R. Civ. P. 56(d) .................................................................... 5, 15, 16, 17, 18

H.R. Rep. No. 94-1476 (1976) ............................................................................ 8

U.S. Copyright Office, Library of Cong., DMCA Section 104 Report (2001), available at
    www.copyright.gov/reports/studies/ ................................................................ 22, 23

iii

## PRELIMINARY STATEMENT

In seeking summary judgment, ReDigi attempts to avoid the express language of the Copyright Act and the realities of its infringing service.  It insists, because it has no other choice, that infringement is not "definitional," but rather a matter of its own convoluted description of its technology and selective interpretation of copyright law policies.  However, the Copyright Act provides crystal clear guidance on what "copies" and "phonorecords" mean, and what the rights of reproduction and distribution protect.  Technological and semantic smokescreens aside, ReDigi does precisely what the Copyright Act proscribes.  It creates unauthorized fixations of "phonorecords" (copies of sound recordings) on its own server and then sells them for its own profit.  That conduct violates both the plain language of the Copyright Act and the overriding policy of promoting creativity upon which the statute is based.

ReDigi expends great effort recharacterizing the technical operations of its service, going so far as to contradict its own prior judicial admissions.  What was once a conceded act of "copying" has now been relabeled as **REDACTED** which turns out to be just programmer's code-language for copying a file from a private hard drive to a cloud service.  What was touted as ReDigi's "deletion" of files from users' computers is now adamantly disavowed.  Presumably, ReDigi has finally realized that admitting that it has to delete the source file from the user's computer betrays that a copy of that file is created on ReDigi's server.  Putting aside that ReDigi is bound by its prior judicial admissions, its attempted backpedaling is legally irrelevant.  Whatever labels ReDigi may adopt, the definitions of the Copyright Act doom a service whose modus operandi is to create and sell unauthorized fixations of Capitol's sound recordings.

ReDigi also unveils on this motion a brand new supplementary service – introduced only

# REDACTED

Because ReDigi just

1

implemented this new service and thus the parties do not even mention it in any of their pleadings, any ruling on its lawfulness would be an improper advisory opinion. Moreover, because Capitol has not had a fair opportunity to examine the service in discovery, summary judgment regarding this service should be denied pursuant to Fed. R. Civ. P. 56(d). In any event, even if considered on this motion, the service as described by ReDigi appears to be just another means by which ReDigi makes infringing copies of sound recordings on its own cloud server.

Finally, ReDigi pitches this case as one of "first impression" in which Capitol would "create precedent that the first sale doctrine cannot apply to digital goods" and restrict a "secondary market for digital music." However, Capitol seeks to establish no new precedent, but only to apply well-established principles of law to protect its intellectual property. Digital music files have been around for nearly two decades. Until ReDigi, no party has been brazen enough to recast them as "used" or to peddle them in an imaginary "secondary market" – notions ReDigi invented – because it has always been plainly understood that unauthorized digital transfers involve reproduction and distribution in violation of the Copyright Act. Rather, it is ReDigi who seems determined to make new law, presumably to vindicate a self-serving "policy" of earning a handsome fee every time it processes the infringing sale of a copyrighted sound recording. But even if ReDigi were sincere in its alleged motives, then its appropriate avenue for relief would be to ask the legislature to amend the Copyright Act, which as currently structured does not permit ReDigi's business model without license.

Far removed from establishing that ReDigi is entitled to summary judgment in its own favor, ReDigi's tortured arguments only underscore that it violates Capitol's copyrights as a matter of law. ReDigi's motion should accordingly be denied.

2

## STATEMENT OF FACTS

The facts relevant to this motion are set forth in Capitol's previously submitted Plaintiff's

Statement of Undisputed Facts Pursuant to Local Rule 56.1 (Docket No. 50) ("Pl. 56.1"), and the

accompanying Plaintiff's Response To  Defendant's Statement Of Undisputed Facts Pursuant To

Local Rule 56.1 ("Pl. 56.1 Resp."), Declaration of Richard S. Mandel in Opposition to

Defendant's Motion for Summary Judgment ("Mandel SJ Opp. Decl.") and exhibits thereto, and

Declaration of Doug Jacobson ("Jacobson Decl.").

## ARGUMENT

## I.   REDIGI VIOLATES CAPITOL'S EXCLUSIVE RIGHT OF REPRODUCTION

### A.   ReDigi's Alleged "Migration" of Files to its Server Creates Unauthorized Phonorecords As Defined By The Copyright Act

The Copyright Act reserves for Capitol the exclusive right "to reproduce" its sound

recordings "in phonorecords," which are in turn defined as "material objects in which sounds …

are fixed" and from which they "can be perceived, reproduced, or otherwise communicated."  17

U.S.C. § § 101, 106(1).  Based on this statutory language and definition, Nimmer's leading

treatise crystallizes the right of reproduction as follows:  "[I]n order to infringe the reproduction

right, the defendant must embody the plaintiff's work in a 'material object.'"  2 M. & D.

Nimmer, Nimmer on Copyright § 8.02[B][1], at 8-32 (Matthew Bender, rev. ed. 2012)

(hereinafter "Nimmer").  See also Chase v. Public Utility Comm'n of Pa., 2008 WL 906491, at

*5 (M.D. Pa. Mar. 31, 2008) ("the reproduction right guaranteed by § 106 ensures that a

copyright owner has the exclusive right to create new material objects in which a copyrighted

work may be fixed").

There is no factual dispute that ReDigi does precisely what these definitions proscribe.

Without authorization, it embodies Capitol's sound recordings on ReDigi's own servers, thereby

creating fixations of new phonorecords containing Capitol's copyrighted works.  Nimmer §

8.02[C], at 8-35 ("copyright infringement occurs whenever an unauthorized … phonorecord is

made").  As set forth in Capitol's own summary judgment motion, that activity constitutes

infringement as a matter of law.  See Plaintiff's Memorandum of Law in Support of Motion for

Partial Summary Judgment ("Pl. SJ Br.") (Docket No. 49) at 5-10.

 While ReDigi pays lip service to the basic principle that "[s]tatutory definitions control

the meaning of statutory words," see ReDigi SJ Br. at 20-21 (citing Lawson v. Suwannee Fruit &

Steamship Co., 336 U.S. 198, 201 (1949)), it protests adamantly that on the lone matter of the

reproduction right, infringement is somehow "not a definitional issue."  See ReDigi SJ Br. at 1,

12.  Instead, ReDigi invents its own definitions of the reproduction right, untethered to a single

relevant case or statutory citation, but curiously tailored to its newly described technology of

**REDACTED** However, statutory definitions, not ReDigi's technological doublespeak,

control this case.

 ReDigi asserts as its primary argument that "the essence of duplication and/or

reproduction is that more than one of that particular phonorecord could exist at the same time."

ReDigi SJ Br. at 11-12; see also id. at 14 ("The sine qua non of infringement is that a

'reproduction' was made, i.e., that there could have been an Eligible File on the user's hard drive

and a duplicate in the Cloud Locker in existence at the same time").  Of course, no case or

statutory citation supports that proposition.  The right of reproduction reserves to the copyright

owner the right to embody the copyrighted work in a material object, and has nothing to do with

whether a user's source copy is retained, destroyed or co-exists simultaneously with another

copy.

4

# REDACTED

[1] In any case, regardless of this irrelevant shift in nomenclature, ReDigi again pays scant attention to the statutory definitions. No "phonorecord" – by definition a material object from which the sounds can be perceived – is or can be **REDACTED** through the Internet. See H.R. Rep. No. 94-1476, at 56 (1976) (describing phonorecords as "physical objects in which sounds are fixed") (emphasis added).

# REDACTED

so that it becomes, by definition, a new and unauthorized fixation of a phonorecord in violation of Capitol's rights. ReDigi and no other creates this new fixation and thus invades Capitol's rights.

---

[1]Specifically, ReDigi produced not a single document referencing **REDACTED** **REDACTED** in discovery, and its various descriptions of its service in all prior marketing pieces, its website, legal filings and the like refer exclusively to "uploads" accompanied by deletion of the original file. Indeed, as noted in Capitol's moving papers, ReDigi judicially admitted that these uploads involved copying, see Pl. SJ Br. at 8-9, and only unveiled its new notion of **REDACTED** in a deposition two days before the close of discovery.

5

Not surprisingly, the Courts have readily concluded that uploading files by digital transfer constitutes unauthorized reproduction. See, e.g., Sega Enters. Ltd. v. MAPHIA, 948 F. Supp. 923, 932 (N.D. Cal. 1996) ("copies were made" for purposes of Copyright Act when protected works were "uploaded to or downloaded from" defendant's electronic bulletin board). Moreover, in other contexts where computer code is disassembled and reconstituted in a perceivable form, Courts have likewise assumed that such activities constitute copying. See, e.g., Sega Enters. Ltd. v. Accolade, Inc., 977 F.2d 1510, 1519-1520 (9th Cir. 1992) (reverse engineering, where machine readable object code is transformed into human readable source code, constitutes prohibited "intermediate" copying). The reason is clear. By embodying a copyrighted work on a new disc or server, a defendant violates the right to reproduce that work in copies or phonorecords. It is not the mode of transport that controls, but the end product that results in what is by definition a newly fixed and unauthorized phonorecord.

ReDigi cites but one case in support of its novel view of reproduction, but that case is so obviously distinguishable that it only serves to highlight why ReDigi's service infringes. In C.M. Paula Co. v. Logan, 355 F. Supp. 189 (N.D. Tex. 1973), the defendant applied chemicals to photographs on greeting cards to "strip the printed indicia from the original surface" and apply that stripped photo to ceramic plaques as a "decal." Id. at 190. In other words, the defendant literally "peeled away" the "paper backing" holding the actual photos onto the greeting cards and reapplied those same actual photos to the plaques. Not surprisingly, the Court held that the "process utilized by defendant that is now in question results in the use of the original image on a ceramic plaque; such process is not a 'reproduction or duplication.'" Id. at 191 (emphasis added). Unlike ReDigi, the defendant physically moved the tangible, material object of an

actual photograph and reapplied it to a different surface.      **REDACTED**      and

the "original image" remained the same, perceivable material object throughout the transfer.

ReDigi is hard pressed to liken such a physical transfer of a tangible "decal" to its digital

transmission of      **REDACTED**      to a new physical object and creation of a new

phonorecord.  By way of analogy, ReDigi does not empty jewel cases of compact discs and

insert those discs into a new container, nor does it ship physical hard drives from one desk to

another.

# REDACTED

**B.**      **ReDigi's Admitted "Deletion" of Uploaded Music Files From Users'**
     **Computers Confirms that ReDigi Reproduces Capitol's Sound Recordings**

That ReDigi "reproduces" Capitol's sound recordings is also confirmed by ReDigi's

repeated judicial and testimonial admissions that music files uploaded to the ReDigi server must

also be "deleted" from the user's computer.  See Pl. SJ Br. at 9-10.  For most of this case, in fact,

ReDigi trumpeted this act of deletion as a key to its system's efficacy in facilitating a "used"

marketplace.  But, this act of deletion presupposes the creation of a different copy on the ReDigi

server; otherwise, there would be nothing to delete in the first place.

# REDACTED

7

**REDACTED**          ReDigi SJ Br. at 5.[2]  ReDigi is long past being able to

make this kind of assertion, which flatly contradicts its prior statements.  Not only did it certify

in its pleadings that uploaded files are in fact deleted – a binding judicial admission, see Gibbs v.

Cigna Corp., 440 F.3d 571, 578 (2d Cir. 2006) – but it repeated the fact of deletion in a prior

sworn declaration to this Court.  See Answer (Docket No. 6) ¶ 47 ("Upon the upload of an

Eligible File to a User's Cloud Locker, such file and all copies thereof residing on the user's

computer, and on attached synchronization and storage devices, are deleted therefrom")

(emphasis added); Rudolph Declaration (Docket No. 11) ¶ 6 (same).

Indeed, even at his 30(b)(6) deposition, where Mr. Rudolph was designated to speak on

ReDigi's behalf regarding its technological operations, he repeatedly confirmed that the original

file is deleted from the user's computer:

> Q. Okay. And that original file and those additional copies will all be deleted upon
> upload to the ReDigi cloud, correct?
>
> MR. ADELMAN: Objection to form.
>
> A. Those files would be deleted, yes.
>
> Q. Okay. But we need to be precise.  When you say the files, it means the original source
> file and then any other additional copies, correct?
>
> MR. ADELMAN: Asked and answered. You can answer if you'd like.
>
> A. Yes.

---

[2]

# REDACTED

*       *       *

Q. Okay. So let me make sure I understand this. It's possible -- when I upload a song to the ReDigi service, I'm talking about initially uploading the song to the ReDigi service, I believe you said that that song file has to be deleted from my machine to get to the ReDigi cloud in the first instance; is that correct?

A. That is correct.

*       *       *

Q. So in that sentence you state that upon the upload of an eligible file, that file itself, put aside the other copies, but that file is deleted, correct?

A. Correct.

Q. And that statement is accurate, correct?

A. Correct.

See Rudolph Dep. at 132, 150-51, 236 (attached to Appendix of Deposition Excerpts submitted as part of Capitol's moving papers).

## REDACTED                    3

Parties are often admonished that they may not create issues of fact by submitting affidavits contradicting prior deposition testimony.  See, e.g., Hayes v. New York City Dep't of Corrections, 84 F.3d 614, 619 (2d Cir. 1996).  Here, ReDigi seeks to go one step further by affirmatively seeking summary judgment based on disavowals of its prior judicial admissions, sworn declarations, and deposition testimony.  Prior to this motion, ReDigi was always at pains to emphasize that it "deleted" music files from users' computers upon upload.  Indeed, its

---

3

# REDACTED

defenses, such as the first sale doctrine discussed below, were largely (albeit erroneously)

premised on the promise of that deletion.[4]   ReDigi may now have awoken to the consequences of

admitting the truth, but no amount of recharacterization or disavowal changes the basic facts of

this case: ReDigi must delete the music file from a user's computer precisely because ReDigi

creates a new and different copy on ReDigi's server.

     C.                      # REDACTED

     In view of the plain language of the Copyright Act and ReDigi's admissions, the Court

need not parse ReDigi's opaque rebranding of its technology.  Whatever technological methods

are used, the results of the process are plainly violations of the reproduction right sufficient to

deny ReDigi's motion and grant Capitol's cross-motion.  However, even when measured by

computer science standards,                      **REDACTED**

     As set forth in the accompanying declaration of Professor Doug Jacobson, an expert in

computer networking with decades of experience,

# REDACTED

---

[4]Because the first sale doctrine only provides a defense where the owner of a "particular
phonorecord" disposes of "that phronorecord," ReDigi's deletion of the source file does not
exonerate it from selling a different copy of Capitol's sound recordings.  See pp. 20-22 infra.

# REDACTED

This reality of computer programming fully corroborates ReDigi's admissions – and indeed prior insistence – that it scrupulously "deletes" an "eligible file" after uploading.  Thus, behind the technical vocabulary ReDigi adopts for this motion are further admissions and concessions that its service reproduces sound recordings in its cloud, and then deletes the source copy to cover its tracks.

### D.   **REDACTED**

In its motion, ReDigi's also reveals an entirely new service whereby recordings newly purchased on iTunes are   **REDACTED**   downloaded directly from iTunes to the ReDigi cloud.  ReDigi SJ Br. at 5-6; Lin Decl. ¶ 11; Worth Decl. ¶ 12.

# REDACTED

Mandel SJ Opp. Decl. ¶ ¶ 2-3.  ReDigi 2.0 is not targeted in Capitol's complaint, and there is no evidence that it has ever been used in connection with any Capitol recording.  Accordingly, any ruling on its lawfulness would be advisory.  Moreover, because it has only just now been disclosed with virtually no discovery, it is not properly the subject of ReDigi's motion, pursuant

11

to Fed. R. Civ. P. 56(d).  Finally, even as cursorily described, if applied to Capitol's recordings, this new service appears to be just another means by which ReDigi makes infringing reproductions of sound recordings,                    **REDACTED**

### 1.      A Ruling on ReDigi 2.0 Would Be Advisory

As a threshold matter, ReDigi's service is not part of the "case or controversy" of this litigation.  Capitol's complaint and this entire litigation have focused on ReDigi's existing service of a "used marketplace" where consumers upload music files from their home computers to ReDigi's cloud for purposes of "resale."  See Complaint (Docket No. 1) ¶ ¶ 20-21, 23-24, 27-30, 34-36.                    **REDACTED**

No evidence exists that any recording generally, much less any Capitol recording, has been delivered from iTunes to ReDigi's cloud in this new fashion, or that any such recording has been offered for sale or sold through ReDigi's marketplace.

Moreover, this new service would seem to have little to do with the core conduct that provoked this lawsuit – a "used marketplace" where users unload copies of "unwanted music files."  See Rudolph Decl. ¶ 23.

# REDACTED

In short, Capitol was unaware of and has never challenged this new conduct, and ReDigi likewise has never moved to amend its pleadings to seek a declaratory judgment that this new service is non-infringing.

In these circumstances, any ruling on ReDigi 2.0 would be impermissibly advisory. "Federal courts do not render advisory opinions" and "have a duty to refrain from deciding issues whose resolution is not necessary to the disposition of a case." Cal. Pub. Employees' Ret. Sys. v. Ebbers (In re Worldcom, Inc. Sec. Litig.), 308 F. Supp. 2d 214, 233-234 (S.D.N.Y. 2004) (quoting United States v. Tomasi, 313 F.3d 653, 661-62 (2d Cir. 2002) (Sotomayor, J., concurring)). Capitol's claims regarding infringing uploads may be fully resolved without reference to ReDigi's new service, which is not the subject of this lawsuit. ReDigi in turn has no right to obtain a ruling on a hypothetical or potential future set of facts, where it is unclear whether ReDigi 2.0 has ever copied, or will in the future copy, Capitol's sound recordings so they can be offered for sale. See Rivera v. Salomon Smith Barney, Inc., No. 01 Civ. 9282 (RWS), 2002 WL 31106418, at *2 (S.D.N.Y. Sept. 20, 2002) (Court cannot "entertain a claim which is based upon contingent future events that may not occur as anticipated, or indeed may not occur at all") (quoting Thomas v. City of New York, 143 F.3d 31, 34 (2d Cir. 1998)). ReDigi's request for relief both exceeds the boundaries of this case and the claims asserted, and is thus not ripe for adjudication. See Pacific Gas & Elec. Co. v. State Energy Res. Conservation and Dev. Comm'n, 461 U.S. 190, 203 (1983) (ripeness doctrine prevents the premature adjudication of issues that may never arise).

### 2. Summary Judgment on ReDigi 2.0 Should be Denied Pursuant to Fed. R. Civ. P. 56(d)

Moreover, even if ReDigi 2.0 is grafted onto this case by implication, summary judgment for ReDigi would be improper under Fed. R. Civ. P. 56(d)(1) and (2), which provides that the Court may either deny summary judgment or order further discovery if the non-movant shows by affidavit that it cannot "present facts essential to justify its opposition." Summary judgment is inappropriate where the opposing party has not "had the opportunity to discover information that

13

is essential to his opposition to the motion." Miller v. Wolpoff, 321 F.3d 292, 304 (2d Cir. 2003); Robinson v. Transworld Airlines, Inc., 947 F.2d 40, 42-43 (2d Cir. 1991) (when non-movant "has not been dilatory in seeking discovery, summary judgment should not be granted when he is denied reasonable access to potentially favorable information"). See also 10B C. Wright et al., Federal Practice and Procedure § 2740, at 402 (3d ed. 1998) (Rule 56(d) "should be applied with a spirit of liberality"). Where the defending party seeks more discovery to defeat the motion, it must show by affidavit: "(1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." Miller, 321 F.3d at 303 (citation omitted).

## REDACTED

Mandel SJ Opp. Decl. ¶ 3. Not a single produced document makes mention of any such service, and Capitol has had no opportunity to take meaningful discovery of the service other than an ambush disclosure in vague answers at a deposition the day before discovery closed. Id. ¶ ¶ 2-4 and Ex. 1 (Ossenmacher Dep. at 201-04). For example, Capitol cannot assess how ReDigi 2.0 works in practice; whether it operates as described in ReDigi's papers or has additional or contrary operations that have not been disclosed;

# REDACTED

# REDACTED

See id. ¶ 3.

In fact, even as preliminarily disclosed, there are already questions about the accuracy

and consistency of ReDigi's self-serving declarations describing ReDigi 2.0.

# REDACTED

[5] Thus, Capitol has been afforded at best

an incomplete and inconsistent picture of how ReDigi 2.0 operates.

In these circumstances, ReDigi's motion for summary judgment on ReDigi 2.0 should be

denied pursuant to Fed. R. Civ. P. 56(d)(1).  Capitol has not targeted this service, which may not

even implicate its recordings, and ReDigi cagily and vaguely disclosed its existence at a time

when Capitol was precluded from examining it in any detail.  Fairness and sensible

administration of this case dictate that summary judgment should be denied outright.

Alternatively, Capitol should be afforded the opportunity to take discovery regarding

ReDigi 2.0 prior to any consideration of ReDigi's motion as to its lawfulness.  Pursuant to the

---

[5]

# REDACTED

first two of the four <u>Miller</u> factors noted above, the Mandel declaration shows that Capitol is

entitled to seek documents and take depositions of ReDigi's three declarants regarding the

operations of ReDigi 2.0 and the service's interaction with Capitol's recordings.  <u>See</u> Mandel SJ

Opp. Decl. ¶ ¶ 2-4.  Those facts are reasonably expected to create genuine issues of fact

regarding whether ReDigi's description of the service is complete or accurate (already a suspect

proposition);

# REDACTED
and

Any such

facts would certainly undermine ReDigi's claim for judgment as a matter of law.  As to the final

two <u>Miller</u> factors regarding Capitol's prior efforts to obtain this information, Capitol of course

had no such opportunity where the service was not even in existence or disclosed.  <u>See</u> <u>Robinson</u>,

947 F.2d at 42-43 (plaintiff entitled to discovery before having to oppose summary judgment

where defendant had not provided that discovery before it filed its summary judgment motion).

> **3.      If Used in Connection With Capitol's Recordings, ReDigi 2.0 Would
> Infringe Capitol's Copyrights**

Finally, if the Court nonetheless elects to consider ReDigi 2.0 at this juncture, even as

cursorily described, it would violate Capitol's rights if used in connection with Capitol's

recordings.

# REDACTED

# REDACTED

29503/003/1329311.3

# REDACTED

Thus, not only does ReDigi have no basis for seeking an advisory ruling on a service it just disclosed, but its description of that service betrays simply another mechanism for infringement.[7]

### E.   Downloads of "Used" Music Files Purchased on ReDigi Are Conceded to Be Unauthorized Reproductions of Capitol's Sound Recordings

ReDigi concedes that when a user downloads a music file from its cloud, one copy is delivered to the user's computer while another remains in the ReDigi cloud. See ReDigi SJ Br. at 7, 14. Deeming such downloads to be "personal use copies," ReDigi concludes that all downloaded files from its system are protected by the fair use doctrine, regardless of their origins. Id. at 15-19. They are not. Where users purchase and download copies of "used"

---

[6] To add insult to injury, ReDigi 2.0 further encourages iTunes users to violate the Terms and Conditions that govern their rights to use downloaded content. Those terms provide, among other things, that users are "authorized to use iTunes Products only for personal, noncommercial use" and "on five iTunes-authorized devices at any time." See Adelman Decl. Ex. 3 (iTunes Usage Rules (i)-(ii)). By encouraging users to sell copies of copyrighted recordings through the ReDigi "marketplace," ReDigi surely urges more than "personal, noncommercial use,"

## REDACTED

[7] Nor can ReDigi defend its new service as a fair use, which "presupposes good faith and fair dealing." Time, Inc. v. Bernard Geiss Assocs., 293 F. Supp. 130, 146 (S.D.N.Y. 1968). See also Roy Export Co. v. Columbia Broadcasting Sys., Inc., 503 F. Supp. 1137, 1146 (S.D.N.Y. 1980), aff'd, 672 F.2d 1095 (2d Cir. 1982).        **REDACTED**                        The only conceivable purpose of such a system is to further ReDigi's business goal of populating its site to encourage the sales activity it needs to survive. See Pl. 56.1 ¶ ¶ 7, 42. ReDigi cannot argue that such a service vindicates any consumer rights, transforms anything creatively or beneficially, or otherwise satisfies the equitable four-factor fair use analysis. See Pl. SJ Br. at 17-18. Surely the fair use "equitable rule of reason," see ReDigi Br. at 15, does not exonerate one who           **REDACTED**

18

music via ReDigi's infringing service – that is, files that others have uploaded to ReDigi's cloud and offered for sale – they are not engaging in the simple act of space-shifting that ReDigi suggests. Rather, they are making infringing copies of infringing copies, purchased at reduced prices that undercut the legitimate market for digital music distribution. For these reasons, as well as those described in Capitol's own summary judgment motion, see Pl. SJ Br. at 17-18, such downloads are far removed from the general purposes or specific factors necessary to make a use fair. While Capitol does not in this case challenge cloud storage of what are truly legally purchased recordings, it has consistently maintained that the "used" recordings peddled via ReDigi are illegal and cannot be either uploaded to or downloaded from its service.

# REDACTED

That Capitol chooses to exploit its intellectual property for proper payment with legitimate digital distributors hardly constitutes a waiver permitting ReDigi and its users to make unauthorized reproductions with no corresponding payment or permission. The only thing Capitol has "encouraged" is the lawful use of its sound recordings, and not an expanding, infringing service entirely outside its control.

## II.   REDIGI VIOLATES CAPITOL'S EXCLUSIVE RIGHT OF DISTRIBUTION

ReDigi argues that there is an inconsistency between Capitol's interpretation of the term "phonorecord" for purposes of Capitol's distribution right and ReDigi's asserted first sale defense. However, ReDigi ignores that while the term "phonorecord" obviously carries the same meaning in both §§ 106(3) and 109(a) of the Copyright Act, there is a critical distinction in the other language of those respective sections. While section 106(3) reserves to the copyright

19

owner the exclusive right to "distribute ... phonorecords of the copyrighted work," section 109(a) only provides a defense when the owner of a "particular ... phonorecord lawfully made ... dispose[s] of the possession of that ... phonorecord." 17 U.S.C. § § 106(3), 109(a) (emphasis added).

Where a recording first fixed on the hard drive of one ReDigi user is then copied and fixed on ReDigi's server so that it can be sold to another ReDigi user, there can be no serious dispute that the first user (and indeed ReDigi itself) has distributed a phonorecord of the copyrighted work.  As the Court explained in London-Sire Records, Inc. v. Doe I, 542 F. Supp. 2d 153 (D. Mass. 2008), a case on which ReDigi itself relies, the fact that a sound recording is fixed in a material object (a computer hard drive) both before and after a transaction between users establishes a distribution of a phonorecord.  Id. at 170-174.  Any other result would effectively declare "open season" on copyrighted works on the Internet, permitting infringers to make unauthorized distributions of copyrighted works in digital form with impunity.  Nothing in the language of section 106(3) granting copyright owners an exclusive right to distribute "phonorecords" suggests such an absurd result, and indeed courts, including the Supreme Court, have had little difficulty recognizing that digital transactions fall within the distribution right of section 106(3).  See, e.g., New York Times Co. v. Tasini, 533 U.S. 483, 498 (2001); Arista Records, LLC v. Greubel, 453 F. Supp. 2d 961, 968 (N.D. Tex. 2006) (citing cases).

It does not follow, however, that an electronic distribution disposes of possession of the particular phonorecord with which the user began.  ReDigi tries to shoehorn its conduct into the language of section 109(a) by claiming that the electronic file constitutes the "material object" in which the sound recording is fixed.  ReDigi SJ Brief at 19.  However, the London-Sire case cited by ReDigi does not support such a conclusion.  Indeed, a review of the full passage from which

20

ReDigi selectively and misleadingly quotes makes clear that the particular segment on the hard

disk in which the electronic file is fixed (not the electronic file itself) actually constitutes a

"phonorecord" under the Copyright Act:

> Thus, any object in which a sound recording can be fixed is a 'material
> object.' That includes the electronic files at issue here. When a user on
> a peer-to-peer network downloads a song from another user, he receives
> into his computer a digital sequence representing the sound recording. That
> digital sequence is magnetically encoded on a segment of his hard disk (or
> likewise written on other media). With the right hardware and software, the
> downloader can use the magnetic sequence to reproduce the sound recording.
> The electronic file (or, perhaps more accurately, the appropriate segment of
> the hard disk) is therefore a 'phonorecord' within the meaning of the statute.

542 F. Supp. 2d at 171 (emphasis added).

For purposes of first sale analysis, the parenthetical statement offered as a technical point

of accuracy by the London-Sire Court actually becomes dispositive. Because the computer disc

on the hard drive of the original user's computer and the disc on the ReDigi server are

indisputably two different phonorecords, a distribution that begins on one and culminates on the

other cannot be a distribution of the first user's particular phonorecord, as required by section

109(a). And the electronic file itself –

## REDACTED

– by definition cannot be a "phonorecord." See 17 U.S.C. § 101

(defining "phonorecords" as "material objects in which sounds ... are fixed ..., and from which

the sounds can be perceived, reproduced, or otherwise communicated ..."); see also 17 U.S.C.

§ 101 (defining a work as "fixed" if "its embodiment in a ... phonorecord ... is sufficiently

permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a

period of more than transitory duration").

21

While ReDigi claims that Capitol's interpretation of section 109 fails to give effect to the statute by excluding digital files from the first sale doctrine (ReDigi SJ Brief at 20-21), the plain language of the Copyright Act itself, including its specific definitions, serves to render the first sale doctrine inapplicable in the context of a digital transmission.  Indeed, the Copyright Office reached that precise conclusion in its DMCA Section 104 Report, explaining that the end product of a digital transmission is a new copy of the work, in violation of the very essence of the first sale doctrine.  See U.S. Copyright Office, Library of Cong., DMCA Section 104 Report (2001), available at www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf (hereafter the "DMCA Report") at 79.  While ReDigi disingenuously claims that the Copyright Office concluded that section 109 does apply to works in digital form (ReDigi SJ Brief at 20 n. 5), ReDigi fails to mention that the DMCA Report was acknowledging the section's applicability to "[p]hysical copies of works in a digital form, such as CDs or DVDs."  See DMCA Report at 78 (noting such physical copies are "subject to section 109 in the same way as physical copies of works in analog form").  The Copyright Office plainly distinguished those situations from digital transmissions in which reproduction necessarily occurs, and there is no transfer of the physical copy.  Id. at 80 ("We therefore conclude that section 109 does not apply to digital transmission of works").

Finally, ReDigi's policy argument that application of the first-sale defense here "furthers the goals of copyright law" (ReDigi SJ Brief at 22-24) is entirely misplaced.  In the first instance, it is for Congress to make such a determination and to enact a provision that would render the first sale defense applicable to digital transmissions.  The current statute plainly does not do that, as the Copyright Office concluded in considering (and rejecting) an amendment that would be needed to expand the defense to digital transmissions.

In any event, even if considered by this Court, ReDigi's policy argument about the alienability of personal property fails to account for the significant distinctions between digital and physical goods. As the DMCA Report concluded in rejecting the very policy argument advanced here by ReDigi, "[d]igital transmission of a work does not implicate the alienability of a physical artifact.... [T]he sender is not exercising common-law dominion over an item of personal property; he is exercising the central copyright right of reproduction with respect to the intangible work." DMCA Report at 87. Indeed, application of the first sale doctrine to digital transmissions would fail to provide adequate protection for copyright owners and the legitimate digital distribution market:

> Physical copies of works degrade with time and use, making used copies less desirable than new ones. Digital information does not degrade, and can be reproduced perfectly on a recipient's computer. The 'used' copy is as just as desirable as (in fact, is indistinguishable from) a new copy of the same work. Time, space, effort and cost no longer act as barriers to the movement of copies, since digital copies can be transmitted nearly instantaneously anywhere in the world with minimal effort and negligible cost. The need to transport physical copies of works, which acts as a natural brake on the effect of resales on the copyright owner's market, no longer exists in the realm of digital transmissions. The ability of such 'used' copies to compete with market share for new copies is thus far greater in the digital world.

Id. at 82-83 (footnotes omitted). [8] For these reasons, the Copyright Office correctly concluded that extension of the first sale doctrine to the online environment would impede the copyright law's central goal of providing an incentive to create. Id. at 90-91. ReDigi provides no basis for concluding otherwise.

---

[8] The many ways in which users can concededly retain copies of the recordings with which they have supposedly parted through ReDigi's marketplace aggravate these risks to copyright owners identified by the Copyright Office. See Pl. 56.1 ¶¶ 57-64.

**III.   REDIGI HAS FAILED TO DEMONSTRATE THAT IT IS ENTITLED TO SUMMARY JUDGMENT ON THE CLAIMS FOR VIOLATION OF CAPITOL'S RIGHTS OF PERFORMANCE AND DISPLAY**

As a threshold matter, ReDigi's argument concerning users' personal streaming of recordings stored in their own cloud lockers (ReDigi SJ Brief at 24) is irrelevant.  Capitol's complaint was only directed to playing clips to any interested purchaser, not streaming authorized copies of songs to people who already own them.  See Complaint (Docket No. 1) ¶ 3. By making these clips available to any interested shoppers to entice them to purchase illegal copies, ReDigi publicly performs the recordings.  See 17 U.S.C. § 101 (public performance includes transmission to the public "whether the members of the public ... receive it in the same place or in separate places and at the same time or at different times").

ReDigi claims that it had licenses permitting it to stream the 30 second clips of the Capitol recordings and also to display artwork.  ReDigi 56.1 ¶ ¶ 73, 76.

# REDACTED

...."  Pl. 56.1 Resp. ¶ 73.  Similarly, its subsequent alleged license with Rdio prevented ReDigi from using the licensed technology "in any manner that advocates, encourages, condones, promotes or facilitates the infringement of any third party intellectual property rights, including without limitation ... copyright rights."  Mandel SJ Opp. Decl. Ex. 4 at 2.[9]  Since ReDigi plays

---

[9]ReDigi violated other terms of the Rdio agreement, which also prohibited using the licensed technology or "Transmitted Content" to "populate any website" and "[m]onetizing any

24

the clips and displays the artwork solely to encourage the purchase of infringing copies, ReDigi

violated the very licenses on which it relies as justifying its uses.

## CONCLUSION

For the foregoing reasons, ReDigi's motion for summary judgment should be denied in

its entirety.

Dated: New York, New York
      August 14, 2012

                Respectfully submitted,

                COWAN, LIEBOWITZ & LATMAN, P.C.
                Attorneys for Plaintiff Capitol Records, LLC

                By: _____
                        Richard S. Mandel
                        Jonathan Z. King

                1133 Avenue of the Americas
                New York, New York 10036-6799
                (212) 790-9200

---

application using" the licensed technology.  See Mandel SJ Opp. Decl. Ex. 4 at 2, 3, 4.  ReDigi
populated its site extensively with artwork and sound clips, and used the Rdio service to
"monetize" its own services and encourage sales.