UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CAPITOL RECORDS, LLC,

                             Plaintiff,

           v.

REDIGI INC.,

                         Defendant.

------------------------------------------------------------X

Civil Action No.: 12CIV0095
(RJS)


## MEMORANDUM OF LAW IN OPPOSITION TO CAPITOL RECORD LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT


**MEISTER SEELIG & FEIN LLP**
**Two Grand Central Tower**
**140 East 45th Street, 19th Floor**
**New York, New York 10017**
**Phone: (212) 655-3580**
*Attorneys for ReDigi Inc.*

**Gary Adelman, Esq.**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................... 1

THE SUMMARY JUDGMENT STANDARD ............................................................ 2

ARGUMENT ................................................................................................................ 2

   I.    NONE OF CAPITOL'S EXCLUSIVE RIGHTS HAVE BEEN VIOLATED ................. 3

     A.   NO REPRODUCTION TAKES PLACE IN A SALE TRANSACTION.................. 3

     B.   REPRODUCTION DOES NOT TAKE PLACE BY DEFINITION ........................ 7

     C.   ARCHIVAL DUPLICATES THAT WERE MADE
ARE NOT INFRINGEMENTS ......................................................................... 13

     D.   PERSONAL USE COPIES ARE NOT INFRINGEMENTS.................................. 13

     E.   CAPITOL'S DISTRIBUTION RIGHT HAS NOT BEEN VIOLATED.................. 15

   II.    REDIGI CANNOT BE LIABLE AS A DIRECT INFRINGER.............................. 18

   III.    REDIGI CANNOT BE SECONDARILY LIABLE ............................................. 20

     A.   REDIGI CANNOT BE LIABLE FOR CONTRIBUTORY INFRINGEMENT........ 20

     B.   REDIGI CANNOT BE LIABLE FOR VICARIOUS INFRINGEMENT ................. 22

     C.   REDIGI CANNOT BE LIABLE FOR INDUCEMENT OF INFRINGEMENT ...... 23

   III.    REDIGI 2.0 CANNOT BE ENJOINED ........................................................ 25

CONCLUSION............................................................................................................ 25

i

## TABLE OF AUTHORITIES

**Cases**

*A&M Records, Inc. v. Napster, Inc.,*
   239 F.3d 1004 (9th Cir. 2001) ............................................................................................ 13

*Arista Records LLC v. Usenet.com, Inc.,*
   633 F. Supp. 2d 124 (S.D.N.Y. 2009)................................................................................ 20

*Astroworks, Inc. v. Astroexhibit, Inc.,*
   257 F. Supp. 2d 609 (S.D.N.Y. 2003)................................................................................. 7

*Best v. District of Columbia,*
   291 U.S. 411 (1934)............................................................................................................ 5

*Butynski v. Springfield Terminal R.Co.,*
   592 F.3d 272 (1st Cir. 2010).............................................................................................. 5

*C. M. Paula Co. v. Logan,*
   355 F. Supp. 189 (N.D. Tex. 1973) .................................................................................. 11

*Campbell v. Acuff-Rose Music, Inc.,*
   510 U.S. 569, 114 S. Ct. 1164, 127 L. Ed. 2d 500 (1994)............................................ 14, 15

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.,*
   536 F.3d 121 (2d Cir. 2008)................................................................... 13, 16, 19, 20

*Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc.,*
   150 F.3d 132 (2d Cir. 1998).............................................................................................. 15

*Chase v. Pub. Util. Comm'n of PA,*
   CIVA 1:05-CV-2375, 2008 WL 906491 (M.D. Pa. Mar. 31, 2008) ................................ 12

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
   499 U.S. 340 (1991)............................................................................................................ 2

*Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.,*
   443 F.2d 1159 (2d Cir. 1971)............................................................................................ 21

*Kregler v. City of New York,*
   821 F. Supp. 2d 651 (S.D.N.Y. 2011)................................................................................ 5

*London-Sire Records, Inc. v. Doe 1,*
   542 F. Supp. 2d 153 (D. Mass. 2008) ....................................................................... passim

*MacDonald v. Gen. Motors Corp.,*
  110 F.3d 337 (6th Cir. 1997) ................................................................. 5

*Matthew Bender & Co., Inc. v. W. Pub. Co.,*
  158 F.3d 693 (2d Cir. 1998)................................................................... 20

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,*
  545 U.S. 913, 125 S. Ct. 2764, 162 L. Ed. 2d 781 (2005)................................ passim

*Natl Car Rental Sys., Inc., v. Computer Assocs Int'l, Inc.,*
  991 F.2d 426 (8th Cir. 1993) ................................................................. 15

*Oscanyan v. Arms Co.,*
  103 U.S. 261, 26 L. Ed. 539 (1880)......................................................... 5

*Playboy Enterprises, Inc. v. Russ Hardenburgh, Inc.,*
  982 F. Supp. 503 (N.D. Ohio 1997)......................................................... 20

*Quality King Distribs v. L'anza Research Int'l, Inc.,*
  523 U.S. 135 (1998)............................................................................. 17

*Ringgold v. Black Entm't Television, Inc.,*
  126 F.3d 70 (2d Cir. 1997)..................................................................... 14

*Robinson v. McNeil Consumer Healthcare,*
  615 F.3d 861 (7th Cir. 2010) ................................................................. 5

*Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.,*
  391 F.3d 77 (2d Cir. 2004).................................................................... 2

*Sega Enterprises Ltd. v. MAPHIA,*
  948 F. Supp. 923 (N.D. Cal. 1996).......................................................... 12

*Shapiro, Bernstein & Co. v. H. L. Green Co.,*
  316 F.2d 304 (2d Cir. 1963).................................................................. 22

*Skidmore v. Swift & Co.,*
  323 U.S. 134 (1994)............................................................................. 16

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
  464 U.S. 417, 104 S. Ct. 774, 78 L. Ed. 2d 574 (1984).................................. passim

*Stowe v. Nat'l R.R. Passenger Corp.,*
  793 F. Supp. 2d 549 (E.D.N.Y. 2011) ...................................................... 4

*Twentieth Century Music Corp. v. Aiken,*
    422 U.S. 151 (1975)........................................................................................ 10

*Twin Peaks Productions, Inc. v. Publications Int'l, Ltd.,*
    996 F.2d 1366 (2d Cir. 1993)........................................................................ 3

*United States v. McKeon,*
    738 F.2d 26 (2d Cir. 1984)............................................................................ 5

*Weissmann v. Freeman,*
    868 F.2d 1313 (2d Cir. 1989)...................................................................... 14

*Winter v. United States,*
    196 F.3d 339 (2d Cir. 1999)........................................................................ 2

**Statutes**

17 U.S.C. § 202 ................................................................................................... 9

17 U.S.C. §101 ................................................................................................... 10

17 U.S.C. 109(a) ................................................................................................. 9

17 U.S.C. § 107 ................................................................................................. 14

**Rules**

Fed. R. Civ. P. 56(c) ......................................................................................... 2

Fed. R. Civ. P. 8(d)(2)-(3)................................................................................ 6

**Regulations**

17 C.F.R. § 230.502(b)(2).................................................................................. 24

## PRELIMINARY STATEMENT

Defendant ReDigi Inc. ("Defendant" or "ReDigi") submits this memorandum, the declarations submitted in support of same together with the exhibits annexed thereto,[1] and the Rule 56.1 Counter Statement of Disputed Facts ("RDF") in opposition to plaintiff Capitol Records LLC's ("Plaintiff" or "Capitol") motion for partial summary judgment.

Capitol has failed to demonstrate its entitlement to judgment as a matter of law as it has not demonstrated that any aspect of the ReDigi system infringes its exclusive rights. Capitol's motion lacks any evidentiary support that infringement takes place on the ReDigi system and instead, rests entirely on misinterpretations of the law and unsupported assumptions about ReDigi's technology. There is no evidence that the ReDigi system is used to infringe nor is there evidence that the ReDigi system was created for the purpose of infringement, encouraging others to infringe or any other activity that would support the imposition of direct or secondary liability. As set forth below, none of Capitol's exclusive rights are violated by consumers' use of the ReDigi system. Despite Capitol's best efforts to confuse the issues and convince the Court that proof of infringement is unnecessary, the undisputed facts of this case lead to only one conclusion –that Capitol has failed to satisfy its burden of proof and its motion must be denied.

---

[1] The materials submitted in support of ReDigi's Opposition as referred to herein include the Declaration of Gary Adelman dated August 14, 2012 together with the exhibits annexed thereto ("Adelman Decl."), the declaration of John Ossenmacher dated August 14, 2012 ("Ossenmacher Decl.") and the declaration of Lawrence S. Rudolph a/k/a Larry Rogel dated August 14, 2012 ("Rogel Decl."). Many of the facts and arguments referred to herein are more fully set forth in ReDigi's Memorandum of Law In Support of its Motion for Summary Judgment dated July 20, 2012, (Docket No. 55) ("Def. Br."), ReDigi's Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 (Docket No. 56) ("RSUF"), the Declaration of Gary Adelman dated July 20, 2012 together with the exhibits annexed thereto (Docket No. 57) ("7/20/12 Adelman Decl."), Declaration of Lawrence S. Rudolph (Rogel) dated July 20, 2012 (Docket No. 58) ("7/20/12 Rogel Decl."), the Declaration of Colin Worth dated July 20, 2012 (Docket No. 59) ("Worth Decl."), and the Declaration of Jonathan Lin dated July 20, 2012 (Docket No. 60) ("Lin Decl."), all of which are fully incorporated herein by reference, but will not be repeated at length.

1

## THE SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Winter v. United States*, 196 F.3d 339, 346 (2d Cir. 1999). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). To defeat summary judgment, non-movant need offer only enough evidence for a reasonable jury to return a verdict in its favor. *Id.*

## ARGUMENT

As evidenced herein, Capitol cannot prevail on its motion for summary judgment. It undisputed that as plaintiff, Capitol bears the burden of proving the elements of its copyright infringement claims. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).(To succeed on a claim of copyright infringement, plaintiff must prove two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."). However, on its best day Capitol's motion leaves serious genuine issues of material fact that would allow a trier of fact to find in favor of ReDigi on all claims.[2] While Capitol has tried to confuse the issues with unsupported assumptions as to how it thinks ReDigi's technology works, its efforts are futile. Capitol has never examined ReDigi's system code and has no knowledge of how its technology works. As such Capitol has no evidence to prove that infringement has occurred through use of the ReDigi system, which is a necessary element to any finding of infringement under any theory of liability. Instead of supporting its motion with evidence, Capitol has asked the Court to base its ruling on its erroneous interpretation of certain statements and a definitional theory that is illogical and without merit.

---

[2] Alternatively, as set forth in the Def. Br., judgment in ReDigi's favor is appropriate.

All of the evidence in the record here supports the conclusion that Capitol's arguments are without support and that its understanding of ReDigi's technology is wrong. As discussed herein, Capitol has failed to satisfy its burden here and as such its motion must be denied.

## I.   NONE OF CAPITOL'S EXCLUSIVE RIGHTS HAVE BEEN VIOLATED

Capitol cannot prevail on its claims of infringement, as it has failed to prove the second element of a copyright infringement claim i.e. that ReDigi violated any of its exclusive rights. *See Twin Peaks Productions, Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1372 (2d Cir. 1993) (copyright infringement requires showing that defendant violated plaintiff's exclusive rights).[3]

## A.   NO REPRODUCTION TAKES PLACE IN A SALE TRANSACTION

A "reproduction" does not take place during a sale transaction on the ReDigi system. *See*



These facts, which demonstrate that ReDigi's software does not reproduce or duplicate ▮▮▮▮ Files during the upload process, are undisputed. Despite the fact that it has been clear since the preliminary injunction hearing that the workings of ReDigi's technology was a key issue in this

---

[3]Capitol has only sought judgment as to the assertion that its exclusive rights to reproduction and distribution were violated. As such ReDigi will only address its arguments as to these issues.

case, Capitol chose not to pursue discovery on this issue and has continued to assume it knows how the technology works. *See* Adelman Decl. Ex. 3, at 43:10-20. Capitol has never looked at ReDigi's migration process or ReDigi's code. *See* 7/20/12 Adelman Decl., Ex. 12, McMullan Dep. 125:13-15. Thus, Capitol cannot present any evidence to prove that use of the ReDigi system infringes. Realizing its mistake, Capitol has tried to shift the focus away from its inability to present proof, by accusing ReDigi of changing its story, when ReDigi has done no such thing.

Capitol bears the burden of proof and has been on notice since ReDigi filed its Answer that ReDigi denies the accusation that its technology makes reproductions of ██████ Files to send to the Cloud Locker. To the extent there were any statements made at the preliminary injunction stage that Capitol felt were inconsistent with ReDigi's denial of those allegations, Capitol had more than ample opportunity to explore those issues in discovery. But Capitol did not. Now Capitol is asking the Court to construe these very statements in a way that is inconsistent with the truth. Capitol's request that the challenged statements be judicial admissions of infringement against ReDigi is tantamount to asking the Court to blindly accept an inaccurate interpretation of statements, when all of the evidence in factual record demonstrates that Capitol is wrong.

"[A]ttorney's statements . . . may constitute admissions of his client; however, to bind the client by such statements, they must constitute 'a clear and unambiguous admission of fact.'" *Stowe v. Nat'l R.R. Passenger Corp.*, 793 F. Supp. 2d 549, 554-55 (E.D.N.Y. 2011) (quoting *United States v. McKeon*, 738 F.2d 26, 30 (2d Cir. 1984); *Oscanyan v. Arms Co.*, 103 U.S. 261, 263 (1880)); *Butynski v. Springfield Terminal R.Co.*, 592 F.3d 272, 277 (1st Cir. 2010) (to qualify as binding admission, counsel's "statement, when viewed in context, must be clear and unambiguous"); *Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861, 872 (7th Cir. 2010) (quoting *MacDonald v. Gen. Motors Corp.*, 110 F.3d 337, 340 (6th Cir. 1997) ("to qualify as judicial admissions, an attorney's statements must be deliberate, clear and unambiguous.")); *Kregler v. City of New York*,

4

821 F. Supp. 2d 651, 656 (S.D.N.Y. 2011) (same). All inferences must be made in favor of the party

against whose interests the admission was allegedly made. *See Best v. District of Columbia*, 291

U.S. 411, 415 (1934).

The statement in ReDigi's opposition to Capitol's motion for a preliminary injunction that

"[t]he only copying which takes place in ReDigi service occurs when a user uploads music files to

the ReDigi cloud," cannot be interpreted as a judicial admission that ReDigi's upload process

involves transfer of a duplication of music files as that is <u>not clearly or unambiguously what it</u>



Capitol has also challenged the part of the statement in ReDigi's brief that "copies" are

stored in the Cloud Locker, and has asked the Court to accept this statement as a judicial admission

that a "reproduction" of an  File is stored in the Cloud Locker. However, this is not what

the statement means. Throughout this litigation Capitol has equivocated between the meaning of

---

[5] To the extent that the patent uses the word "copied", ReDigi's patent was not filed to cover the specific method of uploading files to the cloud, it was filed for ReDigi business process. Moreover at the time the patent was filed, the data migration program was not finished. *See* RDF § I, ¶42.

"copy" or "copies" and reproduction which confuses the technical issues with legal terminology.[6]
However, the meaning of the two uses is not synonymous. The word "copies" as used in ReDigi's
materials are not always used to describe ReDigi's technology. *See* RDF § I ¶37-38. Just as one
goes to the record store to get a 'copy' of a new or used album, one can go to ReDigi to get a
"copy" of a song. *Id.* However in this instance the word copy is not used to describe the
technology or indicate that a reproduction was made or sold, rather it is just a colloquial usage of
the word "copy", which is commonplace. *Id.*

The evidence demonstrates that Capitol's interpretation of the challenged statements is
wrong. ReDigi unequivocally denied Capitol's accusation that "the user's original file is duplicated
and then stored by the ReDigi service," in its Answer. *Compare* 7/20/12 Adelman Decl., Ex. 1,
Complaint ¶21 *with* Ex. 2, Answer ¶15. Capitol's claim that ReDigi never suggested that its
technology avoided sending a copy to the cloud is highly disingenuous, given ReDigi's denial of
that exact allegation. *Id.* Similarly, Capitol's assertion that ReDigi's fair use and essential step
defenses could be interpreted to support an admission of infringement is ridiculous. That argument
flies in the face of black letter law allowing pleading of alternative inconsistent theories of relief.
*See* Fed. R. Civ. P. 8(d)(2)-(3); *Astroworks, Inc. v. Astroexhibit, Inc.*, 257 F. Supp. 2d 609, 616
(S.D.N.Y. 2003) (legal allegations are properly plead in the alternative).

As to Paragraph 47 of ReDigi's Answer and Paragraph 6 of the Declaration of Larry
Rudolph dated January 27, 2012 ("1/27/12 Rudolph Decl."), Capitol has taken these statements out
of context and again tries to attribute a meaning that does not exist. The phrase "such file" refers to
the archival copy that could have previously been created for recovery purposes, it does not refer to
the Eligible File. *See* RDF §I ¶¶39-40 This is further clarified by the next sentence in the

---

[6] One such example was in Capitol's motion for a preliminary injunction where it used the phrase a
"copy" to describe what, admittedly more accurately, should have been referred to as a
"phonorecord." *See* 7/20/12 Adelman Decl. Ex. 13, at 5 n.2. Given that Capitol uses the word
interchangeably to mean different things, it is hypocritical to attack ReDigi's use here.

declaration, which explains that "[i]f the user were to attempt to upload the file without first accepting the prompt to delete **the other copy or copies detected by Music Manager**, the upload would be blocked." (Emphasis Added.) *See id.*

When viewed in context with the other evidence it is clear that the challenged statements do not prove that ReDigi's system makes a duplicate copy and sends that copy to the Cloud Locker and cannot be construed as judicial admissions against ReDigi to that effect. When asked about these statements at deposition, ReDigi's witnesses clearly explained their meaning. *See* RDF §I, ¶¶37-40; § II ¶26. ReDigi's position has never changed. To the extent these statements were at all ambiguous at the preliminary injunction stage, that was not ReDigi's intent. *See* RDF §I, ¶¶41. ReDigi's system is highly technical and complicated and in opposing the motion for a preliminary injunction, ReDigi sought to explain to the Court in the best way possible how its system worked. *Id.* However without a protective order in place, ReDigi was also concerned about going into detail as to the details and workings of its technology, as it is highly sensitive, proprietary information. *Id.*

When read in context with ReDigi's Answer, which expressly denied the allegation that duplications of ████ Files were sent to the Cloud Locker, Capitol should have known that ReDigi's upload process did not involve duplicating files. Capitol's choice not to investigate further is not a reason to construe these statements as a judicial admission of infringement against ReDigi. Capitol's request that the Court ignore the undisputed evidence in the record as to how the technology works and instead grant summary judgment in their favor would be prejudicial, unjust and should not be countenanced by this Court.

## B. REPRODUCTION DOES NOT TAKE PLACE BY DEFINITION

Capitol's argument that infringement is a definitional issue also fails. Capitol has taken the position that the exclusive right to reproduction is the exclusive right to prevent others from making new phonorecords, which it claims, albeit incorrectly, is tantamount to the right to move a digital

7

file from one place on a hard drive to another.  Capitol relies on *London-Sire Records, Inc. v. Doe 1*,
to mean that when an electronic music file is written to a hard disk the fixation of the file on the
disk is a "phonorecord." *London-Sire Records, Inc. v. Doe 1*, 542 F. Supp. 2d 153, 171 (D. Mass.
2008).  Based on this, Capitol has taken the position that by ███████████ File to the Cloud
Locker a new phonorecord is created in violation of the copyright act, as a matter of definition.  At
first blush, if considered in a vacuum, the theory may seem attractive, but in reality Capitol's
position makes no sense.

      In the *London-Sire* case the court noted that the "electronic file (or, perhaps more accurately,
the appropriate segment of the hard disk) is . . . a 'phonorecord.'" *Id.*  Therefore, assuming
*arguendo* that Capitol's position is correct, each time a computer, by any process, moved an
electronic music file to a different section of the hard disk, a new phonorecord would be created and
the copyright holder's rights would have been infringed.  Applied to how computers function, this
position is irrational.  In executing many different user commands, computers move the location of
files all the time.  For example, computers move the location of electronic files when they go
through defragmenting processes or when a person moves their music files from one directory to
another because they want to use a new media player.  *See* RDF §I, ¶43.  If Capitol were right, by
moving a file from one segment of someone's hard drive to another segment of the same hard drive
a new phonorecord would be made in violation of Capitol's reproduction right.  It would be illogical
and inefficient to propose that the intent of the Copyright Act was to prevent this. The power of
authors to exercise their exclusive rights cannot interfere with the progress and development of
technology.  *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 442 (1984).

      In addition, adoption of this view would change the application of the limitations on
exclusive rights, such as the first sale doctrine.  If, by moving an electronic file an infringement had
occurred, digital files would be excluded from the limitations provided by the first sale doctrine,

unless a user sold his or her whole hard drive, which would be cumbersome and would still make it impossible to sell different tracks to different people. *See* 17 U.S.C. 109(a). As addressed in Section IV of the Def. Br., precluding digital files from the first sale doctrine is inconsistent with both the policy considerations behind the first sale doctrine and principles governing statutory interpretation. *See* Def. Br., p. 19-24. It is clear that Capitol's argument is advanced for the sole purpose of preventing a secondary market for digital goods. Such purpose is squarely at odds with the Copyright Acts provision of a **limited monopoly.** *Id.*

Additionally, when read in context with the rest of *London-Sire*, Capitol's conclusion is at odds with the purpose of the law. Congress did not distinguish between the copyrightable work, which consists of aggregation of sounds and phonorecords (i.e. material objects in which sounds are fixed), so that infringement would be a matter of definition. As noted in *London-Sire*, Congress "distinguished between the abstract, original work on the one hand, which is the source of the copyrights, and its material incarnation on the other which is protected by the copyrights" to abolish the common law presumption that if a material object containing the copyrighted work was sold the sale included the copyright unless the agreement excepted them. *London-Sire Records, Inc.*, 542 F. Supp. 2d at 171 (citing H.R. Rep. 94-14767 at 52-53 (1976)). It was because Congress made this distinction that "the two are different, [and] the author can freely sell a copy without disturbing the copyrights." *Id.* "[I]n the sense of the Copyright Act, **'material objects' should not be understood as separating tangible copies from non-tangible copies. Rather, it separates a copy from the abstract original work and from a performance of the work.**" (Emphasis Added.) *Id.* at 173. Furthermore, while distribution of phonorecord must be of a material object, "there is no

reason to limit 'distribution' to processes in which a material object exists throughout the entire transaction," as opposed to where a material object is elsewhere at the finish. *Id*.[7]

The Court should not, as Capitol urges, consider the meaning of language in the Copyright Act in a vacuum. The Supreme Court has mandated that "[w]hen technological change has rendered its literal terms ambiguous, the Copyright Act must be construed in light of this basic purpose."[8] *See Sony Corp. of Am.*, 464 U.S. at 432, *citing Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975). The progressive language contained in the definition of "phonorecord,"[9] makes clear Congress' intent that the definition be broad enough so that its application (in protections and limitations) could be applied to changing technology. In this instance, as in all cases where a Court is asked to apply existing law to a new technology, it is imperative that the meaning of the law be applied to technology with consideration as to how the technology functions.

Here it is illogical to believe that Congress intended to prevent movement of a singularly purchased copyrighted good whether tangible or in-tangible, i.e. the █████ File, so long as it is not reproduced or duplicated. In fact the congressional reports cited by Capitol are indicative of this

---

[7] In *London-Sire Records*, the Court referenced that distribution took place on peer-to-peer file sharing networks and specifically noted that there was no requirement that a material object exist throughout a transaction. The Court further noted that this included situations where "'an original copy' is read at point A and duplicated elsewhere at point B." *Id*. at 174. By "original copy" the court necessarily meant the file residing on the user's hard drive. In ReDigi's system to the extent these original copy files were purchased from iTunes they are █████ Files. On reply Capitol will likely argue that this statement supports their theory that infringement is a definitional issue, but this argument fails on its face. The duplication referenced by the Court in *London-Sire*, is specific to the facts of the electronic transactions that were at issue in that case, which were peer to peer file sharing networks where a duplication from an original file was made --i.e. the original copy and a new copy both existed after the transaction was complete. These facts are wholly inapposite to the facts here. ReDigi does not duplicate Eligible Files, rather █████ Files ██████ the Cloud Locker. In the ReDigi system only the █████ File ever exists. *See* RSUF ¶¶9-24, 36.

[8] Referring to the cause of promoting broad public availability of literature, music and other arts for the general public good. *See Sony Corp. of Am.*, 464 U.S. at 432.

[9] Phonorecords are "material objects in which sounds . . . are **fixed** by any **method now known or later developed** . . ." (Emphasis Added). 17 U.S.C. §101.

conclusion.  Although conveniently omitted in Capitol's brief the legislative history indicates that

the reproductive right to produce a material object is concerned with preventing unauthorized

duplication and reproduction.  *See* S. Rep. No. 94-473, 58 (1975) ("As under the present law, a

copyrighted work would be infringed by **reproducing it** in whole or in any substantial part, and by

**duplicating it** exactly or by imitation or simulation." (Emphasis Added.)).  Congress clearly

intended to limit the reproduction of a work, but there is no indication that it meant to limit the

ability to transfer a purchased work to a new location, as ReDigi does.

   In fact other courts that have addressed the question of whether it is an infringement to

remove a copyrighted work from a medium on which it was fixed and apply it to a different

medium have held that this is not an infringement because the work itself was moved, not

reproduced.  *See C. M. Paula Co. v. Logan*, 355 F. Supp. 189, 191 (N.D. Tex. 1973).  In *C.M.*

*Paula*, the defendant utilized a process of transferring printed designs from legally purchased

greeting cards to other mediums.  Essentially the defendant coated greeting cards that plaintiffs

copyrighted designs were affixed to with resins and then through the use of chemicals lifted the

original image from the greeting card and reapplied that same lifted image elsewhere.  *Id.* at 190.

The Court held that such a process was not a reproduction.  *Id.* at 191.  Each plaque sold by

defendant required the purchase and use an individual piece of artwork sold by plaintiff.  If

defendant wanted to make 100 plaques using the identical print, defendant would be required to

purchase 100 separate prints, and that process did not "constitute copying." *Id.*  The court rejected

the notion that merely because the design was affixed to different mediums at different times, that it

was "reproduced" or "copied" in violation of the Copyright Act.  The design was transferred, but

transfer of the work from one physical medium to another does not constitute a reproduction where

no reproduction of the work was made.

The technology here, albeit more advanced, presents the same issue that was decided in

*C.M. Paula Co.* By a user instructing ReDigi to upload an ███████ File, ReDigi ████████████

████████ the ███████ File from a user's computer to the Cloud Locker. But the ███████ Files are

not duplicated, as there is never an instance where the ███████ File is in more than one place at a

time. The ███████ File ████████████████████████████████ but the process of

████████ the file itself is not reproduced or duplicated. *See* RSUF ¶¶12, 20-23. Additionally, here

as in *C.M. Paula*, each ███████ File sold on the ReDigi system was legally purchased through

iTunes. In order for one hundred individual digital files of a song to be available for purchase on

ReDigi, one hundred individual digital files of that song had to have been previously purchased

from iTunes and offered for sale on ReDigi. *See* RSUF ¶80. The essence of a violation of the right

to reproduction is that that there could have been an ███████ File on the user's hard drive and a

duplicate in the Cloud Locker in existence at the same time. ReDigi does not allow that to happen

████████████████████ sale process, thus there is no reproduction. It does not matter that for mere

seconds the ███████ File was not embodied in a material object as the Copyright Act does not

require that "a material object exist[] throughout the entire transaction." *London-Sire Records, Inc.*,

542 F. Supp. 2d at 173.

The other authority cited by Capitol to support their argument does not further their cause,

as the facts are distinguishable from the facts here. The cases relied upon by Capitol involve

instances where a copy was made i.e. where an original existed and that original was duplicated or

reproduced. *See Chase v. Pub. Util. Comm'n of PA*, No. 05CV2375, 2008 WL 906491 (M.D. Pa.

Mar. 31, 2008) (involving reproduction of transcripts by photocopying); *Sega Enterprises Ltd. v.*

*MAPHIA*, 948 F. Supp. 923, 932 (N.D. Cal. 1996) (involving the reproduction of video games by

making and downloading a copy of a game maintained on a central storage database). These cases

are more closely analogous to file sharing cases, where an electronic file that was permanently

stored on one hard drive, was then copied and transferred to thousands of other users.  *See e.g.*

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 921-22 (2005) (a requesting

user can download a copy of a file stored on another user's computer); *A&M Records, Inc. v.*

*Napster, Inc.*, 239 F.3d 1004, 1012 (9th Cir. 2001) (a copy of the contents of an MP3 file are

downloaded from one computer to the other).

      ReDigi's marketplace is wholly unlike these cases.  ReDigi does not sell duplications of

████ Files to multiple users.  A user can only sell the exact ████ File that that user purchased

from iTunes – and they can only sell it once. *See* RSUF ¶80.  ReDigi's system does not send a

reproduction or duplication of the ████ File to the Cloud Locker, but rather transfers the

particular ████ File to the Cloud Locker, which can later be sold. *See* RSUF ¶12-23.  Thus no

reproduction or infringement has occurred.

## C.  ARCHIVAL DUPLICATES THAT WERE MADE ARE NOT INFRINGEMENTS

      Capitol has not produced any evidence that archival copies of its copyrighted works were

made.  However, even in the event that one was, as explained at length in Section 1 of the Def. Br.,

since it could only have existed for mere seconds, it could not have been sufficiently fixed to

qualify as a reproduction of a phonorecord under the Copyright Act and cannot be an infringement.

*See Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 129-130 (2d Cir. 2008)

(where "[n]o bit of data remains in any buffer for more than a fleeting 1.2 seconds", the work is

only embodied for a "transitory" period and "thus fails the duration requirement."); Def Br., p. 9-10.

## D.  PERSONAL USE COPIES ARE NOT INFRINGEMENTS

      Similarly, as also explained at length in Section III of the Def. Br., when a user downloads a

Personal Use Copy of a purchased Eligible File from ReDigi for his or her own personal use, these

downloads are not an infringement as they are protected by fair use and/or the license that comes

with the purchase of a track from iTunes. *See* Def. Br., p. 14-19.

Capitol's argument that fair use does not apply has completely missed the point. Capitol's motion focused on the applicability of fair use to the upload transaction but failed to analyze the applicability of fair use to Personal Use Copies downloaded after purchase. While Capitol's seems to presume that fair use does not apply, it has failed to present any evidence that demonstrates that fair use should not apply to a Personal Use Copy downloaded after purchase.

The fair use doctrine allows a holder of the privilege to use copyrighted material in a reasonable manner without the consent of the copyright owner. *Weissmann v. Freeman*, 868 F.2d 1313, 1323 (2d Cir. 1989). The fair use doctrine is grounded in the well founded notion that copyright protection is only a limited monopoly and the protection has never accorded copyright owners complete control over all possible uses of his or her work. *Sony Corp. of Am.*, 464 U.S. at 432. Section 107 identifies factors that enable a court to apply "an 'equitable rule of reason' analysis to particular claims of infringement" to determine whether the use in question qualifies. *Id.* at 448. Contrary to Capitol's assertion the examples of types of fair use activities listed in the preamble are only common and are not exclusive of other protected uses. *See Sony Corp. of Am.*, 464 U.S. at 448 citing H.R. Rep. No. 94-1476, at 65-66 (Section 107 was not intended "to freeze the doctrine in the statute, especially during a period of rapid technological change. Beyond a very broad statutory explanation . . . and some of the criteria . . . the courts must be free to adapt the doctrine to particular situations on a case-by-case basis."). *C.f. Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 78 (2d Cir. 1997)(citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578-79 (1994) ("[t]he enquiry **may** be guided by examples in the preamble) (Emphasis Added.)).

As explained at length in Section III of the Def. Br., all four of the factors listed in Section 107, weigh in favor of a finding that fair use protects the download of a Personal Use Copy of a legally purchased music track. *See* RSUF ¶¶52-65. Furthermore, Capitol's argument that ReDigi earns a fee on a sales transaction has no bearing on the analysis, given that the Personal Use Copy is

14

made *after* purchase and confers no benefit to ReDigi of any kind. *Id.* at ¶53. Fair use in this situation is applied to personal storage of a user's purchased files, which only benefits the user, who because of the Personal Use Copy can enjoy the track at their convenience. *Id.* at ¶¶52-65

The fair use doctrine "permits and requires courts to avoid rigid application of the copyright statute, when, on occasion, it would stifle the very creativity which that law is designed to foster." *Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc.*, 150 F.3d 132, 141 (2d Cir. 1998) (quoting *Campbell*, 510 U.S. at 577). Courts must adapt the doctrine to situations on a case-by-case basis and in light of technological changes. *Sony Corp. of Am.*, 464 U.S. at 451. As set forth in ReDigi's motion, the statutory factors and equitable considerations present here, support the conclusion that Personal Use Copies are protected by fair use. *See* Def. Br., p. 14-19. As Capitol has presented no evidence to the contrary, it is clear Personal Use Copies are protected.

## E.  CAPITOL'S DISTRIBUTION RIGHT HAS NOT BEEN VIOLATED

Similarly to the above no violation of Capitol's distribution right has occurred within the ReDigi system. As explained at length in Section IV of the Def. Br., any distributions of Eligible Files by users[10] which occur on the ReDigi marketplace are protected by the first sale doctrine. *See* Def. Br., p. 19-24. ReDigi users do not sell "reproductions" of Eligible Files on the ReDigi marketplace. Any Eligible Files on a user's computer that a user chooses to sell are migrated, without reproduction to the Cloud Locker. *See* RSUF ¶¶14-24. Any new music purchased through iTunes using ReDigi 2.0 is downloaded directly to the Cloud Locker. *Id.* at ¶¶40-45. Thereafter the

---

[10] Additionally, Capitol's assertion that a distribution takes place when an Eligible File is offered for sale, contradicts the express language of the distribution right. *See* 17 U.S.C. 106(3). There can be no distribution where no sale occurred. *See London-Sire Records, Inc.*, 542 F. Supp. 2d at 169 (defendants cannot be liable for violating the plaintiffs' distribution right unless a "distribution" actually occurred); *Nat'l Car Rental Sys., Inc., v. Computer Assocs Int'l, Inc.*, 991 F.2d 426, 434 (8th Cir. 1993) (stating that infringement of the distribution right requires the actual dissemination of copies or phonorecords). If an offer for sale were a distribution, then those offers are protected by the first sale doctrine as well. *See* Def. Br., p. 19-24.

ownership of an ▮▮▮▮File is transferred ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Cloud Locker where the ▮▮▮▮ File is resident - no copying or duplication occurs. *Id.* ¶¶47-51.[11]

Moreover ReDigi's users are disposing of the particular phonorecord that they legally

purchased from iTunes i.e. the ▮▮▮▮File that is in the Cloud Locker.  There is no requirement in

the Copyright Act that a material object exist throughout a sale transaction.  *See London-Sire*

*Records, Inc.*, 542 F. Supp. 2d at 173 ("while the statute requires that distribution be of 'material

objects,' there is no reason to limit 'distribution' to processes in which a material object exists

throughout the entire transaction").  Through ReDigi a particular ▮▮▮▮File purchased by a

ReDigi user is migrated to the Cloud Locker and then that particular▮▮▮▮File, now in the Cloud

Locker (a material object), is sold to a new user.  It is beyond dispute that the particular

phonorecord purchased has been sold.  There is no requirement that it be resident in the exact same

material object for the entire transaction.

Capitol's reliance on the report from Copyright Office from August 2001 "DMCA Section

104 Report," is misplaced.[12]  The report's conclusions are inapposite, as it was premised on the

question of whether the first sale doctrine applies to instances where "reproduction of the works

[are] involved." DMCA Section 104 Report at 70-80.  Since reproduction is not involved in

ReDigi's sale process the report has no bearing on the issues in this case.

---

[11] As mentioned above, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮ ReDigi never actually had to use an ▮▮▮▮
▮▮▮▮ that could have been made as there was never an instance in which there was a disruption
or in which the transfer failed.  *See* RSUF ¶¶25-33.  Since these duplicates were never used in the
▮▮▮▮▮▮▮▮ they do not change the analysis here.

[12] As an initial matter the DMCA Section 104 Report is not binding. *See Cartoon Network*, 536 F.
3d at 129 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1994)) (the Second Circuit held that
the DMCA Section 104 Report "deserves only Skidmore deference, deference based on its 'power
to persuade'" and further declined to follow the Report's interpretation regarding the durational
requirements).

16

However even if the Court agreed with Capitol's argument that a reproduction had taken place as a matter of definition, the DMCA Section 104 Report actually provides support for a finding that the first sale doctrine should still apply to digital goods. Assuming *arguendo* Capitol's definitional structure were adopted, ReDigi's technology transfers ██████ Files while ensuring that the ██████ File itself is no longer on the transferring user's hard drive after the transfer is complete. In addition to this ReDigi's ██████████████████████████████ ████████████ o ensure that a transferring user cannot retain a separate copy of the transferred ██████ file. *See* RSUF ¶10; DMCA Section 104 Report at 81-84 (unless a 'forward and delete' technology is employed an additional affirmative act by sender would be required which would make it difficult to prove or disprove whether the act of transfer had taken place and increases the risk of infringement). Although ReDigi is not a "forward and delete," technology, the end result is the same. That a user can transfer ownership of an electronic file, and the technology ensures the transferor does not retain a separate copy of that electronic file.

Additionally assuming *arguendo* that the Court were to adopt Capitol's argument that transferring a file is necessarily a reproduction because it is moved to a different place, the Court should still apply the first sale doctrine in order to give full effect its purpose, which is to limit a copyright owner's control over a copyrighted item after it is placed in the stream of commerce by the copyright owner. *See Quality King Distributors, Inc. v. L'anza Research Int'l, Inc.*, 523 U.S. 135, 152 (1998) ("The whole point of the first sale doctrine is that once the copyright owner places a copyrighted item in the stream of commerce by selling it, he has exhausted his exclusive statutory right to control its distribution."); *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 351 (1908) (the copyright owner sold copies . . . in quantities and at a price "satisfactory to it" and when it did so it exercised its right to vend. To add "the authority to control all future retail sales . . . would give a

17

right not included in the terms of the statute . . .[and] extend its operation, by construction, beyond its meaning, when interpreted with a view to ascertaining the legislative intent in its enactment.").

To hold that infringement takes place by definition as a result of any change in the physical location of storage of an electronic file while refusing to apply the first sale doctrine, or a rule of law equivalent to it, would have the net effect of improperly extending Capitol's right to distribution to include control over all future dispositions of digital property. This effect is inconsistent with the policy behind the first sale doctrine and inconsistent with the policy behind the Copyright Act as a whole. Although the immediate effect of copyright law is to secure a fair return for creative labor, the "ultimate aim, is by this incentive, to stimulate artistic creativity for the general public good," the latter of which is the primary object of the **limited monopoly**. *See Sony Corp. of Am.*, 464 U.S. at 432. *See also* Def. Br., p. 19-24. For the Court to accept Capitol's argument and preclude legally purchased digital goods from being re-sold would give Capitol an unlimited monopoly and an ability to forever control the further sales of copies of works it already secured a fair return on. Capitol placed the ▮▮▮▮ Files into the stream of commerce through iTunes and received the benefit of the sale it was entitled to. *See* RSUF ¶¶68-72. As a result Capitol has exhausted its exclusive statutory right to control distribution. *Quality King Distributors, Inc.*, 523 U.S. at 152. Capitol should not be allowed to extend its exclusive rights beyond the scope of what the Copyright Act intended. *Bobbs-Merrill Co.*, 210 U.S. at 351. If this Court finds that a reproduction must occur when a singular electronic file is transferred –not copied-- because of the Copyright Act's literal terms, the transaction must be construed in light of the basic purposes of the act. *Sony Corp. of Am.*, 464 U.S. at 432. In that case, reproduction would be an essential step to a lawful transaction and the first sale doctrine should still apply to protect future sales of lawfully obtained phonorecords.

## II.    REDIGI CANNOT BE LIABLE AS A DIRECT INFRINGER

Even if the Court were to agree with Capitol's argument that by definition reproduction occurred during the upload process, ReDigi cannot be liable as a direct infringer as it has not engaged in "volitional conduct." *See Cartoon Network LP, LLLP*, 536 F.3d at 131("volitional conduct is an important element of direct liability"). Where a defendant merely houses and maintains a system where "copies" can be made some other conduct must be shown to demonstrate that the defendant operates the copying device. *Id.* In *Cartoon Network*, the Second Circuit held that by selling access to a system that automatically produces copies on command, Cablevision resembled a store proprietor who charges customers to use a photocopier on the premises and without more cannot be said that Cablevision "makes" any copies when its machines are operated by customers. *Id.* at 131-132. This is especially true where the defendant "automatically obeys commands and engages in no volitional conduct." *Id.*

If the Court accepts Capitol's definitional argument, ReDigi cannot be liable directly as its only act was making a service available. This does not constitute volitional conduct analogous to operating a "copy device." ReDigi provides a cloud storage space and a marketplace for the sale of legally purchased music. Just as the owner of a used CD store, ReDigi has not engaged in any conduct that would rise to the level of volitional conduct. Merely allowing a user to command the system to upload files is not conduct that is operational in a way that is more than Cablevision's conduct, which the Second Circuit found did not confer direct liability on Cablevision. *Id.*

Capitol's argument that since "ReDigi is intimately involved in selecting and screening" each file through ReDigi's verification software, imposing direct liability would be appropriate is also without merit and was rejected by the Second Circuit in *Cartoon Network*. *Id.* at 132 (unfettered discretion in selecting programming that it would make available for recording was not sufficient to displace consumer as person who "makes copies" when determining liability).  As in *Cablevision*, where the decision focused on the defendant's lack of control over which programs

19

were made available or when they will air.

¶44. ReDigi's system is limited to the content that is made available through iTunes and is further limited by which ███████ Files users choose to upload. *Id.*[13] Like in *Cablevision,* ReDigi has not engaged in volitional conduct, which is an essential element of direct liability. As such even if this Court found that acts of infringement occurred through its system, ReDigi cannot be directly liable.

## III.   REDIGI CANNOT BE SECONDARILY LIABLE

ReDigi also cannot be held liable under the theories of vicarious infringement, contributory infringement or inducement of copyright infringement. As discussed at length in Section I *supra,* no act of infringement occurs on the ReDigi system, either by the processes of the system or by ReDigi's users, thus ReDigi cannot be secondarily liable. *See Matthew Bender & Co., Inc. v. W. Pub. Co.,* 158 F.3d 693, 706 (2d Cir. 1998) (for all three theories of secondary copyright infringement, there must be the direct infringement of a third party). Additionally, Capitol's suggestion that random independent acts of infringement which predate and/or are committed outside the system is not enough to hold ReDigi liable under any theory of secondary liability.

## A.   REDIGI CANNOT BE LIABLE FOR CONTRIBUTORY INFRINGEMENT

---

[13] *Usenet* and *Russ Hardenburgh,* are inapplicable to the facts here. Even to the extent those holdings are persuasive, there are very important differences between their holdings and the facts here. Most importantly, in both cases the defendants had their employees engaged in review activities. *See Arista Records LLC v. Usenet.com, Inc.,* 633 F. Supp. 2d 124, 148 (S.D.N.Y. 2009) (defendants took active steps including "human review"); *Playboy Enterprises, Inc. v. Russ Hardenburgh, Inc.,* 982 F. Supp. 503, 513 (N.D. Ohio 1997) (defendant had a policy that allowed employees to view files before they were uploaded and to move them to a generally available file).

*See* RDF §I, ¶44. The distinction between automated processes and individual supervision, which is the difference here, goes to the heart of the *Cartoon Network* decision which found that a "significant difference exists between making a request to a human employee, who then volitionally operates . . . and issuing a command directly to a system, which automatically obeys commands and engages in no volitional conduct." *Cartoon Network,* 536 F.3d at 131-132.

ReDigi's active steps to discourage piracy and prevent infringement precludes liability based on a theory of contributory infringement. Contributory infringement liability arises by conduct where one "intentionally induc[es] or encourag[es] direct infringement." *Grokster* 545 U.S. at 930, citing *Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971). Furthermore providing technology capable of substantial non-infringing uses does not constitute contributory infringement. *See Sony Corp. of Am.*, 464 U.S. at 456.

It is undisputed that ReDigi went to great lengths to build a system that was complaint with copyright law in every respect. *See RDF §1, ¶¶5-36.* ReDigi's founders researched copyright law, consulted with attorneys and determined that under the first sale doctrine they could provide a legal market place for digital music if they had technology that could effectuate uploads and sales within the confines of copyright law. *Id.* at ¶5,7. ReDigi's founders also explored existing technologies, and when they determined that the technology that could work within the confines of the law was not readily available -- they built technology that would. *Id.* at ¶6.

ReDigi's entire business model was designed is to provide incentives for legally purchasing music. *Id.* at ¶9. To further ReDigi's goals of discouraging piracy and preventing infringement ReDigi's has implemented many controls. *Id.* at ¶10-17. By way of example ReDigi was designed as closed system meaning users cannot get cash out of the system, they can only use credits to purchase more music. *Id.* at ¶18-22. ReDigi also sought to discourage independent acts of infringement by educating consumers about their responsibilities under the law and by developing Media Manager, which actually makes it more difficult for a user to commit an independent act of infringement than any enforcement technique utilized for physical distribution. *Id.* at ¶23-25, 29-33. In addition, ReDigi created tools that users could use to get rid of music they may have previously pirated and gave users the option to easily purchase legal tracks. *Id.* at ¶34-35

ReDigi has gone to extreme lengths to build a system compliant with the law and to implement measures that are meant to deter and prevent independent acts of infringement. These efforts are fundamentally incongruent with a finding of inducement or encouragement of direct infringement. As such, ReDigi cannot be held liable for contributory infringement.

## B.   REDIGI CANNOT BE LIABLE FOR VICARIOUS INFRINGEMENT

Similarly to the above ReDigi cannot be held liable under a theory of vicarious infringement. One infringes vicariously "by profiting from direct infringement while declining to exercise a right to stop or limit it." *Grokster*, 545 U.S. at 930, *citing Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963). To the extent it is possible for a user to commit an independent act of infringement outside of the ReDigi system, ReDigi does not have the right or ability to stop or limit those acts. ReDigi has done everything that is technologically possible to prevent and discourage users from committing independent acts of infringement. ReDigi's Media



A user would have to go to extreme measures to get around ReDigi's Media Manager software. Despite the fact that Capitol has repeatedly tried to imply that this is a likely occurrence, there is no evidence that its implication is true. To the contrary, the ways in which consumers use products that are capable of storing and playing media, which depend on connectivity for

████████████████████████████████████████████

████████████████ Moreover it is not as if a user could sell all of his or her Eligible Files, retain copies, get cash out of the system and uninstall ReDigi, because ReDigi does not allow individuals to get cash out of the system. *Id.* at ¶¶18-19. In order for a person to obtain the benefit of use of any credit received they have to keep using ReDigi – and in order to keep using ReDigi the user must remain legally compliant.

There is virtually no chance of this type of infringement occurring in anything more than isolated instances, and there can be no dispute that ReDigi has done everything possible to discourage and prevent even the few instances where an individual could try to commit such acts. Frankly speaking, instead of investing lots of time into figuring out how to get around ReDigi's software, if an individual is committed to stealing music it would be much easier and more likely for that person to go to a file sharing service, where in a matter of seconds that person can steal whatever music they want. However, to the extent that a person could go to these extreme measures, it would be preposterous to say that ReDigi declined a right or ability to stop or limit this behavior when ReDigi has done the exact opposite. As a result, ReDigi cannot be held vicariously liable for any such acts of infringement.

## C. REDIGI CANNOT BE LIABLE FOR INDUCEMENT OF INFRINGEMENT

Lastly, ReDigi cannot be liable for inducement of copyright infringement. To be liable for inducement of copyright infringement one must distribute a device with the object of promoting its use to infringe copyright, as shown by clear expression or affirmative steps taken to foster infringement. *See Grokster*, 545 U.S. at 919. There is no evidence that ReDigi has distributed its service with the object of promoting its use for third parties to infringe copyright. To the contrary, as discussed above ReDigi has made extraordinary efforts to build a service that is compliant with copyright law, discourages piracy and prevents infringement.

23

Even if this Court were to agree with Capitol and decide that violation of the exclusive reproduction right is a definitional issue, ReDigi should not be held liable under any of these theories of secondary liability. It cannot be disputed that ReDigi has endeavored to build a lawful business. ReDigi undertook great efforts to understand copyright law and build a system that was compliant with it and then built a system meant to operate within its confines. *See* RDF §I, ¶¶1-17. ReDigi's belief that its actions are lawful is objectively reasonable given that there is no clear authority to the contrary. *Id.* at ¶36. To this day, there is no clear authority that would have led ReDigi to know that their actions are unlawful, because they are not. ReDigi's service is nothing like the type of file sharing services that case law has focused on. File sharing services, which are clearly illegal, distribute duplicated copies of one source file to millions of users. Unlike these s██████████████████████████████████ File and then are able to sell that ███████ File without duplicating it. *C.f. id.* at ¶8. Further unlike these services, here there is no evidence of bad faith, willful infringement or nefarious purpose. Capitol's attempt to imply that the disclosures contained in ReDigi's subscription agreements constitute an acknowledgement that ReDigi knew its service was unlawful is preposterous. As Capitol should know, securities laws require full disclosure of all <u>potential risks</u> to investors. *See* 17 C.F.R. § 240.10b-5. Given the litigious history of the music industry when faced with any new technology, it was not imprudent for ReDigi to warn its investors that, despite its well-founded belief that its service was legal, the record labels might nevertheless sue ReDigi. *See* RDF §I, ¶¶36. A truthful disclosure about the state of the law to potential investors cannot be construed negatively against ReDigi.

There is no question that ReDigi's system is the first of its kind. There is no question that ReDigi built the system to comply with the law. ReDigi did not induce, know about, decline to stop or promote infringement in any way. Here, there is no evidence of bad faith or improper motive.

*C.f. Grokster*, 545 U.S. at 938.  For this reason even if the Court decides on a prospective basis to accept Capitol's definitional argument ReDigi should not be held liable.

### III.    REDIGI 2.0 CANNOT BE ENJOINED

Additionally, and in the event that the Court agrees with Capitol's definitional argument, ReDigi cannot be enjoined from operation of ReDigi 2.0.  If the Court accepts Capitol's argument it necessarily follows that ReDigi 2.0 is legal. In ReDigi 2.0 a new file purchased from iTunes is downloaded directly to the ReDigi Cloud Locker.  According to Capitol, the "phonorecord" is created in the Cloud Locker.  T███████████████████████████████████████████ ████████████████████████████████████████████████████████████████ Under Capitol's theory, this process does not violate its exclusive rights and as such it cannot be enjoined.

### CONCLUSION

Capitol's theories of liability in this case are based upon nothing but speculation and assumption—it has no proof. As set forth above it is undisputed that none of Capitol's exclusive rights are infringed by any use of the ReDigi system.  For this reason Capitol's motion for judgment as a matter of law must be denied and judgment in favor of ReDigi should be granted.  Additionally, although Capitol has prevented no proof of its occurrence, even in the event that this Court believes that some type of infringement could potentially occur outside of the ReDigi system, Capitol's motion must still be denied as ReDigi cannot be held liable under any theory of secondary liability for independent acts that it has never encouraged, induced, known about or declined to limit or stop. For all of these reasons ReDigi respectfully requests that Capitol's motion be denied in its entirety.

Dated: New York, New York
            August 14, 2012

Respectfully submitted,

*[signature]*

Gary Adelman, Esq.
Meister Seelig & Fein, LLP
140 East 45th Street, 19th Floor
New York, New York 10017
Phone (212) 655-3580
Email gpa@msf-law.com