UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CAPITOL RECORDS, LLC,

                       Plaintiff,

    v.

REDIGI INC.,

                       Defendant.
------------------------------------------------------------X

Civil Action No.: 12CIV0095
(RJS)

# MEMORANDUM OF LAW IN FURTHER SUPPORT OF REDIGI'S SUMMARY JUDGMENT MOTION

**MEISTER SEELIG & FEIN LLP**
Two Grand Central Tower
140 East 45th Street, 19th Floor
New York, New York 10017
Phone: (212) 655-3580
*Attorneys for ReDigi Inc.*

Gary Adelman, Esq.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

I.    REDIGI DOES NOT VIOLATE CAPITOL'S RIGHT TO REPRODUCE ......................... 2

II.   REDIGI 2.0 DOES NOT INFRINGE AND CANNOT BE ENJOINED ............................. 7

III.  THE FIRST SALE DOCTRINE IS APPLICABLE HERE .................................................. 9

IV.   THE JACOBSON DECLARATION SHOULD BE EXCLUDED ..................................... 13

CONCLUSION ............................................................................................................................ 15

<code>
</code>

# **TABLE OF AUTHORITIES**

**Cases**

*A&M Records, Inc. v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001) .................................................................................................. 3

*Bobbs-Merrill Co. v. Straus*,
  210 U.S. 339 (1908) ............................................................................................................ 10, 12

*C.M. Paula Co. v. Logan*,
  355 F. Supp. 189 (N.D. Tex. 1973) ...................................................................................... 3, 4

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
  536 F.3d 121 (2d Cir. 2008) ..................................................................................................... 5

*Chase v. Pub. Util. Comm'n of PA*,
  No. 05CV2375, 2008 WL 906491 (M.D. Pa. Mar. 31, 2008) ................................................. 3

*London-Sire Records, Inc. v. Doe 1*,
  542 F. Supp. 2d 153 (D. Mass. 2008) ................................................................................. 5, 11

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005) ................................................................................................................. 3

*Miller v. Wolpoff & Abramson, L.L.P.*,
  321 F.3d 292 (2d Cir. 2003) ..................................................................................................... 8

*Quality King Distribs v. L'anza Research Int'l, Inc.*,
  523 U.S. 135 (1998) ........................................................................................................... 10, 12

*Quality King Distributors, Inc. v. L'anza Research Int'l, Inc.*,
  523 U.S. 135 (1998) ............................................................................................................... 10

*Schipani v. McLeod*,
  541 F.3d 158 (2d Cir. 2008) ................................................................................................... 14

*Sega Enterprises Ltd. v. MAPHIA*,
  948 F. Supp. 923 (N.D. Cal. 1996) .......................................................................................... 3

*Sega Enterprises Ltd., v. Accolade, Inc.*,
  977 F.2d 1510 (9th Cir. 1992) ................................................................................................. 3

*Sony Corp. of Am. v Universal City Studios Inc.*,
  464 U.S. 417 (1984) ........................................................................................................... 10, 12

*Twentieth Century Music Corp. v. Aiken,*
   422 U.S. 151 (1975) ............................................................................................................. 10

*White Smith Music Pub. Co. v. Appolo Co.,*
   209 U.S. 1 (1908) ................................................................................................................... 3

*Ziegenfus v. John Veriha Trucking,*
   10 Civ. 5946, 2012 WL 1075841 (S.D.N.Y. Mar. 28, 2012) ............................................... 13

**Statutes**

17 U.S.C. § 101 .............................................................................................................................. 4

U.S. Const. Art. I, § 8 .................................................................................................................... 2

**Rules**

Fed. R. Civ. P. 26(a)(2) .......................................................................................................... 13, 14

Fed. R. Civ. P. 37(c)(1) .......................................................................................................... 13, 14

Fed. R. Evid. 702 ................................................................................................................... 13, 15

ReDigi Inc. ("Defendant" or "ReDigi") submits this memorandum of law in further support of its summary judgment motion.[1] Capitol's claims of infringement should be dismissed. Capitol has not presented any proof that an act of infringement takes place through the ReDigi system. There is no support for Capitol's position that infringement is purely a definitional matter. This position is contradicted by the very authority Capitol cited in its opposition, which clearly involved proof of infringement. Here there is no such proof. ███████████████ ███████████████ but those files are not duplicated or reproduced.

Capitol has ignored ReDigi's technology claiming that it is legally irrelevant when it is clearly relevant. Capitol continues to compare ReDigi to file sharing services that are engaged in mass scale reproduction of copyrighted works, when ReDigi's service could not be more different. Like a broken record, Capitol's arguments are tired. Capitol has failed to present evidence that a "reproduction" occurs during upload or sale of an ███ through the ReDigi system because there is none, and as a result, its claims fail. Capitol's arguments in support of its position strain the policy and purpose of copyright law in an indefensible way. Capitol's claim that it seeks to protect its content is unconvincing. It is obvious that in this increasingly digital world, Capitol's motivation

---

[1] The Declaration of Lawrence S. Rudolph a/k/a Larry Rogel dated August 23, 2012 ("Rogel Decl.") and the Declaration of Gary Adelman dated August 24, 2012 together with exhibits ("Adelman Decl.") are also submitted herewith in support. The facts and arguments referred to herein are more fully set forth in ReDigi's Memorandum of Law In Support of its Motion for Summary Judgment dated July 20, 2012, (Docket No. 55) ("Def. Br."), ReDigi's Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 (Docket No. 56) ("RSUF"), the Declaration of Gary Adelman dated July 20, 2012 together with the exhibits annexed thereto (Docket No. 57) ("7/20/12 Adelman Decl."), Declaration of Lawrence S. Rudolph (Rogel) dated July 20, 2012 (Docket No. 58) ("7/20/12 Rogel Decl."), the Declaration of Colin Worth dated July 20, 2012 (Docket No. 59) ("Worth Decl."), the Declaration of Jonathan Lin dated July 20, 2012 (Docket No. 60) ("Lin Decl."), the Declaration of Gary Adelman dated August 14, 2012 together with the exhibits annexed thereto (Docket No. 82) ("8/14/12 Adelman Decl."), the declaration of John Ossenmacher dated August 14, 2012 (Docket No. 81) ("Ossenmacher Decl."), the declaration of Lawrence S. Rudolph a/k/a Larry Rogel dated August 14, 2012 (Docket No. 80) ("8/14/12 Rogel Decl."), ReDigi's Memorandum of Law in Opposition to Capitol's Motion for Partial Summary Judgment dated August 14, 2012 (Docket No. 79) ("Def. Opp. Br."), and ReDigi's Counter Statement of Disputed Facts Pursuant to Local Rule 56.1 (Docket No. 83) ("RDF"), all of which are also fully incorporated herein by reference, but will not be repeated at length.

1

is to annihilate a secondary market for used digital music so that it can control the distribution of its content well beyond the first sale and into perpetuity. Capitol has tried to belittle ReDigi's technological achievements and to turn the fact that no one has done what ReDigi is doing into support for the argument that it cannot be done. Capitol is pushing for an unduly narrow interpretation of the copyright law, which would undermine the purpose of copyright law and strip individuals of digital personal property of their right to use and re-sell that property. For the reasons herein, and those articulated in Def. Br., ReDigi's motion should be granted.

## I. REDIGI DOES NOT VIOLATE CAPITOL'S RIGHT TO REPRODUCE

Capitol's contention that ReDigi's ▮▮▮▮ violates its exclusive right to reproduce is without evidentiary or legal support. As explained at length in ReDigi's moving papers, ReDigi's ▮▮▮▮ on the user's hard drive to the Cloud Locker, it does not "reproduce" or "duplicate" the Eligible File. *See* Def. Br. at 10-11.

Similarly incorrect is Capitol's assertion that its right to "reproduce" is violated by ▮▮▮▮ from the user's hard drive to the Cloud Locker. It strains any rational interpretation of copyright law, to find that Congress intended to prohibit the movement of a particular ▮▮▮▮ from one storage location to another. As explained in Def. Opp. Br., it would be illogical to find, as Capitol urges, that movement of a file creates an "unauthorized phonorecord." *See* Def. Opp. Br. at 7-8. If this were the case, each time a computer function ▮▮▮▮ from one place on a hard drive to a different place on that same hard drive, an "unauthorized phonorecord" would have been made and the owner of a legally purchased digital track would be liable for copyright infringement. *Id.* Moreover, prohibiting individuals who legally purchase digital music files from moving their location of storage and instead, forcing consumers to buy new tracks, would give Capitol a windfall that was never contemplated by Congress in giving authors a "limited monopoly." *See* U.S. Const. Art. I, § 8. This would lead to a ridiculous outcome,

2

and is clearly contrary to legislative intent. *See* S. Rep. No. 94-473, 58 (1975) (indicating that the exclusive right to reproduce is concerned with preventing unauthorized **duplication** and **reproduction**). *See also C.M. Paula Co. v. Logan*, 355 F. Supp. 189 (N.D. Tex. 1973) ("plaintiff has the burden of establishing there has been a copying – a 'reproduction or duplication' of a thing" (citing *White Smith Music Pub. Co. v. Appolo Co.*, 209 U.S. 1, 28 (1908)). The location of storage is not evidence of infringement because ReDigi does not duplicate or reproduce ▮▮▮▮▮

There is a clear and important distinction between the cases Capitol relies upon concerning digital transfer and the facts here. In those cases a particular "copy" or "phonorecord" (legally placed in the stream of commerce) was actually duplicated or reproduced.[2] Unlike these cases, ReDigi's system ▮▮▮▮▮ from a hard drive to the Cloud Locker. *See* RSUF ¶¶12-24. There is no instance during which the particular ▮▮▮▮▮ or any part thereof, is resident on ▮▮▮▮▮ it is not true that a "new" or "unauthorized" phonorecord has been made. *Id.* ¶¶35-36. The exact same legally purchased ▮▮▮▮▮

Further illustrating the legality of ReDigi's system is the fact ▮▮▮▮▮ is analogous to the ▮▮▮▮▮ in *C.M. Paula Co.*, in which the court held that the ▮▮▮▮▮ did not constitute a reproduction or copying. *See C. M. Paula Co.*, 355 F. Supp. at 191. In *C.M. Paula*, the

---

[2] *See Chase v. Pub. Util. Comm'n of PA*, No. 05CV2375, 2008 WL 906491 (M.D. Pa. Mar. 31, 2008) (involving reproduction of transcripts by photocopying); *Sega Enterprises Ltd. v. MAPHIA*, 948 F. Supp. 923, 932 (N.D. Cal. 1996) (involving the reproduction of video games by making and downloading a copy of a game maintained on a central storage database); *Sega Enterprises Ltd., v. Accolade, Inc.*, 977 F.2d 1510, 1518 (9th Cir. 1992) (copies made from reading three of Sega's purchased video game cartridges). These cases are distinguishable from the facts here, just as peer-to-peer file sharing networks are different from ReDigi. *See e.g. Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 921-22 (2005) (a requesting user can download a copy of a file stored on another user's computer); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1012 (9th Cir. 2001) (a copy of the contents of an MP3 file are downloaded from one computer to the other). Unlike ReDigi these services actually duplicate a "phonorecord" whereas ReDigi does not. ▮▮▮▮▮ thus no reproduction has occurred, is not novel or without support. The facts of Capitol's cited cases demonstrate that the files being in two places at once is a factor to finding of infringement.

3

defendant removed printed indicia from the original surface on which it had been printed. *See id.* at 190. The ink of the printed design, which had originally been fixed to the original surface of the greeting card, was coated with chemicals that dried into a film. *Id.* The film, which the printed design was newly fixed to, was then removed and applied to other mediums. *Id.* The ink that formed the printed design was originally fixed on the paper and could be perceived. It was then, through chemical process fixed to the film created by the resin chemicals. *Id.* The Court held that the second affixation of the same ink in a particular format to the film was "not a reproduction or duplication." *Id.* at 191. The ink itself, if merely floating in the ethos and un-affixed to any material object, was not perceivable as a work by itself. Contrary to Capitol's statement, <u>the printed ink was not a tangible or material object by itself</u>, it was only perceivable as a "copy"[3] of a work because it was first printed on a paper backing. Moreover it could not have been perceivable if it had been removed from the paper backing without being then affixed to the film. In *C.M. Paula*, despite the fact that the defendant fixed the ink to a different material object i.e. the film, the Court held that these affixations were not a "reproduction" and the process did not constitute copying. *Id.*

This decision follows basic legal reasoning that transference of a work from one object to another does not constitute copying. *Id.* The Court in *C.M. Paula*, noted proof of the finding that there had been no duplication, was that each plaque with a print affixed to it, required the purchase of an individual greeting card sold by the plaintiff. *Id.* If the defendant wanted to make 100 plaques, it had to purchase 100 greeting cards from the plaintiff – just like ReDigi users. RSUF ¶80.

The *C.M. Paula* court was presented with the same argument that Capitol has made and the Court rejected that argument holding that ████████ did not infringe. Here, ████████ do not, as Capitol has urged, have to be shipped around in physical hard drives or on compact disks,

---

[3] Defined as a "material object . . . in which a work is fixed . . . and from which the work can be perceived." *See* 17 U.S.C. § 101. Similarly a "phonorecords" are "material objects in which sounds . . . are fixed . . . and from which the sounds can be perceived." *Id.*

4

to be moved without violating Section 106(1). Like in *C.M. Paula*, transferring a particular ▮▮▮ from one storage location to another does not constitute copying. In fact, as specifically noted in *London-Sire*, there is no requirement in the Copyright Act that a material object exist throughout the entire process to distribute a "phonorecord." *See London-Sire Records, Inc. v. Doe 1*, 542 F. Supp. 2d 153, 173 (D. Mass. 2008) ("there is no reason to limit 'distribution' to processes in which a material object exists throughout the entire transaction"). Capitol's contention is nonsensical and cannot be endorsed as it would in effect prohibit digital files from legal movement.

Capitol's definitional argument is just wrong. The way ReDigi's technology works is not legally irrelevant. The definitions contained in the Copyright Act cannot be applied to a claim of infringement without looking at the facts, i.e. here, ReDigi's technology. Capitol is trying to belittle the importance of the undisputed facts surrounding how ReDigi's migration process uploads ▮▮▮ where there is no precedent to do so. Courts routinely consider the functionality of technology and these facts are central to any decision in a copyright infringement action. *See e.g. Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 123-125 (2d Cir. 2008).

Furthermore, ReDigi's prior use of the word "delete" does not confirm that Capitol's sound recordings have been reproduced. As explained at length in Def. Opp. Br., Capitol has taken ReDigi's prior statements out of context and imputed meaning to those statements that does not exist. *See* Def. Opp. Br. at 3-7. In Capitol's opposition, again, Capitol has taken statements made during depositions out of context. As explained the Rogel Decl., when the word "delete" was used during his deposition it was in the context of the non-technical dialogue that the ReDigi system has with its users. *See* Rogel Decl., ¶¶24-28. To a layman there is no difference in the effect of a ▮▮▮ or a user delete, but there is a significant difference in the processes. *Id.* Making Capitol's argument worse, Capitol is aware of the difference between the use of the word "delete" as used it

5

in a non-technical sense with laypersons and the way the technology functions. It was explained during Rogel's deposition. *Id.* at ¶25; 7/20/12 Adelman Decl., Ex. 10, 67:9-71:8; Rogel Decl., ¶27. Ignoring these important differences, Capitol continues to argue that ReDigi's ▇▇▇ ▇▇▇ presupposes the creation of a different copy on the Cloud Locker. *See* Pl. Opp. at 7. To support their argument, Capitol has submitted the declaration of Doug Jacobson dated August 9, 2012 (Docket No. 75) ("Jacobson Decl."). Mr. Jacobson's opinions regarding ReDigi's ▇▇▇ are wrong. Jacobson opines that ReDigi's ▇▇▇ is the same as a program that copies all of the data in an ▇▇▇ and then simply deletes the data from the user's hard drive (Jacobson Decl., ¶¶9-14) – but this is not how ReDigi works. In ReDigi, ▇▇▇

▇▇▇

18. ▇▇▇

▇▇▇ This sequence of commands is not the same as a program delete. *Id.* ¶16. ▇▇▇

▇▇▇

This is not possible with a simple program delete command. *Id.* ¶20-21, 23; RSUF ¶¶35-36.

ReDigi's ▇▇▇ is also unlike a deletion because ReDigi's ▇▇▇ results in ▇▇▇

▇▇▇

▇▇▇ This is wholly unlike a copy and delete operation, which happens in two distinct steps. *Id.* ¶19. Further proof that ReDigi's ▇▇▇ is not a copy and delete program, ▇▇▇

▇▇▇

Capitol's assertion that ReDigi has admitted that it "deletes" is nothing more than an attempt to muddy the waters. Capitol never looked at ReDigi's system, never downloaded Media Manager,

6

and has no understanding of how ReDigi's ███ works. Instead, Capitol has misstated how ReDigi's ███ works, because the truth is inconvenient to Capitol. ReDigi has not submitted contradictory evidence on this motion. Like in all cases, in discovery ReDigi sought to elaborate and clarify the technical processes of its system, which is the purpose of discovery. *Id.* ¶¶24-28. It is Capitol who, instead of trying to understand ReDigi's system, has taken the position that it can and should remain ignorant so that it can advance arguments that have no evidentiary support. The uncontradicted evidence in this case demonstrates that no violation of Capitol's reproduction right takes place on the ReDigi system and as such no infringement occurs.

## II. REDIGI 2.0 DOES NOT INFRINGE AND CANNOT BE ENJOINED

In a continued concerted effort to avoid the reality that ReDigi has created a marketplace that allows individuals to sell their used digital music without copying, Capitol has tried to avoid the undisputed fact that even if their arguments were accepted, ReDigi 2.0 would not infringe and cannot be enjoined. Rather than face the truth, Capitol now argues that summary judgment is inappropriate for ReDigi 2.0 and attempts to argue that an opinion would be "advisory."

ReDigi 2.0 allows users to download their iTunes purchases directly to the Cloud Locker and in this regard the first instance of an Eligible File is in the Cloud Locker. *See* RSUF ¶¶40-45. A user may then choose to sell an Eligible File. *Id.* ¶¶46-52. Capitol's assertion that it was denied an opportunity to conduct discovery is false. Capitol was aware of ReDigi 2.0 prior to the close of discovery, and had an opportunity to, and in fact did, question ReDigi's 30(b)(6) witnesses about ReDigi 2.0. *See* 8/14/12 Mandel Decl., Ex. 1, p. 201-204. Additionally, in its June 26, 2012 letter to the Court requesting additional time to conduct <u>other</u> discovery, Capitol did not mention that it needed additional discovery on ReDigi 2.0. In light of this it is clear that Capitol had an opportunity to conduct discovery, but did not. *See Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 303 (2d Cir. 2003)(when defending party seeks more discovery it must show efforts made to obtain

7

discovery and why those efforts were unsuccessful). Capitol failed to make an effort to obtain discovery on ReDigi 2.0 and has failed to show why its lack of effort was "unsuccessful."

Capitol's argument further fails to demonstrate how further discovery would raise material issues of fact, which is also required. *See id.* at 303. Many of its alleged "questions" have already been answered in ReDigi's lengthy explanation of the service. *See* RSUF ¶¶40-48. Its other alleged issues are wholly irrelevant to ReDigi 2.0's legality. ReDigi is not required to "communicate or notify"



---

[5] Downloads of personal use copies of legally purchased tracks by users is protected by fair use. If an individual purchases an iTunes track through ReDigi 2.0 their purpose is necessarily to own the

The fact that ReDigi allows users to download a copy of iTunes files from the Cloud Locker to their personal hard drive for personal use is not an admission of infringement in any way. As explained at length in Def. Br., Personal Use Copies are protected by fair use. *See* Def. Br. at 14-19. In fact, in its opposition Capitol conceded the legality of cloud storage for legally purchased recordings. Pl. Opp. at 19. This practice is also expressly allowed by iTunes Terms and Conditions and Capitol's agreement with Apple, and as such is not an infringement. *See* RSUF ¶¶ 63-65, 68.

### III. THE FIRST SALE DOCTRINE IS APPLICABLE HERE

The issues before this Court strike at the heart of the delicate balance that copyright law strives to maintain. Capitol essentially argues that people do not own legally purchased digital media and like a toll on a road, consumers must pay every time they want to use that media.[6]

As set forth in ReDigi's moving papers, the plain language of the first sale doctrine contemplates the sale of phonorecords in a digital form. *See* Def. Br. 19-24. ReDigi has built a system that allows individuals to sell their previously owned digital music files without copying or reproduction. As such its marketplace is protected by the first sale doctrine. *Id.* ReDigi's marketplace does not violate Capitol's right to distribution. Capitol continues to control the number of digital phonorecords that they place into the stream of commerce and continues to derive the benefit of the limited monopoly that copyright law confers for each first sale. *See* RSUF ¶72, 80. Despite the fact that the ReDigi marketplace does not interfere with any benefit of the distribution right to Capitol, Capitol continues to advance a position that the law should treat digital property

---

track for their own enjoyment, at least for a time. There would be no benefit to a user to download a track and immediately sell it as the benefit of credit from a sale is less than the amount paid for the track in the first place. Thus these are protected by fair use. *See* Def. Br. 14-19. Additionally Capitol has conceded that cloud storage of legally purchased tracks is fair use. *See* Pl. Opp. at 19.

[6] *See* J. Leber, *Startup Asks: Why Can't You Resell Old Digital Songs?*, Technology Review, published by MIT, August 15, 2012, http://www.technologyreview.com/news/428792/a-startup-asks-why-cant-you-resell-old-digital/, (citing Jason Schultz quotation).

9

differently. Capitol's motivation is obvious—money and control. If the Court found that the first sale doctrine did not apply to digital music, the effect would extend the limited monopoly granted to authors, to complete control in perpetuity, where such an extension was never contemplated by the Constitution. Courts have repeatedly held that perpetual control is not what is contemplated by copyright law. *See Quality King Distributors, Inc. v. L'anza Research Int'l, Inc.*, 523 U.S. 135, 152 (1998) ("[t]he whole point of the first sale doctrine is that once the copyright owner places a copyrighted item in the stream of commerce by selling it, he has exhausted his exclusive statutory right to control its distribution."); *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 351 (1908) (copyright owner sold copies . . . in quantities and at a price "satisfactory to it" and when it did so it exercised its right to vend. To add "the authority to control all future retail sales . . . would give a right not included in the terms of the statute . . .[and] extend its operation, by construction, beyond its meaning, when interpreted with a view to ascertaining the legislative intent in its enactment.").

The same limits on an author's control of the future sales must apply here. ReDigi's migration procedure has all the salient features of moving a physical phonorecord. *See* Rogel Decl. ¶1-34. "When technological change has rendered its literal terms ambiguous, the Copyright Act must be construed in light of this basic purpose."[7] *See Sony Corp. of Am. v Universal City Studios Inc.*, 464 U.S. 417, 432 (1984) (citing *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975)). Here, the Court should construe the provisions of the Copyright Act in light of the purpose of maintaining a <u>limited monopoly</u>. The purposes of copyright law should only lead to one conclusion – that Capitol has derived the benefit of the first sale and cannot control future sales.

Capitol has conceded that at the point of sale i.e. when the ▮▮▮▮ is in the Cloud Locker and ▮▮▮▮ to the new owner, a phonorecord is what is being distributed. *See* Pl. Opp. at 20. That is all that is required. The user has transferred the particular ▮▮▮▮ to the

---

[7] Referring to the cause of promoting broad public availability of literature, music and other arts for the general public good. *See Sony Corp. of Am.*, 464 U.S. at 432.

10

Cloud Locker and that ▮▮▮ now resident in the Cloud Locker, is what is being sold. There is simply no requirement that the ▮▮▮ be fixed in a material object throughout the entire process to distribute that phonorecord. *See London-Sire Records, Inc.*, 542 F. Supp. 2d at 173. ReDigi disputes Capitol's statement that the hard drive and the Cloud Locker are two different phonorecords – what ReDigi allows users to sell is the **particular** ▮▮▮ It would be ridiculous to force people to ship their hard drives around the country when they wanted to sell a song. How would they sell different songs to different people—break the hard drive in two?

The suggestion that a finding against Capitol would effectively declare "open season" on copyrighted works is preposterous. ReDigi has already developed a system that ensures only the ▮▮▮ can be sold, that disincentivizes and dramatically decreases the possibility that individuals who use ReDigi can commit acts of infringement outside of the ReDigi system. Moreover ReDigi's system gives full effect to the provisions of Section 109(a) which does not exclude the sale of phonorecords in digital form. There is no binding authority that renders the Copyright Act inapplicable in the context of digital transmissions. *See* Def. Br. at 20, n. 5.

In 2011 digital music outsold physical music sales for the first time.[8] Prior to this shift a robust secondary market existed. Now that market is all but disappearing because before ReDigi, no one had created a way to legally sell previously owned digital goods. Capitol would of course love to prevent a secondary market for digital goods from existing, because as sales of digital goods continue to increase, Capitol will be the only source for buying those goods. The question before this Court is in essence when people buy copyrighted goods in digital form—do they have ownership of that particular "copy" or "phonorecord" and can individuals exercise their right to alienation of items of digital personal property. The answer must be yes, as to find otherwise would

---

[8] C. Sherman, CEO, RIAA, *Comments, Questions, Concerns: RIAA CEO Reflects on Responses to His New York Times Op-Ed*, February 3, 2012, http://www.riaa.com/news_room.php?content_selector=riaa-news-blog&blog_type=&news_month_filter=2&news_year_filter=2012.

11

be far beyond what was intended by the grant to Congress to make laws that conferred a "limited monopoly." Capitol has enjoyed the benefit that the limited monopoly provides and should not be allowed to control secondary sales for added benefit. There is no evidence that application of the first sale doctrine to previously owned digital goods would impede the incentive to create. A secondary market, like ReDigi, could never detract from sales of newly released tracks and purchases of older tracks where there are no previously owned tracks available. *See* RSUF ¶80 (for a song to be available for purchase another user must have offered that song for sale).

Capitol's suggestion that this Court lacks the power to apply the first sale doctrine to digital transmissions of copyrighted works is without merit. As noted in *Sony*, the Court can and should interpret the provisions of the Copyright Act in light of changing technology. *Sony Corp. of Am.*, 464 U.S. at 432. Courts have repeatedly imposed equitable limitations on the exclusive rights of copyright owners –notably here with reference to the first sale doctrine, which was created as a common law limitation prior to its codification by Congress. *Bobbs-Merrill Co.*, 210 U.S. at 351. In fact, with respect to other limitations on liability, Congress has expressly noted its desire not to interfere with common law limitations on copyright law. S. Rep. 105-190, 19 (1998) (Rather than "embarking on a wholesale clarification of these doctrines," Congress decided to leave case law in its evolving state and enact a series of safe harbors for service providers).

Other Courts have recognized that the sale of copyrighted digital goods constitutes a first sale within the meaning of provisions similar to the first sale doctrine. Specifically the European Court of Justice recently noted that to enable a copyright holder to prevent further sales of a digital copy of a work would undermine the effectiveness of these provisions and allow copyright holders to circumvent the rule of exhaustion and divest it of all scope. *See UsedSoft GmbH v. Oracle Int'l Corp.*, 128/11 E.C.J. at 47-49 (2012). That court held that to avoid infringing the exclusive right to reproduction of a computer program that was being sold, all the seller had to do was make the copy

12

downloaded to the computer unusable at the time of sale. *Id.* at 78. The court further noted that it would be no more difficult for the copyright holder to determine if the copy was made unusable, than it would be to determine if a person selling a CD-ROM had made a copy prior to sale. *Id.* at 79. Like physical copies, digital copies of works must be subject to the same principles of exhaustion. The first sale doctrine should apply here to limit Capitol's right to control sales after the first sale.

## IV. THE JACOBSON DECLARATION SHOULD BE EXCLUDED

The Court should exclude the declaration of Capitol's purported expert, Doug Jacobson dated August 9, 2012 ("Jacobson Decl.") on the grounds that Capitol failed to identify Jacobson as an expert prior to the submission of its opposition, failed to serve the requisite disclosures mandated by Fed. R. Civ. P. 26(a)(2) and Jacobson's opinions are inadmissible pursuant to Fed. R. Evid. 702.

Pursuant to Fed. R. Civ. P. 37(c)(1), if a party fails to disclose information required by Rule 26(a), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." *See Ziegenfus v. John Veriha Trucking,* 10 Civ. 5946, 2012 WL 1075841, at *5 (S.D.N.Y. Mar. 28, 2012) (Sullivan, J.) (excluding expert declarations on summary judgment where experts were unidentified and disclosures were not provided). Although Courts have discretion to consider whether to exclude untimely evidence, here the factors considered clearly weigh in favor of excluding the evidence. *Id.* at *6 (a district court should consider "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the evidence; (3) the prejudice suffered by the opposing party as a result of having to respond to the new evidence; and (4) the possibility of a continuance."). Rule 26(a)(2) requires disclosure of the identity of expert witnesses along with a written report.[9]

---

[9] Rule 26(a)(2) requires expert disclosures at least 90 days before summary judgment, since summary judgment is the procedural equivalent of a trial. *See Schipani v. McLeod,* 541 F.3d 158, 162 (2d Cir. 2008) ("[T]here is no logical distinction between a jury verdict and an award of summary judgment on the issue of liability . . . in both federal and New York state courts, summary judgment is only appropriate where 'there can be but one reasonable conclusion as to the verdict.'").

13

Prior to submission of its opposition papers Capitol never identified Jacobson as an expert whom Capitol would rely on to present opinion evidence in relation to ReDigi's technology, nor did capitol provide the required Rule 26(a)(2) written disclosures. This failure alone is sufficient to warrant exclusion of the Jacobson Decl. *See* Fed. R. Civ. P. 37(c)(1). Additionally Capitol has given no reason to excuse its failure to comply with disclosure requirements, or provided any reason for waiting until submission of its opposition to identify Jacobson. Capitol did not request reconsideration of the Court's June 28, 2012 Order denying its previous request to extend discovery for other reasons, nor did it make any attempt to re-open discovery for this purpose shortly after ReDigi filed its motion. Instead, Capitol waited and submitted the Jacobson Decl., without any attempt to mitigate the prejudice to ReDigi. *See Ziegenfus,* at *6 (if plaintiff had made efforts to re-open discovery just after defendants' had filed their motion papers, there would have been less prejudice).

As a result of Capitol's actions, ReDigi has been denied the opportunity to assess Jacobson's qualifications, background, and the reliability of the basis for, and opinions, as a whole, so that it can properly respond to Jacobson's misguided and uninformed statements. Based upon the limited information that has been provided, ReDigi has serious concerns about Jacobson's qualification as his experience is in network security, but not in the area of computer systems, in particular operating systems/file systems, which is crucial to the understanding of ReDigi's technology. *See* Rogel Decl., ¶3. It appears that Jacobson has not taught, published or gained other experience in the

---

Capitol's argument in its August 20, 2012 letter to the Court that the scheduling order excused it from mandatory disclosure is meritless. Capitol knew that the workings of ReDigi's technology would be an issue and knew that ReDigi unequivocally denied Capitol's allegation that ReDigi's upload process involved copying in its Answer. *See* Complaint ¶21 (Docket No. 1), Answer ¶15 (Docket No. 6). Instead of conducting discovery, Capitol waited until submission of its opposition to introduce expert testimony. The fact that Capitol initially decided to defer expert testimony did not preclude them from disclosing an expert when it realized it was needed in discovery. ReDigi did not need an independent expert to present evidence on ReDigi's technology because it had the testimony of its chief technical officer, as well as the programmers who helped design the ReDigi system, who were disclosed in ReDigi's interrogatory responses at the beginning of discovery.

area of operating systems. None of Jacobson's background demonstrates that he is qualified as an expert to testify as to the workings of the operating system of a PC or a Macintosh computer.

Moreover, there is no indication that his opinions are reliable nor are they are based on sufficient information. As discussed above, Jacobson's failure to recognize the basic difference between different types of file removal, here, the difference between a ▮▮▮▮▮ and a program delete, is deeply concerning. *See id.* ¶¶3-23. Jacobson's treatment of all types of deletion and ▮▮▮ as the same can lead to only one of three conclusions: (1) that he is unqualified to understand the file system operations that are critical to understanding ReDigi's system; (2) that Jacobson's opinions are not based upon reliable information or methodology; or worse (3) that Jacobson is an expert for hire that is being paid to tout Capitol's party line. No matter which of the three it is, the Jacobson's Decl., is inadmissible as it fails the requirements of Fed. R. Evid. 702.

After expending vast amounts of time to brief these motions, Capitol cannot be allowed to surprise ReDigi and ask for more discovery, where it had ample opportunity to timely do so.

## CONCLUSION

Capitol has failed to show any reason to deny ReDigi's motion. ReDigi's service does not infringe *any* of Capitol's exclusive rights directly or indirectly. Capitol's motivation in bringing this lawsuit is to advance an incorrect interpretation of copyright law that would allow them more control than copyright law provides to authors. For all of these reasons ReDigi respectfully requests that this Court grant ReDigi judgment as a matter of law dismissing all of Capitol's claims.

Dated: New York, New York  
       August 24, 2012

Respectfully submitted,

_____  
Gary Adelman, Esq.  
Meister Seelig & Fein, LLP  
140 East 45th Street, 19th Floor  
New York, New York 10017  
Phone (212) 655-3580  
Email gpa@msf-law.com