CA5PCAPC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

CAPITOL RECORDS, LLC,

               Plaintiff,

       v.                     12 CV 00095 (RJS)

REDIGI, INC.,

               Defendant.

------------------------------x

                           New York, N.Y.
                           October 5, 2012
                           10:22 a.m.

Before:

             HON. RICHARD J. SULLIVAN,

                         District Judge

                APPEARANCES

COWAN, LIEBOWITZ & LATMAN, PC
   Attorneys for Plaintiff
RICHARD S. MANDEL
JONATHAN Z. KING

DAVIS SHAPIRO LEWIT & HAYES, LLP
   Attorney for Defendant
GARY ADELMAN

ALSO PRESENT:  SARAH MATZ

CA5PCAPC

1              (In open court)

2              (Case called)

3              THE COURT:  Good morning.  Have a seat.

4              MR. MANDEL:  Richard Mandel, Cowan, Liebowitz and

5    Latman for the plaintiff, Capitol Records.

6              THE COURT:  Okay.  Mr. Mandel, good morning.

7              MR. MANDEL:  Good morning, your Honor.

8              MR. KING:  Jonathan King, also with Cowan, Liebowitz

9    and Latman.

10             THE COURT:  All right.  Mr. King, good morning to you.

11             MR. ADELMAN:  Gary Adelman, Davis, Shapiro, Lewit and

12   Hayes for the defendant, and with me is my non-admitted

13   associated.  With your permission, your Honor, I'd like her to

14   help me at the table today and --

15             THE COURT:  And that is?  Her name?

16             MR. ADELMAN:  Sarah Matz, M-a-t-z.

17             THE COURT:  Okay.  Good morning, Miss Matz.  Have a

18   seat.  I gather we have some interested parties or people who

19   just like to see lawyers go at it.  So I think you'll get your

20   money's worth.  Welcome.  It's a public courtroom.  Everybody

21   is welcome here.  The issues that we're going to be discussing

22   today are very interesting ones, I think.

23             I want to thank the parties for their briefs.  I

24   thought they were very well written and helpful to me.  There's

25   a lot of stuff here.  There are two motions.  They are really

CA5PCAPC

1    cross motions for summary judgment.  Each party believes that

2    there are no issues that are disputed, no fact that would be

3    disputed that would require this to go to a trial or a fact

4    finder; so that each should win as a matter of law, since there

5    are undisputed facts.  And, yet, you seem to dispute facts.  So

6    we'll talk about that.

7         I guess I should be clear on a couple of things.

8    There are a lot of people who are very interested in what the

9    law should be and what would be a wise way to arrange ourselves

10   with respect to this kind of technology and having access to

11   music or other things like this digital recordings.

12        That's a fascinating issue in its own right, but

13   that's not really what we're here to decide today.  We're here

14   today to decide what the law is and what is the proper

15   application of that law.  And so certainly I think the law

16   ought to be different, but if the law is clear and the

17   application is obvious, then that's what we're going to do.

18        So I think there are honest disagreements as to what

19   the law says and how it ought to be applied, but I want to make

20   it very clear that just sort of broad policy arguments about

21   what -- in an ideal world what we ought to do is not really

22   relevant, at least not for this forum.  Okay?

23        So each of you has a motion.  I thought we'd start

24   with the plaintiffs, since it's their case.  And so they'll

25   start, and then we'll go to the defense.  And I'll allow each

CA5PCAPC

1    of you to respond to the other.  I'm in no terrible rush, but I

2    don't want to be here all day either.  So you're going to carry

3    the ball for your team --

4              MR. MANDEL:  Yes.

5              THE COURT:  -- Mr. Mandel?

6              MR. MANDEL:  Your Honor, Capitol believes that it is

7    entitled to partial summary judgment with respect to its

8    copyright infringement claims that turn on violation of the

9    right of reproduction and the right of distribution.  I just

10   point out, at the outset, the motions are not perfect mirror

11   images in that we haven't moved on the performance and display

12   portion of the case; so I just want to make that clarification.

13             There's no dispute with respect to ownership.  It's

14   not disputed on its motion.  It's been admitted in the 56.1

15   statement that Capitol owns valid copyrights in the sound

16   recordings, both under federal law with respect to the

17   post-1972 recordings and state law with respect to the pre-'72

18   recordings.  And the issue, really, and I think what this case

19   turns on, is their an infringement of the exclusive rights

20   under 106 of the Copyright Act.

21             I'll start, if I may, with the reproduction, which is

22   in 106.1 and grants the copyright owner the exclusive right to

23   reproduce the copyrighted work in copies or phono records and

24   in this case, of course, dealing with sound recordings, it's

25   phono records that are applicable.

CA5PCAPC

1              THE COURT:  It's such a quaint term.  I love it.

2              MR. MANDEL:  I know.  It's interesting, and I think

3      the first time, throughout the PI we talked about copies

4      because there's a tendency to lump them together.  They do have

5      the same definitional effect, but phono records is the precise

6      term for purposes of the material object that embodies sounds,

7      which is what we're talking about here.

8              And picking up on your Honor's statement, we believe

9      that the issues are clear under existing law, and we actually

10     think that much of what Redigi spends its time arguing on are

11     broad policy items.  They think the law should be a certain

12     way.  They think the Copyright Act should, in effect, be

13     amended.  These are the same arguments that were put before

14     Congress and that were the subject of a report at Congress'

15     request by the copyright office to decide that issue.

16             But the reality is, that Congress had the opportunity

17     to amend the copyright law.  Congress specifically had a

18     statute, actually, that was under consideration at the time of

19     the Digital Millennium Copyright Act that would have changed

20     the law with respect to first set.  So it chose not to do that

21     and, instead, to send it out to the copyright office for its

22     report, which the copyright office issued.

23             THE COURT:  Right, but they choose not to do a lot of

24     stuff.  That's another story.

25             MR. MANDEL:  But beyond not amending it, they

CA5PCAPC

1    actually, in the statute, said that they wanted further

2    certificate, enact a pretty significant statute in the Digital

3    Millennium Copyright Act.  It was designed to bring us into the

4    digital age, and they did choose to act in certain respects,

5    but on the question of the first sale doctrine, they didn't

6    and, instead, said we'd like to see a report on this.  And they

7    sent it to the copyright office.

8         I think the copyright office report is very

9    significant because what the copyright office did, it looked at

10   the existing law, and there really wasn't much debate about

11   what the existing law was.  The whole report was really focused

12   on whether a change should be made, and the copyright office

13   made arguments, from a policy perspective, as to why it didn't

14   think an amendment was a good idea.  And Congress chose not to,

15   in fact, enact an amendment in any of the ten years since then

16   or more than ten years.

17        But in the report, it talks about, although it's a

18   report on the first sale doctrine and distribution, it explains

19   why you would need an amendment.  And the reason is because the

20   first sale doctrine does not apply if there's been a

21   reproduction.  You can't claim a first sale defense if you

22   actually reproduce the copyrighted work, and the work that's

23   being distributed or the phono record that's being distributed

24   is not the particular phono record with which you start.

25        So it's not just a report on distribution.  It's a

CA5PCAPC

1   report that looks at the reproduction right, and it explains in

2   very clear terms why there is a reproduction, by necessity, in

3   a digital transmission.

4          THE COURT:  Can I ask you a question, though, because

5   last time we were here for the preliminary injunction, maybe it

6   was the pre-motion conference, I forget which, but I asked you

7   if I could sell my iPod to somebody and you said I could.

8          MR. MANDEL:  Yes, and you know, it's interesting you

9   say that because I would actually have to say that I think that

10  answer probably was not a correct one.  I think that part of

11  the problem, you know, with the hypotheticals, to be frank,

12  it's tough, you know.  I was reading an article in the past few

13  weeks about an actual dispute on a similar issue with Bruce

14  Willis and Apple are disputing whether Bruce Willis would have

15  the right to bequeath his collection of iTunes recordings,

16  which is apparently quite extensive, as part of his will and

17  apparently that's a subject for litigation.  So my initial

18  reaction on that might not have been correct because the

19  problem with the iPod is, you know, that there's copy thereto.

20         THE COURT:  Right, that's where I was going.  It seems

21  to me it's been copied to get to the iPod.

22         MR. MANDEL:  Right.  And, you know, fortunately, I

23  think the answer is none of it is, I think, very difficult in

24  the context of this case and the issues that are here.  You

25  know, we've been playing with hypotheticals a lot in the

1     context of this case because it is interesting to think about

2     all the ramifications and what would happen in this case and

3     what would happen in that one.  And I guess the Bruce Willis

4     example highlights that you could probably have other very

5     interesting litigations about some of those issues as well.

6          But in terms of the issue that we're here to decide

7     today, I think it's pretty clear, and it's largely governed by

8     the statutory definitions in the Copyright Act itself, what a

9     phono record is, and what's involved in the process of upload

10    in order for a Redigi user to be able to sell their recording.

11    And if I can turn --

12          THE COURT:  There is a dispute on that, isn't there?

13    What is involved in the process of uploading, it's sort of

14    obviates a dispute between defendant's first set of papers and

15    their latter set of papers, but there is a dispute as to

16    whether it's copying or migrating, which all sounds like

17    semantics on some level.

18          MR. MANDEL:  And I think that is my answer to it.  I

19    think it is semantics.  It's semantics because here's what's

20    not in dispute.  When a user for Redigi starts with is a sound

21    recording on their home computer and has to upload it to get to

22    the Redigi cloud in order for it to be sold.  There's no

23    dispute that there are two separate material objects there.

24    There is the computer hard drive, where that sound recording

25    sits at the beginning of the process, and then there's the

CA5PCAPC

1    Redigi server out in Arizona, where the sound recording ends up

2    before it can be distributed.

3             If you look at the statutory definitions under the

4    Copyright Act of what a phono record is, those are two

5    different phono records.  And they -- our position is that if

6    you look at what the right of reproduction is, as it's been

7    explained in the House and the Senate report, and really, as

8    very basic copyright law, Professor Nimrick describes it as

9    anytime you create a new phono record, that is a reproduction.

10             THE COURT:  I guess they're saying it's not a copy,

11    right?  They're saying that it's transported from one place to

12    another, and it's sort of schuu -- like that.

13             MR. MANDEL:  I think --

14             THE COURT:  Let the record say I said "schuu."

15             MR. MANDEL:  I'm not quite sure what they're saying in

16    terms of technologically.  I don't think they're really saying

17    it flies through the wire.  I mean, they're kind of a little

18    vague about that, but here's what they can't dispute and what

19    the facts say, and that is undisputed.  There's no dispute that

20    there are two different material objects here, that there is a

21    server in Arizona, the Redigi cloud, as it were; there's a

22    server on which the user first has that sound recording

23    embodied, and that there are two different phono records.

24             THE COURT:  But I think that there are -- I assume

25    you're going to dispute that, right?

CA5PCAPC

1          MR. ADELMAN:  Yes, absolutely, your Honor.

2          THE COURT:  I kept thinking about this, but -- I'm not

3     a Trekkie, but I kept thinking it's the difference from Captain

4     Kirk going from the Enterprise to the planet through that

5     transporter thing, where he's not duplicated, to the cloning

6     where there's a good and a bad Captain Kirk where they're both

7     running around.  I think one is a copy and the other is -- the

8     other was transported and it's only one Captain Kirk.

9          MR. MANDEL:  Right.  And, you know, that's part of the

10    problem we have at a basic level because it's not Star Trek

11    here, and I don't think they're really saying --

12          THE COURT:  Wouldn't it be cool if it were?

13          MR. MANDEL:  I know.  It would be exciting and maybe

14    it would require a whole other Copyright Act, but, you know,

15    that's not where we are.  And they don't quite say that because

16    they can't say that.  And, you know, the dispute between --

17    it's not just a dispute between their prior papers and their

18    current papers.  It's a statement that appears in a number of

19    different contexts.  It's a statement that appears in their

20    answer, where they admit that -- and state clearly that they

21    delete the existing file.

22          Well, obviously, if you have to delete the original

23    file on the user's hard drive, then, obviously, there's a copy.

24    You know, that's what they said in their answer.  It still

25    stands.  It's there.  They said it in a sworn declaration that

CA5PCAPC

1   Mr. Rudolph submitted to this Court, and they, frankly, said it

2   a number of times at the deposition.  If you look at

3   Mr. Rudolph's testimony at Page 132 and 236, I believe it is of

4   his deposition, these are pretty clear questions.  Mr. King was

5   very precise in the questions he put to them, and he said to

6   them the first time, we need to be precise.  I'm talking about

7   the original file.  That's the lead in.  The answer is yes.

8          The second time, at Page 236, they're talking about

9   specifically the declaration.  Mr. King is going over the

10  language of the declaration and, again, it says, okay, that

11  file, we're talking about the file itself, the original file.

12  That's the lead in.  The answer is yes.  So you have that

13  admission in their answer, in deposition testimony, in the

14  declaration.

15         You also have an admission in the preliminary

16  injunction brief in absolutely crystal clear terms that we

17  submit it should be binding and should be a judicial admission.

18  And while they dispute that, they don't dispute that it's

19  appropriate legally for that to constitute an admission.  They

20  just say the statement is not sufficiently clear, that it's

21  ambiguous, and therefore, you shouldn't construe it as a

22  binding judicial admission.

23         But if you look at that statement, it's absolutely

24  crystal clear.  I mean, their explanations to try to argue

25  around that, frankly, just make no sense.  They say, well, you

CA5PCAPC

1    know, it's a colloquial usage.  People can say copies and be

2    using it colloquially, but that's not the context.  This is a

3    legal brief talking about the Copyright Act, introducing an

4    argument as to why it's permissible and saying, okay, the only

5    copying that occurs is in this context.  That copying is

6    excused by the fair use doctrine.  That's not colloquial usage.

7    That's legal terminology.  That's --

8         THE COURT:  All right.  I'm sorry to interrupt you,

9    but the process of just using the cloud for storage, not

10   resale, but storage, is that a violation of the Copyright Act?

11        MR. MANDEL:  The simple act of storing?

12        THE COURT:  Yeah.

13        MR. MANDEL:  It's certainly not something we challenge

14   in this case.

15        THE COURT:  Okay.  But why not?  If copying is going

16   on, why not?

17        MR. MANDEL:  Because in a case of pure storage, there

18   probably is a fair use defense.  If that's all we're talking

19   about, we wouldn't have brought this lawsuit.  The problem with

20   these storage situations is they're all different business

21   models that involve different things and do different things.

22        In this context, the business model is quite clearly

23   not about storage.  It's about a marketplace, and it's about --

24        THE COURT:  I get that, but I just, I'm thinking poor

25   Bruce Willis who spent so much time and money on his

CA5PCAPC

1    collection.  I remember a friend of mine years and years ago

2    took all his records and converted them to reel-to-reel, great

3    period sound, all in one spot, I'm sure he regrets it now, but

4    spent a lot of time and money doing that.  If he sold his

5    reel-to-reels, would that be a violation?

6           MR. MANDEL:  I'm sorry, if he sold his?

7           THE COURT:  He took all his records, and then he

8    trans -- he recorded it on reel-to-reel all the songs, I guess,

9    he liked, in the he order he liked them.

10          MR. MANDEL:  And then he sold them?  I think it would

11   be a violation.

12          THE COURT:  Okay.  But just having them in on the

13   reel-to-reel would not be?

14          MR. MANDEL:  Right.  And that's the distinction, and

15   they really walked away from that.  I mean, that was their

16   argument at the preliminary injunction stage.  They basically

17   asserted fair use with respect to the upload process.  They

18   haven't even done that here, I mean, because I think they

19   recognize how weak the fair use argument is under the four

20   factors, and so they've adopted the recharacterization

21   approach.

22          They haven't even attempted to posit this case as

23   being about storage, and if you read Mr. Ossenmacher's

24   deposition testimony, he was quite clear that this business

25   model is not even viable as a storage option.  The only way

CA5PCAPC

1    they make money is by taking commission on sales.

2          So this is not about storage.  This is about a

3    marketplace in which Redigi profits by having sales of the

4    recordings made.  That's what it's in business to do.  That's

5    what we're seeking to enjoin.  The fact is that most people,

6    according to the data we receive to bring it up to the cloud,

7    do sell it, or at least offer it for sale because that's what

8    they're doing here.  They're saying take your old, unwanted

9    recordings, make some bucks at it or, you know, buy some other

10   music out of it, turn it into something profitable.  That's

11   what they're pitching.  That's what they have built a business

12   on.  That's what we say is illegal.  That's why we filed this

13   lawsuit.

14          So I think storage really was a red herring, and I

15   think that's why they moved away from it, frankly, because they

16   know that defense isn't going to work.  It's not going to get

17   it done for them.  So what have they done?  They've basically

18   decided to walk away from their own statements, recharacterize

19   everything and adopted a new approach.

20          Now, the problem with that is, even apart from the

21   fact that we say you can't do that, that you're bound by your

22   judicial admissions, and we think that's a separate independent

23   ground for summary judgment, the definitional argument still,

24   from our perspective, also defeats their position.  Because you

25   can call it whatever you want, you know, you can pretend that

CA5PCAPC

1   we're in a new century and it's Star Trek now, but it doesn't

2   change the fact that there are two different phono records.

3         A phono record is a material object in which sounds

4   are fixed and from which they can be perceived, reproduced or

5   otherwise communicated.  The electronic file, in and of itself,

6   is not a phono record.

7         In fact, the undisputed evidence shows that while this

8   process of upload is taking place, you can't access that

9   recording, you can't perceive it, you can't hear it.  It's just

10  data that's being copied, we say.  They would say transmitted

11  or moved, migrated, but whatever you want to say, there's no

12  dispute that you -- it can't be a material object as a

13  definitional matter.

14        I mean that's a legal dispute, I guess, but we think

15  that it's pretty clear that if you can't perceive it, you can't

16  access it, you can't hear it, that's not a material object.

17  And so you have created a new material object, and the process

18  of creating -- and I should really say a phono record to be

19  more precise.

20        THE COURT:  So what is the phono record?  The phono

21  record is the server in Arizona?

22        MR. MANDEL:  Yes.  The phono record is the server in

23  Arizona, which now has digital sequence magnetically encoded on

24  it.  So that from that server, you can play it, you can

25  reproduce it, you can do all the things that you were able to

CA5PCAPC

1    do when it was on the user's home drive -- home computer, which

2    is a separate phono record, a different material object.

3        And that's what we think controls this case, as a

4    matter of statutory definitions, and why they can call it

5    whatever they want, they can say whatever they want, but it is

6    reproduction.  It's a violation of the reproduction right, as

7    it's always been understood in its most fundamental

8    application, the right to create a new phono record.  You need

9    some defense to be able to do that.

10        Now, they talk about, well, then if you move it on

11   your hard drive, that would be a problem under my

12   interpretation because that's a new phono record.  Well, even

13   if it is, there are lots of things that may be technically a

14   violation of the reproduction right, which would have a valid

15   defense.  Nobody is challenging the ability to move it among

16   your files on your hard drive.  Nobody would be -- anybody

17   would be crazy to bring a case like that.  Obviously, you have

18   a fair use right to do that, but it doesn't change the fact

19   that there may be a reproduction.

20        Certainly there is in the context where we're talking

21   about two different servers.  We're talking about two different

22   computers.  We're talking about a material object that the user

23   has, and we're talking about a material object that exists

24   somewhere out in Arizona.  And that, by definition, is the

25   reproduction of the copyrighted work in a new phono record in

CA5PCAPC

```
 1    violation of the reproduction right in the absence of some
 2    defense; so....
 3              THE COURT:  No, but I see why you want to back off the
 4    statement you made the last time about selling the iPod because
 5    it seems to me that if the copy is made to your iPod or to your
 6    computer, you download it, and then you allow someone else
 7    access to your computer, do you sell the computer or the iPod
 8    or you sell them the right to come onto your computer iPod and
 9    listen?  That would basically seem to be the same thing that
10    Mr. Adelman is saying goes on in Arizona.  Right?
11              MR. MANDEL:  Well, I don't know if it's the same
12    thing.  I guess if you sold your iPod, you're saying --
13              THE COURT:  Well, I guess what it would really be is I
14    got my iPod at home, and I allow my law clerk to go to my home
15    and listen to it.  He's saying that Redigi is about making --
16    getting the recording, the phono record in Arizona and allowing
17    it to be accessed by someone other than the person who bought
18    it.
19              MR. MANDEL:  Nobody is saying that you can't in your
20    home, you know, play something that's on your iPod and have
21    somebody -- you could have somebody over and you could be
22    playing recordings and give them access, in a sense, to the
23    iPod.  I mean, that would --
24              THE COURT:  Right, but what if you charged them for
25    it?
```

CA5PCAPC

1          MR. MANDEL:  Right.

2          THE COURT:  I have twins.  They each have an iPod, and

3     I can certainly imagine charging the other two to listen to

4     their songs.

5          MR. MANDEL:  Well, I think that's the point.  At some

6     point, when you move into the commercial realm, the facts do

7     change under, you know, what you might have a right to do, you

8     don't have a right to do.  That's why you can play with kind of

9     fun hypotheticals.

10          But in this context, it's not that you're just giving

11     access.  I mean, you are basically selling and distributing

12     that recording.  And in order to do that, you'd have to make a

13     copy, and that is a violation of the reproduction right that

14     has no defense.  And, really, that has been admitted, in

15     effect, in their papers, in their answer, in their deposition

16     testimony.

17          I can address the technological issues, as well.

18     They're not part of our motion.  I don't think it's necessary

19     to reach them in order to grant us summary judgment.  We didn't

20     put them into issue in this case.  We have raised them in

21     response to their motion.  It might be more appropriate to

22     discuss those at that time, but it depends on how your Honor

23     wants to --

24          THE COURT:  I'll give you a chance to respond to

25     Mr. Adelman, but I just want to make sure that I've heard you

CA5PCAPC

1    with respect to Redigi 2.0.

2              MR. MANDEL:  Okay.  With respect to Redigi 2.0.  I

3    think with respect to Redigi 2.0, our basic position is that is

4    not this case.  Redigi 2.0 did not exist when this lawsuit was

5    filed.  It wasn't something that we thought about, knew about,

6    challenged in the complaint that we filed.  It's not something

7    that's raised in their answer.  It's not something that they

8    brought a declaratory judgment on.

9              THE COURT:  So you're not seeking to --

10             MR. MANDEL:  No.

11             THE COURT:  -- enjoin that?

12             MR. MANDEL:  No.

13             THE COURT:  And you're not seeking damages off of

14   that?

15             MR. MANDEL:  No, not in this case.  Frankly, we don't

16   even know, at this point, whether Capitol Recording has ever

17   been the subject of a sale through Redigi 2.0.  It's something

18   that was unveiled nine days before the close of discovery that

19   we learned about -- when I say unveiled, it was implemented

20   nine days before the close of discovery that we learned about,

21   for the first time -- a day before the close of discovery.

22             We haven't had an adequate opportunity to consider all

23   the facts that are necessary to address that.  And we, frankly,

24   think it would be an advisory opinion to get into at this

25   point.  It's not the case we brought about, and it's not the

CA5PCAPC

1    subject of our motion, certainly.  So that's my position on it,

2    most fundamentally.

3              THE COURT:  All right.

4              MR. MANDEL:  Let me briefly talk about the

5    distribution right.  Some of it is encompassed within the

6    discussion of the reproduction right for the reasons that I

7    said.  You know, the basic issue on distribution is, is there a

8    first sale defense?  And our response on that is, no, there

9    isn't because the first sale doctrine, as enacted now, the

10   existing law, is very clear that you have the owner of a

11   lawfully made phono record, of a particular lawfully made phono

12   record, has the right to dispose of possession of that phono

13   record.

14             The reason that Congress was considering at the time

15   of the Digital Millennium Copyright Act implementing a first

16   sale doctrine that would work in the digital context was

17   because it recognized that the existing law wouldn't allow

18   that.  They decided not to do it.  Sent it out to the copyright

19   office to prepare a report, which the copyright office did.

20   The copyright office recommended not amending.  Congress has

21   not amended.

22             And the bottom line is that there is no existing

23   defense that would allow you, in the context of a digital

24   transmission, to claim a first sale defense because you are not

25   distributing the phono record, the same particular phono record

CA5PCAPC

1    with which you began.

2              And, you know, again, they talk about their

3    technology.  One of the things that I think is interesting is

4    that Mr. Rudolph admitted at the deposition, they haven't

5    invented a new way of upload; this is, in fact, he says, a very

6    old way of doing it.  And that's important because, at the time

7    that the -- what the copyright office was actually considering

8    was some of the same kind of basic technology.  There's not

9    something new that Redigi invented by their own admission.

10             If you look, I think it's at Page 82 of the copyright

11   office report, they actually talk about, quote, unquote, "move

12   technology"; so that was kind of one of the proposals.  They

13   talk about move or forward and delete.  Now, they use that

14   terminology, both of them, at Page 82, move or forward and

15   delete.  So, you know, this is the same thing that was being

16   considered.  It's -- and it's borne out by all the evidence.

17             THE COURT:  How can I include that now?  You didn't

18   call an expert, right?

19             MR. MANDEL:  Well, we do have an expert in response,

20   who explains it.  I think if you look at what's undisputed,

21   even between their experts, you can tell that, but again, it's

22   really simpler than that.  I think the argument on reproduction

23   basically defines the argument on distribution because if you

24   accept, which we think is right under the statute, that in

25   order to effect that upload, you have created a new phono

CA5PCAPC

1    record.  You have, in effect, you've reproduced it, by

2    definition, when you create a new material object.

3         THE COURT:  What you're saying is a phono record is

4    that is my hard drive laptop, and then the new phono record is

5    a new server in Phoenix.

6         MR. MANDEL:  Correct.  And because of that, you have

7    not met the requirements of Section 109 of the Copyright Act

8    because you have not disposed of the particular phono record

9    with which you began.

10        And the copyright office is instructive because it's

11   basically explaining why it is that -- it doesn't spend a lot

12   of time on it because, frankly, it was pretty much a given that

13   digital transmissions are not covered by the first sale

14   doctrine.  It was analyzing the question of whether it should

15   be.  But the discussion is useful in terms of that -- making

16   that point that you can see why it is the case, and it really

17   is just, again, a question of statutory language.

18        It's not the same phono record that's being

19   distributed in a digital context because it does have to be

20   embodied or fixed in a new fixation on a new phono record in

21   order for it to be perceived or reproduced.  It can't be

22   perceived or reproduced during the upload process, only when it

23   hits the hard drive of -- not the hard drive, the server in the

24   Redigi cloud, and that's a new phono record.  It's not the same

25   phono record with which you started, and for that reason, the

CA5PCAPC

1    first sale doctrine does not apply.  And that's basically why I

2    think reproduction is at the heart of this because if we're

3    correct about reproduction, we're also correct about

4    distribution for the same reason.

5            THE COURT:  All right.

6            MR. MANDEL:  Unless your Honor has any other

7    questions, I think that is the gist of our motion.

8            THE COURT:  No, I'll let you respond to Mr. Adelman

9    when he's wrapped up.  Okay.  Thank you, Mr. Mandel.

10           Give me one second, Mr. Adelman.

11           MR. ADELMAN:  Your Honor, with your indulgence, I was

12   just going to ask if I could go to the men's room for a second.

13           THE COURT:  Okay.  That's fine.  Why don't we come

14   back in five minutes.  If anyone else needs to use the

15   restroom, they can do that.  Five minutes.

16           (Recess taken)

17           THE COURT:  All right.  Is it Adelman or Adelman?

18           MR. ADELMAN:  Adelman.

19           THE COURT:  Okay.  Mr. Adelman.

20           MR. ADELMAN:  Thank you, your Honor.  This case is

21   really not about a definitional issue.  It's about an

22   evidentiary issue, which is what most cases should be about.

23   It's about plaintiff having the burden of proof, demonstrating

24   that there's a violation of one of his exclusive rights.

25           The purpose of the Copyright Act, essentially, is to

CA5PCAPC

1   accept somebody's creation, to serve the ultimate goal of

2   promoting broad public availability of literature, music and

3   other arts.  Copyright laws' limited scope of protection

4   reflects the balance between the two competing claims.  As

5   noted in 20th Century Music Corp. v Aiken, the Copyright Act

6   does not give the copyright control over all uses of his

7   copyrighted work.  Instead, it enumerates several rights that

8   are made exclusive to the holder of the copyright.

9            The two rights that Mr. Mandel discussed today were

10  the reproductive right and the distribution right.  Now, as far

11  as the reproduction right is concerned, plaintiff has the

12  burden of proof of demonstrating that there was an actual

13  reproduction, and within the papers itself there is no evidence

14  that Redigi ever reproduced any of Capitol's files.

15           THE COURT:  What are the phono records?  I mean,

16  that's the language of the statute, right?

17           MR. ADELMAN:  Right.

18           THE COURT:  I mean, we all feel sheepish saying it

19  because we know what it means, those vinyl things.

20           MR. ADELMAN:  I actually like it.  I'm old school.  I

21  still have vinyl.

22           THE COURT:  The phono record is the material object in

23  which sounds are affixed by any method, now known or later

24  developed -- how's that for broad -- and from which the sounds

25  can be perceived, reproduced or otherwise communicated, either

CA5PCAPC

1    directly or with the aid of a machine or a device.

2              So what are the material objects here?  Mr. Mandel is

3    saying that the material object that is my laptop, and there's

4    a separate material object that is, you're calling it a cloud,

5    which makes it sound like it's etherial.

6              MR. ADELMAN:  It's a hard drive.

7              THE COURT:  It's a hard drive?

8              MR. ADELMAN:  Yes, absolutely.

9              THE COURT:  It's in Arizona.  Isn't that a separate

10   phono record?

11             MR. ADELMAN:  No, it's the same phono record.

12             THE COURT:  How can it be the same phono record?

13             MR. ADELMAN:  In our papers, we cited CM Paula, and CM

14   Paula goes through the process and CM Paula stands for the

15   fact --

16             THE COURT:  There are a lot of people here; so tell

17   them what that case is about.  It's not about records.

18             MR. ADELMAN:  No, it's not about records.

19             THE COURT:  It's about greeting cards --

20             MR. ADELMAN:  Yes.

21             THE COURT:  -- or plaques or something.

22             MR. ADELMAN:  Exactly.  What happened was that

23   defendant in that action purchased 100 greetings cards with a

24   copyrighted design on it, and they used the chemical process to

25   lift the ink, the copyrighted picture, off of the greeting

CA5PCAPC

1   cards and placed them on tiles.  They transferred the

2   copyrighted material from the greeting cards to the tiles, and

3   then they sold those tiles.  Then they sold those tiles, and

4   the owner of the copyright to that design brought an action

5   against them for reproduction and distribution.  And, in fact,

6   the Court found that it was not a reproduction.

7            THE COURT:  Right.  And what lofty court found this

8   and what year?

9            MR. ADELMAN:  It was -- I believe it was 19 --

10           THE COURT:  1973.

11           MR. ADELMAN:  '75?

12           THE COURT:  1973, the Northern --

13           MR. ADELMAN:  1973.

14           THE COURT:  The Northern District of Texas.

15           MR. ADELMAN:  That's true.

16           THE COURT:  Not the Supreme Court, not the Second

17  Circuit, not one of my colleagues here, but some guy in Texas.

18  I don't mean to disparage him.  He might have had great wisdom,

19  but it's certainly not controlling precedent.

20           MR. ADELMAN:  No, it's not, but it stands for the

21  logic with which we stand here today, which is Redigi has

22  developed technology which does ostensibly the same thing.  And

23  what CM Paul, the judge in CM Paul was saying is is that -- he

24  wasn't talking about phono records, but what he is saying is

25  you're not changing the phono record.

CA5PCAPC

1      What he said, in order to get a hundred tiles, you

2  must have purchased a hundred greeting cards and, therefore,

3  the plaintiff in this case has extinguished his right.  He's

4  gotten the benefit of that right and, thus, the distribution

5  right has now been extinguished.  And, therefore, the defendant

6  was entitled to sell that copyrighted material on the tiles.

7      THE COURT:  But the deference difference is that the

8  process there, by necessity, only allowed you to do one of

9  these at a time, right?

10      MR. ADELMAN:  It's the same thing with Redigi.

11      THE COURT:  Oh, no.  You could easily do a gozillion

12  of these at one shot.  You've just chosen not to.

13      MR. ADELMAN:  No.

14      THE COURT:  You've designed it so that it doesn't do

15  more than one, but if you wanted to do a million, you could do

16  a million like that.

17      MR. ADELMAN:  Right.  Well, that's what file-sharing

18  services do and that is specifically what Redigi wanted to

19  prevent.  They wanted to make sure that they followed the

20  copyright law.  They designed a system specifically to protect

21  the rights of the copyright owner and facilitate a sale of the

22  109, the first sale voucher.  They went to great lengths to

23  make sure that their process worked perfectly, in that it

24  migrates the file from one hard drive --

25      THE COURT:  What does it mean, it migrates the file?

CA5PCAPC

1        MR. ADELMAN:  It's like a train, as we said in our

2    paper, your Honor.  It grabs the file on the hard drive, the

3    ones and zeros, and it pulls it in a matter of seconds to the

4    cloud hard drive.

5        THE COURT:  It pulls it one little one and then a zero

6    right behind it?

7        MR. ADELMAN:  Yes.  Actually, it goes in reverse, to a

8    certain degree, but again, that's exactly what it does.  That's

9    the technology, like you had said earlier about Star Trek.

10       THE COURT:  Right.

11       MR. ADELMAN:  I mean 40 years ago --

12       THE COURT:  I'm going to regret that one.  I know

13   every blog in America is going to go with that.  I didn't even

14   like the show.

15       MR. ADELMAN:  It has some truth in.  I mean, one of

16   the examples I was thinking of was Willy Wonka.  Remember when

17   they put Tommy on the stage.  They beamed him, and you saw the

18   particles go across the top and, boom, there he was,

19   miniaturized, but still him in that TV.  What's so hard to

20   believe?

21       No, but seriously, as far as data is concerned, why is

22   it so hard to believe that that occurs?  Because it does.  I

23   mean, they filed a patent on it.  Now, I agree, it's a little

24   farfetched for human beings, but for physical objects, in this

25   computer world, when 20 years ago, would you believe that data

CA5PCAPC

could sync or migrate through the air from your computer to a

handheld device?  I mean, did you even believe that you could

take a handheld device and walk around and type to your friends

or make phone calls?  No.  Technology changes.  Technology

improves.  We have very smart people.  This has happened.

            THE COURT:  Okay.  Well, look, the difference between

migrating and copying could be significant.  Earlier I heard

you talking about migrating and using other analogies to

describe the process, and we're all groping for analogies, it

seems.

            MR. ADELMAN:  It's true.  But, actually, I mean, I

object to the use of the word copying because in the case law

it's reproduction, and that, I believe, is different than

copying, but nevertheless --

            THE COURT:  But, again, it's the material object that

is the phono record, right?

            MR. ADELMAN:  Yes.

            THE COURT:  So you've got a material object that is my

laptop, and material object that is the server, and it's not

the code.  The fact that my code got sucked out of this and put

someplace else, I don't think is really the issue, right?  It's

the material object is the phono record.

            MR. ADELMAN:  Well, the thing is, I think London-Sire

also addressed this, is that -- well, they addressed one other

point, which was that the material object does not have to

 1    exist throughout the entire process to distribute a phono

 2    record, but --

 3                THE COURT:  Well, I understand that.  I'm not sure why

 4    that's either here or there, at least for this case.

 5                MR. ADELMAN:  Well, they're also -- I mean, part of

 6    their reproduction right is that it's not perceivable, and they

 7    clearly say that it doesn't have to be during the transaction

 8    process, that transitory three seconds.

 9                But as far as the material object is concerned,

10    there's no question, I think if you follow the logic of CM

11    Paula and what they were trying to say, that it's perfectly

12    permissible.  It is that same unique file, and isn't that

13    what's important?

14                What's important in copyright law is that iTune --

15    Capitol, through iTunes, sold a unique file.  They certainly

16    say they're selling music tracks.  They sold a file.  Me, as a

17    consumer, I have purchased that file.  I am entitled to the

18    rights associated to that file.  That is property for me, okay?

19                Now, under 109, once I purchased that file, the

20    distribution rights of Capitol, they're extinguished.  And,

21    now, I have the right to sell, dispose or destroy.  It's my

22    choice.  But what Capitol is saying, you don't have that right.

23    You only have the right to destroy it.  You don't have the

24    right to sell, and that's -- that's the antithesis of what 109

25    is about.  109 --

CA5PCAPC

1            THE COURT:  Can I -- It seems to me Redigi 2.0 is

2      basically saying we've got this code.  You've purchased the

3      access rights to that code, but before it gets downloaded on

4      your hard drive, it's going to get sent someplace else so that

5      the only phono record, under 2.0, is going to be sitting on a

6      server in Phoenix.

7            MR. ADELMAN:  That's correct.

8            THE COURT:  And so Mr. Mandel said, that's not his

9      case.  He's not pushing that case now, but that's where you

10     have moved to.  Isn't that where we ought to be focused?

11           MR. ADELMAN:  Well, I think that's part of it,

12     absolutely.  And as their technology develops, it's going to

13     get stronger and stronger.  But certainly, this was part of the

14     plan from the beginning, which was cloud storage is where it's

15     at.  It's what everybody is moving to.

16           Everybody wants stuff in their cloud.  They want to

17     access it everywhere.  In fact, iTunes and Capitol, they have a

18     whole section of their agreement which focuses on cloud

19     service, and it allows all of those things that we've been

20     discussing to happen, move the files to the cloud service.

21           THE COURT:  I know that.  I get all that.  If we're

22     looking at the language of section 106 and 101, which is where

23     the definition of phono records is, I mean, it seems to me that

24     what we're dealing with there is a very antiquated provision,

25     which limits the focus to material objects in which sounds are

CA5PCAPC

1    fixed, which requires a process of taking code, putting it on a

2    server someplace, and that is the phono record.

3              MR. ADELMAN:  Correct, your Honor.  And in 2.0, that's

4    what Redigi does.  The user, instead of it coming directly onto

5    the user's hard drive, it's just directed to the user's Redigi

6    cloud.  So that's the first time that it's fixed and --

7              THE COURT:  Right.  I think you've got a great

8    argument under 2.0.  I think you've got a much tougher argument

9    under the original, classic version of Redigi.  Because it

10   seems to me what you're talking about is the process.  The

11   migration is not really any different than my playing my record

12   here, putting the phone next to it and having somebody record

13   it at the other end of the phone.

14             MR. ADELMAN:  No, it's.

15             THE COURT:  Let me finish.

16             MR. ADELMAN:  Sorry, your Honor.

17             THE COURT:  The phono record is here, and there's a

18   new reproduction of the phono record at the other end of my

19   phone.

20             MR. ADELMAN:  It's not.  It's the same data that was

21   on the hard drive.

22             THE COURT:  It's the same data that's basically coming

23   off of my record player.

24             MR. ADELMAN:  You know, what's not on the recording on

25   your phone?  The metadata that's encircled in that.  That's one

CA5PCAPC

1    thing.

2             THE COURT:  But the statute doesn't say anything about

3    metadata.

4             MR. ADELMAN:  No, what I'm saying is --

5             THE COURT:  It just says sounds.

6             MR. ADELMAN:  Yes, I understand, your Honor.

7             THE COURT:  It could be a crappy recording, and it's

8    still a copyright.

9             MR. ADELMAN:  That's a copy.  What Redigi is doing

10   technologically is not a copy.  It is actually taking the

11   unique file that you purchased from iTunes and moving it from

12   the computer's hard drive to the cloud's hard drive.

13            THE COURT:  I get that, but I'm not sure it isn't

14   still a new phono record, a reproduction phono record because

15   the way the statute is set up is it focuses on the material

16   objects in which the sounds are fixed.

17            You are focused on the unmaterial, the code that is in

18   the ether, and I don't think that's what the Copyright Act is

19   about.  Now, again I think Redigi 2.0 may have made all of this

20   obsolete.

21            MR. ADELMAN:  The copyright, well, reproduction is not

22   defined in the Copyright Act.  The case law indicates that

23   reproduction, in essence, is two files existing at the same

24   time, and that never happens with Redigi.  There's only one

25   file existing at one time; so therefore, it's the same material

CA5PCAPC

1    object.  It's just in a different place.

2         THE COURT:  But it's sort of like if I combined my

3    photocopier and my shredder so that I made a photocopy and the

4    original, instead of coming out of the bin where I can pick it

5    up, goes straight to the shredder.  The two don't exist at the

6    same time, but it seems to me the other one is still a copy.

7         MR. ADELMAN:  They actually do exist at some point

8    together, in your scenario.

9         THE COURT:  No, they don't.  No, they don't.  It takes

10   a minute for that image to get transported from the original to

11   the copy, and if in the interim, while that is taking place,

12   the transfer to the second page is taking place, the original

13   is getting shredded, then they don't both exist at the same

14   time.

15        MR. ADELMAN:  But in Redigi's technology, there's no

16   copy.  They're pulling the exact file from the hard drive.

17   There's no copy; so there's nothing to be shredded.  There's

18   nothing to be deleted.  There's no shredding or delete.  This

19   is not a forward and delete situation.

20        THE COURT:  I guess I'm not buying necessarily the

21   argument that, as long as the two don't exist at the same time,

22   then the second one is not a copy.  I think you could use that

23   argument --

24        MR. ADELMAN:  Right.

25        THE COURT:  -- to justify the photocopy I just talked

CA5PCAPC

1    about not being a copy; so I don't think that's what the

2    language of the statute is.

3            MR. ADELMAN:  Yes, but the -- Well, I don't think the

4    language -- I think the language of -- As the case law has come

5    down, that's basically what's been intimated, that a copy is

6    like the file sharing.  You have a copy on your file sharing,

7    and then you down load millions of copies to all types of

8    people.  That's reproduction.  There's no question about that.

9            But Redigi is not copying or reproducing at all.  It's

10   how their technology works.  We spent a lot of time with

11   declarations trying to explain exactly how it works, that there

12   is no copying involved whatsoever.  There's no deleting.  It is

13   the actual file that is being transported like in your Star

14   Trek example or migrating.

15           THE COURT:  Or your Willy Wonka.

16           MR. ADELMAN:  Or my Willy Wonka.

17           THE COURT:  Nicely done.

18           MR. ADELMAN:  That's migrated.  That's how the

19   technology works.  That's what the evidence says.  There's no

20   rebuttable evidence in this case that says it doesn't work that

21   way.  And that's what -- that's actually, I think, the heart of

22   the case, is that there's no two copies ever at the same time.

23   That's reproduction.

24           There's no reproduction.  Capitol only has a

25   reproduction right.  They don't have a copying right.  Copying

CA5PCAPC

1   is not in the statute.  Reproduction is what's been defined as

2   the right, and there is no reproduction of the file in the

3   Redigi system ever.

4            THE COURT:  Now, we haven't talked about it in the

5   papers, spent a lot of time on this, is that certainly

6   previously your client, through different counsel, has made

7   statements that copying does take place.  The only copying

8   which takes place in the Redigi service occurs when a user

9   uploads music files to the Redigi cloud.  Thereby storing

10  copies thereof in the user's personal cloud locker.

11           Now, I know you've worked hard to make that an

12  ambiguous statement, but, boy, that seems pretty emphatic.

13  Maybe that's why he is no longer counsel of record.  I don't

14  see how you get past that.

15           MR. ADELMAN:  Well, there are a number of ways to get

16  past that.  First of all, in the answer we've clearly denied

17  copying.

18           THE COURT:  Well, you can deny copying, but then when

19  you say that, it sure looks like you just admitted certain

20  facts that are going to be fatal.

21           MR. ADELMAN:  It's not what's actually happening,

22  though.  That's the first thing.  The second thing is, it's

23  taken out of context.

24           THE COURT:  What is it taken out of context?

25           MR. ADELMAN:  The only copying that takes place when a

CA5PCAPC

1    user uploads music to a Redigi cloud.  It is like we explained

2    in our files, it was not explained in the PI hearing papers.

3    We have explained --

4              THE COURT:  Thereby storing copies thereof in the

5    user's personal cloud locker.  This sentence says that what

6    what's in the cloud locker is a copy.  That's what it says.

7    And it says it's a copy that results from the Redigi service

8    and the user uploading music, right?

9              MR. ADELMAN:  No.  I mean, it's -- The way that cloud

10   locker storage works is that people put copies up into the

11   cloud.  Redigi is not copying.  It's not a judicial admission.

12   It's within PI papers.  In the answer they clearly said they

13   were not copying.

14             It's very difficult, especially in a preliminary

15   injunction situation, technology is often very hard to

16   describe.  It's often very hard when you just met your lawyer,

17   you're putting together papers in a very quick scenario.  I had

18   the ability to spend weeks with the plaintiffs discussing their

19   technology, understanding their technology, understanding what

20   they were doing, and understanding what it did.  That is why

21   our motion papers look the way they do.

22             It's unfortunate that we have to explain this away

23   because we shouldn't have to because no copying occurs on the

24   system.  The only copy that they were talking about here was an

25   archival copy that was -- that, in the event that there was no

CA5PCAPC

1    other copies on the system, they would place an archival copy

2    on the system in the --

3         THE COURT:  Look, that's not -- That is just not what

4    this statement says.  I think that's said.

5         MR. ADELMAN:  It's the essence of what it means, your

6    Honor.

7         THE COURT:  No.  Look, you may have changed your

8    theory.  You may have come to a deeper understanding of the

9    technology, but there's no way that statement is referring to

10   an archival copy.  That's just -- I mean, that is -- you can't

11   defend it as that.  You can't do it.

12        MR. ADELMAN:  Well, your Honor, they don't copy.  It's

13   a colloquial use of the word.  It just doesn't reflect what was

14   happening with the system.

15        THE COURT:  Well, I mean, you're moving for summary

16   judgment too.  It would seem to me, at the very least, based on

17   the statements that were made that I just recited, there is a

18   disputed fact between your former lawyer and your current

19   expert as to what exactly goes on with this process.

20        Should I make a credibility finding as to whether your

21   expert is making sense, or whether the more accurate statement

22   is the one that was previously made on your client's behalf?

23        MR. ADELMAN:  I don't think that you would have to do

24   that.  I think that, based on that there's no other evidence

25   other than declarations from the people who have put together

CA5PCAPC

1    the technology stating, under oath that this is the way it

2    works, that your Honor can rely on it.

3        There's no opposing -- There's nothing from Capitol

4    saying it doesn't work that way.  They didn't look at the

5    technology.  They had the opportunity to look at the

6    technology.  The only evidence in the record is that no copying

7    takes place.  That is the evidence before you, your Honor.

8        THE COURT:  I mean -- All right.  And Mr. Mandel can

9    respond to that.  All right.  There are other points you want

10   to hit on?  What about 2.0.  Mr. Mandel says we're not here to

11   talk about 2.0.

12       MR. ADELMAN:  We are here to talk about Redigi and

13   Capitol's claim that they violate the reproduction right.  If

14   Capitol -- and the distribution right.

15       On top of that, what Capitol is trying to claim, which

16   I think is ridiculous, that the first sale doctrine does not

17   apply to digital goods.  Certainly 2.0 is in play here.

18       THE COURT:  2.0 didn't come out until -- is a

19   Johnny-come-lately in terms of this case, right?

20       MR. ADELMAN:  No.  I'm sorry.

21       THE COURT:  When was this disclosed in this discovery,

22   that 2.0 was coming out?

23       MR. ADELMAN:  That 2.0 was already out.

24       THE COURT:  When was 2.0 disclosed as part of

25   discovery?

CA5PCAPC

1          MR. ADELMAN:  Probably, you know, within two or three

2     weeks before the end of discovery.

3          THE COURT:  All right.  I mean, it's not supposed to

4     work that way, but the case has radically changed because since

5     the filing of the papers, you are have changed your technology

6     in a significant way.  I don't think it's appropriate to say

7     that they're locked into the discovery deadline that prevents

8     them from assessing this technology when a your argument is now

9     different than what it was at the time you --

10          MR. ADELMAN:  It's not the argument that's different.

11     It's the technology -- the technology has improved to the point

12     where it fits in, even with what the plaintiffs are saying.

13          THE COURT:  But it's certainly different.  I mean, it

14     has an impact on Mr. Mandel's arguments.  It may not make a

15     difference as far as you're concerned, but Mr. Mandel's

16     arguments are premised not on 2.0, but on classic.

17          MR. ADELMAN:  I agree.  But what I'm saying is even

18     under Mr. Mandel's arguments, 2.0 is perfectly proper.

19          THE COURT:  Well, Mr. Mandel is saying 2.0 is not his

20     complaint, and it's not been tee'd up in this action.  You're

21     saying it is tee'd up in this action.  And I'm asking you,

22     well, if it is tee'd up in this action, don't I have to allow

23     additional discovery?

24          MR. ADELMAN:  Well, what -- I'm -- No because the --

25     We gave them the opportunity to look at the technology.  The

CA5PCAPC

1    technology for 2.0 was already in place.  It just wasn't

2    released yet.

3            THE COURT:  Well, you said in two weeks --

4            MR. ADELMAN:  I'm sorry.  Wait.  Your Honor, I

5    apologize.

6            THE COURT:  No.

7            MR. ADELMAN:  I came onto this case on April 24th.

8            THE COURT:  Okay.

9            MR. ADELMAN:  And one of the first things that I

10   discussed with plaintiff's counsel was the technology and

11   looking at it.  That was two months before the end of

12   discovery.  Redigi 2.0 -- we're calling it 2.0, but it's just

13   all part and parcel to the same system.  It just has different

14   effects, okay -- was readily available for them to look at at

15   that time.

16           Because of marketing efforts, it wasn't released until

17   the end of May.  And they chose not to take the depositions of

18   my clients until the middle -- until the middle, late end of

19   May.  I understand the discovery schedule was short, and I was

20   only on this case for less than a minute, you know.  And we put

21   it together.  But nevertheless, they had their opportunities.

22   And, in fact, when they wrote you somewhere around June 20th,

23   they already knew about Redigi 2.0 but did not make the

24   request.

25           THE COURT:  But it's their complaint, right?

CA5PCAPC

1          MR. ADELMAN:  I agree it's their complaint.

2          THE COURT:  So if they want this to be about Redigi

3    classic, I mean, why do you get to say no, no, no, I've decided

4    this is about something else?

5          MR. ADELMAN:  Well, it's not necessarily about

6    something else.  It's still the same law, and we're arguing the

7    same arguments.  What we're just saying is, hey, you know, even

8    if what you say is correct, Redigi 2.0 complies with that.

9          THE COURT:  Well, I'm not --

10          MR. ADELMAN:  So I hear what -- I'm sorry.

11          THE COURT:  I'm not sure they're disagreeing.  I'm not

12    sure Mr. Mandel wants to engage on that right now.  Is that

13    right, Mr. Mandel?

14          MR. MANDEL:  No.  Actually, we do disagree, and we did

15    brief, after our other arguments, as to why we think Redigi 2.0

16    also is a violation on the limited information we had.

17          THE COURT:  But I asked you a minute ago, and you said

18    it's not this case.

19          MR. MANDEL:  We don't think it's this case, but

20    obviously, they made a motion, and I don't know what your Honor

21    is going to say is a part of this case or not.  If you're going

22    to consider it and think we're not entitled to discovery, we do

23    have an argument as to why we think it's a violation.  But our

24    basic position is, no, it's not part of this case.  Certainly,

25    if it is going to be part of this case, we have to have an

CA5PCAPC

1    opportunity for further discovery.

2              THE COURT:  Okay.  Mr. Adelman?

3              MR. ADELMAN:  Yes, your Honor.

4              THE COURT:  Any other points you wanted to make?

5              MR. ADELMAN:  Since you asked us not to make policy

6    arguments, if you wouldn't remind if I just reviewed my notes

7    for a second.

8              THE COURT:  Sure.  Take your time.

9              MR. ADELMAN:  If I could just address the DMCA report

10   for a second.  Our response to that is that the DMCA report is

11   not binding.  It's only entitled to get more deference based on

12   the power to persuade, and the Second Circuit has already

13   declined to follow this report's interpretation concerning

14   duration or requirements in cartoon networks.

15             The one part that I want to address about the report

16   is that Mr. Mandel said that they talked about moving, and the

17   technology was already available.  I didn't see anywhere in the

18   report that it discussed moving.  What it discussed was forward

19   and delete.  And, actually, it did say that --

20             THE COURT:  What did say?

21             MR. ADELMAN:  That the report did say that the -- that

22   their findings were premised on the fact that technology was

23   not available in 2001 to be able to effectuate Section 109, and

24   the report itself conceded that if the right technology was

25   available, it may be conceivable.  So I think that that rebuts

CA5PCAPC

1    Mr. Mandel's arguments on that point.

2              Unless your Honor has any other questions....

3              THE COURT:  No, I don't think I do.  I'll give

4    Mr. Mandel an opportunity to respond, if he wants.

5              MR. ADELMAN:  Thank you, your Honor.

6              THE COURT:  Okay.  Thank you, Mr. Adelman.

7              MR. MANDEL:  Your Honor, you know, Mr. Adelman talks

8    about they filed a patent, but I think it's important to point

9    out the patent they filed is not on this so-called Star Trek

10   technology that we're hearing about today.  In fact, if you

11   look at the language of the patent, which was put in our

12   papers, what it actually says is for a digital media object,

13   which is a music file, to be offered for sale.  It is first

14   copied to a remote server, and served on the disk.

15             That's the way they described their technology in the

16   patent they applied for, which Mr. Adelman just said is the

17   patent that they have.  There's nothing about some migration

18   process that, apparently, now they've decided is what truly the

19   technology is.  And while, for all the reasons I've said, I

20   don't think it's necessary to delve into the technology.

21             I do think that even if you look at it at the

22   technological level, based on the evidence before your Honor,

23   that it is clear that they delete the file.  Because what are

24   our expert said in response, they said this in paragraph 14 of

25   his declaration and it's not disputed in the reply

1    declarations, that basically they use a function called set and

2    defile.  At least that's what they use in the Windows

3    environment.

4           And what that does is effectively truncates the

5    original file that's on the user's hard drive in pieces; so as

6    each piece is read into memory, they truncate that original

7    file so it gets smaller and smaller until, by the end, it's of

8    zero length and it no longer has the recording there.

9           Now, our expert said, and don't dispute this, that the

10   only reason that's there -- that has nothing to do with getting

11   the file to the cloud.  That's there for one reason and one

12   reason only, to make sure that that file that existed on the

13   hard drive can no longer be accessed and that the original file

14   is no longer on the user's hard drive.

15          So if that didn't exist, if they weren't using that

16   truncate function to set and defile, you could do everything

17   they do.  Take it in reverse order, read it in pieces, and

18   nobody would be disputing that there's a copy because that

19   would just be a basic upload, like any other upload, that ends

20   up with two copies.  One here, the original, and one in the

21   cloud.

22          Now, obviously, they didn't want that to happen; so

23   they had to figure out a way to make sure.  It wasn't good

24   enough to just read it in reverse order and send it up that

25   way, because you'd still be left with two, and that would

CA5PCAPC

1    defeat their argument on reproduction.  So they have this

2    additional function, set and defile.

3              THE COURT:  You think that's just a shredder?

4              MR. MANDEL:  Exactly.  That's what it is.  It serves

5    no purpose in terms of making sure that it's duplicated.  It's

6    there only to be shredded.  Now, they say there's no evidence

7    in the record, but there's the evidence of their own

8    admissions, and not just in the brief.  There's the statement

9    in the answer, upon the upload of an eligible file to the

10   cloud, such file is deleted.  Such file and all other copies.

11   That's their language.  That's how they affirmatively described

12   it, and now they say, well, "such file" means the archival copy

13   that we were making temporarily.

14             That's preposterous.  I mean, that's not what it says.

15   It says such file in reference to the eligible file is deleted.

16   And they said it again in their deposition on two occasions

17   when they confirmed that that statement was accurate, and

18   that's a statement that they made in a sworn declaration.  So

19   there is evidence that comes right from them that unequivocally

20   establishes that there is a deletion, and that we're only

21   talking about characterization.

22             And in terms of the copyright office report, if I can

23   just read from Page 81, what it says, they're talking about the

24   proposals.

25             THE COURT:  Page 81 of?

CA5PCAPC

1           MR. MANDEL:  Of the DMCA report that the copyright

2    office did, and they're talking about the similarities between

3    a physical transfer and the technological process that's going

4    to happen online.  And they say, "Some of these proposals would

5    enhance the similarity by requiring the use of technological

6    measures, in some cases referred to as 'move' or 'forward and

7    delete' technology that will disable access to or delete

8    entirely the source file upon transfer of a copy of that file."

9           So it is the same thing they were talking about, and

10   Redigi has said, we didn't invent something new.  It's not like

11   we came up with a new way to do uploads.  In fact, we're using

12   a very old way, and, in fact, they admitted that they delete

13   the file.

14          Now, Mr. Adelman says, why is it so hard to believe?

15   I mean, one of the reasons it's hard to believe is that if you

16   really had this new technology and you were coming into court

17   to defend a preliminary injunction, where you claim your whole

18   business is at stake, I think that might be front and center.

19   It might be one of the first things he said.  Oh, by the way,

20   our technology doesn't make a copy.  But they didn't say

21   anything close to that.

22          In fact, they admitted, clearly and unequivocally, in

23   the brief that they made a copy.  They admitted in the

24   declaration and in the answer, that they delete, and they

25   acknowledge that it at the deposition.  So the evidentiary

CA5PCAPC

1   record is absolutely clear on this point, and there is a

2   violation of the reproduction right.

3          And, in essence, all we have is what they're trying to

4   say, what they're straining to say, well, but there's not two

5   copies at the same time; so therefore, it shouldn't be a

6   reproduction.  But that's not what it means.  I mean, I -- for

7   the reasons that your Honor said.  I mean, if I stood at my

8   photocopy machine and page by page copied it and shredded the

9   page that I copied, there's no dispute that you wouldn't have

10  two at the same time, but what you'd end up with is a copy.

11         The fact of the matter is, the Copyright Act does not

12  permit you to reproduce the work and sell the reproduction.

13  Even if you destroyed the original.  Whatever you do with the

14  original is irrelevant.  Now, I think that really disposes of

15  the reproduction right, and with it, the first sale defense, as

16  well.

17         And I just want to such briefly on the first sale

18  defense.  Mr. Adelman talks about London-Sire, and the fact

19  that a material object doesn't need to exist throughout the

20  process, but London-Sire is a distribution case.  London-Sire

21  is not analyzing a first sale defense to decide whether the

22  particular phono record, which they used to begin, is what's

23  been sold.  They were just analyzing whether there's a

24  violation of the distribution right, and they reached the

25  sensible conclusion, the same conclusion the Supreme Court

CA5PCAPC

1    reached in Tasini, that, yes, that's a violation of the

2    distribution right.  You are distributing with a phono record.

3              If you end up one here and you end up with one at the

4    other end of the process, that's a violation of the

5    distribution right.  But that's not the question that you have

6    to look at for first sale.  For first sale purposes, it has to

7    be the particular phono record, and if you look at London-Sire,

8    even they were very careful in a passage that really didn't

9    matter for purposes of the issue they were deciding, but is

10   critical in the context of this case.  They said, or more

11   precisely, when they were describing what the phono record is,

12   it's the electronic file or more precisely the segment of the

13   hard drive on which the electronic file can be found.

14             And that really is the point, that it's not the

15   electronic file, the data floating in the air that's the

16   material object.  It is the hard drive, and for those reasons,

17   the distribution right is violated, but there is no first sale

18   defense.  There's no inconsistency between those two positions

19   because you're interpreting different statutory language that

20   applies in each case.  Phono record is the same, but the rest

21   of those provisions is not the same.

22             The last point I want to just briefly talk about is

23   Redigi 2.0.

24             THE COURT:  I thought you didn't want to talk about

25   that.

CA5PCAPC

1          MR. MANDEL:  Well, I want to talk about where it fits,

2     and since your Honor has asked about it and is interested; so I

3     want to explain our position on that clearly.

4          First of all, Redigi 2.0, according to the deposition

5     testimony, was implemented on June 11th, 2012.  We didn't take

6     the depositions in late May.  We took the deposition of their

7     witnesses June 20th, I believe the 20th and the 19th, right at

8     the close of the discovery period, literally the day the

9     discovery period was closing.

10         And that's when we found out about it, in a

11    deposition, when -- it wasn't something that anybody was even

12    focusing on or new existed.  It came up in answer to a question

13    that, oh, we do it this way now.  So, you know, it's clear that

14    we didn't have an adequate opportunity to fully flush this out

15    and figure out what's involved.  And that is the reason why,

16    first of all, we say it would be an advisory opinion, it's not

17    an issue here.  And, secondly, certainly if it's going to be

18    considered, there has to be a full opportunity for discovery.

19         Now, the discussions with counsel, and I think this is

20    an important point, part of the problems we had, to be honest,

21    is we were shooting at a moving target.  You know Mr. King had

22    discussions with their prior counsel in which he frankly said,

23    look, we don't think we need to look at your technology if the

24    position you're taking is that it's a copy, and that's conceded

25    as you said in your preliminary injunction papers.  And he

CA5PCAPC

1   said, yeah, that's our position, and that's not in dispute.

2          We also submitted two case management plans to your

3   Honor, including one after Mr. Adelman was substituted in, that

4   specifically said the parties believe that the issues can be

5   resolved on summary judgment following fact discovery, and

6   that's why we're asking that you put off expert disclosures,

7   put off expert discovery until after the summary judgment

8   dates.

9          Now, we still believe that, based on the arguments we

10  made, but the fact of the matter is, they changed completely

11  the position that they were asserting.  A part of our reason

12  for believing that was we thought we were all in agreement

13  that, of course, a copy is made and a deletion has occurred, as

14  they had said repeatedly.  So to now try and say, by the way,

15  we implemented a new technology that was not the subject of

16  your complaint, that was not disclosed in any documents we

17  produced, that was revealed for the first time in a deposition

18  the day before discovery closed or perhaps the day discovery

19  closed, and now it's tee'd up for decision I think is just not

20  fair, and it violates basically Rule 56D and the reason you

21  have that there.  That if you need an opportunity for further

22  discovery, you should be given that.

23          So our position is it's not part of this case.  If it

24  is part of this case, we should have some discovery on it.  But

25  finally, if your Honor disagrees with us on those two points,

CA5PCAPC

1    and says, yes, it is part of this case, we don't agree that

2    it's not a violation.  And we've explained that in our

3    opposition brief.

4            And the reason for that is it's not the case that this

5    is just limited to the Redigi cloud.  I think the deposition

6    testimony that Mr. Ossenmacher offered when he first told us

7    about this technology, was that the file appears in two places

8    virtually simultaneously, in the Redigi cloud and also on the

9    user's hard drive; so that there are two copies.  So it's not

10   the case that there's one copy that's delivered just to the

11   Redigi cloud, and more fundamentally, it's not the case that

12   Redigi has any right to intervene in the relationship here and

13   deliver it in a different manner.

14           Certainly that's part of the Capitol/Apple

15   transaction.  I mean, Capitol and Apple are not agreeing that,

16   by virtue of this, that the downloads can appear in a non-Apple

17   environment.  That's not what the agreement says; so there are

18   issues there that would really need to be thought about,

19   developed and further looked at.

20           By no means do I want to say today that we concede

21   that Redigi 2.0 is okay.  We don't concede that point, but we

22   just don't think this is the appropriate vehicle, this motion,

23   to actually resolve that question.  And the question that

24   brought us to court, and what is at the heart of this case, is

25   that they were setting up a used marketplace that would cover

CA5PCAPC

1   all kinds of existing music that's already been purchased from

2   iTunes that's on users' hard drives that they would now be able

3   to resell.

4        What's going to happen in the future with respect to

5   if somebody who buys something in June has decided, you know,

6   they want to resell that, that's for another day, but that's

7   not what caused this lawsuit to be filed.  And that's what

8   we're seeking relief against.  That's why we're here, and

9   that's what we think is really at the heart of this case.

10       THE COURT:  All right.  Thank you.

11       Mr. Adelman, anything you want to say in response?

12   Any last words?

13       MR. ADELMAN:  Yes, some short comments.  All right.

14   So one point that I want to just address was that Mr. Mandel

15   said earlier that he said that files moving within the same

16   hard drive must be okay, but I think one of the things with

17   Redigi 2.0 is we have to know what uses fall within this

18   statute and what uses fall without.  Why is it okay to move

19   files on my own hard drive and that doesn't violate the

20   production, but to move my file to a cloud does violate

21   reproduction?  It doesn't seem to make sense to me.

22       THE COURT:  But wait, isn't that the same difference?

23   Just if I record my album to my cassette, and then put it in my

24   walkman, which I had 20 years ago, but are you suggesting that

25   is a violation or is not a violation?

CA5PCAPC

1          MR. ADELMAN:  No.  What I'm saying is that the

2     computer itself moves the file around, through certain actions,

3     to make things more efficient, et cetera.  And Mr. Mandel said

4     earlier that that would be ridiculous, that wouldn't be a

5     violation, but the file is clearly moving.  It's clearly moving

6     around the hard drive.

7          So what I'm saying is, there's no difference between

8     the file moving around a hard drive and the file moving to a

9     cloud drive.  It's the same file is what I'm saying.

10          I just want to clarify that the patent that Mr. Mandel

11     was just referring to is not the patent that I was talking

12     about.  There's a second patent.  The patent that Mr. Mandel

13     was talking about is a business model patent that Redigi filed

14     early on.  The patent that I'm talking about is a process

15     patent, which specifically discusses the migration process.

16          THE COURT:  And when was that filed?

17          MR. ADELMAN:  That was filed within the last month or

18     two.

19          THE COURT:  Okay.  But why wouldn't you be also held

20     accountable to what you say in your patents, you know, as a

21     business model?

22          MR. ADELMAN:  I think we do, but there's a difference

23     between a process patent and a technology patent.  A

24     business -- a process patent and a business model patent.

25     There's differences.  And taking what Mr. Mandel just said out

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CA5PCAPC

1    of context is not necessarily the whole of what the patent

2    stands for.

3              There's no question that on our computers we do

4    delete.  Though, I don't like the word delete because nobody

5    really deletes.  I mean, when you delete something off your

6    computer, it goes into the trash.  It's not really deleted.

7    When you move it from the trash, it's still not really deleted

8    because anyone whose hard drive has crashed and has gone to the

9    genius bar knows that sometimes they can recover it.

10             THE COURT:  Right.

11             MR. ADELMAN:  In this case, it's not deleted because

12   it's not there anymore.  This end truncates the argument that

13   their supposed expert, which -- who's only in security and not

14   really in computer science, said it's just not the way it

15   works.  The way it works is the way it's described in our

16   papers, the way it's described in the declarations, and the way

17   I've described it today, is that the file actually moves,

18   leaves no data.  The only thing that's left when the file moves

19   is the name of the file.

20             THE COURT:  Okay.

21             MR. ADELMAN:  A couple other points.  You mentioned

22   the London-Sire point.  That was actual reproduction.  It's a

23   file sharing case.  That's what -- that two different files at

24   two different places because there was a reproduction.  In this

25   case, it is the particular phono record that Redigi is selling.

CA5PCAPC

1    It is the particular phono record that they're migrating from

2    the hard drive to the cloud.

3            THE COURT:  Wait, wait, wait.  They're migrating the

4    phono record?

5            MR. ADELMAN:  They're migrating the unique file.  The

6    unique file that they purchased from iTunes is my --

7            THE COURT:  The phono record is not the file.  The

8    phono record is the material thing that allows a listener to

9    hear sounds, right?

10           MR. ADELMAN:  Right.

11           THE COURT:  And so it's when you have that piece of

12   code, the file, on a particular material thing, which is, in

13   this case, a hard drive; it's no longer in the turntable --

14           MR. ADELMAN:  Right.

15           THE COURT:  -- that's the phono record, right?

16           MR. ADELMAN:  That -- Yes.  It's the same phono record

17   in the cloud, though.  It is.

18           THE COURT:  Well, how is it the same phono record?

19   Phono record is a material thing.  So how can you say that

20   what's in the cloud is the same as the thing that's on my desk?

21           MR. ADELMAN:  Because you can perceive it and listen

22   to it.

23           THE COURT:  But that's -- It's material.  Listening to

24   something doesn't make it material, right?

25           MR. ADELMAN:  No.

CA5PCAPC

1          THE COURT:  A material -- I listen to the radio all

2     the time.  The radio is material; the songs aren't.

3          MR. ADELMAN:  The ability to hear it, though.

4          THE COURT:  The ability to hear it makes it material?

5          MR. ADELMAN:  Without the material object, there could

6     be no ability to hear it.

7          THE COURT:  But that is the point.  That is what the

8     phono record is.  It is a material object in which sounds are

9     fixed, and so the argument of the plaintiffs is that the phono

10    record is the file on a hard drive.

11         MR. ADELMAN:  The hard drive --

12         THE COURT:  And that you, therefore -- that to have

13    the same thing, the same original in Phoenix is a non sequitur,

14    right, if the hard drive is still on my lap?

15         MR. ADELMAN:  It's just the same as in CM Paula.

16         THE COURT:  But that's a 1973 case involving greeting

17    cards and somebody taking stencils and putting them on top of

18    greeting cards.

19         MR. ADELMAN:  The logic still applies.

20         THE COURT:  But that logic is -- I'm not bound by that

21    logic.

22         MR. ADELMAN:  No, you're not.  I'm trying to persuade

23    you to that.

24         THE COURT:  All right.  So then you're really relying

25    on the Northern District of Texas.  That is your case.

CA5PCAPC

1          MR. ADELMAN:  That's a small point.  We're saying

2     there's no reproduction; so you're right.

3          THE COURT:  Okay.  But it seems to me you keep going

4     back to the suggestion, which is appealing to the casual

5     observer, that what you own is the sounds, but you don't.  When

6     you buy these things, what you own is the piece of code that's

7     on your hard drive or your iPod.

8          MR. ADELMAN:  Yes.

9          THE COURT:  That's the phono record.

10         MR. ADELMAN:  You own that particular copy.  Okay?

11    Having -- It would flip the law on its head if the law said

12    that in order to sell that phono record, I had to sell my hard

13    drive.  If I wanted -- I own that track.  For $1.29, I

14    purchased a music track from iTunes.  ITunes delivered it to

15    me.  Whether it's in my cloud, they delivered it to me, or on

16    my hard drive, it's mine.  I now own it.  It's a sale.  It

17    says --

18         THE COURT:  Now, I think you're moving into policy

19    arguments.  Now, I think you're arguing and there's some great

20    arguments there.  They're not for me, though.  They're really

21    for Congress, right?

22         MR. ADELMAN:  No.  They're actually for you.

23         THE COURT:  We the people make the laws.  You're

24    asking me to basically take over the drafting, and I guarantee

25    I can do it better than Congress will, but I don't have that

CA5PCAPC

1    authority.

2              MR. ADELMAN:  I think you do.  But I mean, Section 109

3    was created from Bobbs-Merrill.  Bobbs-Merrill was court's law.

4    Before Bobbs-Merrill there were some cases about first sale,

5    but it really didn't exist in the way it does today.

6    Bobbs-Merrill, in essence, codified first sale, and Congress

7    took Bobbs-Merrill and said, yes, this is what we want to do

8    now.  So, yes, I think you have the absolute right and power to

9    do so because I think --

10             THE COURT:  That's another conversation about courts

11   and their authority.

12             MR. ADELMAN:  I know, your Honor, but if I could just

13   say I think what Redigi is doing is perfectly proper under the

14   copyright law and, therefore, the arguments we're making are,

15   while may be policy, are founded in at least some law and, you

16   know, the arguments against the policy are nowhere.  There's no

17   evidence of it.

18             THE COURT:  Well, I think the argument is against the

19   policy having been made.  I don't think Mr. Mandel --

20             MR. ADELMAN:  I have not.  I don't mean the policy.  I

21   mean, the definitional issue about -- I mean, we argued it; so

22   I'm not going to reiterate it.

23             So the last two things.  One is that Mr. Mandel didn't

24   point out the page and section, but Mr. Ossenmacher in his

25   deposition never said that there are two copies.  He never

CA5PCAPC

1    said.  He described the technology exactly the way I've been

2    describing it today, the way we described it in our papers.

3    It's completely consistent.

4           And the last thing, his comment about iTunes.  ITunes

5    does not tell you you cannot -- where to put the file.  You

6    know, by default they put a file in a certain place; so that

7    the files get delivered all into the same folder.  But you

8    could put that folder anywhere, and there's nothing in the

9    terms -- A, there's nothing in the terms of service that says

10   you can't put that folder into the cloud.

11          In fact, Apple actually encourages you to put it into

12   their cloud or put it into, you know, any other space.

13   Nevertheless, Apple isn't here.  Apple isn't objecting to

14   Redigi putting the files into the cloud, and I don't think

15   that's an issue here.  Thank you very much, your Honor.

16          THE COURT:  Okay.  All right.  Let me thank all the

17   lawyers, those who argued and those who participated in

18   briefing and preparing for the arguments.  It really was very

19   exceptionally well done.  I thought the briefs were terrific.

20   I don't always get briefs of this caliber on a subject that's

21   very interesting in which, you know, obviously, the lawyers

22   have to educate the Court.  So that's, I think you did a good

23   job of that each of you so thanks.

24          I'm going to reserve.  I have a lot to think about.  I

25   know this is an important issue for both of your clients and

CA5PCAPC

1    beyond that.  There's a large public and other interests that

2    are very focused on this.  It's not lost on me, but again, I

3    want to just temper everyone's expectation to acknowledge that

4    we're in a court of law here.  We're not making policy on a

5    blank slate, and so ultimately, what this is about is

6    interpreting and applying an existing statute.  And where I end

7    up on that will make some people happy and some people unhappy,

8    but it's -- you know, don't confuse what I'm doing with what

9    the folks in Congress will be doing, where they will be

10   balancing different policy arguments and reaching conclusions

11   based on the strength of those arguments.  And so that's

12   something that eventually is going to have to happen and

13   probably is already happening.

14           Great.  Thanks a lot.  Let me thank the court

15   reporter, who has worked feverishly the whole time and we

16   really benefit greatly from her skills and talents.  Although,

17   the technology is truly not that advanced.  It hasn't changed

18   that much in 50 or 60 years.  Okay.  Thanks.  Have a good day.

19           (Adjourned)

20

21

22

23

24

25