UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

───────────────

No. 12 Civ. 95 (RJS)

───────────────

CAPITOL RECORDS, LLC,

Plaintiff,

VERSUS

REDIGI INC.,

Defendant.

───────────────

MEMORANDUM AND ORDER
March 30, 2013

───────────────

RICHARD J. SULLIVAN, District Judge:

Capitol Records, LLC ("Capitol"), the recording label for such classic vinyls as Frank Sinatra's "Come Fly With Me" and The Beatles' "Yellow Submarine," brings this action against ReDigi Inc. ("ReDigi"), a twenty-first century technology company that touts itself as a "virtual" marketplace for "pre-owned" digital music. What has ensued in a fundamental clash over culture, policy, and copyright law, with Capitol alleging that ReDigi's web-based service amounts to copyright infringement in violation of the Copyright Act of 1976 (the "Copyright Act"), 17 U.S.C. § 101, *et seq.* Now before the Court are Capitol's motion for partial summary judgment and ReDigi's motion for summary judgment, both filed pursuant to Federal Rule of Civil Procedure 56. Because this is a court of law and not a congressional subcommittee or technology blog, the issues are narrow, technical, and purely legal. Thus, for the reasons that follow, Capitol's motion is granted and ReDigi's motion is denied.

I. BACKGROUND

A. Facts

ReDigi markets itself as "the world's first and only online marketplace for digital used music."[1] (Capitol 56.1 Stmt., Doc. No. 50

───────

[1] The facts are taken from the pleadings, the parties' Local Civil Rule 56.1 Statements, the affidavits submitted in connection with the instant motions, and the exhibits attached thereto. The facts are undisputed unless otherwise noted. Where one party's 56.1 Statement is cited, the other party does not dispute the fact asserted, has offered no

("Cap. 56.1"), ¶ 6.) Launched on October 13, 2011, ReDigi's website invites users to "sell their legally acquired digital music files, and buy used digital music from others at a fraction of the price currently available on iTunes." (*Id.* ¶¶ 6, 9.) Thus, much like used record stores, ReDigi permits its users to recoup value on their unwanted music. Unlike used record stores, however, ReDigi's sales take place entirely in the digital domain. (*See* ReDigi Reply 56.1 Stmt., Doc. No. 83 ("RD Rep. 56.1"), 4 ¶ 16.)

To sell music on ReDigi's website, a user must first download ReDigi's "Media Manager" to his computer. (ReDigi 56.1 Stmt., Doc. No. 56 ("RD 56.1"), ¶ 8.) Once installed, Media Manager analyzes the user's computer to build a list of digital music files eligible for sale. (*Id.*) A file is eligible only if it was purchased on iTunes or from another ReDigi user; music downloaded from a CD or other file-sharing website is ineligible for sale. (*Id.*) After this validation process, Media Manager continually runs on the user's computer and attached devices to ensure that the user has not retained music that has been sold or uploaded for sale. (*Id.* ¶ 10.) However, Media Manager cannot detect copies stored in other locations. (Cap. 56.1 ¶¶ 59-61, 63; *see* Capitol Reply 56.1 Stmt., Doc. No. 78 ("Cap. Rep. 56.1"), ¶ 10.) If a copy is detected, Media Manager prompts the user to delete the file. (Cap. 56.1 ¶ 64.) The file is not deleted automatically or involuntarily, though ReDigi's policy is to suspend the accounts of users who refuse to comply. (*Id.*)

After the list is built, a user may upload any of his eligible files to ReDigi's "Cloud Locker," an ethereal moniker for what is, in fact, merely a remote server in Arizona. (RD 56.1 ¶¶ 9, 11; Cap. 56.1 ¶ 22.)

admissible evidence to refute that fact, or merely objects to inferences drawn from that fact.

ReDigi's upload process is a source of contention between the parties. (*See* RD 56.1 ¶¶ 14-23; Cap. Rep. 56.1 ¶¶ 14-23.) ReDigi asserts that the process involves "migrating" a user's file, packet by packet – "analogous to a train" – from the user's computer to the Cloud Locker so that data does not exist in two places at any one time.[2] (RD 56.1 ¶¶ 14, 36.) Capitol asserts that, semantics aside, ReDigi's upload process "necessarily involves copying" a file from the user's computer to the Cloud Locker. (Cap. Rep. 56.1 ¶ 14.) Regardless, at the end of the process, the digital music file is located in the Cloud Locker and not on the user's computer. (RD 56.1 ¶ 21.) Moreover, Media Manager deletes any additional copies of the file on the user's computer and connected devices. (*Id.* ¶ 38.)

Once uploaded, a digital music file undergoes a second analysis to verify eligibility. (Cap. 56.1 ¶¶ 31-32.) If ReDigi determines that the file has not been tampered with or offered for sale by another user, the file is stored in the Cloud Locker, and the user is given the option of simply storing and streaming the file for personal use or offering it for sale in ReDigi's marketplace. (*Id.* ¶¶ 33-37.) If a user chooses to sell his digital music file, his access to the file is terminated and transferred to the new owner at the time of purchase. (*Id.* ¶ 49.) Thereafter, the new owner can store the file in the Cloud Locker, stream it, sell it, or download it to her computer and other devices. (*Id.* ¶ 50.) No money changes hands in these transactions. (RD Rep. 56.1 5 ¶ 18.) Instead, users buy music with credits they either purchased

---

[2] A train was only one of many analogies used to describe ReDigi's service. At oral argument, the device was likened to the Star Trek transporter – "Beam me up, Scotty" – and Willy Wonka's teleportation device, Wonkavision. (Tr., dated Oct. 5, 2012 ("Tr."), 10:2-12; 28:15-20.)

2

from ReDigi or acquired from other sales. (*Id.*) ReDigi credits, once acquired, cannot be exchanged for money. (*Id.*) Instead, they can only be used to purchase additional music. (*Id.*)

To encourage activity in its marketplace, ReDigi initially permitted users to preview thirty-second clips and view album cover art of songs posted for sale pursuant to a licensing agreement with a third party. (*See* RD 56.1 ¶¶ 73-78.) However, shortly after its launch, ReDigi lost the licenses. (*Id.*) Accordingly, ReDigi now sends users to either YouTube or iTunes to listen to and view this promotional material. (*Id.* ¶¶ 77, 79.) ReDigi also offers its users a number of incentives. (Cap. 56.1 ¶ 39.) For instance, ReDigi gives twenty-cent credits to users who post files for sale and enters active sellers into contests for prizes. (*Id.* ¶¶ 39, 42.) ReDigi also encourages sales by advising new users via email that they can "[c]ash in" their music on the website, tracking and posting the titles of sought after songs on its website and in its newsletter, notifying users when they are low on credits and advising them to either purchase more credits or sell songs, and connecting users who are seeking unavailable songs with potential sellers. (*Id.* ¶¶ 39-48.)

Finally, ReDigi earns a fee for every transaction. (*Id.* ¶ 54.) ReDigi's website prices digital music files at fifty-nine to seventy-nine cents each. (*Id.* ¶ 55.) When users purchase a file, with credits, 20% of the sale price is allocated to the seller, 20% goes to an "escrow" fund for the artist, and 60% is retained by ReDigi.[3] (*Id.*)

### B. Procedural History

Capitol, which owns a number of the recordings sold on ReDigi's website, commenced this action by filing the Complaint on January 6, 2012. (*See* Complaint, dated Jan. 5, 2012, Doc. No. 1 ("Compl."); Cap. 56.1 ¶¶ 68-73.) In its Complaint, Capitol alleges multiple violations of the Copyright Act, 17 U.S.C. § 101, *et seq.*, including direct copyright infringement, inducement of copyright infringement, contributory and vicarious copyright infringement, and common law copyright infringement. (Compl. ¶¶ 44-88.) Capitol seeks preliminary and permanent injunctions of ReDigi's services, as well as damages, attorney's fees and costs, interest, and any other appropriate relief. (*Id.* at 17-18.) On February 6, 2012, the Court denied Capitol's motion for a preliminary injunction, finding that Capitol had failed to establish irreparable harm. (Doc. No. 26.)

On July 20, 2012, Capitol filed its motion for partial summary judgment on the claims that ReDigi directly and secondarily infringed Capitol's reproduction and distribution rights. (Doc. No. 48.) ReDigi filed its cross-motion the same day, seeking summary judgment on all grounds of liability, including ReDigi's alleged infringement of Capitol's performance and display rights.[4] (Doc. No. 54.) Both parties

---

[3] On June 11, 2012, ReDigi launched ReDigi 2.0, new software that, when installed on a user's computer, purportedly directs the user's new iTunes purchases to upload from iTunes directly to the Cloud Locker. (RD 56.1 ¶¶ 40-41.) Accordingly, while access may transfer from user to user upon resale, the file is never moved from its initial location in the Cloud Locker. (*Id.* ¶¶ 44-52.) However, because ReDigi 2.0 launched after Capitol filed the Complaint and mere days before the close of discovery, the Court will not consider it in this action. (*See* Tr. 19:2-20:3.)

[4] ReDigi's arguments in this round of briefing differ markedly from those it asserted in opposition to Capitol's motion for a preliminary injunction. (*See* ReDigi Opp'n to Prelim. Inj., dated Jan. 27, 2012, Doc. No. 14 ("ReDigi Opp'n to PI").) For instance, ReDigi no longer asserts an "essential step defense," nor does it argue that "copying" to the Cloud Locker for storage is protected by the fair use defense. (*Id.* at

3

responded on August 14, 2012 and replied on August 24, 2012. (Doc. Nos. 76, 79, 87, 90.) The Court heard oral argument on October 5, 2012.

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), a court may not grant a motion for summary judgment unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party bears the burden of showing that it is entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The court "is not to weigh evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotation marks omitted); *accord Anderson*, 477 U.S. at 249. As such, "if there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted).

Inferences and burdens of proof on cross-motions for summary judgment are the same as those for a unilateral motion. *See Straube v. Fla. Union Free Sch. Dist.*, 801 F. Supp. 1164, 1174 (S.D.N.Y. 1992). "That is, each cross-movant must present sufficient evidence to satisfy its burden of proof on all material facts." *U.S. Underwriters Ins. Co. v. Roka LLC*, No. 99 Civ. 10136 (AGS), 2000 WL 1473607, at *3 (S.D.N.Y. Sept. 29, 2000); *see Barhold v. Rodriguez*, 863 F.2d 233, 236 (2d Cir. 1988).

## III. DISCUSSION

Section 106 of the Copyright Act grants "the owner of copyright under this title" certain "exclusive rights," including the right "to reproduce the copyrighted work in copies or phonorecords," "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership," and to publicly perform and display certain copyrighted works. 17 U.S.C. §§ 106(1), (3)-(5). However, these exclusive rights are limited by several subsequent sections of the statute. Pertinently, Section 109 sets forth the "first sale" doctrine, which provides that "the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord." *Id.* § 109(a). The novel question presented in this action is whether a digital music file, lawfully made and purchased, may be resold by its owner through ReDigi under the first sale doctrine. The Court determines that it cannot.

A. Infringement of Capitol's Copyrights

To state a claim for copyright infringement, a plaintiff must establish that it owns a valid copyright in the work at issue and that the defendant violated one of the exclusive rights the plaintiff holds in the work. *Twin Peaks Prods., Inc. v. Publ'ns*

---

9-14.) ReDigi has also abandoned its argument that the Digital Millenium Copyright Act, 17 U.S.C. § 512, bars Capitol's claim. (*Id.* at 22.) As such, the Court will consider only those arguments made in the instant motions.

4

*Int'l, Ltd.*, 996 F.2d 1366, 1372 (2d Cir. 1993) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). It is undisputed that Capitol owns copyrights in a number of the recordings sold on ReDigi's website. (*See* Cap. 56.1 ¶¶ 68-73; RD Rep. 56.1 18-19, ¶¶ 68-73; Decl. of Richard S. Mandel, dated July 19, 2012, Doc. No. 52 ("Mandel Decl."), ¶ 16, Ex. M; Decl. of Alasdair J. McMullan, dated July 19, 2012, Doc. No. 51 ("McMullan Decl."), ¶¶ 3-5, Ex. 1.) It is also undisputed that Capitol did not approve the reproduction or distribution of its copyrighted recordings on ReDigi's website. Thus, if digital music files are "reproduce[d]" and "distribute[d]" on ReDigi's website within the meaning of the Copyright Act, Capitol's copyrights have been infringed.

### 1. Reproduction Rights

Courts have consistently held that the unauthorized duplication of digital music files over the Internet infringes a copyright owner's exclusive right to reproduce. *See, e.g.*, *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014 (9th Cir. 2001). However, courts have not previously addressed whether the unauthorized transfer of a digital music file over the Internet – where only one file exists before and after the transfer – constitutes reproduction within the meaning of the Copyright Act. The Court holds that it does.

The Copyright Act provides that a copyright owner has the exclusive right "to reproduce the copyrighted work *in . . . phonorecords*." 17 U. S. C. § 106(1) (emphasis added). Copyrighted works are defined to include, *inter alia*, "sound recordings," which are "works that result from the fixation of a series of musical, spoken, or other sounds." *Id.* § 101. Such works are distinguished from their material embodiments. These include phonorecords, which are the "*material objects* in which sounds . . . are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." *Id.* § 101 (emphasis added). Thus, the plain text of the Copyright Act makes clear that reproduction occurs when a copyrighted work is fixed in a new *material object*. *See Matthew Bender & Co., Inc. v. W. Pub. Co.*, 158 F.3d 693, 703 (2d Cir. 1998).

The legislative history of the Copyright Act bolsters this reading. The House Report on the Copyright Act distinguished between sound recordings and phonorecords, stating that "[t]he copyrightable work comprises the aggregation of sounds and not the tangible medium of fixation. Thus, 'sound recordings' as copyrightable subject matter are distinguished from 'phonorecords[,]' the latter being physical objects in which sounds are fixed." H.R. Rep. No. 94-1476, at 56 (1976). Similarly, the House and Senate Reports on the Act both explained:

> Read together with the relevant definitions in [S]ection 101, the right "to reproduce the copyrighted work in copies or phonorecords" means the right to produce a material object in which the work is duplicated, transcribed, imitated, or simulated in a fixed form from which it can be "perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."

*Id.* at 61; S. Rep. No. 94-473, at 58 (1975). Put differently, the reproduction right is the exclusive right to embody, and to prevent others from embodying, the copyrighted work (or sound recording) in a new material object (or phonorecord). *See* Nimmer on

5

Copyright § 8.02 (stating that "in order to infringe the reproduction right, the defendant must embody the plaintiff's work in a 'material object'").

Courts that have dealt with infringement on peer-to-peer ("P2P") file-sharing systems provide valuable guidance on the application of this right in the digital domain. For instance, in *London-Sire Records, Inc. v. John Doe 1*, the court addressed whether users of P2P software violated copyright owners' distribution rights. 542 F. Supp. 2d 153, 166 & n.16 (D. Mass. 2008). Citing the "material object" requirement, the court expressly differentiated between the copyrighted work – or digital music file – and the phonorecord – or "appropriate segment of the hard disk" that the file would be embodied in following its transfer. *Id.* at 171. Specifically,

> [w]hen a user on a [P2P] network downloads a song from another user, he receives into his computer a digital sequence representing the sound recording. That sequence is magnetically encoded on a segment of his hard disk (or likewise written on other media). With the right hardware and software, the downloader can use the magnetic sequence to *reproduce* the sound recording. The electronic file (or, perhaps more accurately, the appropriate segment of the hard disk) is therefore a "phonorecord" within the meaning of the statute.

*Id.* (emphasis added). Accordingly, when a user downloads a digital music file or "digital sequence" to his "hard disk," the file is "reproduce[d]" on a new phonorecord within the meaning of the Copyright Act. *Id.*

This understanding is, of course, confirmed by the laws of physics. It is simply impossible that the same "material object" can be transferred over the Internet. Thus, logically, the court in *London-Sire* noted that the Internet transfer of a file results in a material object being "created elsewhere at its finish." *Id.* at 173. Because the reproduction right is necessarily implicated when a copyrighted work is embodied in a new material object, and because digital music files must be embodied in a new material object following their transfer over the Internet, the Court determines that the embodiment of a digital music file on a new hard disk is a reproduction within the meaning of the Copyright Act.

This finding holds regardless of whether one or multiple copies of the file exist. *London-Sire*, like all of the P2P cases, obviously concerned multiple copies of one digital music file. But that distinction is immaterial under the plain language of the Copyright Act. Simply put, it is the creation of a *new* material object and not an *additional* material object that defines the reproduction right. The dictionary defines "reproduction" to mean, *inter alia*, "to produce again" or "to cause to exist again *or anew*." *See Merriam-Webster Collegiate Edition* 994 (10th ed. 1998) (emphasis added). Significantly, it is not defined as "to produce again while the original exists." Thus, the right "to reproduce the copyrighted work in . . . phonorecords" is implicated whenever a sound recording is fixed in a new material object, regardless of whether the sound recording remains fixed in the original material object.

Given this finding, the Court concludes that ReDigi's service infringes Capitol's reproduction rights under any description of the technology. ReDigi stresses that it

6

"migrates" a file from a user's computer to its Cloud Locker, so that the same file is transferred to the ReDigi server and no copying occurs.[5]  However, even if that were the case, the fact that a file has moved from one material object – the user's computer – to another – the ReDigi server – means that a reproduction has occurred. Similarly, when a ReDigi user downloads a new purchase from the ReDigi website to her computer, yet another reproduction is created. It is beside the point that the original phonorecord no longer exists. It matters only that a new phonorecord has been created.

ReDigi struggles to avoid this conclusion by pointing to *C.M. Paula Co. v. Logan*, a 1973 case from the Northern District of Texas where the defendant used chemicals to lift images off of greeting cards and place them on plaques for resale. 355 F. Supp. 189, 190 (N.D. Tex. 1973); (*see* ReDigi Mem. of Law, dated July 20, 2012, Doc. No. 55 ("ReDigi Mem."), at 13). The court determined that infringement did not occur because "should defendant desire to make one hundred ceramic plaques . . . , defendant would be required to purchase one hundred separate . . . prints." *C.M. Paula*, 355 F. Supp. at 191. ReDigi argues that, like the defendant in *C.M. Paula*, its users must purchase a song on iTunes in order to sell a song on ReDigi. (ReDigi Mem. 13.) Therefore, no "duplication" occurs. *See C.M. Paula*, 355 F. Supp. at 191 (internal quotation marks omitted). ReDigi's argument is unavailing. Ignoring the questionable merits of the court's holding in *C.M. Paula*, ReDigi's service is distinguishable from the process in that case. There, the copyrighted print, or material object, was lifted from the greeting card and transferred in toto to the ceramic tile; no new material object was created. By contrast, ReDigi's service by necessity creates a new material object when a digital music file is either uploaded to or downloaded from the Cloud Locker.

ReDigi also argues that the Court's conclusion would lead to "irrational" outcomes, as it would render illegal any movement of copyrighted files on a hard drive, including relocating files between directories and defragmenting. (ReDigi Opp'n, dated Aug. 14, 2012, Doc. No. 79 ("ReDigi Opp'n"), at 8.) However, this argument is nothing more than a red herring. As Capitol has conceded, such reproduction is almost certainly protected under other doctrines or defenses, and is not relevant to the instant motion. (Cap. Reply, dated Aug. 24, 2012, Doc. No. 87 ("Cap. Reply"), at 5 n.1.)

Accordingly, the Court finds that, absent the existence of an affirmative defense, the sale of digital music files on ReDigi's website infringes Capitol's exclusive right of reproduction.

---

[5] It bears noting that ReDigi made numerous admissions to the contrary at the preliminary injunction stage. For instance, in its opposition to Capitol's motion, ReDigi stated that, "The only *copying* which takes place in the ReDigi service occurs when a user uploads music files to the ReDigi Cloud, . . . or downloads music files from the user's Cloud Locker." (*See* ReDigi Opp'n to PI at 9 (emphasis added).) ReDigi also stated that, after a digital music file was uploaded to the Cloud Locker, "the copy from which it was made was actually *deleted* from the user's machine." (*Id.* at 14 (emphasis added).) ReDigi's officers made similar statements in their depositions, and ReDigi's patent application for its upload technology states that "to be offered for sale, [a music file] is first *copied* to the remote server and stored on the disc." (*See* Capitol Mem. of Law, dated July 20, 2012, Doc. No. 49 ("Cap. Mem."), at 8-9, n.6 (emphasis added).) But, as earlier stated, these semantic distinctions are immaterial as even ReDigi's most recent description of its service runs afoul of the Copyright Act.

### 2. Distribution Rights

In addition to the reproduction right, a copyright owner also has the exclusive right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership." 17 U. S. C. § 106(3). Like the court in *London-Sire*, the Court agrees that "[a]n electronic file transfer is plainly within the sort of transaction that § 106(3) was intended to reach [and] . . . fit[s] within the definition of 'distribution' of a phonorecord." *London-Sire*, 542 F. Supp. 2d at 173-74. For that reason, "courts have not hesitated to find copyright infringement by distribution in cases of file-sharing or electronic transmission of copyrighted works." *Arista Records LLC v. Greubel*, 453 F. Supp. 2d 961, 968 (N.D. Tex. 2006) (collecting cases); *see, e.g.*, *Napster*, 239 F.3d at 1014. Indeed, in *New York Times Co., Inc. v. Tasini*, the Supreme Court stated it was "clear" that an online news database violated authors' distribution rights by selling electronic copies of their articles for download. 533 U.S. 483, 498 (2001).

There is no dispute that sales occurred on ReDigi's website. Capitol has established that it was able to buy more than one-hundred of its own recordings on ReDigi's webite, and ReDigi itself compiled a list of its completed sales of Capitol's recordings. (Cap. 56.1 ¶¶ 68-73; RD Rep. 56.1 ¶¶ 68-73.) ReDigi, in fact, does not contest that distribution occurs on its website – it only asserts that the distribution is protected by the fair use and first sale defenses. (*See, e.g.*, ReDigi Opp'n 15 (noting that "any distributions . . . which occur on the ReDigi marketplace are protected").)

Accordingly, the Court concludes that, absent the existence of an affirmative defense, the sale of digital music files on ReDigi's website infringes Capitol's exclusive right of distribution.[6]

### 3. Performance and Display Rights

Finally, a copyright owner has the exclusive right, "in the case of . . . musical . . . works, to perform the copyrighted work publicly." 17 U. S. C. § 106(4). Public performance includes transmission to the public regardless of "whether the members of the public . . . receive it in the same place or in separate places and at the same time or at different times." *Id.* § 101. Accordingly, audio streams are performances because a "stream is an electronic transmission that renders the musical work audible as it is received by the client-computer's temporary memory. This transmission, like a television or radio broadcast, is a performance because there is a playing of the song that is perceived simultaneously with the transmission." *United States v. Am. Soc. Of Composers, Authors, & Publishers*, 627 F.3d 64, 74 (2d Cir. 2010). To state a claim for infringement of the performance right, a plaintiff must establish that (1) the public performance or display of the copyrighted work was for profit, and (2) the defendant lacked authorization from the plaintiff or the

---

[6] Capitol argues that ReDigi also violated its distribution rights simply by making Capitol's recordings available for sale to the public, regardless of whether a sale occurred. (*See* Cap. Mem. 11 n.8 (citing *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199, 201 (4th Cir. 1997)). However, a number of courts, including one in this district, have cast significant doubt on this "make available" theory of distribution. *See, e.g.*, *Elektra Entm't Grp., Inc. v. Barker*, 551 F. Supp. 2d 234, 243 (S.D.N.Y. 2008) ("[T]he support in the case law for the "make available" theory of liability is quite limited."); *London-Sire*, 542 F. Supp. 2d at 169 ("[T]he defendants cannot be liable for violating the plaintiffs' distribution right unless a 'distribution' actually occurred."). In any event, because the Court concludes that actual sales on ReDigi's website infringed Capitol's distribution right, it does not reach this additional theory of liability.

plaintiff's representative. *See Broad. Music, Inc. v. 315 W. 44th St. Rest. Corp.*, No. 93 Civ. 8082 (MBM), 1995 WL 408399, at *2 (S.D.N.Y. July 11, 1995).

The copyright owner also has the exclusive right, "in the case of . . . pictorial [and] graphic . . . works[,] . . . to display the copyrighted work publicly."  17 U.S.C. § 106(5).  Public display includes "show[ing] a copy of [a work], either directly or by means of a film, slide, television image, or any other device or process." *Id.* § 101.  The Ninth Circuit has held that the display of a photographic image on a computer may implicate the display right, though infringement hinges, in part, on where the image was hosted. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1160 (9th Cir. 2007).

Capitol alleges that ReDigi infringed its copyrights by streaming thirty-second song clips and exhibiting album cover art to potential buyers.  (Compl. ¶¶ 25-26.)  ReDigi counters that it only posted such content pursuant to a licensing agreement and within the terms of that agreement. (ReDigi Mem. 24-25.)  ReDigi also asserts that it promptly removed the content when its licenses were terminated, and instead sent users to YouTube or iTunes for previews. (*Id.*)  Capitol, in response, claims that ReDigi's use violated the terms of those licenses and did not cease at the time the licenses were terminated. (*Compare* RD 56.1 ¶¶ 73-79, *with* Cap. Rep. 56.1 ¶¶ 73-79.)  As such, there are material disputes as to the source of the content, whether ReDigi was authorized to transmit the content, when authorization was or was not revoked, and when ReDigi ceased providing the content. Because the Court cannot determine whether ReDigi infringed Capitol's display and performance rights on the present record, ReDigi's motion for summary judgment on its alleged infringement of these exclusive rights is denied.

### B.  Affirmative Defenses

Having concluded that sales on ReDigi's website infringe Capitol's exclusive rights of reproduction and distribution, the Court turns to whether the fair use or first sale defenses excuse that infringement.  For the reasons set forth below, the Court determines that they do not.

#### 1.  Fair Use

"The ultimate test of fair use . . . is whether the copyright law's goal of 'promot[ing] the Progress of Science and useful Arts' would be better served by allowing the use than by preventing it." *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 141 (2d Cir. 1998) (quoting U.S. Const., art. I, § 8, cl. 8). Accordingly, fair use permits reproduction of copyrighted work without the copyright owner's consent "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research." 17 U.S.C. § 107.  The list is not exhaustive but merely illustrates the types of copying typically embraced by fair use. *Castle Rock Entm't, Inc.*, 150 F.3d at 141.  In addition, four statutory factors guide courts' application of the doctrine.  Specifically, courts look to:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use

9

upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. Because fair use is an "equitable rule of reason," courts are "free to adapt the doctrine to particular situations on a case-by-case basis." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 448 n.31 (1984) (quoting H. Rep. No. 94-1476, at 65-66); *see Iowa State Univ. Research Found., Inc. v. Am. Broad. Cos.*, 621 F.2d 57, 60 (2d Cir. 1980).

On the record before it, the Court has little difficulty concluding that ReDigi's reproduction and distribution of Capitol's copyrighted works falls well outside the fair use defense. ReDigi obliquely argues that uploading to and downloading from the Cloud Locker for storage and personal use are protected fair use.[7] (*See* ReDigi Mem. 15.) Significantly, Capitol does not contest that claim. (*See* Tr. 12:8-23.) Instead, Capitol asserts only that uploading to and downloading from the Cloud Locker *incident to sale* fall outside the ambit of fair use. The Court agrees. *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 124 (2d Cir. 2010) (rejecting application of fair use to user uploads and downloads on P2P file-sharing network).

Each of the statutory factors counsels against a finding of fair use. The first factor requires the Court to determine whether ReDigi's use "transforms" the copyrighted work and whether it is commercial. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578-79 (1994). Both inquiries disfavor ReDigi's claim. Plainly, the upload, sale, and download of digital music files on ReDigi's website does nothing to "add[] something new, with a further purpose or different character" to the copyrighted works. *Id.*; *see, e.g.*, *Napster*, 239 F.3d at 1015 (endorsing district court finding that "downloading MP3 files does not transform the copyrighted work"). ReDigi's use is also undoubtedly commercial. ReDigi and the uploading user directly profit from the sale of a digital music file, and the downloading user saves significantly on the price of the song in the primary market. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985) ("The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price."). ReDigi asserts that downloads for personal, and not public or commercial, use "must be characterized as . . . noncommercial, nonprofit activity." (ReDigi Mem. 16 (quoting *Sony*, 464 U.S. at 449).) However, ReDigi twists the law to fit its facts. When a user downloads purchased files from the Cloud Locker, the resultant reproduction is an essential component of ReDigi's commercial enterprise. Thus, ReDigi's argument is unavailing.

The second factor – the nature of the copyrighted work – also weighs against application of the fair use defense, as creative works like sound recordings are "close to the core of the intended copyright protection" and "far removed from the . . . factual or descriptive work more amenable to fair use." *UMG Recordings, Inc. v. MP3.Com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000) (alteration and internal quotation marks omitted) (citing *Campbell*, 510 U.S. at 586). The third factor – the portion of the work copied – suggests a similar outcome because ReDigi transmits the works in their entirety, "negating any claim of fair use." *Id.* at 352. Finally,

---

[7] ReDigi's argument is, perhaps, a relic of the argument it previously levied that "copying" to the Cloud Locker is protected as "space shifting" under the fair use doctrine. (*See* ReDigi Opp'n to PI at 10.)

10

ReDigi's sales are likely to undercut the "market for or value of the copyrighted work" and, accordingly, the fourth factor cuts against a finding of fair use. *Cf. Arista Records, LLC v. Doe 3*, 604 F.3d at 124 (rejecting application of fair use to P2P file sharing, in part, because "the likely detrimental effect of file-sharing on the value of copyrighted compositions is well documented." (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 923 (2005)). The product sold in ReDigi's secondary market is indistinguishable from that sold in the legitimate primary market save for its lower price. The clear inference is that ReDigi will divert buyers away from that primary market. ReDigi incredibly argues that Capitol is preempted from making a market-based argument because Capitol itself condones downloading of its works on iTunes. (ReDigi Mem. 18.) Of course, Capitol, as copyright owner, does not forfeit its right to claim copyright infringement merely because it permits certain uses of its works. This argument, too, is therefore unavailing.

In sum, ReDigi facilitates and profits from the sale of copyrighted commercial recordings, transferred in their entirety, with a likely detrimental impact on the primary market for these goods. Accordingly, the Court concludes that the fair use defense does not permit ReDigi's users to upload and download files to and from the Cloud Locker incident to sale.

2. First Sale

The first sale defense, a common law principle recognized in *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 350 (1908) and now codified at Section 109(a) of the Copyright Act, provides that:

> Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord.

17 U.S.C. § 109. Under the first sale defense, "once the copyright owner places a copyrighted item [here, a phonorecord] in the stream of commerce by selling it, he has exhausted his exclusive statutory right to control its distribution." *Quality King Distribs., Inc. v. L'anza Research Int'l, Inc.*, 523 U.S. 135, 152 (1998); *see Kirtsaeng v. John Wiley & Sons, Inc.*, No. 11-697, 2013 WL 1104736, at *4 (U.S. Mar. 19, 2013).

ReDigi asserts that its service, which involves the resale of digital music files lawfully purchased on iTunes, is protected by the first sale defense. (ReDigi Mem. 19.) The Court disagrees.

As an initial matter, it should be noted that the fair use defense is, by its own terms, limited to assertions of the *distribution right*. 17 U.S.C. § 109 (referencing Section 106(3)); *see* Nimmer on Copyright § 8.12. Because the Court has concluded that ReDigi's service violates Capitol's reproduction right, the first sale defense does not apply to ReDigi's infringement of those rights. *See Design Options v. BellePointe, Inc.*, 940 F. Supp. 86, 91 (S.D.N.Y. 1996).

In addition, the first sale doctrine does not protect ReDigi's distribution of Capitol's copyrighted works. This is because, as an unlawful reproduction, a digital music file sold on ReDigi is not "lawfully made under this title." 17 U.S.C. § 109(a). Moreover, the statute protects

11

only distribution by "the owner of a *particular* copy or phonorecord . . . of *that* copy or phonorecord." *Id.* Here, a ReDigi user owns the phonorecord that was created when she purchased and downloaded a song from iTunes to her hard disk. But to sell that song on ReDigi, she must produce a new phonorecord on the ReDigi server. Because it is therefore impossible for the user to sell her "particular" phonorecord on ReDigi, the first sale statute cannot provide a defense. Put another way, the first sale defense is limited to material items, like records, that the copyright owner put into the stream of commerce. Here, ReDigi is not distributing such material items; rather, it is distributing *reproductions* of the copyrighted code embedded in new material objects, namely, the ReDigi server in Arizona and its users' hard drives. The first sale defense does not cover this any more than it covered the sale of cassette recordings of vinyl records in a bygone era.

Rejecting such a conclusion, ReDigi argues that, because "'technological change has rendered its literal terms ambiguous, the Copyright Act must be construed in light of [its] basic purpose,'" namely, to incentivize creative work for the "ultimate[] . . . cause of promoting broad public availability of literature, music, and the other arts." *Sony*, 464 U.S. at 432 (quoting *Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 156 (1975)). Thus, ReDigi asserts that refusal to apply the first sale doctrine to its service would grant Capitol "a Court sanctioned extension of rights under the [C]opyright [A]ct . . . which is against policy, and should not be endorsed by this Court." (ReDigi Mem. 24.)

The Court disagrees. ReDigi effectively requests that the Court amend the statute to achieve ReDigi's broader policy goals – goals that happen to advance ReDigi's economic interests. However, ReDigi's argument fails for two reasons. First, while technological change may have rendered Section 109(a) unsatisfactory to many contemporary observers and consumers, it has not rendered it ambiguous. The statute plainly applies to the lawful owner's "particular" phonorecord, a phonorecord that by definition cannot be uploaded and sold on ReDigi's website. Second, amendment of the Copyright Act in line with ReDigi's proposal is a legislative prerogative that courts are unauthorized and ill suited to attempt.

Nor are the policy arguments as straightforward or uncontested as ReDigi suggests. Indeed, when confronting this precise subject in its report on the Digital Millenium Copyright Act, 17 U.S.C. § 512, the United States Copyright Office (the "USCO") rejected extension of the first sale doctrine to the distribution of digital works, noting that the justifications for the first sale doctrine in the physical world could not be imported into the digital domain. *See* USCO, Library of Cong., DMCA Section 104 Report (2001) ("DMCA Report"); *see also Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 129 (2d Cir. 2008) (finding that the DMCA report is entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). For instance, the USCO stated that "the impact of the [first sale] doctrine on copyright owners [is] limited in the off-line world by a number of factors, including geography and the gradual degradation of books and analog works." DMCA Report at xi. Specifically,

> [p]hysical copies of works degrade with time and use, making used copies less desirable than new ones. Digital information does not degrade, and can be reproduced perfectly on a recipient's computer. The "used" copy is just as desirable as (in fact, is indistinguishable from)

a new copy of the same work. Time, space, effort and cost no longer act as barriers to the movement of copies, since digital copies can be transmitted nearly instantaneously anywhere in the world with minimal effort and negligible cost. The need to transport physical copies of works, which acts as a natural brake on the effect of resales on the copyright owner's market, no longer exists in the realm of digital transmissions. The ability of such "used" copies to compete for market share with new copies is thus far greater in the digital world.

*Id.* at 82-83 (footnotes omitted). Thus, while ReDigi mounts attractive policy arguments, they are not as one-sided as it contends.

Finally, ReDigi feebly argues that the Court's reading of Section 109(a) would in effect exclude digital works from the meaning of the statute. (ReDigi Mem. 21.) That is not the case. Section 109(a) still protects a lawful owner's sale of her "particular" phonorecord, be it a computer hard disk, iPod, or other memory device onto which the file was originally downloaded. While this limitation clearly presents obstacles to resale that are different from, and perhaps even more onerous than, those involved in the resale of CDs and cassettes, the limitation is hardly absurd – the first sale doctrine was enacted in a world where the ease and speed of data transfer could not have been imagined. There are many reasons, some discussed herein, for why such physical limitations may be desirable. It is left to Congress, and not this Court, to deem them outmoded.

Accordingly, the Court concludes that the first sale defense does not permit sales of digital music files on ReDigi's website.

C. Liability

Having determined that sales on ReDigi's website infringe Capitol's copyrights, the Court turns to whether ReDigi is directly and/or secondarily liable for that infringement. Direct liability requires "volitional conduct" that "causes" the reproduction or distribution to be made. *See Cartoon Network*, 536 F.3d at 131. Secondary infringement occurs when a defendant contributed to or benefitted from a third party's infringement such that it is "just" to hold the defendant accountable for the infringing activity. *Sony*, 464 U.S. at 435. For the reasons stated below, the Court finds that ReDigi directly and secondarily infringed Capitol's copyrights.

1. Direct Infringement

To be liable for direct infringement, a defendant must have "engaged in some volitional conduct sufficient to show that [it] actively" violated one of the plaintiff's exclusive rights. *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 148 (S.D.N.Y. 2009). In other words, "'to establish direct liability under . . . the Act, something more must be shown than mere ownership of a machine used by others to make illegal copies. There must be actual infringing conduct with a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner.'" *Cartoon Network*, 536 F.3d at 130 (quoting *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004)) (citing *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1370 (N.D. Cal. 1995)).

In *Cartoon Network*, the Second Circuit addressed whether the cable television provider Cablevision had directly infringed the plaintiff's copyrights by providing

13

digital video recording devices to its customers. 536 F.3d 121. The court determined that it had not. Though Cablevision had "design[ed], hous[ed], and maintain[ed]" the recording devices, it was Cablevision's customers who "made" the copies and therefore directly infringed the plaintiff's reproduction rights. *Id.* at 131-32. The court reasoned that, "[i]n determining who actually 'makes' a copy, a significant difference exists between making a request to a human employee, who then volitionally operates the copying system to make the copy, and issuing a command directly to a system, which automatically obeys commands and engages in no volitional conduct." *Id.* at 131. However, the court allowed that a case may exist where "one's contribution to the creation of an infringing copy [is] so great that it warrants holding that party directly liable for the infringement, even though another party has actually made the copy." *Cartoon Network*, 536 F.3d at 133.

On the record before it, the Court concludes that, if such a case could ever occur, it has occurred with ReDigi. ReDigi's founders built a service where *only* copyrighted work could be sold. Unlike Cablevision's programming, which offered a mix of protected and public television, ReDigi's Media Manager scans a user's computer to build a list of eligible files that consists *solely* of protected music purchased on iTunes. While that process is itself automated, absolving ReDigi of direct liability on that ground alone would be a distinction without a difference. The fact that ReDigi's founders programmed their software to choose copyrighted content satisfies the volitional conduct requirement and renders ReDigi's case indistinguishable from those where human review of content gave rise to direct liability. *See Usenet.com*, 633 F. Supp. 2d at 148; *Playboy Enters., Inc. v. Russ Hardenburgh, Inc.*, 982 F. Supp. 503, 512-13 (N.D. Ohio 1997). Moreover, unlike Cablevision, ReDigi infringed both Capitol's reproduction and distribution rights. ReDigi provided the infrastructure for its users' infringing sales and affirmatively brokered sales by connecting users who are seeking unavailable songs with potential sellers. Given this fundamental and deliberate role, the Court concludes that ReDigi's conduct "transform[ed] [it] from [a] passive provider[] of a space in which infringing activities happened to occur to [an] active participant[] in the process of copyright infringement." *Usenet.com*, 633 F. Supp. 2d at 148. Accordingly, the Court grants Capitol's motion for summary judgment on its claims for ReDigi's direct infringement of its distribution and reproduction rights.[8]

### 2. Secondary Infringement

"The Copyright Act does not expressly render anyone liable for infringement committed by another." *Sony*, 464 U.S. at 434. However, common law doctrines permit a court to impose secondary liability where "just" and appropriate. *Id.* at 435. Capitol asserts that ReDigi is secondarily liable for its users' direct infringement under three such doctrines: contributory

---

[8] Capitol also asserts a claim for common law copyright infringement arising from sales of its pre-1972 recordings on ReDigi's website. (Compl. ¶¶ 82-88.) Capitol correctly argues in its memorandum that the elements for a direct infringement claim under federal law mirror those for infringement of common law copyright under state law. *See Capitol Records, Inc. v. Naxos of Am., Inc.*, 4 N.Y.3d 540, 563 (2005); (Cap. Mem. 4.) Accordingly, the Court also Court grants Capitol's motion for summary judgment with respect to ReDigi's direct infringement of Capitol's distribution and reproduction rights in its pre-1972 recordings. However, because neither Capitol nor ReDigi addressed the question of secondary infringement of common law copyrights, the Court does not reach that claim.

infringement, inducement of infringement, and vicarious infringement. (Cap. Mem. 13-16.) The Court agrees with respect to contributory and vicarious infringement, and therefore does not reach the inducement claim.

### a. Contributory Infringement

Contributory infringement occurs where "one . . . with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Arista Records, LLC v. Doe 3*, 604 F.3d at 118 (quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)); *see, e.g.*, *Grokster*, 545 U.S. at 930. The knowledge requirement is "objective" and satisfied where the defendant knew or had reason to know of the infringing activity. *See Arista Records, LLC v. Doe 3*, 604 F.3d at 118. Further, the support must be "more than a mere quantitative contribution to the primary infringement . . . [, it] must be substantial." *Usenet.com*, 633 F. Supp. 2d 124, 155 (S.D.N.Y. 2009). However, even where a defendant's contribution is material, it may evade liability if its product is "capable of substantial noninfringing uses." *Sony*, 464 U.S. at 442 (the "*Sony-Betamax* rule").

In weighing the knowledge requirement, courts consider evidence of actual and constructive knowledge, including cease-and-desist letters, officer and employee statements, promotional materials, and industry experience. *See, e.g.*, *Napster*, 239 F.3d at 1020-21, 1027; *Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d at 432; *Usenet.com* 633 F. Supp. 2d at 155. In addition, courts have consistently found that material support existed where file-sharing systems provided "the site and facilities" for their users' infringement. *Napster*, 239 F.3d at 1022; *see, e.g.*, *Usenet.com*, 633 F. Supp. 2d at 155.

The Court has little difficulty concluding that ReDigi knew or should have known that its service would encourage infringement. Despite the fact that ReDigi boasted on its website that it was "The Legal Alternative" and insisted "YES, ReDigi is LEGAL," ReDigi warned investors in its subscription agreements that "the law cannot be said to be well-settled" in this area and that it could not guarantee ReDigi would prevail on its copyright defenses. (Cap. 56.1 ¶¶ 65-66.) The Recording Industry Association of America ("RIAA") sent ReDigi a cease-and-desist letter in November 2011, advising ReDigi that its website violated Capitol's and other RIAA members' copyrights. (Compl. ¶ 41.) Further, ReDigi was ensnared in a licensing dispute over song clips and cover art shortly after its launch, plainly indicating that infringement could be afoot. (RD 56.1 ¶¶ 74-75, 77.) ReDigi was also, of course, aware that copyright protected content was being sold on its website – a fact central to its business model and promotional campaigns. (Cap. 56.1 ¶¶ 70-73). Finally, ReDigi's officers claim to have "researched copyright law [and] consulted with attorneys" concerning their service, and also to have met with record companies "to get input, get marketing support[,] and enter into deals with the labels." (RD Rep. 56.1 2 ¶ 5, 5 ¶ 20.) By educating themselves, the officers presumably understood the likelihood that use of ReDigi's service would result in infringement. Indeed, though ReDigi attempts to use its consultations with counsel as a shield, it is telling that ReDigi declined to reveal any of the advice it received on the subject. (*See* Cap. Reply 9). ReDigi's lone rebuttal to this surfeit of evidence could only be that it "sincerely" believed in the legality of its service.

15

However, the Court has not found and will not create a subjective, good faith defense to contributory liability's objective knowledge requirement, and therefore concludes that, based on the objective facts, ReDigi was aware of its users' infringement.

The Court also finds that ReDigi materially contributed to its users' infringement. As ReDigi has admitted, "more than any other website that permits the sale of music, ReDigi is intimately involved in examining the content that will be sold and supervising the steps involved in making the music available for sale and selling it." (Cap. 56.1 ¶ 35; RD Rep. 56.1 15 ¶ 35.) ReDigi thus provided the "site and facilities" for the direct infringement. *See, e.g.*, *Napster*, 239 F.3d at 1022; *Usenet.com*, 633 F. Supp. 2d at 155; *Lime Grp.*, 784 F. Supp. 2d at 434. Without ReDigi's Cloud Locker, no infringement could have occurred. Indeed, Media Manager ensured that *only* infringement occurred by limiting eligible files to iTunes tracks. Contrary to any conception of remote conduct, ReDigi's service was the hub and heart of its users' infringing activity.

The Court finally concludes that ReDigi's service is not capable of substantial noninfringing uses. The *Sony-Betamax* rule requires a court to determine whether a product or service is *capable* of substantial noninfringing uses, not whether it is currently used in a non-infringing manner. *Napster*, 239 F.3d at 1021 (discussing *Sony*, 464 U.S. at 442-43). But, put simply, ReDigi, by virtue of its design, is incapable of compliance with the law. ReDigi's business is built on the erroneous notion that the first sale defense permits the electronic resale of digital music. As such, ReDigi is built to trade only in copyright protected iTunes files. However, as determined above, ReDigi's legal argument – and therefore business model – is fundamentally flawed. Accordingly, to comply with the law, either the law or ReDigi must change. While ReDigi 2.0, 3.0, or 4.0 may ultimately be deemed to comply with copyright law – a finding the Court need not and does not now make – it is clear that ReDigi 1.0 does not. Given the fundamental disconnect between ReDigi and the Copyright Act, and ReDigi's failure to provide any evidence of present or potential noninfringing uses, the Court concludes that the *Sony-Betamax* rule cannot save ReDigi from contributory liability.

Accordingly, the Court grants Capitol's motion for summary judgment on its claim for ReDigi's contributory infringement of its distribution and reproduction rights.[9]

b. Vicarious Infringement

Vicarious liability for copyright infringement exists where the defendant "'has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities.'" *Napster*, 239 F.3d at 1022 (quoting *Gershwin Pub. Corp.*, 443 F.2d at 1162); *see Grokster*, 545 U.S. at 930. Unlike contributory infringement, knowledge is not an element of vicarious liability. *Gershwin*,

---

[9] As noted above, Capitol has alleged a separate cause of action for inducement of infringement. (Compl. ¶¶ 51-60.) Disagreement exists over whether "inducement of infringement" is a separate theory of liability for copyright infringement or merely a subset of contributory liability. *Compare Flava Works, Inc. v. Gunter*, 689 F.3d 754, 758 (7th Cir. 2012) (describing inducement as "a form of contributory infringement"), *with Lime Grp.*, 784 F. Supp. 2d at 424 ("In *Grokster*, the Supreme Court confirmed that inducement of copyright infringement constitutes a distinct cause of action."). Regardless, because the Court concludes that ReDigi is liable for contributing to its users' direct infringement of Capitol's copyrights, it does not reach Capitol's inducement claim.

443 F.2d at 1162; *see Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 262-63 (9th Cir. 1996).

Clearly, ReDigi vicariously infringed Capitol's copyrights. As discussed, ReDigi exercised complete control over its website's content, user access, and sales. Indeed, ReDigi admits that it "is intimately involved in . . . supervising the steps involved in making the music available for sale and selling it" on the website. (Cap. 56.1 ¶ 35; RD Rep. 56.1 ¶ 35); *see, e.g., Lime Grp.*, 784 F. Supp. 2d at 435 (finding right to supervise where P2P file sharing system could filter content and regulate users). In addition, ReDigi financially benefitted from every infringing sale when it collected 60% of each transaction fee. *See, e.g., Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 308 (2d Cir. 1963) (finding a direct financial benefit where the defendant received a share of the gross receipts on every infringing sale). Notably, ReDigi failed to address any of these arguments in its opposition brief, instead insisting that it was not vicariously liable for infringement that occurred *outside* the ReDigi service, for instance, when a user impermissibly retained files on his computer. (*See* ReDigi Opp'n 22-23.) However, this argument is inapposite to the instant motions. Accordingly, the Court grants Capitol's motion for summary judgment on its claim for ReDigi's vicarious infringement of its distribution and reproduction rights.

### IV. CONCLUSION

At base, ReDigi seeks judicial amendment of the Copyright Act to reach its desired policy outcome. However, "[s]ound policy, as well as history, supports [the Court's] consistent deference to Congress when major technological innovations alter the market for copyrighted materials. Congress has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing interests that are inevitably implicated by such new technology." *Sony*, 464 U.S. at 431. Such deference often counsels for a limited interpretation of copyright protection. However, here, the Court cannot of its own accord condone the wholesale application of the first sale defense to the digital sphere, particularly when Congress itself has declined to take that step. Accordingly, and for the reasons stated above, the Court GRANTS Capitol's motion for summary judgment on its claims for ReDigi's direct, contributory, and vicarious infringement of its distribution and reproduction rights. The Court also DENIES ReDigi's motion in its entirety.

Because issues remain with respect to Capitol's performance and display rights, and ReDigi's secondary infringement of Capitol's common law copyrights, as well as damages, injunctive relief, and attorney's fees, IT IS HEREBY ORDERED THAT the parties shall submit a joint letter to the Court no later than April 12, 2013 concerning the next contemplated steps in this case.

The Clerk of Court is respectfully directed to terminate the motions pending at Doc. Nos. 48 and 54.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: March 30, 2013
      New York, New York

\*  \*  \*

17

Plaintiff is represented by Richard Stephen Mandel, Jonathan Zachary King, and Robert William Clarida of Cowan, Liebowitz & Latman, P.C., 1133 Avenue of the Americas, New York, New York 10036.

Defendant is represented by Gary Philip Adelman of Davis Shapiro Lewit & Hayes LLP, 689 Fifth Avenue, Fifth Floor, New York, New York 10022.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3·30·13